## In re FINE PAPER ANTITRUST LITIGATION.

### MDL 323.

United States District Court, E.D. Pennsylvania.

March 3, 1983.

As Amended April 5, 1983.

Arnold Levin, Adler, Barish, Daniels, Levin & Creskoff, Seymour Kurland, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for Moses Jaroslawicz.

Warren Rubin, Gross & Sklar, P.C., Philadelphia, Pa., for The Pengad Companies, Inc.

Lowell E. Sachnoff, Sachnoff, Schrager, Jones, Weaver & Rubenstein, Chicago, Ill., Aaron M. Fine, Philadelphia, Pa., for Joli Greeting Card Co., Inc.

Joseph W. Cotchett, Susan Illston, San Mateo, Cal., Alfred V. Contarino, Contarino, Hutchinson & Cherin, Beverly Hills, Cal., Charles R. Johnson, Johnson, Johnson & Eklund, Gregory, S.D., William Janklow, Atty. Gen., State of S.D., Pierre, S.D., for State of S.D.

Thomas M. Genovese, Asst. Atty. Gen., Chicago, Ill., for State of Ill.

Lawrence Walner, Chicago, Ill., Roy B. Schneider, Schneider, Graf & Trio, Morton

Grove, Ill., Robert S. Atkins, Freeman, Atkins & Coleman, Ltd., Chicago, Ill., Guido Saveri, Saveri & Saveri, San Francisco, Cal., for Campbell Office Supply Co.

Granvil I. Specks, Specks & Goldberg, Ltd., Chicago, Ill., George Yankwitt, Robinson, Silverman, Pearce, Aronsonn & Berman, New York City, for Herst Litho, Inc.

Harold E. Kohn, Dianne M. Nast, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., for Magazine Management Co., Inc.

Jeremiah F. Hallisey, Anne Treseder, O'Brien & Hallisey, San Francisco, Cal., for William Grader.

Marvin H. Lapuk, Donald R. Holtman, Hartford, Conn., for State of Conn.

Leonard Barrack, Barrack, Rodos & McMahon, Philadelphia, Pa., for William Fels t/a Fels Printing.

Bruce Waltzer, Fine & Waltzer, New Orleans, La., for Phillip Meroney.

Stephen Kilgriff, Chief, Antitrust Div., Alan H. Maclin, Saint Paul, Minn., for State of Minn.

Jack L. Chestnut, Thomas M. Stringer, Chestnut & Brooks, P.A., Minneapolis, Minn., for Artcraft Press & Prompt Printing.

Richard D. Greenfield, Greenfield & Schoen, Bala Cynwyd, Pa., for Irving Kanter.

Michael J. Freed, Lawrence H. Eiger, Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., James B. Sloan, Sloan & Connelly, Chicago, Ill., Robert A. Skirnick, Wolf, Popper, Ross, Wolf & Jones, New York City, for David Weis Wholesale Jewelers & Peoria Suppliers.

Wayne E. Hundley, Carl M. Anderson, Deputy Attys. Gen., Topeka, Kan., for State of Kan.

David Berger, H. Laddie Montague, Jr., Berger & Montague, P.C., Philadelphia, Pa., for Archdiocese of Philadelphia.

John R. Flowers, Jr., Ernestine S. Gray, Asst. Attys. Gen., Dept. of Justice, New Orleans, La., for State of La.

Jeremiah F. Hallisey, Anne Treseder, O'Brien & Hallisey, San Francisco, Cal., for Fred Ernst d/b/a Stat Fax Stationers.

Craig Browne, Asst. Atty. Gen., Antitrust Div. Public Protection Bureau, Boston, Mass., for Commonwealth of Mass.

William J. Haynes, Jr., C. Hayes Cooney, Deputy Attys. Gen., Nashville, Tenn., for State of Tenn.

Edward Lawson, Michael Ruedig, Antitrust Unit, Concord, N.H., for State of N.H.

W.D. Flaskamp, Minneapolis, Minn., for Milbank Mut. Ins. Co.

Stewart R. Perry, Minneapolis, Minn., for Eagle Drugs, Inc.

Walter E. Riordan, P.A., James W. Rude, Rodgers, Rude, Candolin, Faulkner & Sjostrom, Minneapolis, Minn., for The Hennepin Press, Inc.

Phillip C. Goldstick, Alan L. Fulkerson, Goldstick & Smith, Chicago, Ill., for Franz Stationery Co.

Thomas C. Bartsh, Minneapolis, Minn., for Royal Stationery Co.

Robert M. Austin, Austin, Roth, Sunde, McDonough & Tierney, Minneapolis, Minn., for National School Studios, Inc.

Donald A. Wheat, O'Brien & Wheat, Minneapolis, Minn., for American Lutheran Churchboard of Publications.

Howard A. Specter, Pittsburgh, Pa., for Copies Unlimited.

William D. Flaskamp, Minneapolis, Minn., for Northern States Power Co.

Ira Millstein, Dennis Block, Weil, Gotshal & Manges, New York City, for Class Objectors.

Fred A. Freund, Kaye, Scholer, Fierman, Hays & Handler, New York City, for Moore Business Forms and F.N. Burt Co., Inc.

## MEMORANDUM OF DECISION

### RE: ATTORNEYS' FEES—PRIVATE PLAINTIFFS and "MINORITY" STATES

McGLYNN, District Judge.

In *Kramer v. Scientific Control Corporation,* 534 F.2d 1085 (3d Cir.), *cert. denied sub nom. Arthur Andersen & Co. v. Kramer,* 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976), our Court of Appeals, although acknowledging the benefits that accrue from class action law suits, noted that "critics have challenged the altruism of some class action lawyers and charged that the paramount motivation for such litigation was counsel's desire to generate substantial fees." *Id.* at 1090–91. Indeed, it is a "widely held notion" that in settled class actions, particularly in the securities and treble damage antitrust context, the great bulk of the money received from the defendants is not distributed to class members, but rather is "devoured by avaricious attorneys" who demand astronomical attorneys' fees. *See* Miller, *Of Frankenstein Monsters and Shining Knights: Myth, Reality, and the "Class Action Problem",* 92 Harv.L.Rev. 664, 667 (1979). As the Second Circuit has stated:

Class actions, termed by some as "lawyer's lawsuits", see *Developments in the Law—Class Actions,* 89 Harv.L.Rev. 1318, 1605 (1976), have received a good deal of criticism; and much of this has been directed at the substantial fees awarded to class attorneys. *See, e.g., Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.,* 481 F.2d 1045, 1049–50 (2d Cir.), *cert. denied,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973). Terms such as "golden harvest of fees", *Free World Foreign Cars, Inc. v. Alfa Romeo, S.p.A.,* 55 F.R.D. 26, 30 (S.D. N.Y.1972), "astronomical fees", M. Blecher, *Is the Class Action Rule Doing the Job?* (Plaintiff's Viewpoint), 55 F.R.D. 365, 366 (1972), and "enormous fees", Comment, 54 U.Det.J.Urb.L. 598, 611 (1977), are used to describe the allowances which often run into the millions of dollars. Critics point particularly to overgenerous application of the equitable fund doctrine, by means of which massive fees are awarded attorneys with too little regard for the interests of the class members. *See City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977). [Much of] [t]his criticism ... is justified....

*Van Gemert v. Boeing Co.,* 573 F.2d 733, 735–36 (2d Cir.1978), *aff'd,* 444 U.S. 472, 100

S.Ct. 745, 62 L.Ed.2d 676 (1980) (footnote omitted).

Presently before the court in this antitrust class action proceeding, are the fee petitions of forty-one private law firms and state attorneys general for approximately $21 million in counsel fees and expenses out of $50,650,000 (net of interest) in settlement proceeds. These requests approximate 40 percent of the class recovery. Twenty of the applications seek fees (not including expenses) in excess of a quarter of a million dollars. A dozen firms seek more than a half a million dollars; six seek approximately $1 million or more; two firms each seek some $2 million in fees and one firm, consisting of only four attorneys, requests nearly $4.3 million in fees. These fee petitions are grossly excessive on their face and, regrettably, lend substance to the widely-held and mostly unfavorable impressions of the plaintiffs' class action bar, sometimes referred to as the class action industry.

This Memorandum of Decision reflects my judgment on the fee petitions in question. My task has not been an easy one. The fee petitions and supporting documentation are voluminous and reflect the time of more than 160 attorneys and scores of paralegals and legal assistants. In addition, the court has had to consider serious and detailed objections to the fee petitions, the petitioners' responses to these objections, hundreds of pages of transcript from the 41 days of fee hearings and over a thousand exhibits which were admitted into evidence during those hearings.

Before proceeding to individual fee petitions, I will outline the pertinent history of this litigation, describe the organizing activities of plaintiffs' counsel, review generally the evidence adduced at the fee petition hearings and outline the legal principles which control my rulings.

I. The History of the Litigation

The *Fine Paper Antitrust Litigation* (MDL 323) began nearly six years ago in mid-1977 with the filing of fifteen complaints in eight separate District Courts. On March 3, 1978, pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation consolidated the fifteen cases before it under common docket number 323, and transferred them to the Eastern District of Pennsylvania, where a federal grand jury was investigating possible antitrust violations in the fine paper industry.[1] *See In re Fine Paper Antitrust Litigation,* 446 F.Supp. 759 (Jud.Pan.Mult.Lit.1978).

Within a year of the transfer, twenty-three additional cases had been filed, and a total of thirty-eight cases were consolidated. The named plaintiffs in the thirty-eight lawsuits were divided into two categories. One group of lawsuits became known as the Private Plaintiffs, which included certain "Minority State Plaintiffs". These plaintiffs alleged a horizontal conspiracy among fifteen named defendants to fix and raise the prices at which fine paper was sold to their customers. These fifteen defendants, known as the "Mill-Defendants", manufactured fine paper and sold it both to middlemen ("Merchants") and other buyers, such as publishing houses, greeting card companies, printers and commercial and other industrial users.

The remaining fourteen plaintiffs were state governmental entities, known as the "Majority States", which alleged a single horizontal and vertical conspiracy among the fifteen mill-defendants and the middlemen, "independent" merchants, to fix the prices of fine paper which was sold to governmental entities in the fourteen states.[2]

The plaintiffs filed two separate motions for class certification. One, filed on behalf of the private plaintiffs, requested the court to certify private plaintiffs (and the "Mi-

---

1. The federal grand jury subsequently was dismissed. No indictments issued. A similarly inconclusive investigation had also been undertaken by the Federal Trade Commission.

2. Naming their middlemen suppliers as co-conspirators enabled the Majority States Plaintiffs to avoid, at least at the pleading stage, the impact of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) which prohibited recovery by "indirect purchasers."

nority States") who alleged a horizontal conspiracy, as representatives of a nationwide direct purchaser class. The other was filed by the Majority States, requesting the court to certify fourteen separate statewide governmental entity classes, each alleging horizontal and vertical conspiracies. After a hearing and argument, I entered an order on February 10, 1979, which denied the Majority States' class certification motion and certified the private plaintiffs and Minority States as class representatives on behalf of the following classes:

*Nationwide Direct Purchaser Class:*

All persons, other than governmental entities, in the United States (excluding defendants and named co-conspirators in the MDL 323 actions, their respective subsidiaries and affiliates) which during the period January 1, 1965 to June 30, 1977, purchased from any defendant, or any subsidiary or affiliate thereof, any kind, type or grade of Fine Paper as hereinafter defined, or any paper product into which such papers were converted by any such defendant, subsidiary or affiliate.

*Statewide Governmental Entity Classes:*

Separate classes, each consisting of the respective State and all of its cities, counties and political subdivisions, and all school districts, governmental universities and community colleges within the State, which during the period January 1, 1965 to June 30, 1977, purchased from any defendant, or any subsidiary or affiliate thereof, any kind, type or grade of Fine Paper as hereinafter defined, or any paper product into which such papers were converted by any such defendant, subsidiary or affiliate.

*See In re Fine Paper Antitrust Litigation,* 82 F.R.D. 143 (E.D.Pa.1979).

At the time the defendants were contesting the plaintiffs' motion for class certification, plaintiffs and certain defendants initiated settlement discussions. These resulted in settlements as follows: with St. Regis Paper Company on July 25, 1978, four and a half months after the MDL transfer, in the amount of $2 million; with International Paper Company on August 18, 1978 in the amount of $5.2 million; and with Potlatch Corporation on September 8, 1978 for $2 million.

A few months later, three more settlements were negotiated as follows: on December 20, 1978, a settlement with Union Camp in the amount of $2 million; on January 15, 1979, with Weyerhaeuser Corporation in the amount of $5 million; and on January 16, 1979, with Boise Cascade Corporation in the amount of $13.8 million. Thus, within nine months after the MDL 323 cases had been transferred to the Eastern District of Pennsylvania, a settlement fund in the amount of $30 million had been established.

Following this series of settlements a multitude of motions were filed by the plaintiffs and the non-settling defendants. The issues raised included the right to contribution among defendants in antitrust cases and the disqualification of several of plaintiffs' counsel for conflict of interest. *See In re Fine Paper Antitrust Litigation,* 617 F.2d 22 (3d Cir.1980).

In preparing for trial against the remaining defendants, the plaintiffs deposed approximately 250 witnesses and, along with the defendants, inspected and copied many thousands of documents and briefed and argued numerous discovery motions.

The imminence of the September 22, 1980 trial date led to the resumption of settlement discussions. On September 15, 1980, the private plaintiffs and Minority States entered into a settlement with Champion International Corporation in the amount of $4 million. On the first day of trial, settlements with the remaining defendants were reached. The additional settlements, including Champion, amounted to $20,650,000 bringing a total settlement fund in the private cases to $50,650,000. With accrued interest the amount of the settlement fund as of February 1, 1983 was $74,830,000, after disbursement of $866,000 representing 75% of claimed expenses.

Immediately after the private plaintiff cases settled, the Majority State cases were consolidated and called for trial on October

6, 1980. At the close of the plaintiffs' case the defendants rested without offering any evidence. The jury returned a verdict in favor of all defendants on December 2, 1980. Subsequently the court adopted the findings of the jury, denied equitable relief, and entered judgments accordingly. The judgments were affirmed by the United States Court of Appeals for the Third Circuit. *In re Fine Paper Antitrust Litigation*, 685 F.2d 810 (3d Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983).

## II. Organizational Structure of the Private Plaintiffs' Case

The lawyers representing the private plaintiffs' class created an organizational structure consisting of tiers of committees and subcommittees with numerous "Chairmen" and scores of "Co-Chairmen" for virtually every task in the case. This arrangement succeeded in utilizing the services of over three dozen law firms and state attorneys general and resulted in enormous charges against the fund by lawyers and numerous paralegals. This top-heavy structure was a model of inefficiency and worked to the detriment of thousands of unnamed class members on whose behalf counsel purported to act. For a three-year period, approximately 97,000 hours were billed to the class—70,000 in lawyer hours and over 16,000 in paralegal hours. Most of this time, approximately 85,000 hours, was spent in the two-year period after the initial $30 million in settlements had been obtained. Such billing, most of which was at senior partner rates, resulted in an aggregate proposed lodestar of nearly $8 million and, with the application of the requested multipliers, a total fee request of over $20 million.

### (A) Formation of the Organizational Structure

On July 18, 1977 Specks & Goldberg, Ltd. filed a complaint in the Northern District of Illinois on behalf of Herst Litho, Inc., a New York based company. Specks' co-counsel on this initial complaint was the New York firm of Robinson, Silverman, Pearce, Aronsohn & Berman. On October 11, 1977, Specks & Goldberg, Ltd. filed a second *Fine Paper* case in the District of Connecticut, this time on behalf of Phillip and Ruth Meroney of New Orleans. Specks' co-counsel on this complaint was Fine, Waltzer & Bagneris, a New Orleans law firm. Each of these actions was brought on behalf of a national class of direct purchasers of fine paper similar to the class eventually certified by the court.

After filing these two complaints, Specks circulated copies of them to several lawyers with whom he had worked in prior class actions, including Jack Chestnut's firm in Minneapolis, Leonard Barrack of Philadelphia, Lawrence Walner of Chicago, Gene Mesh of Cincinnati, David Berger of Philadelphia and Harold E. Kohn of Philadelphia. N.T., 2/1/82 at 40; Exhibits to Class Member Objectors' Report in Support of Their Objections to Attorneys' Fees and Expenses Filed by Class Counsel E 164, 584 (hereinafter referred to as "Class Objectors' E [no.])". These lawyers in turn filed actions in various United States District Courts. For example, Leonard Barrack filed a complaint for his Philadelphia-based client in the District of Connecticut. David Berger filed a complaint for his client in the Eastern District of Pennsylvania, although Specks had asked Berger to file his complaint in the District of Connecticut. *See* Class Objectors' E 164. Harold Kohn filed his complaint on behalf of his firm's client in the Southern District of New York in November of 1977. Kohn testified that although his client was a member of the national class sought by Specks in his initial complaint, he decided to file his complaint because Specks "begged" him to "over a period of several months." N.T., 4/21/82 at 2010. Lawrence Walner filed a complaint on behalf of Campbell Office Supply Company of Chicago in the Northern District of Illinois. Four other law firms were co-counsel with Walner on this complaint. Harold Kohn claims that one of these firms, Saveri & Saveri, was added by Walner to his complaint "as a favor" to Specks. Class Objectors' E 586–87.

At the time the Judicial Panel on Multi-district Litigation entered its transfer order in March of 1978, there were fifteen actions filed in eight different federal districts. "All the actions were filed as purported class actions. While there ... [were] some variations in the descriptions of the classes sought, most ... [were] national classes of all, or some group of fine paper purchasers." Opinion of Panel, 446 F.Supp. at 759. Within a year of the Panel's transfer order, twenty-three additional cases had been filed by various lawyers, despite the fact that their clients' interests were already protected by the previously-filed class actions. Indeed, many of these complaints were filed as late as 1979, after the first $30 million of settlements had been obtained and the class already had been certified. As noted by the class objectors, the only logical reason for these new filings was to permit counsel to participate in the case and thereby to obtain attorneys' fees. Class Objectors' Report at 22.

### (B) Preorganization Meetings Among Counsel

As the complaints were being filed, Granvil I. Specks and others began planning for the distribution of patronage, that is, deciding to which firms the work assignments would be allocated. The planning appears to have begun in January 1978 in anticipation of the February 3, 1978 "organizational meeting" in Chicago (discussed below) at which the structure of the case was formally proposed, voted upon and determined by various plaintiffs' counsel. The time records of Michael Freed of the firm of Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C. clearly demonstrate that there were several meetings and phone calls which took place on January 23, 24, 25, 27 and February 2, 1978 between James Sloan of the Chicago firm of Sloan & Connelly, P.C., Freed, Specks and other unspecified "Chicago counsel" regarding the organization of the case. As a direct result of these conferences, on January 25, 1978, Sloan & Connelly was brought into the case by being added as co-counsel on the complaint filed by the Much, Shelist firm, see N.T., 4/6/82 at 1975,

and on the next day the Chicago firm of Freeman, Atkins & Coleman, Ltd. was added as co-counsel on the Campbell Office Supply complaint filed by Lawrence Walner.

In addition to these conferences in Chicago, on January 29, 1978, there was a meeting of plaintiffs' counsel in Atlanta, Georgia where many of the same lawyers were attending a hearing in the Armored Car Antitrust Litigation. This meeting was referred to by Aaron M. Fine of Philadelphia, an experienced antitrust lawyer, who wrote to Specks on March 8, 1978 to complain about not being invited to participate in the Atlanta session. See Class Objectors' E–155–56. Certain documents, including Mr. Fine's letter, are quoted at length because they provide some insight into the workings of the class action bar and help to demonstrate that the polestar of plaintiffs' organizational structure in this case was patronage, not efficiency:

I called you on Thursday, February 2, 1978, after receiving your notice that there was to be an organizational meeting of all plaintiffs' counsel to be held on the following day in Chicago, because I had heard disquieting reports from a number of sources. As I told you, I had heard that there had been a meeting of selected plaintiffs' counsel in Atlanta at which an Executive Committee had been agreed upon, and that Harold [Kohn] had made disparaging remarks about our firm and stated that we could not serve on any such committee.

When I called you on February 2, you told me that there had indeed been a meeting in Atlanta; and that we could not be on the Executive Committee, because Harold had said so. You stated, however, that we would certainly not be barred from serving on other committees and, indeed, you said that you had the highest regard for the legal abilities of our firm. When I asked you who was going to be on the Executive Committee, you identified lawyers in five Philadelphia firms, including Dave Berger. While I have great respect and admira-

tion for Dave's legal abilities, I questioned you about his inclusion on the Executive Committee when we were to be excluded, in view of the fact that he had not yet to our knowledge filed a fine paper case and that we had not only filed a case, but taken an active part in obtaining the impoundment of the Grand Jury documents and in the transfer hearing before the Multidistrict Panel. You replied that Dave would certainly have to have a case on file to be on the committee and that he was selected to be on the committee because of his "position in the industry." I asked whether you meant his position in the fine paper industry, and you replied that you meant his position in the plaintiffs' antitrust industry, which may, in fact, be an apt description of what is going on. I later learned that Dave did file a case on February 2, 1978, but instead of putting Dave on the Executive Committee, you put Laddie Montague of his firm on it. Again, I have great respect for Laddie and his abilities, but question why he should be on to the exclusion of somebody from our firm.

As you know, Allen Black attended the meeting in Chicago on February 3, 1978, and was unsuccessful in seeking to expand the Executive Committee to include our firm and others. I question whether the Chicago proceedings should be conclusive on the subject, however, since your January 27, 1978 notice to all plaintiffs' counsel that there was to be an organizational meeting did not give clear notice that an Executive Committee was to be voted upon. Moreover, the outcome of the meeting appears to have been prearranged so as to exclude several very capable law firms, including our own, for no apparently valid reason. A number of plaintiffs' counsel did not attend the meeting.

We have now received your status report of March 3, 1978, addressed to all plaintiffs' counsel, except counsel for the states of Arizona and Colorado. The status report disclosed that the members of the Plaintiffs' Executive Committee had approved the establishment of standing committees. A list of the members of those committees was annexed to the report. We are not represented on any of the committees. A number of plaintiffs' counsel, on the other hand, have multiple assignments, including yourself and Messrs. Kohn, Montague, Walner, Barrack, Rubin and others.

I would appreciate it if you would let me know on what basis the committee assignments were made and on what basis our firm was excluded from any assignment. I hope that it was not done in response to Harold Kohn's expressed feelings about us. Particularly now that the litigation has been transferred to Philadelphia as a result of the applications made by Sy Kurland and us, I suggest that you may want to reconsider our exclusion from the Executive and other meaningful committees.

(C) The February 3, 1978 Organizational Meeting

The formal organizational meeting was held in Chicago on February 3, 1978. The minutes of this meeting show that 21 private law firms representing 13 clients (5 law firms represented Campbell Office Supply) and 11 state attorneys general were in attendance. The minutes state that "it was the consensus, voting on both a case basis and a counsel basis, that for the purpose of this meeting each Attorney General and each private law firm should have one vote on any matter . . . ." Class Objectors' E 158.

Following the above procedure, the meeting elected a four-man lead counsel team: Granvil Specks, Harold Kohn, Joseph Cotchett and John Noel. Later Seymour Kurland was added to this group. The meeting then elected a dozen-member Executive Committee (later expanded to 14), with two Co-Chairmen, Specks and Kohn, which had the power to appoint standing committees. The minutes of the meeting concluded with a "Statement of Guiding Principles":

The Chairman [Granvil I. Specks] stated that the members of the Executive Committee were of the opinion that the

Fine Paper Antitrust Litigation should be governed by two guiding principles:

(1) There will be a fair and equitable allocation of work so that all plaintiffs' counsel can actively participate in the litigation.

(2) That plaintiffs' counsel will be reasonably compensated for services actually and productively rendered. As a corollary of this principle, the litigation should be run as efficiently as possible and duplicative work should be avoided. Class Objectors' E 161 [3]

Within a matter of a few weeks a host of committees and subcommittees had been formed by the Executive Committee. A plaintiffs' Discovery Committee was formed with one chairman and three vice-chairmen. Fifteen individual defendants' Discovery Subcommittees were formed with two chairmen for each subcommittee. Other committees included a Plaintiff's Rule 37 Subcommittee, a Consolidated Amended Complaint Subcommittee, an Industrial Analysis Committee, and a Finance Committee, most with a chairman and a vice-chairman. *See* Specks' Status Report dated March 3, 1978, Class Objectors' E 588–93.[4]

At this court's first pretrial conference on April 19, 1978, certain states' attorneys general objected to the makeup of the Executive Committee established at the February 3rd organizational meeting. In particular, Michael Spiegel, Deputy Attorney General of California complained at length about the organization of the case and about the voting procedures used by the private law firms, N.T., 4/19/78 at 28–33:

"I think what we are coming down to in this case is what really is at stake here. In this litigation you have got a group of States who have filed cases. These States are claiming damages for purchases that they have made. They have got clients, that is, the attorneys general representing them have clients with purchases, they have something at stake in this litigation.

\*　　\*　　\*　　\*　　\*　　\*

"On the other side we have a group of private attorneys here without substantial clients.[5] If you go down that list and look at the clients they represent you have three or four of the most prominent antitrust attorneys in this country representing a mom and pop greeting card store, a fishmonger from Fort Bragg, California who buys wrapping paper to wrap fish, and these people, just because they have had the ingenuity to allege a national class action representing the Fortune 500 corporations who also buy fine paper, it doesn't seem to me that that ought to give them a position to walk into a courtroom and say we're going to run this thing.

"What have they got at stake here? Their clients have nothing at stake. The defendants could buy all their clients for less than probably a month's attorneys' fees.

---

**3.** This second principle was being disregarded even as they adopted it. The February 3rd meeting was attended—and the class has been billed—by numerous attorneys, including three attorneys (two partners) from Specks & Goldberg, Ltd. and three attorneys (two partners) from the Much, Shelist firm.

**4.** Harold Kohn questioned the utility of the committee structure. Perhaps, his sharpest criticism is found in his firm's Reply to the Class Objectors' Report at 35:

This firm's reluctance to waste time in extensive "committee meetings" is well known to the Objectors and to the Court, and the correspondence inspected by the Objectors amply so attests. It is interesting to note that the Specks group does not share the Kohn distaste for committee meetings. Were

it not so serious, it would be humorous, that the Specks contingent established yet even more committees to attack the Kohn application. The correspondence reveals at least two new committees, one to prepare for the "evidentiary" hearing, and one to prepare the report opposing the Kohn fee petition. Mediocrity needs group shelter, but as a perceptive commentator observed "no park contains a shrub erected to honor the accomplishments of a committee."

**5.** Indeed, eight clients who are represented by 11 law firms have not filed claims for any portion of the settlement fund mainly because their claims are too insignificant. *See, e.g.,* Perry affidavit filed 11/6/81 at 35; N.T., 4/6/82 at 1942–43.

"What is really at stake here is attorneys' fees. These lawyers have filed these cases. They hope to proceed in this case so that at the end they can have an award of attorneys' fees. That is their interest. From my point of view that is a conflict of interest.

\* \* \* \* \* \*

"Your Honor can be very sure that the decisions that are made on the executive committees, on any committees between attorneys whose interest is down the line on what they are going to get out of this for their own pocket as opposed to what their client is going to get is very divergent.

"I think that is the real fight that is going on here in this courtroom."

\* \* \* \* \* \*

"The interesting thing that occurred at the meeting in ... Chicago is that they decided to vote based on one attorney, one vote.

"I could have brought a 400-man staff out there and packed that meeting if I wanted to. They didn't vote in terms of one client, one vote, you see, so that the mom and pop greeting card store with four attorneys got four votes, whereas at that meeting the State of Colorado would only get one vote.

"Now that is the way this thing was set up and, of course, this was set up before the cases were even transferred. So that whatever was done had no authority in terms of any court order, by any request of any court to have this committee set up.

"My experience in the past has simply been that this is the way that this is done, if somebody wants to make a run for it and grab the power and run the case you do it before anybody else has got together, before the panel has made any transfer, before anybody knows what happens.

"Then you walk into court and say now we have this executive committee and I am in charge of it and here are my four co-lead plaintiffs and we are going to run this thing and everybody else should sit down and be quiet."

Mr. Kohn, who now complains about the voting and committee system, was a major proponent at that time. He stated, *inter alia:*

"We would ask that the arrangement which is provided for in our proposed pretrial order No. 2 be the one adopted by the Court. The Court, of course, has extremely wide discretion in this matter. The general procedure has been to follow the recommendations of counsel, particularly when they are arrived at in a democratic method, as we did arrive at them here. That is precisely what Judge Will and Judge Robinson did in the Folding Cartons case, which is the nearest analogy here. It is precisely what Judge Cahn did in the Eastern Sugar case, where I think he went even further...." N.T., 4/19/78 at 15.[6]

In retrospect, I can recognize the force of Mr. Spiegel's argument but at the time the court was persuaded by the array of distinguished counsel for the private plaintiffs and had no reason to anticipate that the case would not be prosecuted in the best interests of the class.

(D) The Addition of New Law Firms and the Exclusion of Others

The number of law firms appearing as counsel for the class continued to grow even after the organizational structure was in place. For example, eight of the petitioning firms did not become involved in the case until well after the first $30 million in settlements were in the bank and the class had been certified. Kohn repeatedly objected to the entry of additional firms, Class Objectors' E 754–61, but Specks and other members of the Executive Committee nonetheless assigned work to the newcomers.[7]

---

6. While Kohn initially endorsed the organizational structure, he was constantly at odds with his co-counsel over the manner in which it operated.

7. These eight firms have billed the Class for 6,756.65 hours. Their requests for fees and for reimbursement of expenses total $1,595,498.33.

Incredibly, while new counsel were being invited to participate, other counsel, including some who had been involved from the outset were frozen out of the case. For example, Gene Mesh of Cincinnati failed in his bid for the Executive Committee; he then asked for the return of his assessment, and apparently dropped out of the case. Class Objectors' E 169. Fine, Kaplan & Black was shut out of any committee assignments despite its protests. Class Objectors' E 155–56, 601–02. Stewart Perry complained that he was being squeezed out of this case as well as future class action litigation and unsuccessfully asked Specks to include him in the work. Class Objectors' E 546–49, 609. The Kohn firm's request to Mr. Specks in May of 1979 that the Philadelphia firm of Greenfield & Schoen be given work assignments apparently went unheeded. See Class Objectors' E 610, 168, 594, 595.

### (E) The Operation of the Committee System

It was inevitable that this type of structure would generate wasted hours on useless tasks, propagate duplication and mask outright padding. The following are some examples:

1. Counsel have billed approximately one-half million dollars for 1,446 hours of preparation, travel and attendance at pretrial conferences. The class was ably represented at these conferences by lead counsel and except perhaps for their immediate assistants, the attendance of the other lawyers who merely sat and watched was superfluous.

2. Work on the pretrial memorandum was one of the major boondoggles of this case. Fifty-one plaintiffs' lawyers, including twenty-one partners from nineteen different law firms, and deputy attorneys general devoted a total of over 4,500 hours to the preparation of this Memorandum—especially extravagant figures considering it was to be filed after the Majority States had already filed a similar document dealing with most of the same issues. Not only were these hours excessive, but many of the partner hours were poorly allocated because the same work could have been accomplished by associates and paralegals. Based on the fee petitions, the cost to the class for this one Memorandum is over $1 million.

3. In excess of 4,200 hours were charged to the development of a damage theory to be incorporated into the plaintiffs' pretrial memorandum and for use at trial. Despite this enormous cost to the class, as of the date of trial, plaintiffs' counsel had not developed a viable damage theory.

4. Sixteen law firms and attorneys general seek compensation from the class for some 460 hours devoted to researching and briefing motions pending before the Multidistrict Panel.

5. A total of 1,310.7 hours was billed to the class for discovery on the issue of class certification.

6. Approximately 1500 hours were billed to the class by nine law firms for preparing and taking the deposition of one third-party witness, James Nelson.

7. A dozen law firms and state attorneys general bill the class over 1800 hours for work on the Industrial Analysis Committee at a cost of approximately a quarter of a million dollars. The work of this committee, which was purportedly formed to gather information on various facets of the paper industry and the defendant corporations, resulted in little, if any, benefit to the class, largely because of grossly inefficient staffing. The time records disclose that most of the lawyer hours were devoted to researching and reviewing microfilm. Inexpensive retrieval systems, consultants or paralegals could have been utilized to provide the same information at much lower rates than those billed by the partners and associates on the committee.

8. Hundreds of hours were billed to the class by individual attorneys who spent time reading and reviewing a multitude of documents such as memoranda, correspondence, briefs, motions, and interrogatories, which crossed their desk during the course of this case, even though these attorneys were not closely involved with

or responsible for the subject matter of these documents.

9. Hundreds of hours were spent on coordination of brief writing. For example, fourteen firms list time for working on the moving brief for class certification. Most of these firms were billing simply for the time they spent reading and reviewing the work done by the Specks and Kohn firms. Eleven firms also bill time for the certification reply brief.

10. The work of the Rule 37 Committee, which was involved in obtaining and reviewing defendants' discovery responses, was marked by overstaffing and by grossly excessive time changes. Useless mass meetings of plaintiffs' attorneys, repetitive "read and review" time charged to the same defendants' discovery responses, unproductive negotiating sessions by a gaggle of plaintiffs' lawyers and approximately 1,271 hours devoted just to the briefing of motions are just some examples of these excesses.

11. Almost all 160 lawyers who participated in this case were involved in some phase of discovery, with a minimum of forty-five lawyers involved just in the taking of depositions. While time constraints imposed by the court may have contributed to the double tracking and triple tracking of depositions, the work of the fifteen discovery subcommittees seems to have been very poorly coordinated. This resulted in numerous meetings among counsel, reviewing and rereviewing thousands of discovery documents by dozens of partners, associates and paralegals, and tasks being performed by senior level personnel which more appropriately could be carried out by less expensive juniors.

III. Fee Negotiations

Immediately following the final round of settlements in September of 1980, the lawyers for the private plaintiffs turned their attention to the question of the total amount of fees that should be requested from the court. Beginning on October 3, 1980, the plaintiffs' lawyers began a series of discussions in an attempt to arrive at a mutually agreed upon total fee request, hoping, with some justification, that in the absence of a fee dispute, the court would not feel compelled to subject the petitions to the type of scrutiny they are now undergoing.

On October 8, 1980, Specks sent a letter to all counsel asking that information concerning their time and expenses be sent to Messrs. Atkins, Cotchett, Kohn, Saveri and Specks so that the Executive Committee would "be in a position to make ... estimates [of fees and expenses] and arrive at recommendations regarding reasonable guide lines [sic] with respect to multiples, etc. ...." Class Objectors' E 618. On November 13, 1980, a meeting took place which was attended by Specks and other plaintiffs' counsel for the purpose of reviewing the lodestar computations and out-of-pocket expenses of all plaintiffs' counsel, this information having been obtained in response to the October 8th letter. According to Mr. Specks' summary of the meeting, a "consensus" was reached "that counsel for the private plaintiffs and the certified states should seek fees aggregating approximately 25% of the settlement fund, including interest to the date of distribution." Class Objectors' E 619–22. This apparent "consensus" did not last long, for Harold Kohn would not agree, insisting that the total amount of fees awarded should not exceed 20% of the recovery or approximately $10 million.

In order to avoid a "blood bath over the fee applications", see Sachnoff letter, 6/4/81, Class Objectors' E 628,[8] negotiations were undertaken by Messrs. Specks, Barrack, Sachnoff, Cochett and others to persuade Kohn to change his position. Kohn proposed that the plaintiffs' attorneys make recommendations to the court with respect to all of the fee petitions with the exception

8. One petitioning lawyer has compared his co-counsel to "sharks in a feeding frenzy". Affidavit of Stewart Perry filed 11/6/81 at 53.

of the Specks, Saveri and Sloan petitions. Specks rejected this proposal. According to Kohn, Specks "refused, as he has refused every suggestion which would not give him and Saveri patently and grossly excessive fees." Letter from Kohn to Sachnoff, 4/28/81, Class Objectors' E 625.

In the spring of 1981, as the date for filing the fee petitions drew near, Kohn let it be known that he would file formal objections with the court unless the proposed fees totaled under $10 million. Another round of negotiations ensued in an attempt to dissuade Kohn from this action. During these negotiations, Kohn claims that some plaintiffs' lawyers privately attempted to have him raise his fee request while publically stating that Kohn's request was too high. See Kohn's Memo in Opposition to Subpoena, filed 5/20/81; N.T., 5/3/82, at 2215–16; Letter to Sachnoff, 4/28/81, Class Objectors' E 625.

The negotiations collapsed primarily because Specks, Saveri and Sloan feared that if the plaintiffs' lawyers reduced their fee to the level suggested by Kohn then the court would use the new, lower suggested level as a base from which to cut the fees even further. Sachnoff letter to all counsel, 6/4/81, Class Objectors' E 628, N.T., 5/12/82 at 2297. Other plaintiffs' counsel also refused to trim their fee requests because they feared they would be excluded from further antitrust cases by Specks, Saveri and Sloan. N.T., 5/3/82 at 2227; 5/12/82 at 2297–2314.

The negotiations having failed, the plaintiffs' counsel filed their fee petitions on March 20, 1981, the deadline set by the court. The fee requests did not even conform to the originally agreed upon ceiling of 25%. Instead the requested fees totaled approximately 21 million dollars or 40% of the settlement fund (without interest). Efforts to persuade Kohn not to file objections continued. See Sachnoff's 6/4/81 letter, Class Objectors' E 628.

IV. The Fee Petitions

In anticipation of the fee requests, this court entered Pretrial Order No. 143, amended by Pretrial Order No. 147, detailing the information to be included in the fee petitions. A copy is appended to this memorandum. (Appendix). Many of the petitions filed did not comply with the requirements of Pretrial Order No. 143 as amended, making a difficult task more time consuming and burdensome.

The fees and expenses requested range from a low of $16,529, by Litman, Litman, Harris & Specter of Pittsburgh, to a high of $4,397,321 by Specks & Goldberg, Ltd. of Chicago. The petitions totaled $20,220,962 for attorneys' fees and $1,197,151 for expenses.

Granvil I. Specks, co-lead counsel for the plaintiffs, along with several other plaintiffs' lawyers asked the court to appoint a Fee Review Committee which would consist of seven of the plaintiffs' counsel. As explained by Specks, this committee would review each petition filed and make recommendations to the court "as to the overall gross fees and expenses that should be awarded as well as the individual fees and expenses based upon that analysis." N.T., 3/27/81 at 22.

Kohn objected to a fee review committee made up of plaintiffs' counsel on conflict of interest grounds. Objections, filed 3/26/81, Docket Entry No. 3275. I agreed that it would be inappropriate under the circumstances and declined to appoint the committee. N.T., 3/27/81, at 21.

At the time the fee petitions were filed, Specks and other counsel recognized that some of the fee requests were outrageous. According to Kohn, Specks called the fee petition of Saveri & Saveri, which requested fees in excess of 2 million dollars, including $650 per hour for every hour Guido Saveri spent on the case "ridiculous" and thought that the petition should be "substantially reduced and cannot be allowed." Kohn's Objections to Petition of Saveri & Saveri at 6. Lowell E. Sachnoff, one of the petitioning attorneys here, told Specks that many of the firm's fee petitions had "inflated lodestar time, rates, and multiples" (Letter to Specks, 4/27/81, Class Objectors' E

521–524) and, accordingly, he urged co-lead counsel to make the "Herculean effort" to "sweep out the Aegean [sic] stables."[9] N.T., 5/12/82 at 2298, 2308.

## V. Objections to the Fee Petitions

Other interested parties also shared Specks' and Sachnoff's sentiment that some of the fee petitions were outrageous. After the fee petitions were filed, detailed objections to them were filed by Harold Kohn and fifteen class member corporations.[10]

### (A) Kohn's Objections

Kohn filed specific objections on behalf of his client to sixteen of the fee petitions. He also made general recommendations with respect to all of the petitions. An acknowledged leader of the class action bar with vast experience in the antitrust field, Kohn asserted that the 97,000 hours claimed by the plaintiffs' lawyers were excessive, and that the same work could have been accomplished with an expenditure of 5,000 to 15,000 hours by one competent firm. Kohn alleged that much of the time claimed was unnecessary and duplicated the work of others, pointing particularly to time charged for travel and attendance at hearings at which attorneys did nothing but sit and listen to other counsel make presentations. He also complained about the many hours charged by lawyers who on their own undertook to "review" the work of others.

Kohn also was of the opinion that the hourly rates requested by many of the attorneys were excessive, as were the rates claimed for paralegals, who performed simple clerical and administrative tasks and yet for whom hourly rates were sought in many cases for amounts five times what paralegals are actually paid. Moreover, Kohn contended that the multipliers requested by many of the petitioning firms were excessive, especially in light of the fact that many of these firms made claims after the January, 1979 settlements when there was no longer any contingency to be considered.

Even more serious, Kohn claimed that five firms, Specks & Goldberg, Ltd., Saveri & Saveri, Sloan & Connelly, Lawrence Walner & Associates, Ltd. and Freeman, Atkins & Coleman, Ltd., gained control of the litigation through a voting block formed by lawyers who were importuned to file additional redundant class actions or who were simply added as co-counsel to complaints already filed. This coterie elected lead counsel and the Executive Committee who were responsible for handing out committee and other work assignments to themselves and to attorneys who voted for them. Such assignments were highly desirable because they enabled firms to increase their lodestar billing, frequently just for mere meetings and review tasks, and to claim multipliers for their leadership roles. Kohn alleged that these firms, in filing their fees petitions, had violated the good faith requirement of Fed.R.Civ.P. 11 by conspiring to produce overstaffing, overbilling, and needless "busy work."[11]

In his objections, Kohn concluded that the maximum proportion of fees to the overall settlement fund should have been no more than twenty percent, especially considering that in similar cases the recovery has been in the range of 6% to 20%.[12]

---

9. One of the "Twelve Labors of Hercules" was cleaning the Augean stables. Augeas, king of Elis, had a herd of three thousand oxen, whose stalls had not been cleaned for thirty years. Hercules diverted the courses of two rivers and made them flow through the stables in a great flood that washed out the filth in one day. T. BULFINCH, MYTHOLOGY at 144 (1947).

10. General objections were also filed by one of the defendants, Mead Corporation, and by two additional members of the class, Boston Gas Company and Conde Nast Publications, Inc. These last two objections were stricken as untimely by Post-Judgment Orders 16 and 18.

11. Counsel for the Class Objectors noted, "Mr. Kohn suggests a price-fixing conspiracy far more pernicious than the one which was the subject matter of the underlying litigation." Affidavit of Dennis J. Block, filed 6/8/81 at 44.

12. *Folding Carton Litigation,* 84 F.R.D. 245 (N.D.Ill.1979) (6.8% was awarded, and many of the same counsel in the *Fine Paper* case were involved); *Eastern Sugar Antitrust Litigation,* M.D.L. 201 A (E.D.Pa.) (Judge Cahn awarded 20% of a smaller $25 million settlement); *Western Sugar Antitrust Litigation,* M.D.L. 201 (N.D.Cal.) (Judge Cahn, along with Judge

### (B) Class Objectors

Among the members of the class were fifteen corporations [13] who engaged the New York City firm of Weil, Gotshal & Manges ("Weil, Gotshal") to challenge the fee requests of class counsel. On May 15, 1981, the deadline for filing objections to the fee petitions, Weil, Gotshal filed a "Notice of Intention to Appear and Object to Applications For Attorneys' Fees and Costs". Simultaneously, on behalf of the class objectors they filed a motion for an order (1) granting them permission to review all the attorneys' fee applications and (2) for an extension of time to file additional written objections to the fee applications after they had had an adequate amount of time to review the fee petitions. Over the objections of plaintiffs' counsel except Mr. Kohn, N.T. 6/10/81, I granted the class objectors' motion.

The class objectors submitted a 525 page report with 1200 pages of exhibits and appendices reflecting a detailed analysis of many aspects of the fee petitions and which, to a great extent, supported the Kohn assertions of gross inefficiency, incompetence and overreaching on the part of plaintiffs' counsel.

The report also made a number of recommendations including (1) denying fees to counsel who misstated facts underlying

their fee application or who deliberately participated in the logging of unnecessary hours, and (2) fixing the number of compensable hours at 15,000, the number attested to by Kohn as being reasonable but adding, however, that even if the number were doubled with a rate of $100 per hour and a multiplier of 1.5, it would result in a generous award of 4.5 million dollars.

### VI. The Response to the Objections

#### (A) Retaliation Against Kohn

Plaintiffs' counsel returned the volley by filing numerous objections to the Kohn firm's fee petition.[14]

Although these same objectors did not challenge any other fee petitions, the objections to the Kohn petition apply equally to many other petitions.[15] For example, Specks & Goldberg attacked Kohn's average hourly rates of $610 per hour as "scandalous", Preliminary Statement of Objectors to Kohn Petition at 5, but have not challenged Saveri's hourly rate of $650. Lowell Sachnoff in his objection to Kohn's fee petition alleges that Kohn oftentimes used lawyers for ministerial work when he could have used paralegals; however, these same objections could be applied to nearly all the firms in this case, including Sachnoff.[16]

---

Boldt, awarded 14.9% of a $60 million settlement).

13. Xerox Corporation, The Prudential Insurance Company of America, Mobil Corporation, Time, Incorporated, Texaco Inc., General Electric Company, Allied Corporation, International Business Machines Corporation, Union Carbide Corporation, Exxon Corporation, McGraw—Hill, Inc., General Motors Corporation, American Telephone and Telegraph Company, GTE Service Corporation, and Owens Illinois, Inc.

14. These same lawyers had filed a four page statement of objections [to the Kohn petition] on April 24, 1981, about three weeks prior to the deadline for filing objections. As explained by Kohn, this pleading was an attempt "to intimidate and coerce the Kohn firm to refrain from filing objections" to these attorneys' fee petitions. *See* Memorandum in Support of Motion to Quash Deposition, filed 5/20/81, Docket Entry No. 3344.

15. Thus, more evidence of the "buddy" system at work at the expense of the class.

16. The lawyers also attacked Kohn on other fronts. In class action antitrust cases, such as *Ocean Shipping Antitrust Litigation* and in the *Corn Products Derivative Antitrust Litigation* in which Kohn and other *Fine Paper* lawyers are presently involved, retaliatory measures against Kohn such as removing him from the executive committee have been taken by Specks, Saveri, Sloan and members of the Much, Shelist firm allegedly because of Kohn's objections to their fee petitions in *Fine Paper*. *See* N.T., 4/21/82 at 2034–41 and Supplemental Filing With Respect to Fee Applications, Docket Entry No. 3710, filed 3/16/82, which relates to the *Ocean Shipping* case, and Sloan's comment on Kohn's cooperation with Weil, Gotshall in this case: "Harold, when you lie down with dogs, you get up with fleas. Regretfully, James B. Sloan." Class Objectors' E 872–3.

### (B) Response to the Class Objectors' Report

Not unexpectedly, the petitioners (except Kohn) defended the organizational structure and the hours charged claiming that the division of labor had been the most effective way of tackling the massive task confronting them and that only their long hours, hard work and sheer persistence produced the fund which benefited the class.[17]

Kohn, in his response, agreed with Weil, Gotshal that there had been tremendous waste, particularly, in the deposition program. However, he noted that he had "steadfastly opposed the proliferation of work among additional firms which were engaged and were assigned by Mr. Specks over [my] objections." Reply at 12, filed 11/12/81. Furthermore, he added, "There is a limit as to what any one lawyer, however dedicated and able, can do when so many lawyers, for reasons of their own, are united in opposing him . . . ." Reply at 12. Finally, he claimed that he had been wary of displaying plaintiffs' disputes before the watchful eyes of defendants' counsel while settlement negotiations were going on.

### VII. The Fee Hearings

The court notified all interested parties that an evidentiary hearing on the fee issue would be granted to any person desiring one. A total of eight firms took advantage of this opportunity. Inexplicably, Sloan & Connelly, P.C., having objected only to Kohn's petition, filed a motion requesting an order compelling evidentiary hearings for all petitioning attorneys and seeking a denial of any fees to petitioners who did not present evidence at a hearing. This motion was denied.[18]

The hearings commenced on February 1, 1982 and ended with a closing argument by the class objectors on June 7, 1982.[19]

### VIII. The Legal Principles

█ Although American courts generally require every litigant to pay his own attorneys' fees and costs, the common fund doctrine represents a well-recognized exception to that rule. *Silberman v. Bogle,* 683 F.2d 62, 64 (3d Cir.1982). This doctrine permits a court of equity to award reasonable attorney's fees to a party who produces or preserves a common fund for the benefit of others. *Id.* The basis of this equitable award is to prevent the unjust enrichment of those who benefited from but did not participate in, the litigation. *Id.*

█ In *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973) (*"Lindy I"*), and 540 F.2d 102 (3d Cir.1976) (*"Lindy II"*), our Court of Appeals set forth the guidelines for the computation of fee awards. First, the court must determine the hours expended by counsel which created, protected or preserved the fund. *Lindy II* at 111. Second, the number of hours is multiplied by a reasonable hourly rate for the attorney's services. Hourly rates may vary according to the status of the attorney (i.e., his experience, reputation, practice, qualifications, etc.) who performed the work or the nature of the services provided.

---

**17.** Regrettably, the responses of Specks, Saveri and Sloan, in particular, were accompanied by thoroughly unprofessional and totally unwarranted attacks on the motives and integrity of class objectors' counsel. This reaction by petitioning counsel was of no value to their cause and does not enhance their esteem.

**18.** Upon receipt of the Sloan motion, Lowell Sachnoff wrote to Sloan as follows:

The fee proceedings in *Fine Paper* have apparently put you and Gig [Specks] under great strain which has robbed you of all good sense and that is sad. That you and Gig fail to see that waiving our right to an evidentiary hearing and seeking a prompt ruling on our fees not only is of no prejudice to you, but on the contrary, will enable you to present your case in a simpler and clearer context, is even more sad.

**19.** The hearings usually commenced at 4:00 P.M. and lasted approximately two hours each day for a total 73.5 hours. The Specks & Goldberg hearing lasted 40 hours during which witnesses from the Kohn and Sachnoff firms were called to give testimony and generated 413 exhibits. Another ten court hours were spent conducting hearings on other aspects of the fee petitions. By way of contrast, the trial of the majority states case consumed 198 courtroom hours from voir dire to verdict.

*Lindy I* at 167. This multiplication of the number of compensable hours by the reasonable hourly rate constitutes the "lodestar" of the court's fee determination. *Id.* at 168.

■ The lodestar can be increased or decreased based upon the contingent nature of the particular case involved and the quality of the attorney's work. An increase or decrease of the lodestar amount is referred to as a "multiplier". In determining whether to increase the lodestar to reflect the contingent nature of the case "the district court should consider any information that may help to establish the probability of success." *Id.* at 168. However, "[t]he court may find that the contingency was so slight or the amount found to constitute reasonable compensation for the hours worked was so large a proportion of the total recovery that an increased allowance for the contingent nature of the fee would be minimal." *Id.* A multiplier for quality should only be awarded for "an unusual degree of skill, superior or inferior, exhibited by counsel in the specific case before the court." *Silberman, supra,* at 64.

## IX. Guidelines

When applying the *Lindy* analysis to the fee petitions in the instant case, I have had to make numerous rulings with respect to compensable hours, hourly rates and multipliers which are applicable to most—if not all—of the fee petitions. Before proceeding to a *Lindy* analysis of each individual fee petition, it would seem appropriate to outline in a general way the standards by which I measured the accuracy of the data submitted, the reasonableness of the hours charged and rates sought and the appropriateness of a multiplier for contingency and quality.

### (A) Compensable Hours
#### (1) Disallowed Hours

I have disallowed or reduced time for the following tasks:

### (a) Pretrial Memorandum

■ As mentioned earlier, this was one of the major examples of maladministration in this case. No less than 51 plaintiff lawyers devoted a total of over 4,500 hours to this task at a cost (based on the fees requested) of over one million dollars. This was a grossly excessive amount of time to expend on this one brief and accordingly, I have reduced each firm's hours expended on this task by one-half.

### (b) Read and Review Time

■ As mentioned previously, hundreds of hours have been billed to the class by attorneys for reading and reviewing documents for which the attorneys were not responsible. This time has been disallowed for all attorneys except members of the fourteen member Executive Committee. *See In re Equity Funding Corporation Securities Litigation,* 438 F.Supp. 1303, 1329 (C.D.Cal.1977)

### (c) Fee Petition Time

■ In accordance with the rule of *Lindy II,* time involved in the preparation of fee petitions is not compensable as it does not enure to the benefit of the class, 540 F.2d at 111.

### (d) Pretrial Conferences

■ As noted above, counsel billed a total of 1446 hours for the 31 conferences. This large number of hours was primarily due to the attendance of attorneys who contributed nothing to the conferences but were merely there as spectators. The hours billed by these attorneys will not be compensated by the class. *See Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir.1974).

### (e) Hours Without Adequate Supporting Data

■ Hundreds of hours which were described by vague or meaningless terms or insufficiently documented, will not be compensated. *See In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357, 1387 (N.D.Ga. 1979), *modified on other grounds,* 645 F.2d

488 (5th Cir.1981). "The burden is clearly on counsel to file adequately-documented applications for fees and those who fail to meet that burden do so at their own risk." *In re Equity Funding Corporation Securities Litigation,* 438 F.Supp. at 1327.

### (f) Industrial Analysis Committee

█ Approximately 1800 lawyer and paralegal hours have been billed to the class for work on the Industrial Analysis Committee ("IAC"). Approximately 150 of these hours were spent in the IAC meetings alone. The membership of this committee consisted of: one chairman, four co-chairmen and seven other private law firms. Also on the committee were five assistant attorneys general of the Minority States. The members of the IAC performed such clerical and ministerial tasks as gathering and microfilming defendants' 1973–77 Form 10–Ks for sales volume, trying to determine defendants' market shares and reviewing Lockwood's Directory for the names of subsidiaries and affiliates of the defendants.

The work of this committee was basically useless. It duplicated the efforts of others and resulted in no appreciable benefit to the class. It therefore will not be compensated by the class.

My conclusion is supported by co-lead counsel's repeated and well-documented objections to the work of this committee. Commencing with a letter dated August 23, 1978, to Joseph Cotchett, Chairman of the IAC, Harold Kohn, as a member of the IAC, continually took the position that the work of the IAC should cease as it was wasteful and of no benefit to the class. In the August 23, 1978 letter, Class Objectors' E 278–79, Kohn complained of the fact that 15 persons attended a two-day meeting of the Industrial Analysis Committee regarding industry statistics—much of which came from publicly available publications of which most people were already aware. He also noted that the industry's statistics were of limited use and that there had already been two settlements in the case based on market share information obtained without any input from the IAC.

Kohn's letters to Cotchett criticizing the work of the IAC continued. On November 21, 1978, he again wrote to Cotchett stating that the work of the IAC had not ceased; that the committee's work did not justify the amount of time devoted to it; and that his firm had been obtaining on its own industry information sufficient to conduct negotiations and to conclude settlements. *See* Class Objectors' E 282–83; *see also* letter of 10/12/78, Class Objectors' E 280. Kohn specifically noted that the information he obtained was the type of information he should have been, but was not, receiving from the committee, and that such information should not take very much time to obtain. Kohn concluded by directing that the activities of this committee be suspended until after the class was certified, when the situation could be reexamined. Kohn warned Cotchett that he would object to any attorney fees requested for any time expended after November 21, 1978 on IAC matters. Kohn continued to write Cotchett repeating his objections, but his warnings went unheeded. *See* letters of 12/15/78, 1/19/79, Class Objectors' E 284–85, 287.

Because of his intimate knowledge of the workings of this committee and his vast experience, Kohn's assessment of the value of this committee is persuasive. I am in accord with Kohn's view that the Industrial Analysis Committee work was of no benefit to the class.

### (2) Allowed Hours

The class objectors have objected to the following hours, but for the reasons given below, I have determined that the time should be compensated.

### (a) Proceedings before the Judicial Panel on Multidistrict Litigation ("JPML")

█ Class objectors urge that time spent before the Panel should be disallowed because they claim it was of no benefit to the class since the actions would inevitably be consolidated no matter what was argued by the plaintiffs' lawyers to the Panel. Block affidavit, filed 6/8/81 at 36. I am not persuaded by this argument and I note

it was specifically rejected by the court in *Equity Funding, supra,* 438 F.Supp. at 1334. Since the petitioning lawyers who argued before the JPML acted on behalf of their clients and the putative class and since counsels' views and arguments are an essential part of the Panel's decision-making process, the time will be compensated.

### (b) Class Action Discovery

■ The class objectors object to the 1,310.7 hours devoted to class action discovery and they urge the court to disallow a substantial number of these hours because the class did not benefit from having 16 representatives certified.

Although this is an excessive number of hours to be spent on this one activity, all of it resulted from the action of the defendants, who requested the discovery of the 16 would-be class representatives. Since the responsibility for this inordinate number of hours lies with the defendants, not the plaintiffs' lawyers, the petitioners should not be denied compensation for class discovery. On the other hand, to award the plaintiffs' counsel fees for this time at their customary hourly rate would be an injustice to the class. I think a proper balance can be struck by compensating for class action discovery, but only at a rate of $50 per hour.[20]

### (B) Hourly Rate

■ Because of the duplication, waste and inefficiency which resulted from the participation of 41 sets of attorneys and the committee structure established by counsel, "it is only proper that the fee award be adjusted to reflect this." *In Re Penn Central Securities Litigation,* 416 F.Supp. at 916. Because of these circumstances, attorneys cannot expect to receive the same hourly rates awarded to them by other courts in class action litigation. The abun-

dance of attorneys representing the class substantially diluted each attorney's role and, therefore, the rates should be reduced accordingly to reflect their diminished contribution. In many instances, adequate representation for the class may result in some degree of duplication but the proliferation of lawyers here cannot be justified on any rational basis.

■ In this litigation, it was not unusual for senior partners to devote a great deal of time to clerical, administrative and investigative tasks such as document review. Partners will not be compensated at partner-level rates for tasks which are customarily performed by junior associates or paralegals. *Lindy I, supra* at 167; *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d at 717. As my colleague Judge Cahn has aptly stated: "[A]n attorney who charges $150 per hour for work that could properly be completed by an attorney whose time is valued at only $75 per hour, should be paid only $75 per hour from the settlement funds." *In re Sugar Industry Antitrust Litigation* (East Coast) MDL 201(A), slip. op. at 11 (E.D.Pa., filed September 30, 1980).

■ In light of all the circumstances presented here, I am satisfied that the following rates are fair and reasonable for the private attorneys:[21]

1. Hourly rate for partner-level work: *$100.00.*

2. Hourly rate for associate-level work performed by a partner or an associate: *$50.00*

3. Hourly rate for co-lead counsel (Specks and Kohn): *$150.00.*

These rates are in conformity with the regular hourly rates billed to noncontingent clients by private law firms in major metropolitan areas. Paralegals will be compensated at the rate of $25 per hour which I

---

**20.** This is how Senior Judge (then Chief Judge) Lord handled the same problem in *In re Penn Central Securities Litigation,* 416 F.Supp. 907, 916 (E.D.Pa.1976), *rev'd on other grounds,* 560 F.2d 1138 (3d Cir.1977), although at the reduced rate of $20 per hour.

**21.** In arriving at these rates, I have considered the status of the many attorneys involved here (i.e., their experience, reputation, practice, qualifications, etc.) as set forth in the biographical information included with the petitions.

find to be reasonable and which is the rate the majority of petitioners have requested. *See Dorfman v. First Boston Corp.,* 70 F.R.D. 366, 373–74 (E.D.Pa.1976); *Entin v. Barg,* 412 F.Supp. 508, 517 (E.D.Pa.1976) (In both cases paralegals were awarded $20 per hour).

### (C) Multipliers

■ I will allow, for the contingency factor, a positive multiplier of 1.5 for all compensable time expended prior to the $30 million settlements consummated in January of 1979.[22] Once the initial settlements were approved, there was no risk of non-payment for services or reimbursement of expenses. As Robert Atkins, Esq., one of the petitioners here, stated when he wrote to the New Hampshire Attorney General:

As you know, there have been previous settlements with certain defendants amounting to $30 million; approximately $6 million in interest has accrued since that date. As a result of these settlements, which have been approved, reimbursement of your State's assessment payments is virtually assured.

Class Objectors' E 205. I have not chosen a higher multiplier because prior to January 1979, the risk of an unsuccessful result in this case was spread among 25 law firms and 7 attorneys general.[23] Moreover, it appears that this was not a case of high risk because there was a "large number of attorneys who were willing to prosecute this case on a purely contingent basis. This was quite obviously not a case where counsel were reluctant to invest considerable time because of the fear that they would go unpaid." *In re Penn Central Securities Litigation,* 416 F.Supp. at 919 n. 30.

■ No positive quality multiplier will be allowed. Under all the circumstances of the case, I am not persuaded that any counsel demonstrated such an unusually high degree of skill as would warrant compensation beyond that reflected in the hourly rates.

■ Specks & Goldberg, however, because of its dominant leadership role, must be charged with primary responsibility for all the wasted hours, duplication and gross inefficiency which marked this case from its inception. While I recognize that in a case as large and complex as this, some duplication of effort is inevitable, nevertheless, the court cannot condone the needless proliferation of lawyers, wasted time and unnecessary expenses, all of which were orchestrated by Mr. Specks despite warnings and objections by his co-lead counsel.

Based on the record before me, a good case can be made for denying the Specks & Goldberg petition altogether. But weighing in the balance the positive aspects of the firm's contribution such as the vital role Granvil Specks played in the settlement negotiations and the utilization of his broad experience in class action litigation, I am convinced that something less Draconian is in order.

■ *Lindy I* and its progeny authorize the application of a negative multiplier as a "penalty" based on "[a]n evaluation of the professional methods utilized in processing the case." *Lindy II* at 118. This is the course I will follow and, accordingly, I will apply a negative multiplier of .5 to the Specks & Goldberg lodestar. This reflects my considered judgment that effective management could have produced the same results in less than half the time expended. The application of a negative multiplier is necessary in a case of this nature to remind counsel, particularly those in a leadership role, that a class action is something more than a fee-generating device. It is a cause

---

**22.** Between July 1978 and January 1979 six of the fifteen defendants came to terms with the class. I have applied the 1.5 contingency multiplier to all compensable time up to and including January 16, 1979, the date the sixth agreement was reached in this first wave of settlements.

**23.** *Cf.* Response of Lawrence Walner & Associates, Ltd. to Class Objectors' Report, Docket Entry 3608, filed 11/16/81, in which Mr. Walner defends his decision to have five counsel represent Campbell Office Supply because it "served as a hedge against an otherwise greater commitment of time *and risk in the case.*" *Id.* at 10 (emphasis added).

of action belonging to the members of the class to whom counsel owe a duty of fidelity. Their primary job is to create a fund for the class not the lawyers.

### (D) Expenses

The petitioning attorneys here have asked the court for reimbursement of expenses totaling $1,197,151. The court has previously awarded counsel (except Messrs. Perry and Riordan) reimbursement for all but 25% of the expenses for which they have petitioned, with the understanding that if any of the requested expenses are disallowed, that amount will be subtracted from any fee awarded, or if necessary, repaid by counsel. Postjudgment Orders No. 5, filed 7/24/81, and No. 6, filed 8/13/80. My examination of the expense reimbursement requests prompts some general comments at this time with a more detailed analysis to follow.

First, where I have disallowed attorney time (e.g., for unnecessary attendance by an attorney at a pretrial conference), I have not permitted reimbursement for any expenses incurred in connection with such time.

Second, I have assumed that the class members "have agreed to pay [only] modest to moderate travel and per diem costs when the trips served their beneficial interests." *In re Armored Car Antitrust Litigation,* 472 F.Supp. at 1389. Accordingly, petitioners have not been reimbursed for "unnecessary or extravagant travel and related expenses." *Id.*

Finally, I have scrutinized with particular care repeated charges for meals consumed at hometown restaurants and have disallowed those which appeared to have been arranged primarily for the benefit of the lawyer.

### X. The Depth of the Review

In *Lindy II,* the Court of Appeals stated that it "did not ... intend that a district court, in setting an attorney's fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation," nor "that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief." 540 F.2d at 116. Unfortunately, the expectations of *Lindy II* cannot be realized in this case. The internecine warfare which broke out among plaintiffs' counsel resulted in charges of gross mismanagement, ethical misconduct, bad faith and overreaching. The eruption from within, in turn, generated an all out assault from without in the form of the class objectors' investigations and report.[24] These circumstances made it imperative for the court to undertake a thorough examination of each of the fee petitions.

I regret to say that my inquiry has given substance to the worst fears of the critics of the class action device—that it is being manipulated by lawyers to generate fees. Some of the petitioners here were reminded on a prior occasion that

> [t]he principal attacks on the [Rule 23] are largely the result of conduct by counsel for plaintiffs in some cases who have acted as though the rule was adopted for their benefit rather than for the multitude of individuals comprising the class or classes whose rights they were presumably vindicating.... It would be ironic indeed if class actions ... were to be restricted or eliminated as a result of the conduct of a very small segment of the bar specializing in plaintiffs' representation.

*Liebman v. J.W. Petersen Coal & Oil Co.,* 63 F.R.D. 684, 701 (N.D.Ill.1974).

My rulings with respect to the fees may seem harsh to many, but as long as Rule 23 and *Lindy* and its progeny impose upon the court the duty to protect the class from overreaching by class counsel, I have no alternative. Moreover, the court must take a firm stand if Rule 23 is to retain

---

24. The Class Objectors' Report was utilized by the court only to the extent that it coincided with the court's independent analysis.

respectability as a legitimate and effective tool of judicial administration.

## XI. The Individual Fee Petitions

In alphabetical order by firm (except for Stewart Perry, Esq., whose petition is reviewed in conjunction with that of Walter Riordan, Esq.) the results of my analysis of the fee petitions follow. In sum, I have allowed fees totaling $4,343,103 and expenses of $1,121,020.

## ADLER, BARISH, LEVIN AND CRESKOFF

Adler, Barish is located in Philadelphia, Pennsylvania. The firm was co-counsel with Wolf, Block for plaintiff, Moses Jaroslawicz, t/a J & B Toy Stationery, on a complaint filed in August of 1977.

It seeks compensation for 965.5 partner hours, 1382.25 associate hours and 98.75 paralegal hours. Its total lodestar request is $219,925 and with the application of a requested multiplier of two, the total fee sought is $439,850. Adler, Barish's major responsibility was discovery of Scott Paper Company in conjunction with co-counsel Wolf, Block. Both firms performed this task under the supervision of the discovery chairman (Specks) and co-chairmen (Saveri and Cotchett).

I. Arnold Levin

(A) Hours Expended

 Levin is a partner in the firm. He asks to be compensated for 965.5 hours of work. After a careful review of the time records submitted, I find that only 622.75 of the total hours claimed by Levin have benefited the class. Specifically, in accordance with the Guidelines set forth above, I find the following hours did not benefit the class and accordingly will not be allowed:

1. .75 hours for status phone calls to Levin's client. Such activity did not benefit the class.

2. 39.5 hours are claimed for the argument before the MultiDistrict Litigation Panel. This claim is clearly excessive. The court will allow 12 hours for this endeavor.

3. In the monthly time sheets, 51 hours are described only as "correspondence." Such entries are too vague or inadequately documented to allow compensation since it cannot be determined whether the time benefited the class and what an appropriate hourly rate would be.

4. 6.5 hours devoted to attendance at pretrial conferences will not be compensated since such attendance did not benefit the class. In this litigation, Adler, Barish had no leadership role; its participation was limited to Scott Paper discovery. Therefore, it was neither necessary nor beneficial to the class for Levin to attend pretrial conferences.

5. 225 hours spent by Levin reviewing documents, correspondence and filings for which Adler, Barish was not responsible (i.e., those not pertaining to Scott Paper Company) will not be compensated. For example: (1) On May 7, 1979, Levin spent .5 hours reviewing the Potlach cast of characters, .5 hours reviewing the joint memorandum of merchant house defendants in opposition to motion for reconsideration and an additional .5 hours reviewing the reply brief of Potlach in opposition to motion for reconsideration; (2) On January 4, 1980, two hours were spent reviewing the Majority States' answer to the merchant house defendants' interrogatories; and (3) On April 2, 1980, 1.5 hours were spent by Levin reviewing the Majority States' petition for certiorari to the United States Supreme Court. As discussed earlier, in a case such as this, where there are 160 attorneys participating, every attorney cannot possibly be compensated for reading every piece of paper over the course of three years of litigation, as Levin apparently did.[25]

Generally the courts have disallowed time for duplicative tasks; *time spent reading and reviewing documents (other than pretrial orders and plaintiffs' newsletters) for which the attorney had been assigned no specific responsibili-*

---

**25.** Compare Granvil Specks' statement in his letter to Stewart Perry dated January 30, 1981 in which Specks gives Perry suggestions concerning his fee petition:

6. 64 hours spent by Levin on the Trial Memorandum and Final Contentions (nearly 44 hours spent in meetings or conferences on the subject) appears excessive in light of the combined 4604.93 hours spent on these same tasks by all the lawyers in this case. Accordingly, I will reduce the 64 hours claimed by Levin by one-half. Only 32 of these hours will be compensated.

7. Finally, I have considered the class objectors' challenge to the 19.4 hours Levin spent traveling and attending discovery-related meetings, most of them in Chicago, Illinois, and the general objection to his time spent in the discovery of Scott Paper Company. I have carefully considered these objections and especially share the objectors' recommendation that meetings of plaintiff's counsel, who are headquartered in various parts of the country, be kept to the bare minimum due to the expense of travel. I find, however, that since Levin played an appreciable role in the discovery of Scott Paper Company from the start to the finish of this litigation, the hours spent by him were reasonable and therefore compensable.

For all of the above reasons, then, Levin will be compensated for a total of 622.75 hours. The number of hours disallowed is 342.75.

**(B) Hourly Rate**

██ Levin asks for an hourly rate of $100 during the years 1977 through 1978 and $125 for 1979 through 1981. As was stated earlier, Levin's compensable time in this litigation was devoted almost exclusively to Scott Paper discovery. He reviewed that defendant's documents and took nine depositions. This task was performed in conjunction with members of the Wolf, Block office and under the supervision of Specks, Saveri & Cotchett. In short, it is of the type of work normally assigned to a junior partner or senior associate. On balance, an average rate of $100 per hour for Levin's time seems fair and appropriate.

**(C) Total Lodestar**

622.75 hours × $100/hour = $62,275

**(D) Multiplier**

██ A contingency multiplier of 1.5 will be applied to all compensable Adler, Barish time (171 hours) expended prior to the initial settlements. This includes 117.75 hours of Levin's time and all of Michael Fishbein's time. No adjustment to the lodestar is justified for the quality of Levin's services. Adler, Barish did not have a leadership position in the case and the vast majority of Levin's compensation is for routine discovery matters. A quality factor is inherent in Levin's $100 hourly rate and an adjustment to that rate is not justified because Levin did not demonstrate an unusually high degree of skill.

**II. Michael Fishbein**

**(A) Hours Expended**

██ Fishbein, a 1977 law graduate, is an associate at Adler, Barish. He asks for compensation for 53.25 hours which were devoted to responding to the defendants' discovery of the firm's client and communications with or concerning that client.

The objectors challenge the award of compensation to Fishbein for class action discovery because the class did not benefit from having sixteen representatives certified. Nevertheless, the Adler, Barish client was a named party and a designated class representative. Certification was a necessary part of the proceedings and inured to the benefit of the class. Accordingly, I will allow compensation for the time Fishbein spent on this task.

**(B) Hourly Rate**

██ Adler, Barish has asked for $75 an hour for Fishbein's time. However, since

---

ty; time spent on fee petitions; excessive time for a particular task performed; time spent for the benefit of an individual client rather than the class.

(emphasis added) (Letter is attached to Perry affidavit of November 6, 1981.)

Fishbein had only recently graduated from law school when he worked on this case, $50 an hour is a fair and appropriate hourly rate.

(C) Total Lodestar

53.25 hours × $50/hour = $2,662.50

(D) Multiplier

See I.D.

III. Arlene Lotman

(A) Hours Expended

 Ms. Lotman is an associate of Adler, Barish. She spent a total of 1313.75 hours almost exclusively on discovery work, a substantial portion of which consisted of document review, microfilm review and deposition summarization pertaining to the Scott Paper discovery. After a review of the time records of Ms. Lotman, I find that the following hours of the total claimed by her are not compensable:

1. In the monthly time sheets submitted to the court 17.3 hours are merely described as "Telephone conversation with co-counsel." Such entries are too vague or inadequately documented to allow compensation since it cannot be determined whether this time benefited the class or what an appropriate hourly rate would be for such time.[26]

2. 6.5 hours of Lotman's time devoted to attendance at pretrial conferences will be disallowed; it did not benefit the class.

3. 7 hours for one day of telephone calls to the Wolf, Block firm and James Sloan, Esquire (Entry of June 10, 1980) is excessive on its face. Only one hour of such time will be compensated.

4. 9.5 hours spent on July 7, 1980 reviewing the Majority States Pretrial Memorandum will be disallowed; it did not benefit the class.

5. 4.5 hours spent on September 3, 1980 reviewing correspondence and private plaintiffs' pretrial memorandum is excessive; only one hour of this time will be compensated.

6. 3.25 hours spent on September 4, 1980 for "tel. call to co-counsel and complete review of trial memo" will be disallowed. This entry of 3.25 hours is contained in the monthly time summaries submitted to the court. It is at variance with Lotman's contemporaneous time sheets, which list only .75 hours for this same activity. Accordingly, she will be compensated for only .75 hours.

7. Finally, it is my view that Ms. Lotman's claim of 149.75 hours devoted to the preparation of depositions pertaining to Scott Paper is excessive in view of the fact that (1) Levin spent 117.5 hours in preparation for the same depositions and (2) Ms. Lotman devoted over 680 hours to review of Scott documents and microfilm and an additional 100 hours preparing a discovery book and report and an undated cast of characters for Scott. Given these circumstances, it is my judgment that 149.75 hours for preparation of these depositions is unreasonable; only 50 hours of this time will be allowed.

Accordingly, I will disallow a total of 145.05 hours of Ms. Lotman's time. The total amount of compensable time is therefore 1168.7.

(B) Hourly Rate

 Adler, Barish is asking for $75 an hour for Ms. Lotman's time. As in the case of Mr. Fishbein, Ms. Lotman began work on *Fine Paper* as a recent law school graduate. In the light of the level of the work she performed and her junior associate status, an award of $50 per hour for her time is fair and appropriate.

(C) Total Lodestar

1168.7 hours × $50 = $58,435

(D) Multiplier

*See* I. (D) *supra,* at 57.

---

**26.** For example, on January 31, 1981, Lotman billed the class .25 hours for "Telephone, Bar-

rack," and on April 30, 1980, .5 hours for "Telephone, H. Fink."

IV. Barbara Sarkin and Claudia Tesoro

▮ These two attorneys first appear in the Adler, Barish time records in late September 1980, less than a week before the final settlement agreements in this case were concluded. They reviewed pleadings and other general materials but performed no substantive work prior to settlement. Prior to this time, neither had any prior experience in *Fine Paper* and their addition to an already-crowded array of some 160 attorneys was of no benefit to the class. Accordingly, all of their 15.25 hours will be disallowed.

V. Paralegal

Adler, Barish asks for compensation of 98.75 paralegal hours at the rate of $25 per hour. A review of the time records indicate that their work did benefit the class and that time expended was reasonable. For the reasons stated in the Guidelines section, I believe that $25 an hour for paralegal time is fair and appropriate. However, for reasons already stated, no multiplier will be awarded for paralegal time. Accordingly, Adler, Barish will be awarded $2,468.75 for paralegal time.

VI. Expenses

Adler, Barish's total expenses are $30,-269.12, which I find reasonable. As explained earlier, the firm has already received 75% of these expenses. Accordingly, I will award the firm the remainder of its expenses in the amount of $7,568.12.

VII. Conclusion

The following represents my determination of the fees and expenses to which Adler, Barish is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Levin | 622.75 | $100.00 | $ 62,275.00 | $ 68,162.50 | $227,575.00 |
| Fishbein | 53.25 | $ 50.00 | $ 2,662.50 | $ 3,993.75 | $ 7,987.50 |
| Lotman | 1168.7 | $ 50.00 | $ 58,435.00 | $ 58,435.00 | $197,062.50 |
| Sarkin | 0.0 | 0 | 0 | 0 | $ 1,725.00 |
| Tesoro | 0.0 | 0 | 0 | 0 | $ 562.50 |
| Paralegals | 98.75 | $ 25.00 | $ 2,468.75 | $ 2,468.75 | $ 4,937.50 |
| TOTAL | | | $125,841.25 | $133,060.00 | $439,850.00 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 30,269.12 |
| Amount Previously Distributed | $ 22,701.00 |
| Amount Outstanding | $ 7,568.12 |
| Amount Awarded | $ 7,568.12 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $133,060.00 |
| Expenses | $ 7,568.12 |
| Final Award | $140,628.12 |

AUSTIN, ROTH, SUNDE, McDONOUGH & TIERNEY, P.A.[27]

This Minneapolis firm became counsel of record for National School Studios, Inc., Universal Publications, Inc. and Prestige Portraits, Inc. on April 1, 1979. As in the case of other Minneapolis firms, the Austin firm became involved in this case at the importuning of Walter Riordan, Esquire, long after the initial 30 million dollar settle-

27. Formerly known as Carroll, Cronan, Roth & Austin, P.A.

ments were obtained, after the class was certified, and after there was already an abundance of counsel representing the class.

The firm claims to have spent 117 partner hours, 55.75 associate hours and 169.25 paralegal hours (totalling 342 hours), on such tasks as reviewing and indexing microfilmed documents of Kimberly-Clark Corporation, Hammermill Paper Company and Gilbert Paper Company. The firm was apparently assisting other firms that were responsible for obtaining discovery from these defendants.[28] The firm seeks total fees of $29,584.38.

## I. Robert M. Austin

### (A) Hours Expended

 This partner claims to have spent 117 hours on the litigation. After careful review of the time sheets submitted, I find that the 97 hours are not compensable:

1. 29 hours of work which did not benefit the class. These consist of 19 hours billed to work on the firm's fee petition, 6 hours billed to conferences with Mr. Riordan in March and April, 1979 (apparently to obtain information about the case which the Austin firm was about to enter for the first time), and 4 hours devoted to the drafting of a complaint for the firm's clients. Since the firm entered the case after the class was certified, these latter 10 hours were of no benefit to the class. The 19 hours spent on the firm's fee petition are not compensable, since they conferred no benefit on the class.

2. 23 hours of Mr. Austin's time were spent reading and reviewing materials for which the Austin firm did not have responsibility, such as Mead and Union Camp interrogatory answers. As discussed earlier, in a case such as this, where there are 160 attorneys participating, every attorney cannot possibly be compensated for reading or

reviewing pleadings which do not directly pertain to their particular assignment.

3. 45 hours of Austin's entries are so vague that, in view of his firm's minimal role in the case, I am unable to discern what work was done, whether it benefited the class, whether it was duplicative or excessive, or at what rate the work should be compensated. Examples of such entries are "status conference," "conference—Walter Riordan," "general file review," "background file—doc. procedure," and "examining correspondence and pleadings." Accordingly, the firm will not be compensated for this time.

The number of Austin's disallowed hours amounts to 97. The remaining 20 hours spent by him on reviewing documents and document indices are compensable.

### (B) Hourly Rate

██ Austin requests a rate of $100 to $125 per hour. This rate is not Austin's non-contingent historical hourly rate, rather, as revealed in the petition, Austin's historic hourly rate is $55 to $65 per hour. In view of these figures and the nature of the compensable tasks performed by Austin— document review—$50 per hour is a fair and appropriate rate for Austin's time.

### (C) Total Lodestar

20 hours $\times$ $50/hour $=$ $1,000

### (D) Multiplier

██ Austin requests a multiplier of 1.5 for the hours he expended in this case. This request, for obvious reasons, will be denied. At the time Austin's firm entered the case, the risk of non-payment of attorney fees was virtually non-existent. The class already had been certified and $30 million dollars had already been obtained in settlements. As noted above, Robert Atkins, Chairman of plaintiffs' finance committee, conceded the absence of a risk of

---

**28.** This is one of the firms referred to in part II (D) above which was given work assignments while others already in the case were being excluded. These assignments were made over the repeated objections of Harold Kohn that

there were already too many lawyers in the case. N.T., 2/17/82 at 612–613; N.T., 3/30/82 at 1781–87; Magazine Management Exhibit No. 10 (hereinafter referred to as MM Exhibit No. XX); Class Objectors' E 754–61.

non-payment.[29] Furthermore, no multiplier is appropriate for the quality of the firm's work. Austin's compensable time was spent reviewing documents and supervising the indexing of documents. This type of routine work, performed in a case in which some 160 other attorneys were involved, does not warrant an increment for quality.

## II. Donna Geck

### (A) Hours Expended

 This associate devoted 54.25 hours to this litigation. After careful review of the time sheets submitted, I have concluded that only 12 hours of her time should be compensated by the class. Specifically, the following time will be disallowed:

1. 10 hours will be disallowed because the work was of no benefit to the class and duplicative of the work of other counsel in the case. These hours are reflected by the following entries: 2 hours for "conference re: rep. of client, status of case, recent developments, pleadings," 1.5 hours for "conference re: fine paper settlement, strategy," 1.5 hours "legal research" and for 5 hours for "examine corres., pleadings, and orders to determine the status of litigation, legal research."

2. 4.75 hours are reflected by vague entries such as "conference on legal research on strategy," or "intra-office conferences" in which the other participants and the subject thereof are unspecified. I cannot tell from such entries whether this time benefited the class or whether it was duplicative of the efforts of other counsel.

3. 27.5 hours devoted to reading and reviewing documents for which this firm had no responsibility such as unspecified pleadings and correspondence relating to unidentified defendants. As in the case of Mr. Austin, Geck will not be compensated for this "read and review" time.

Geck's 12 compensable hours were spent meeting with and supervising paralegals who were reviewing documents and Kimberly-Clark and Hammermill answers to interrogatories.

### (B) Hourly Rate

Geck requests $50 to $55 for her time. $50 an hour is a fair and appropriate rate for her time.

### (C) Total Lodestar

12 hours × $50/hour = $600

### (D) Multiplier

No multiplier is requested for Geck's time, nor does one appear warranted.

## III. Other Attorneys

 Richard Sunde, a partner in the firm, seeks to be compensated for one hour he spent locating and leasing a microfilm reader. He will be compensated for this time, but only at the paralegal rate of $25 an hour. Michael Tierney, an associate, devoted one-half an hour to this litigation for attendance at an intra-office conference. Since Tierney did not become further involved in this case, and there being no description of the purpose of his involvement, no compensation will be awarded for his time. Obviously, no multiplier will be awarded to either of these attorneys.

## IV. Paralegals

 169.25 hours were expended by the firm's paralegals on document review, indexing and "file maintenance". These hours appear to have benefited the class. However, of these hours, 43 are charged to "file maintenance". In view of the firm's minor role in this case, 43 hours on "file maintenance" is excessive. The firm will only be compensated for 10 hours spent by paralegals on this task. Thus, the firm will be compensated for 136.25 paralegal hours at the rate of $25 per hour, not the $35 per hour rate requested here. Thus, the total award for paralegal time is $3,406.25.

## V. Expenses

The Austin firm's total expenses are $5,719.81 of which $4,500 represents the

---

**29.** *See* Class Objectors' E 205.

firm's contribution to the plaintiff's litigation fund. The expenses appear reasonable. Since the firm has already received 75% of these expenses or $4,290, I will allow the remaining $1,429.81 for expenses.

## VI. Conclusion

The following represents my determination of the fees and expenses to which the Austin firm is entitled:

| Attorney Name | Hours | Hourly Rate | Lodestar | Total Award | Total Request |
|---|---|---|---|---|---|
| Austin | 20 | $50 | $1,000.00 | $1,000.00 | $20,709.38 |
| Geck | 12 | $50 | $ 600.00 | $ 600.00 | $ 2,858.75 |
| Tierney | 0 | – | 0 | 0 | $ 27.50 |
| Sunde | 1 | $25 | $ 25.00 | $ 25.00 | $ 65.00 |
| Paralegals | 136.25 | $25 | $3,406.25 | $3,406.25 | $ 5,923.75 |
| | | | | $5,031.25 | $29,584.38 |

Expenses

| | |
|---|---|
| Amount Requested | $5,719.81 |
| Amount Previously Distributed | $4,290.00 |
| Amount Outstanding | $1,429.81 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $5,031.25 |
| Expenses | $1,429.81 |
| Final Award | $6,461.06 |

## BARRACK, RODOS & McMAHON

Barrack, Rodos & McMahon, a Philadelphia law firm, represented plaintiff William Fels in a complaint filed in October of 1977. The firm's major contribution to the class was discovery of the Hammermill Corporation. Barrack was appointed chairman of the Hammermill discovery subcommittee under the supervision of the discovery committee chairman and co-chairmen. In connection with the Hammermill discovery, the Barrack firm reviewed documents and took depositions of Hammermill employees. The firm also prepared a discovery book and drafted the Hammermill contentions section of the pre-trial memorandum. Barrack was one of the two co-chairmen of the Rule 37 committee. The firm also notes in its fee petition that Barrack was a member of the trial team appointed as "Liaison to and Chairman of the support teams preparing for trial". Finally, throughout the course of this litigation, the firm was a member of the Executive Committee.

The firm seeks total compensation for its services in the amount of $998,276.25. This is based on requested hourly rates of $100–$145 per hour for Barrack, $85–$115 per hour for Rodos, $80–$105 per hour for McMahon, $75–$85 per hour for Bacine, $65–$75 per hour for Keener, and $25 per hour for all law clerks and paralegals. The firm also requests a multiplier of 2.5 to be applied to their lodestar over the period of June to September 1980 and a multiplier of 2 for the remaining time. The firm also seeks reimbursement for $75,079.65 in expenses.

## I. Leonard Barrack

### (A) Hours Expended

Barrack is a partner in the firm. He asks to be compensated for 1278 hours of work. Upon analysis of the time sheets submitted, I find, however, that Barrack should only be compensated for 722.63 hours of work in this litigation. This is the

only time which can reasonably be said to have benefited the class.

1. 134.5 hours will not be compensated because the supporting entries are too vague. It was impossible to determine exactly what work was done and, therefore, the court is unable to make a determination of benefit to the class. These include: (a) time spent in telephone conferences and/or calls without an explanation of what was discussed; (b) time noted merely as "review" and/or "read correspondence", without further explanation or documentation; (c) all efforts expended in "conference" or "meetings" without an explanation of the subject matter; (d) hours marked "amended complaint"; (e) time billed to "analyze filings"; and (f) letter writing time to various parties without explanation or documentation. In addition to these general classifications, there were numerous others.[30]

2. 217.75 hours charged to discovery by Barrack are also disallowed because of vagueness. Disallowed time entries are those reflected by simple one or two word notations and include: (a) "general discovery review", (b) "discovery", (c) "documents", (d) "document review", (e) "examine documents", (f) "review documents." Such entries render impossible the court's task of making a determination of benefit to the class. Fees are awarded on the basis of "whether the *specific* services benefited the fund ..." and such cursory explanations will not allow a general assumption of benefit to the class. *Lindy II* at 112 (emphasis added). It bears repeating that inadequately documented fee petitions are filed at the risk of the petitioning attorneys. *In re Equity Funding Corporation of America Securities Litigation,* 438 F.Supp. at 1327.

3. 59 hours spent in preparing for and attendance at pretrial conferences are also disallowed. Barrack had no substantial leadership position, and the firm's designated responsibility was limited to Hammermill discovery. Furthermore, Messrs. Kohn and Specks were appointed spokesmen for the private plaintiffs with Kohn later being solely designated as senior spokesman in the courtroom. *See* Class Objectors' E 743–44 and N.T., 9/3/80 at 4–5. I am not persuaded by Barrack's argument that his attendance at these conferences, particularly the last two, was warranted because of his appointment to the trial team.[31] Accordingly, Barrack's preparation and attendance time is disallowed.

4. 41 hours spent in conferences concerning matters for which the firm was not responsible. This total reflects time spent in reading or review of documents of defendant companies other than Hammermill or on other matters for which the firm clearly was not responsible.[32] As co-chair-

---

**30.** For example, Barrack billed 1.50 hours on 4/3/78 to "Executive Committee Meeting". As there was no Executive Committee Meeting on this date, I was unable to determine exactly what this entry meant. Furthermore, Barrack billed .50 hour to "Don Hardison, PJM" on 6/10/78, 1.00 hour to "Affidavit re Class" on 5/4/78, and 1.75 hours to "microfilm" on 9/10/79. I also found impossible to discern any real benefit from entries noted as "Pat Metzger" for .25 hour on 9/30/80 and "pretrial order" for .50 hour on 3/3/81. Such entries are confusing and so hopelessly inadequate that a determination of benefit to the class is impossible.

**31.** See note 165, *infra* at p. 218, for Kohn's appraisal of Barrack's contributions to the conferences.

Likewise I find Barrack's contention that his firm's designation as trial headquarters warranted his active participation in the later pre- trial conferences to be unpersuasive. The Kohn firm noted in its objections to the fee petition of the Barrack firm that Mr. Specks directed this trial headquarters activity by the Barrack firm so Specks could maintain a separate base of operations in Philadelphia with the Barrack firm as his "satrap." Kohn's objections to petition of Barrack, Rodos & McMahon at 2.

Finally, several firms, including the Barrack firm, sent more than one attorney to each conference. It is noted that three partners of the Barrack firm have billed for attendance at the first pretrial conference on April 19, 1978. The class simply cannot be expected to compensate such redundancy.

**32.** I have noted the Barrack firm's numerous references in their response to the Class Objectors' Report to correspondence from both Specks and Kohn which directed the firm to take up numerous tasks other than those con-

man of the Rule 37 committee Barrack will be compensated for time spent in ensuring compliance with discovery by companies other than Hammermill. Other efforts by Barrack were plainly duplicative, including time charged to settlement discussions, and class brief review.

5. I have disallowed 54.12 hours spent on pretrial memorandum and final contentions as well as 38.25 hours spent in trial preparation.[33] All of the attorneys involved in this litigation expended a combined total of 7874.52 hours on these tasks (4604.93 on pretrial memorandum and final contentions and 3269.59 on trial preparation). I find these hours to be excessive for such work and, accordingly, I have reduced Barrack's requested compensable hours in these areas by one-half.[34]

6. 5 hours spent on 12/13/79 watching Harold Kohn argue the Kimberly-Clark disqualification appeal before the Third Circuit Court of Appeals. See N.T., 5/12/82 at 2336. Likewise, 2.5 hours spent in review of the Third Circuit decision on 2/22/80 is also disallowed. These efforts were of no benefit to the class and Barrack had no responsibility in these matters.

7. 3.25 hours for preparation and attendance at the Executive Committee meeting in Chicago on 3/6/81. I fail to see the benefit to the class from meetings held almost six months after the final settlements. I will allow time for one Executive Committee meeting for administrative purposes after final settlement.

The total hours for which Barrack is not compensated is 555.37. The remaining 722.-63 hours of compensation which Barrack seeks for his work I will allow. The hours of work for which Barrack is compensated

include the document and discovery work specifically connected with Hammermill. Likewise Barrack is compensated for the time he spent in taking six depositions of Hammermill employees and in representing plaintiff Fels at his deposition. Since Barrack was a member of the Executive Committee, I have allowed reasonable "read & review" time. I have also allowed a reasonable number of hours for pretrial memorandum, final contentions, and trial preparation work. Finally, Barrack is compensated for reasonable Rule 37 and Executive Committee time.

(B) Hourly Rate

Barrack seeks an hourly rate of $100–$145 an hour for his work in this litigation, although the firm does not have historical, non-contingent hourly rates. Barrack's compensable time is largely made up of Hammermill discovery work including the six depositions he took pursuant to this assignment. He was not one of the lead counsel or co-chairmen of the Executive Committee. His role in trial preparation was insignificant and his designation as "Liaison to and Chairman of the Support Teams" did not in any way confer a benefit on the class.

 Accordingly, based on the rates received by partners in other firms for similar work, particularly the rates awarded for those involved with this litigation, I have determined a reasonable compensable hourly rate for Barrack to be $100. This rate reflects a reasonable remuneration for the type of work Barrack performed. However, Barrack cannot be compensated at this rate for all of his work. Of the 722.63 compensable hours, 114 hours will be com-

---

cerning Hammermill. These activities included, inter alia, preparation and filing of plaintiffs' answers and objections to defendants' interrogatories, coordination and analysis of defendants' responses to plaintiffs' discovery requests, analyzing the responses and objections of Hammermill, Scott and Westvaco to plaintiffs' Set I Interrogatories, and coordination in Philadelphia for all plaintiffs in connection with the deposition program. Accordingly, in disallowing hours of work for which the Barrack firm had no responsibility an exception was

made for the "good faith" efforts of Barrack and all other members of the firm who acted on direction from one of the co-lead counsel.

33. Throughout this memorandum these totals do not include time entries previously disallowed for other reasons such as vagueness, etc.

34. This despite Barrack's designation as "Liaison to and Chairman of the Support Teams," a title without any substantive responsibilities. See note 31, supra.

pensated at a rate of $50 an hour. This time includes 58.75 hours devoted to the Hammermill discovery book, 21.5 hours in review of Florida Grand Jury documents, and 33.75 hours of class discovery. These tasks are usually performed by juniors or associates and, therefore, any other rate of compensation would be excessive.

(C) Total Lodestar

608.63 hours × $100/hour = $60,863
114.00 hours × $ 50/hour = $ 5,700

(D) Multiplier

■ The Barrack, Rodos & McMahon firm requests a multiplier of 2 for their work throughout this litigation except for the period from June until September of 1980 when a multiplier of 2.5 is requested. I find that no quality multiplier is merited. Barrack was only appointed chairman of the Hammermill discovery subcommittee; a title which was doled out to many other attorneys who were given "charge" of discovery of a particular defendant. Likewise the leadership role played by Barrack as only co-chairman of the Rule 37 committee was dubious at best. I find equally unimpressive Barrack's role as "Liaison to and Chairman of the Support Teams" in light of the fact that the case was settled before trial. Barrack followed the lead of Messrs. Kohn or Specks (particularly Specks, sometimes to the exclusion of Kohn). Accordingly, I find nothing in the work of Barrack which demonstrates the type of exceptional quality which warrants the award of a positive quality multiplier.

A contingency multiplier of 1.5 will be awarded for the 137 compensable hours expended prior to the initial settlements.

II. Gerald J. Rodos

(A) Hours Expended

■ Rodos is a partner. He asks to be compensated for 577.5 hours of work. My analysis of the time sheets leads me to conclude that Rodos can be compensated for only 352.25 hours of work in this litigation. The following hours are disallowed:

1. 58 hours for which the supporting entries were incomplete. It was not possible to determine from these entries exactly what work was done and, therefore, not possible to make a determination of benefit to the class. Entries disallowed as too vague included: (a) telephone calls and/or conferences without an explanation of what was discussed; (b) entries marked simply "review microfilm"; (c) time noted merely as "review of file" and/or "document review"; (d) an entry marked "review of pleading" and "review brief"; (e) time noted "review [and/or] read correspondence"; (f) all time charged to "conference" or "meeting" without an explanation of the subject matter; and (g) time writing letters to various parties without documentation or explanation as to their content.

2. 16.75 hours devoted to discovery by Rodos are also disallowed because of vagueness. Time designations charged to discovery and disallowed because of vagueness include: (a) "general review"; (b) "review discovery"; (c) "document discovery"; (d) "document work"; and (e) "general discovery review".

3. 5 hours to review proceedings before the Judicial Panel on Multidistrict Litigation ("JPML"). Numerous other attorneys, including Barrack, not only reviewed the same proceedings but were in attendance. In light of the 13 hours allowed Barrack for this work·the efforts by Rodos were superfluous.

4. 39.25 hours spent in reading or reviewing documents of defendant companies other than Hammermill and on other matters for which the firm was clearly not responsible including settlement review time and class brief review and entries concerning defendants other than Hammermill that indicated duplicative review.

5. 15.25 hours spent in attendance at pretrial conferences. At the first pretrial conference on April 19, 1978 Messrs. Barrack, McMahon, and Rodos were all in attendance. It is plainly duplicative and wasteful of class funds for three partners to bill for this time. Moreover, Rodos did not have the type of leadership role in this litigation

which warranted his attendance at pretrial conferences. Accordingly, all of his pretrial conference time is disallowed.

6. 29 hours Rodos charged to preparation for and attendance at both Executive Committee meetings and discovery meetings with Barrack.[35] As Barrack also attended and prepared for each of these meetings, all of Rodos' efforts were duplicative and of no benefit to the class.

7. 30.5 hours devoted to Hammermill deposition work by Rodos. These disallowed hours include all preparation, discussion, meeting, or review time in connection with any of these depositions. These efforts were of no benefit to the class since Rodos took no depositions of any Hammermill employees.

8. I have disallowed 22.87 hours spent on pretrial memorandum and final contentions as well as 8.63 hours spent in trial preparation. As previously noted, the total number of hours spent on these tasks by all the attorneys involved in this litigation is excessive. I have reduced Rodos' requested compensable hours in these areas by one-half.

The total number of hours for which Rodos is not compensated is 225.25. The remaining 352.25 hours will be allowed. The hours of work for which Rodos is compensated include his document and discovery work specifically connected with Hammermill. Rodos also will be compensated for his briefing and contentions work.

(B) Hourly Rate

Rodos seeks an hourly rate of $85–$115 an hour for his work in this litigation. However, Rodos' compensable time is made up largely of Hammermill discovery, *viz.*, document inspection, review, and microfilm analysis, tasks ordinarily performed by someone other than a senior partner.[36] Accordingly, I will allow a rate of $50 an hour for Rodos.

(C) Total Lodestar

352.25 hours $\times$ $50/hour $=$ $17,612.50

(D) Multiplier

As noted above, the Barrack firm requests a multiplier of 2.5 for their work in this litigation from June until September of 1980 and a multiplier of 2 for their work during· the remaining period. On balance Rodos' role in the Barrack firm's contribution to this litigation was limited. Furthermore, unlike Barrack, Rodos does not even make a pretense of having played a leadership role in this litigation. His efforts were confined largely to routine discovery work. Accordingly, I find nothing in the work of Rodos which demonstrates the type of exceptional quality which suggests the award of a positive quality multiplier. As with Barrack a 1.5 contingency multiplier will be allowed for his 105.75 compensable pre-January 1979 hours.

## III. Paul J. McMahon

(A) Hours Expended

 McMahon is a partner with the firm. He asks to be compensated for 874.25 hours of work in this litigation. However, I find that only 577 hours of work reasonably can be said to have benefited the class. Compensation for the following time will be disallowed:

1. 201.75 hours cannot be compensated because the supporting entries are too vague. The cursory explanations accompanying these time charges are an insufficient basis for determining the benefit, if any, to the

---

**35.** Included in this total are 4 hours in preparation for a discovery meeting and an Executive Committee meeting as well as 4.5 hours in attendance at a discovery meeting in March of 1978; 2.5 hours in preparation for meetings in Chicago during May of 1978; 2.5 hours in attendance at the Executive Committee meeting in June of 1978; and 15.5 hours in preparation for and attendance at the Chicago discovery meeting in June of 1979.

**36.** An excessively high number of the 160 attorneys involved in this litigation seek to be compensated at premium partner rates. The fund should not be required to absorb these high rates because of the indiscriminate and inefficient assignment of routine tasks. This is particularly true of Rodos' part in the Barrack firm's overall contribution to *Fine Paper*.

class. These include: (a) entries marked simply "interrogatories"; (b) "research"; (c) "file review"; (d) numerous entries (99.-75 hours) from February until May of 1978 noted only as "motion to compel"; (e) "documents" or "document review"; (f) "conference" or "meeting" without an explanation of the subject matter; (g) time spent in telephone conference without an explanation of what was discussed; and (h) "microfilm" or "microfilm review" time.

2. 62.75 hours devoted to discovery by McMahon are also disallowed because of vagueness.[37] While some of the hours McMahon devoted to discovery were allowed because such work included an adequate explanation of exactly what was done, entries which are supported by one or two word notations such as "review discovery", "discovery", and "discovery review" are excluded.

3. 2 hours in preparation for the JPML proceedings. These hours are disallowed for the same reasons I have disallowed similar Rodos charges.

4. 5.5 hours in preparation and attendance at the pretrial conference on April 19, 1978. As previously noted, three partners of the firm attended this conference. This wasteful and duplicative effort will not be compensated by the class.

5. 18.25 hours in review of the class brief. McMahon did not have any direct responsibilities concerning the class brief. This time merely duplicated the hours of many other attorneys involved in this litigation.

6. I have disallowed 2.5 hours spent on pretrial memorandum and final contentions as well as 4.5 hours spent in trial preparation. As previously noted, the total number of hours spent on these tasks is excessive. Accordingly, I have reduced McMahon's compensable hours in these areas by one-half.

■ The total of disallowed hours is 297.25. The remaining 577 hours are compensable. The hours for which McMahon is compensated include his Hammermill discovery work and the three depositions he took pursuant to this activity. Likewise he is compensated for reasonable preparation of the Hammermill discovery book, plaintiffs' contentions, and briefing activities.

(B) Hourly Rate

McMahon seeks an hourly rate of $80–$105 for his work in this litigation. However, McMahon's compensable time consists almost exclusively of Hammermill discovery work. With the exception of the three depositions McMahon took, the type of tasks which McMahon performed in connection with this litigation were routine and of the type ordinarily assigned to junior associates. Accordingly, I will allow McMahon to be compensated at $85 an hour for 68.25 hours, the reasonable amount of time he spent in preparation for and deposing Hammermill employees. The remaining 508.75 hours of mostly general discovery work will be compensated at $50 an hour. In light of the rates awarded Barrack and Rodos as well as the rates requested for McMahon, this rate of compensation is reasonable.

(C) Total Lodestar

508.75 hours × $50/hour = $25,437.50
 68.25 hours × $85/hour = $ 5,801.25

(D) Multiplier:

No positive quality multiplier will be applied to McMahon's lodestar for the reasons I have not awarded one to Rodos. But, as with the others, a contingency multiplier will be applied to the compensable hours (57.5) expended prior to January 1979.

IV. Herbert B. Newberg

■ Newberg is a partner in the firm. According to the Barrack fee petition com-

---

**37.** Included in this total are 8 hours McMahon listed on 2/5/80 for "discovery meeting." Not only is this entry too vague, it is unsubstantiated and typical of many of the Barrack firm entries. There was no general discovery meeting on this date nor do the time entries of any of the other members of the firm indicate they were in such a meeting on this day. It is impossible to conduct a meeting without other people present and I am unable to determine who attended this meeting or what was discussed. Accordingly, the time is disallowed.

pensation for 10 hours of his time is requested. It is claimed that Newberg's time involved reviewing briefs and memorandum. However, Newberg's total requested hours, in light of the over 5200 hours requested by the entire Barrack firm, leads me to conclude that his services were insubstantial and of no benefit to the class. Furthermore, I am unable to find any documentation of Newberg's 10 hours in the submitted time records of the Barrack firm. Only .5 hours are noted in the time sheets. Accordingly, compensation for Newberg's time is denied.[38]

## V. Donald E. Keener

### (A) Hours Expended

 Keener is an associate with the firm. He asks to be compensated for 2165.85 hours of work in this litigation. However, on the basis of my analysis Keener can only be compensated for 1840.64 hours of work. This is the only time I found to be beneficial to the class. The following hours are disallowed:

1. 6.45 hours cannot be compensated because they are too vague. It is impossible to determine from these entries whether the work performed was beneficial to the class. These include: (a) telephone calls and/or conferences without an explanation of what was discussed; (b) time noted merely as "review correspondence"; (c) entries marked simply "research"; (d) time noted merely as "review file [and/or] pleadings"; and (e) entries logged as "file and document organization."

2. 32.6 hours of work in October of 1980. All the defendants in *Fine Paper* settled in September of 1980. At this time there was already a $50,000,000 fund created for the class. In light of this I find none of the "post settlement" work billed by Keener to be beneficial to the class. In addition, I find Keener's efforts did nothing to "protect" or preserve the class fund as his work

during this month involved only document search, review and organization.

3. 135 hours in preparation and attendance at meetings with other members of the firm. This time expenditure was unnecessary and of no benefit to the class. The hours include Keener's attendance with Barrack at discovery, pretrial memorandum, and trial preparation meetings in Chicago during June, July and August of 1980. In all three of these areas there was an excessive amount of time billed by all the attorneys involved in this litigation. The attendance at meetings by several attorneys from the same firm only compounded an already wasteful situation.

4. I have disallowed 83.83 hours spent on pretrial memorandum and final contentions as well as 67.33 hours spent in trial preparation. As already noted, there was an excessive amount of time spent on these tasks. Accordingly, I have reduced Keener's requested hours in these areas by one-half.

The total hours for which Keener is not compensated is 325.21. The remaining 1840.64 hours I will allow. The hours of work for which Keener is compensated include his Hammermill discovery, on-site document production and review, Hammermill microfilm review, discovery book preparation, and preparation of the cast of characters. Additionally, Keener is reasonably compensated for pretrial memorandum and trial preparation work.

### (B) Hourly Rate

Keener asks for an hourly rate of $65 to $75 an hour depending on when he rendered his services in this litigation. I find this rate request too high. The overwhelming majority of Keener's compensable hours are devoted to Hammermill discovery work. My examination of his efforts shows this discovery work to have been simple and routine. Furthermore, all of Keener's work in this litigation was accomplished between

---

**38.** It should be noted that the name Robert A. Rovner, also appears in the time sheets submitted. The total hours of work listed for Rovner is 41.5. The Barrack firm fee petition notes that 27 of these hours were mistakenly attributed to Rovner and were actually expended by Daniel E. Bacine. No request for compensation has been made for the remaining 14.5 hours of Rovner's time.

his first and second year out of law school. Accordingly, I will allow a rate of $50 an hour as compensation. This is a reasonable rate for the type of work Keener performed.

### (C) Total Lodestar

1840.64 hours × $50/hour = $92,032

### (D) Multiplier

Keener's compensable hours consist mainly of routine Hammermill discovery work. An examination of his work reveals nothing of exceptional quality for which I should award a positive multiplier. Furthermore, Keener was under the direct supervision of Messrs. Barrack, Rodos, or McMahon. Accordingly, his work does not warrant the award of a quality multiplier. Moreover, since all his time was logged after the initial settlements, there will be no award of a contingency multiplier.

### VI. Daniel E. Bacine

Bacine is an associate of the firm. The firm asks to be compensated for 102.05 hours of his work in this litigation. However, my analysis of his time records leads me to conclude that Bacine can be compensated for only 23 hours. The following hours are disapproved:

1. 25.8 hours because of the vagueness of the supporting entries. It was impossible to determine from those entries exactly what work was done and, therefore, it was not possible to make a determination of benefit to the class. Entries disallowed as too vague included: (a) time marked simply "analysis" or "analysis of responses"; (b) an entry marked simply "memo"; (c) time noted as "telephone call" without reference to what was discussed; (d) time noted simply as "review correspondence"; (e) an entry noted as "review complaint"; (f) all time entered merely as "documents" or "document review."

2. 53.25 hours devoted to discovery are also disallowed because of vagueness. In light of the total number of hours devoted to discovery by the Barrack firm, simple one or two word entries do not provide sufficient basis for this court to make a determination of benefit to the class. Discovery entries disallowed because of vagueness include: (a) "document discovery"; (b) "discovery analysis"; (c) "discovery"; and (d) "review discovery."

The remaining 23 hours of Bacine's time appear to have benefited the class and therefore will be compensated. This includes 15.5 hours devoted to "Rule 37 preparation", 3.25 hours devoted to motion to compel work, and 4.25 hours devoted to Rule 37 discovery and analysis. However, in view of the fact that Bacine's time was spent on routine tasks, Bacine will be awarded $50 an hour for his time, not the $75 to $85 an hour requested. Thus, Bacine's lodestar is $1150. No quality multiplier is warranted, but I will apply a 1.5 contingency multiplier to the 7.5 compensable hours expended before the end of the first wave of settlements.

### VII. Paralegals

The Barrack firm asks to be compensated for 225.2 paralegal hours.[39] I find the hours expended by the firm's paralegals can reasonably be said to have benefited the class as an ancillary service to the work done by the attorneys of the firm. Furthermore, I have determined a reasonable hourly rate for the paralegal time to be $25 an hour.

### VIII. Expenses

The Barrack firm seeks compensation for $75,079.65 in expenses. The firm has already been awarded 75% of these expenses or $56,310. After a careful review of the documentation supporting the firm's claim for costs and expenses, I have concluded that the following expenses should not be paid for by the class.[40]

---

**39.** This figure is not disputed by the class objectors.

**40.** Pretrial Order No. 143 states, "... expenses and costs incurred ... shall be accompanied by

copies of the original supporting documentation..." The firm's "travel expenses" reimbursement forms were often too inadequately documented to support a request for expense

1. $4,416 in office equipment and office space rental will not be reimbursed. The Barrack firm incurred this expense pursuant to their responsibilities as "trial headquarters". However, in light of the fact the Adler, Barish firm provided space for this purpose at no charge, and the Kohn firm also kept a complete set of documents necessary for trial at its office, it would be an imposition on the class to allow these expenses. Accordingly, they are disallowed, as unnecessary and duplicative.

2. $8,043.74 in office supply expenses will not be reimbursed. For the reasons noted above, any expenses incurred because of the trial headquarters designation will not be compensated.

3. $320.72 in archive expenses. These expenditures are disallowed because it is uncertain exactly what this cost represents. Assuming, arguendo, it involved document storage for trial, then it was unnecessary as the Adler, Barish firm and the Kohn firm were providing adequate space as a document depository.

4. $226.39 in "special secretarial services" also will be disallowed. This amount represents money paid to employees for whom the firm is being reimbursed at an hourly rate.[41]

5. $5,604.32 in travel expenses will not be reimbursed because of a lack of adequate documentation. The only support provided

was copies of checks made payable to the member of the firm requesting the reimbursement.[42] Often these intra-office expense vouchers did not even offer a description of how the expenditure was related to the class. Pretrial Order No. 143 required all expenses and costs incurred in connection with this litigation to be accompanied by copies of the original supporting documentation. The intra-office expense vouchers as submitted do not meet this requirement.

6. $175 in travel expenses must be disallowed. A check in this amount was made payable to Paul J. McMahon on 6/27/79. Again, there is no supporting explanation.

7. $3,884.09 in air fare and travel expenses must be disallowed as the hours for the work involving this travel were also disallowed or there were no entries in the time records which substantiated the expenses. Included in this total: $214 in air fare expense to Chicago incurred by Paul McMahon in a check disbursed to him on 6/26/78; $198 in air fare to Chicago for Gerald Rodos on a TWA bill paid by a check dated 7/24/79; $365 in expenses and $260 in air fare to Chicago incurred by Donald Keener on an intra-office expense voucher and a TWA bill dated 7/28/80; $205.41 in expenses and $496 in air fare to Los Angeles, California for Gerald Rodos in checks dated 9/12/79 and 8/23/79;[43] $298.94 in expenses

---

remuneration from the class. Of these forms submitted by the Barrack firm, many had no explanation of how the money was spent and many even lacked the location of where the expense was incurred. Furthermore, there were instances where checks were drafted and made payable to members of the firm for "148" [*Fine Paper*] expenses. Often the checks indicated "see stub for breakdown." This is exactly what Pretrial Order No. 143 required to be submitted to the court. Absent such documentation the expenses are disallowed.

**41.** Included in this total: $16.60 on 7/17/80, $52.53 on 7/23/80, $38.43 on 8/4/80, $11.01 on 10/10/80, and $35.82 on 9/26/80, all paid to Darlene E. Dawson; $50 on 9/20/79 to Herbert Newberg; and $22 on 10/27/79 to Wei Wei Chiu. Dawson and Chiu are paralegals whose time is being allowed on an hourly basis. Newberg is a partner.

**42.** The monthly breakdown of the total travel expenses disallowed because of inadequate documentation is as follows: $49.85 in 12/78, $130.96 in 2/78, $336.07 in 5/78, $15.00 in 4/78, $52.00 in 5/78, $67.65 in 6/78, $71.20 in 7/78, $32.50 in 3/79, $174.49 in 5/79, $427.48 in 6/79, $109.71 in 7/80, $281.32 in 7/79, $348.40 in 8/79, $196.69 in 9/79, $224.51 in 10/79, $103.64 in 11/79, $148.01 in 1/80, $37.00 in 2/80, $1,038.44 in 3/80, $675.60 in 4/80, $771.30 in 5/80, $56.55 in 6/80, $197.95 in 8/80, and $58.00 in 11/80.

**43.** I note in the fee petition of the Barrack firm it is claimed a trip was made to Los Angeles for discovery. However, there is nothing in the time sheets submitted which indicates Rodos was ever in Los Angeles. Absent a sufficient entry in the time records, I cannot make a determination as to whether the trip benefited the class. Accordingly, the expense is disallowed.

and $620 in air fare to Los Angeles for Paul J. McMahon in a check dated 9/12/79; [44] $257 in air fare to Chicago for Paul J. McMahon on a TWA bill paid by check dated 1/24/80; $121 in air fare to Chicago for Donald E. Keener on a TWA bill paid by a check dated 6/16/80; $132.75 in expenses and $252 in air fare to Chicago for Leonard Barrack without documentation paid in checks dated 8/15/80 and 8/26/80; and $463.99 in air fare to Chicago for Donald Keener on a TWA bill dated 9/26/80.

8. The following miscellaneous expenses totaling $326.39 are also disallowed: (a) $34 in train fare to Washington, D.C. on 5/16/79 for Paul McMahon as I find nothing in the time records to indicate he was in Washington in connection with *Fine Paper* on this date; (b) $63.83 paid to Paul McMahon in a check dated 7/27/79 for "148" [*Fine Paper*] expenses without documentation; (c) $51.63 for car rental expenses in Kansas City, Missouri by Paul McMahon on 10/26/79 as there was no indication in his time records that he was in Kansas City on this date; (d) $36.50 in train fare to Washington, D.C. for Paul McMahon on 10/26/79

as there was nothing in McMahon's time records to indicate he was in Washington on this date; (e) $24.36 paid to the Locust Club for "148" [*Fine Paper*] expenses in a check dated 7/28/80 without documentation; (f) $100 in travel expenses incurred by Leonard Barrack in Chicago in a check dated 8/8/80 without documentation; and (g) $16.07 billed to "148" [*Fine Paper*] expenses paid to "petty cash" in a check dated 11/12/80 without documentation.

The total expenses for which the Barrack firm is not compensated is $22,996.65. This means that of the total claimed expenses of $75,079.65, the Barrack firm will only be awarded $52,083. In light of the previous disbursement of $56,310 for expenses there has been an overpayment of $4,227 to the firm. Accordingly, I will deduct this amount from the final award.

## IX. Conclusion

The following represents my determination of the fees and expenses to which the Barrack firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Barrack | 722.63 | $50/100 | $ 66,563.00 | $ 73,413.00 | $351,894.63 |
| Rodos | 352.25 | $50 | $ 17,612.50 | $ 20,256.25 | $120,927.50 |
| McMahon | 577.00 | $50/85 | $ 31,238.75 | $ 32,895.00 | $156,765.00 |
| Newberg | 0 | – | 0 | 0 | $ 3,100.00 |
| Keener | 1840.64 | $50 | $ 92,032.00 | $ 92,032.00 | $336,610.25 |
| Bacine | 23 | $50 | $ 1,150.00 | $ 1,337.50 | $ 16,513.50 |
| Paralegals | 225.2 | $25 | $ 5,630.00 | $ 5,630.00 | $ 12,465.37 |
| Total | | | $214,226.25 | $225,563.75 | $998,276.25 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 75,079.65 |
| Amount Previously Distributed | $ 56,310.00 |
| Amount Outstanding | $ 18,769.65 |
| Amount Disallowed | $ 22,996.65 |
| Amount to be Returned to the Class | $ 4,227.00 |

**44.** These expenses are disallowed for the same reasons expenses were disallowed for Rodos. Furthermore, like Rodos' expenses, there was no documentation, *viz.,* a TWA air fare bill, receipts, etc., to support these claims.

TOTAL AWARD: ·

| | |
|---|---|
| Attorneys' Fees | $225,563.75 |
| Less: Amount of Previously Awarded Expenses to be Returned to the Class | $ 4,227.00 |
| Final Award | $221,336.75 |

## BARTSH AND McINTOSH [45]

Bartsh & McIntosh, a Minnesota law firm, became involved in this litigation as counsel for plaintiff Royal Stationery Co. in June of 1979. The firm participated in inspection of Hammermill, Kimberly-Clark, and Mead documents. The Bartsh firm also prepared for and took thirteen merchant depositions pursuant to Fed.R.Civ.P. 30(b)(6). Finally, the firm engaged in some trial preparation, viz., organization and coordination of merchant depositions and documents, and participated in obtaining immunity from prosecution for plaintiffs' witness James Nelson.

The firm seeks total compensation for its services in the amount of $95,212.75. This is based on requested hourly rates of $90–$125 an hour for Bartsh, $95 an hour for McIntosh, $50–$60 an hour for Tripp, $55 an hour for Schwebach, and $20–$25 an hour for all paralegals. The Bartsh firm also requests a multiplier of between 1.5 and 2.5 to be applied to certain categories of work performed by its members in Fine Paper. Finally, the Bartsh firm seeks reimbursement for $8,274.87 in expenses.

Before proceeding to the Lindy analysis, it should be noted that although the Kohn firm did not file an objection to the Bartsh fee petition, it objected to the participation of the firm in the litigation. See Class Objectors' E 755 and N.T., 4/5/82 at 1822–23.

I find it difficult to understand why the services of another firm were needed at this stage of the litigation, i.e., after a $30,000,000 settlement had already been reached and given the number of lawyers already involved. As should have been expected, the Bartsh participation resulted in more duplication and unnecessary expenses. For example, work assigned this firm involved extensive travel to locations where other firms active in this litigation were based, clearly a most inefficient method of operation. In addition, many of the firms already involved in the litigation were looking for work and had written co-lead counsel requesting assignments.[46] See Class Objectors' E 167, 168, 169 & 170. The participation of the Bartsh firm in Fine Paper under these circumstances is further evidence of the grossly inefficient utilization of lawyers' time.

### I. Thomas C. Bartsh

#### (A) Hours Expended

 Bartsh is a partner in the firm. He asks to be compensated for 186.3 hours of work. However, my analysis of the time sheets leads me to conclude that only 154 hours are compensable. I have disallowed the following:

---

**45.** Now Bartsh, McIntosh, Tripp & Wildfang, P.A.

**46.** The firms which requested work assignments but were never given any included: Litman, Litman, Harris & Specter; Greenfield & Schoen; Gene Mesh Co.; and Fine, Kaplan & Black. These firms are located in Pittsburgh, Philadelphia, Cincinnati and Philadelphia respectively. Ten of the depositions taken by the Bartsh firm were in East Coast cities, i.e., Richmond, Boston, New York and Washington, and any of the East Coast firms could have carried out the task. Similarly, the Bartsh firm took a deposition in Los Angeles, where one of the several California law firms could have been assigned to take these depositions. Bartsh testified that he specifically questioned Specks as to why the merchant deposition assignments were given to his firm when it involved running all over the country and Specks replied "everybody was busy with assignments .... they didn't have available personnel to do it." N.T., 4/5/82 at 1834.

1. 14.1 hours cannot be compensated because the entries are too vague. All of this time indicated Bartsh was in conference. While these entries sometimes indicated the parties with whom Bartsh was meeting, there was no adequate explanation of what was discussed.[47] These hours are disallowed since I cannot make a determination of benefit to the class.

2. 18.2 hours devoted to "Protection of plaintiffs' chief witness, James Nelson" must also be disallowed. I find this work to be of no benefit to the class. The work was performed solely for the benefit of Nelson and the Majority States and occurred after the final settlements.

The hours for which Bartsh will not be compensated total 32.3. The time for which Bartsh is compensated includes discovery work in connection with Mead, Hammermill and Kimberly-Clark. Bartsh will be allowed time charged to the preparation and depositions of paper merchants. Finally, Bartsh also will be compensated for trial preparation work, *viz.*, analyzing and coordinating merchant depositions and documents for trial. All this compensable work was done at the specific direction of Granvil I. Specks. *See* N.T., 4/5/82 at 1832–35.

## (B) Hourly Rate

Bartsh requests an hourly rate of $90 an hour for his work during 1979 and $125 an hour for his work during 1980. His compensable time consists primarily of the hours he expended in connection with the merchant deposition program. The thirteen depositions taken by Bartsh were not particularly long or complex. In addition, four of the depositions were of coarse paper, not fine paper, merchants. Another of the de-

ponents was a mill representative who never dealt directly with the defendant mills.

Bartsh's remaining efforts involved mostly document and microfilm inspection of defendant paper companies which were primarily the responsibility of other law firms participating in *Fine Paper*.[48]

It is evident that the services rendered by Bartsh were simple and routine. He accomplished nothing which could not have been done just as well by a junior partner or associate. Accordingly, I will allow $50 for this work.

## (C) Total Lodestar

154 hours $\times$ $50/hour = $7,700

## (D) Multiplier

The Bartsh firm has broken down its requested compensable services into one of five categories. Depending on where in the five categories the services rendered fall, a multiplier request of between 1.0 and 2.5 is sought. I have determined that no positive multiplier should be awarded to Bartsh's lodestar.

There was no contingency factor since a $30,000,000 settlement fund was in existence at the time the firm entered this litigation, thus eliminating the risk of nonpayment.

There will be no award of a positive multiplier for any quality factor. I find nothing in the work of Bartsh or any member of his firm which demonstrates the type of exceptional quality which warrants the award of a positive multiplier. On page 6 of their response to the Class Objectors' Report, Bartsh argues that the firm assumed a *de facto* leadership role in document discovery, merchant deposition coordi-

---

47. Entries disallowed because they were too vague included: 3.1 hours to "conference re: documents" on 9/20/79; 1 hour to "conference with Riordan" on 5/20/80; 1 hour to "conference with Riordan" on 5/23/80; 3.2 hours to "conference with Riordan before and after deposition" on 5/28/80; 1.5 hours to "conference with Riordan and ACM" on 7/3/80; 2 hours to "conference with Riordan; telephone conversation with Fink" on 7/10/80; and 1.1 hours to "conference—Austin and Riordan" on 6/25/79.

48. The Bartsh firm acted in good faith in inspecting these documents. Bartsh was directed to conduct these activities by co-lead counsel, Granvil I. Specks. After having been asked how the task of inspecting Hammermill documents was assigned to him, Bartsh testified, "I got a call from Mr. Granvil Specks requesting I call Mr. Leonard Barrack [Chairman of the Hammermill discovery subcommittee] in Philadelphia. . . ." N.T., 4/5/82 at 1832.

nation, and the Nelson discovery. There is no doubt the Bartsh firm carried out those assignments, but it was under the direct supervision of Specks.

The inspection by Bartsh and other members of his firm of the Hammermill, Kimberly-Clark and Mead documents and microfilm was done at the direction of Specks. The number of hours which the Bartsh firm devoted to inspection of these documents pales in light of the numerous hours which the firms of Barrack, Rodos & McMahon; Chestnut & Brooks; and Sachnoff, Schrager, Jones, Weaver & Rubenstein spent in discovery and document review of these same defendants.

I find insubstantial any contribution made by the Bartsh firm in coordinating and organizing in preparation for trial of any defendants' documents produced in discovery. Likewise, I see little benefit from the preparation of merchant deposition summaries. As already noted in this memorandum, there was an excessive amount of time spent in trial preparation by all the attorneys involved in *Fine Paper.* In light of this, I see little benefit from these additional activities of the Bartsh firm.

■ By and large, the Bartsh firm's limited involvement burdened the class with duplicative effort and the "fruits" of the firm's labors were run-of-the mill. Accordingly, Bartsh's work as well as the work of the other members of his firm do not warrant the award of a quality multiplier.

II. Andrew C. McIntosh

(A) Hours Expended

■ McIntosh is a partner in the firm. He asks to be compensated for 187.8 hours of work involved with *Fine Paper.* However, my analysis of his time records leads me to conclude that McIntosh can be compensated only for 168.55 hours. This is the only time which can reasonably be said to have at least marginally benefited the class. The hours of work which I have disallowed include:

1. 13.95 hours cannot be compensated because the entries are too vague. All of the

time disallowed because of vagueness included hours devoted to correspondence, conference, and telephone conversation. Simply listing who attended the meeting, with whom one was speaking, or to whom a letter is written is insufficient without an adequate explanation of either what was discussed or the subject matter addressed. Accordingly, the time is disallowed since I cannot make a determination of benefit to the class.

2. 5.3 hours devoted to "Protection of plaintiffs' Chief witness, James Nelson" must be disallowed. These hours are disallowed for the reasons I disallowed the same hours of work for Bartsh.

The total number of hours for which McIntosh is not compensated is 19.25. The remaining 168.55 hours of compensation which McIntosh seeks I will allow. McIntosh is compensated for his merchant deposition work and minor trial preparation work.

(B) Hourly Rate

■ McIntosh requests an hourly rate of $95 an hour for all of his work in this litigation. I find a reasonable rate of compensation for McIntosh's work to be $50 an hour. McIntosh's compensable time consists mostly of his merchant deposition work. As previously noted in both Bartsh's hourly rate and multiplier analysis, I do not find this deposition work particularly complex. I also do not find the merchant deposition and discovery work to be especially beneficial to the class. Accordingly, I will allow this hourly rate for all but 10 of the total 168.55 hours of compensation I have awarded McIntosh. The remaining 10 hours, involving time spent locating missing deposition transcripts, will only be compensated at $25 an hour. A task such as this does not warrant compensation at an attorney's rate; rather, this task could have been performed by a paralegal at the rate noted.

(C) Total Lodestar

158.55 hours × $50/hour = $7,927.50
10.00 hours × $25/hour = $ 250.00

## (D) Multiplier

An award of a positive multiplier to McIntosh's lodestar is not warranted for the same reasons it was not awarded to Bartsh.

## III. M. Joanne Schwebach

### (A) Hours Expended

 Schwebach is an associate with the firm. The firm seeks compensation for 27.5 hours of her work. I have concluded that Schwebach is not entitled to be compensated for any of her time charged to this litigation.

Schwebach's time charges related to a document discovery and inspection of Hammermill, Kimberly-Clark, and Mead. Other law firms were primarily responsible for this work and I fail to see how Schwebach's 26.1 hours of further "review" and 1.4 hours of travel aided these efforts.

## IV. Samuel C. Tripp

### (A) Hours Expended

Tripp is an associate for whom the firm seeks compensation for 59.2 hours of work. 31.8 hours will be approved. I have disallowed 27.4 hours because the entries are too vague. This total is made up of "conference" and "review" entries which do not permit the court to make a determination of benefit to the class.[49]

The 31.8 hours of work for which Tripp is compensated includes his discovery services, merchant deposition work, and some minor trial preparation efforts.

### (B) Hourly Rate

I will allow an hourly rate of compensation for Tripp's services of $50. I find this rate to be reasonable for the reasons I awarded the same rate to Bartsh and McIntosh.

### (C) Total Lodestar

31.8 hours $\times$ $50/hour = $1,590

### (D) Multiplier

No multiplier will be awarded to Tripp's lodestar for the same reasons I did not award a multiplier to Bartsh or McIntosh.

## V. Paralegals

The Bartsh firm seeks compensation for 15 hours of paralegal time.[50] I will allow the firm to be compensated for this time. I find the services rendered by the paralegals reasonably related to that work already accomplished and compensated by the attorneys of the firm. Furthermore, I will award the firm its requested hourly rates of $20 and $25 for 1979 and 1980 paralegal time. I find these rate requests reasonable.

## VI. Expenses

 The Bartsh firm seeks reimbursement for $8,274.87 in expenses. The firm has already been awarded 75% of these expenses or $6,206. After a careful review of the documentation supporting the firm's claim for costs and expenses, I have concluded the following expenses should not be paid by the class:

1. $53.50 billed to "beverages" and $35.78 billed to "miscellaneous" on Bartsh's bill at the Beverly Wilshire Hotel on May 12–13, 1980. Bartsh lodged here while taking a deposition in Los Angeles. I find these charges to be excessive given the insufficient headings under which they were billed. Accordingly, I fail to see the benefit to the class from these expenses and they will not be compensated.

2. $456.97 of the $913.94 which, in addition to the above expenses, was billed as travel expenses for the Los Angeles trip of Bartsh.

---

**49.** Entries disallowed as too vague included: 8 hours to "review microfilm" on 9/20/79; .6 hour to "telephone conference with Don Keener, Philadelphia" on 10/5/79; .5 hour to "library research, conversation with paralegal from Austin's office" on 9/21/79; 6 hours to "telephone conference with Don Keener; re-view tapes" on 10/12/79; 6.3 hours to "conference with Riordan; review documents" on 11/21/79; and 6 hours to "review documents" on 12/3/79.

**50.** This figure is not disputed by the class objectors.

Considering the nature of the one deposition which Bartsh took on this trip, I find this sum, which principally resulted from Bartsh's first class air fare and $125 a night accommodations, excessive. Accordingly, I have reduced the expenses for this trip by one-half as noted.

The total expenses for which the Bartsh firm is not compensated is $546.25. I will deduct this amount from the remaining $2,068.87 yet to be awarded to the firm. Accordingly, the final expenses to be awarded the Bartsh firm are $1,522.62.

## VII. Conclusion

The following represents my determination of the fees and expenses to which the Bartsh firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Bartsh | 154 | $50 | $ 7,700.00 | $ 7,700.00 | $48,755.75 |
| McIntosh | 168.55 | $25/50 | $ 8,177.50 | $ 8,177.50 | $38,118.75 |
| Schwebach | 0 | 0 | 0 | 0 | $ 2,268.75 |
| Tripp | 31 | $50 | $ 1,590.00 | $ 1,590.00 | $ 5,687.00 |
| Paralegals | 15.6 | $20/25 | $ 382.50 | $ 382.50 | $ 382.50 |
| Total | | | $17,850.00 | $17,850.00 | $95,212.75 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 8,274.87 |
| Amount Previously Distributed | $ 6,206.00 |
| Amount Outstanding | $ 2,068.87 |
| Amount Disallowed | $ 546.25 |
| Final Expense Award Not Yet Disbursed | $ 1,522.62 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $17,467.50 |
| Paralegal Fees | $ 382.50 |
| | $17,850.00 |
| Expenses | $ 1,522.62 |
| | $19,372.62 |

## BERGER & MONTAGUE

The Berger firm, located in Philadelphia, entered this litigation early in 1978 as counsel of record for the Archdiocese of Philadelphia.[51] At the initial organizational meeting of plaintiffs' counsel, H. Laddie Montague was elected to the Executive Committee. Montague was also made one of two co-chairmen (under Chairman Joseph Cotchett) of the Rule 37 Subcommittee. The firm was assigned joint responsibility with Litman, Litman, Harris & Specter for the discovery of defendant Union Camp.[52] According to its fee petition, the firm also assisted Barrack, Rodos & McMahon in ana-

51. Berger & Montague has an oral contingent fee agreement with the Archdiocese. In its fee petition, the firm asserts that it intends to waive its fee with the Archdiocese and accept the fee awarded by the court. Fee Petition, Docket Entry No. 3250, at 3. I have taken this into consideration in my review of the firm's computer time records.

52. A comparison of the fee petitions of the Berger and Litman firms reveals that the Litman firm played only a minor role in Union Camp discovery. *See* my discussion of the Litman firm's fee request, *infra.*

lyzing documents produced by defendant Hammermill Corp.

After the July 23, 1980 Executive Committee meeting in Chicago when it had become apparent that the pricing analysis done by the Sloan & Connelly firm could not be used to support a damage theory at trial, co-lead counsel Harold Kohn asked the Berger firm to assist Kohn's firm in preparing the case on damages.[53] *See* letter from Berger to Kohn, August 18, 1980, Class Objectors' E 448–454. Two economic experts and the accounting firm of Peat, Marwick were hired, and the Berger and Kohn firms set about doing what, as Berger saw it, the Chicago firms "were supposed, but failed to do." Letter to Kohn, August 19, 1980, Class Objectors' E 455. Pursuant to Pretrial Order No. 115, the Sloan firm sent Kohn a complete set of the pricing documents (some 18,000 sheets) it had collected from the discovery subcommittees.[54] For the two months before the scheduled September 22 trial, the Chicago and Philadelphia groups, each with their own economic experts, engaged in separate, uncooperative, and even hostile efforts to develop a damage theory.[55]

I will defer my discussion of work by the other firms on the damage studies until I consider their respective fee petitions. I have determined that, unless otherwise disallowed, time spent by the Berger firm on developing a damage theory is compensable. When Kohn asked the Berger firm to take up the matter, the plaintiffs were two months from trial and had essentially no case to present on damages. As late as August 14, 1980, according to Berger, Perry Goldberg of the Chicago group had stated that "the case was in a settlement posture only and that the plaintiffs could not go to trial on [the] basis of the present damage case." Letter from Berger to Kohn, August 18, 1980, Class Objectors' E 453. I find that the work by the Berger firm to prepare the case on damages was done at the request of one of the co-lead counsel at a time when the interests of the class required that some action be taken to insure that this important element of plaintiffs' case be adequately developed in time for trial. It may well be that the Berger firm's involvement in this matter resulted, in part, from the battle between Kohn and Specks for control of the case, but I am

**53.** For a more complete discussion of the Sloan firm's work on price analysis, see the section of this memorandum dealing with the fee request of Sloan & Connelly.

**54.** Kohn sought the court order because his request to James Sloan that the latter send him the pricing sheets, Letter to Sloan, July 24, 1980, Class Objectors' E 459, went unheeded. Such infighting among plaintiffs' counsel is a disservice to the class they represent.

**55.** In a letter to Kohn on August 18, 1980, Berger reported that discussions between the Berger and Specks offices on August 8 "indicated that Chicago counsel, at the time, were totally unwilling to cooperate in any fashion with Philadelphia counsel in preparation of the damage case. Gig Specks exhibited an extremely hostile attitude in particular, and stated that under no circumstances would he undertake to cooperate or even talk with Philadelphia counsel." Class Objectors' E 448–454 at 450. There followed a cooling off period and the scheduling of a meeting to try and coordinate the efforts of the two groups, but a separate battle between Kohn and Specks over the content of the trial brief cancelled the meeting

and led Perry Goldberg, according to the same Berger letter, to assert that "no further cooperation between Philadelphia and Chicago was possible while you [Kohn] were lead counsel in this case, that he was bowing out of any further involvement in *Fine Paper,* and that he recommended the Berger firm follow the same course or risk inevitable retaliation by Chicago firms in this case in the future." *Id.* at E 453. The whole episode prompted Berger to conclude that the "Chicago firms are at 'war' with you [Kohn] and cooperation in this matter has completely broken down." *Id.* at E 454.

From Chicago, the situation looked different. In a letter dated August 21, 1982, Specks took Kohn's office to task for, among other things, proceeding "on a frolic of its own" with the 18,000 price sheets Kohn had obtained by court order from Sloan & Connelly. Letter from Specks to Kohn, Class Objectors' E 647–650 at 649. Specks concluded, with reference to the continuing rift over the damages issue and the trial brief, "Your irresponsible and counter-productive actions and continuing failure and refusal to cooperate with other members of the trial team and to abide by the decisions of Plaintiffs' Executive Committee cannot be tolerated." *Id.* at 650.

satisfied that the Berger firm acted in the best interests of the class.

■ I am, however, faced with another issue that must be addressed before I proceed with the *Lindy* analysis of the Berger firm's fee petition. The firm has submitted computer print-outs of the daily time records of each attorney. Class objectors rightly point out that the descriptions contained in these computer records are extremely vague.[56] Class Objectors' Report at 242–243. As Judge Freeman said in *Armored Car*:

> Working hours identified in only vague and meaningless terms, such as "general," "miscellaneous," or "special services," should not be charged to an involuntary class of claimants. *In re Sugar Industry Antitrust Litigation,* slip. op. at 28. Indefinite documentation might be acceptable in the understandings developed over years of extended lawyer-client relationships but may not be allowed under the equitable fund theory of this nationwide class action.

*In re Armored Car Antitrust Litigation,* 472 F.Supp. at 1387. The use of standardized time categories may be sufficient for the purpose of preparing a bill for a client, but absent class members do not have contact with the lawyers representing their interests and cannot keep track of what the attorneys are doing or ask them to explain the "bill" (fee petition) when the work is completed. Attorneys with extensive experience in class actions should realize that these vague categories do not lend themselves to the *Lindy* analysis that the courts

of this circuit are required to perform before granting attorneys' fees.

I do, however, recognize the practical value of a computerized time system, and I am aware that Pretrial Order 143 (as modified by Pretrial Order 147) expressly permitted the submission of computer time records. Furthermore, I recognize the limitations of computer systems with their ever-present pressure for concise input and output. Nevertheless, I would not be justified, under *Lindy,* if I awarded fees based solely on such records. Standing alone they are inadequate.

■ The information that Pretrial Order 143 required to be included in the fee petitions as well as the opportunity each firm had to participate in the evidentiary hearings provided additional ways for firms to "explain their bill". In my analysis of the fee petitions of firms who submitted computer records,[57] I have been particularly careful not to disallow time if it could be supported by information contained elsewhere in the record (e.g. narrative summaries of work done which are attested to by affidavit, the firm's response to the class objectors, monthly summaries, or other documents in the record). Nothing will save an entry of "miscellaneous" or "pretrial" or "telephone", but I have only disallowed time for vagueness if there is *no* basis for a determination of any possible benefit to the class.

The Berger firm chose not to participate in the evidentiary hearings, but its fee petition contains a lengthy discussion of the

---

**56.** The method of computerized time-keeping used by the firm requires each attorney to describe his/her work by making combinations of up to three standardized activity codes. There are some 96 categories available covering all areas of the firm's practice. For example, two hours on one day might be described as "PRE–TRIAL FILE STRATEGY CONFERENCE" or "DISCOVERY PREPARATION MISCELLANEOUS". In its response to the class objectors, the Berger firm explains that it did not provide the daily written time sheets because they contain descriptions of work in other cases. Response of Berger & Montague, Docket Entry No. 3582, at 2. Although other firms have submitted time sheets that include

entries for other cases, I note that the sample daily time sheet attached to the Berger firm's response is geared toward the computerized category system. The form provides space for additional description, but the attorney is limited to only 25 characters and given a choice of whether or not the additional comments are to be printed by the computer. The written time sheets would not have improved matters very much.

**57.** These firms are: Berger & Montague; Kleinman, Steinberg & Lapuk; and Wolf, Block, Schorr & Solis-Cohen. None of these firms participated in the evidentiary hearings.

firm's contributions to the litigation as well as what work was done by those attorneys with significant involvement in the case. With the aid of these narrative summaries and additional information gleaned from the firm's response to the class objectors and from the exhibits to the Class Objectors' Report itself, I have been able to perform the required analysis of the submitted time records.

The Berger firm requests an award of $266,100.50 in attorneys' fees (including a multiplier of 2 for each attorney, paralegal, and law clerk) and $43,402.18 in expenses. The firm devoted a total of 2446.75 hours to the litigation.

## I. David Berger

### (A) Hours Expended

 This senior attorney devoted 47.5 hours to *Fine Paper*. Over 40 of these hours were expended after the firm began work on developing a damage theory. Berger participated in three Executive Committee meetings, but the fee petition has little to say about the nature of his other activities apart from the vague computer entries. A total of 26.75 hours (exclusive of compensable Executive Committee time) was expended between 7/23/80 and 9/22/80, the period in which the firm worked on the damage issue. Although there is little to suggest that Berger's involvement in the damage study was more than supervisory, I will compensate him for this time. I can find no basis apart from the inadequate computer entries to compensate the remaining 11.25 hours. Examples of such entries are "PRE–TRIAL REVIEW"; and "CONFERENCE TELEPHONE REVIEW". This time will be disallowed leaving Berger with 36.25 compensable hours.

### (B) Hourly Rate

To be consistent with the hourly rate awarded other senior attorneys for similar work, I will compensate Berger at an hourly rate of $100.

### (C) Total Lodestar

36.25 hours × $100/hour = $3625

### (D) Multiplier

Berger's efforts were not of such an unusually high degree of skill to merit a quality multiplier. Moreover, since all of his compensable time was expended after the first wave of settlements, I will not apply any contingency multiplier.

## II. H. Laddie Montague

### (A) Hours Expended

Montague devoted 102.75 hours to the case. He represented the firm on the Executive Committee (although in the latter stages of the case, David Berger attended the meetings in his place) and the Rule 37 Subcommittee. Montague also directed the discovery of defendant Union Camp. I have determined that the following hours must be disallowed:

1. 3.5 hours for attendance at the April 19, 1978 pretrial conference. The class was adequately represented by co-lead counsel at this conference.

2. 12.5 hours for which I can find no basis for a determination of any benefit to the class apart from the inadequate computer entries.

3. .5 hours devoted to the fee petition.

With the disallowance of the above 16.5 hours, Montague is left with 86.25 compensable hours.

### (B) Hourly Rate

To be consistent with the hourly rate awarded other senior attorneys for similar work, I will compensate Montague at an hourly rate of $100 subject to modification in one area. As explained in the Guidelines, time spent on class certification discovery will be compensated at $50/hour. Montague spent 15 hours on matters relating to the deposition of the firm's client.

### (C) Total Lodestar

71.25 hours × $100/hour = $7125
15 hours × $ 50/hour = $ 750

(D) Multiplier

Montague's work was not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 71 compensable hours expended prior to the end of the first wave of settlements.

III. Merrill Davidoff

(A) Hours Expended

Davidoff spent 71.25 hours on *Fine Paper* matters. The firm's fee petition explains Davidoff's contributions to the litigation only in connection with the damage study. I will, therefore, compensate him for the 26.5 hours expended between 7/23/80 and 9/22/80. For the remaining 44.75 hours, I have nowhere to look but the computer time sheets. Of this time I will compensate the 8 hours spent preparing and making arrangements for the depositions of Union Camp employees but I disallow:

1. 2 hours for attendance at the 3/7/79 pretrial conference. The class was adequately represented by co-lead counsel at this conference.

2. The remaining 34.75 hours for which I can find no basis for making a determination of any benefit to the class apart from the inadequate computer entries. Examples of such entries include: "MEETING REVIEW FILE REVIEW"; "CONFERENCE FILE STRATEGY"; and "TELEPHONE CORRESPONDENCE."

With the disallowance of the above 36.75 hours, Davidoff is left with 34.5 compensable hours.

(B) Hourly Rate

I find that $50/hour is a reasonable rate for the work done by Davidoff. As far as I can determine, it consisted primarily of associate-level tasks (preparing for depositions, attending in-house conferences on the damage study). There certainly is no basis for a higher hourly rate in the time sheets.

(C) Total Lodestar

34.5 hours × $50/hour = $1725

(D) Multiplier

I will not apply any multiplier to Davidoff's time because the work—to the extent I can determine its substance—was not of such an unusually high degree of skill to merit a quality multiplier. Moreover, since all the compensable time was expended after the first wave of settlements, I will not apply any contingency multiplier.

IV. Sherrie Savett

(A) Hours Expended

Savett devoted 57.5 hours to this litigation. The fee petition indicates that she spent most of her time working on the damage study. Savett and Daniel Berger worked with the economic experts hired by the firm to analyze the price sheets and to serve as possible expert witnesses at trial. I will compensate Savett for the 53 hours spent on this matter, but I can find no basis apart from the inadequate computer records for determining whether the remaining 4.5 hours benefited the class. These hours will be disallowed.

(B) Hourly Rate

I find that $50/hour is a reasonable rate for the work done by Savett. As far as I can determine, it consisted primarily of associate-level tasks. There clearly is no basis for a higher hourly rate in the time sheets.

(C) Total Lodestar

53 hours × $50/hour = $2650

(D) Multiplier

I will not apply any multiplier to Savett's time for the reasons stated above in the discussion of Merrill Davidoff's fee request.

V. Daniel Berger

(A) Hours Expended

Daniel Berger spent 156.75 hours working on *Fine Paper*. Nearly all of this time was devoted to the damage study. I will compensate him for the 143.5 hours logged between 7/23/80 and 9/22/80, but I can find

no basis apart from the inadequate computer records for a determination of whether the remaining 13.25 hours benefited the class. This time will be disallowed.

(B) Hourly Rate

I find that $50/hour is a reasonable rate for the work done by Daniel Berger. As far as I can determine, it consisted of associate-level tasks. There certainly is no basis for a higher hourly rate in the time sheets.

(C) Total Lodestar

143.5 hours × $50/hour = $7175

(D) Multiplier

I will not apply any multiplier to Berger's time for the reasons stated above in the discussion of Merrill Davidoff's fee request.

VI. Roger Bernstein

(A) Hours Expended

This attorney devoted 205 hours to the case. He worked on drafting the complaint, Rule 37 Subcommittee matters, and the discovery of both the client and defendant Union Camp. Bernstein took the depositions of two Union Camp employees and attended the defendant's document production sessions in New York and Virginia. I have determined that the following hours must be disallowed:

1. 57.5 hours for which I can find no basis for a determination of any possible benefit to the class apart from the inadequate computer entries. Examples of such entries are: "PRETRIAL REVIEW"; "DISCOVERY TELEPHONE"; and "CLASS ACTION DISCOVERY PREPARATION."

2. 3.25 hours for attendance at the 4/19/78 and 6/14/78 pretrial conferences. The class was adequately represented by co-lead counsel at these conferences.

3. 5 hours spent on matters related to attorneys' fees and the fee petition.

With the disallowance of the above 65.75 hours, Bernstein is left with 139.25 compensable hours.

(B) Hourly Rate

I find that $50/hour is a reasonable rate for the work done by Bernstein. Most of his work consisted of discovery-related matters (class action interrogatories, taking depositions, reviewing documents) justifying compensation at an associate-level rate.

(C) Total Lodestar

139.25 hours × $50/hour = $6962.50

(D) Multiplier

Bernstein's work was not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 86.75 compensable hours expended before the end of the first wave of settlements.

VII. Joan Zubras

Zubras spent 470.25 hours on *Fine Paper*. She worked on the discovery of the client and defendant Union Camp as well as Rule 37 matters and the damage study.

Unfortunately, although the firm's fee petition gives some indication of the nature of Zubras' work, many of her computer entries are so vague that I cannot tell whether or not the work was of the type described in the fee petition. For example, a total of 85.25 hours are described only as "REVIEW". Many others indicate only "PREPARATION" or "TELEPHONE". A total of 214.5 hours are described in a manner that I find unnecessarily vague even for computer records. These entries are too numerous to justify full compensation. Accordingly, I will disallow half of the time (107.25 hours).

Zubras spent 8.25 hours working on the fee petition. This time must also be disallowed, leaving her with 354.75 compensable hours.

(B) Hourly Rate

I find that $50/hour is a reasonable rate for the work done by Zubras. As far as I can determine, it consisted of associate-level

tasks. There certainly is no basis for a higher rate in the time sheets.

**(C) Total Lodestar**

354.75 hours × $50/hour = $17,737.50

**(D) Multiplier**

I will not apply any multiplier to Zubras' time for the reasons stated above in the discussion of Merrill Davidoff's fee request.

## VIII. Other Attorneys and Law Clerk

The firm seeks compensation for the time of seven other attorneys and one summer law clerk, none of whom spent more than 5 hours on the case.[58] I have determined that only Russell Henkin's time (3.75 hours) is compensable. The fee petition says nothing about what any of these individuals did. Only Henkin's time entries (drafting requests for discovery) provide any basis for determining whether the work benefited the class. The other attorneys' time is variously described as "PREPARATION CONFERENCE"; "REVIEW"; "PRE–TRIAL MEETING FILE REVIEW"; "TELEPHONE"; etc. In view of their minimal involvement in the litigation, I cannot justify charging the class for time that is not described more precisely. The law clerk's time is disallowed because he merely attended the 6/14/78 pretrial conference.

I will compensate Henkin's time at $50/hour. No multiplier will be applied since the work was not of the type to justify a quality multiplier and was done after the first wave of settlements.

## IX. Paralegals

■ The firm employed 11 paralegals who devoted a total of 1318.25 hours to *Fine Paper*. Nearly all of this time was spent on document analysis in connection with class certification discovery, the discovery of Union Camp and Hammermill, the damage study, and preparation for expert testimony. I find that all of this time is compensable at $25/hour. No multiplier is applied to paralegal time.

## X. Expenses

The firm seeks reimbursement of $43,402.18 in expenses. It has already received 75% of this figure ($32,551). I find the requested expenses to be reasonable and will therefore allow reimbursement of the outstanding $10,851.18.

## XI. Conclusion

The following is my determination of the fees and expenses to which the Berger firm is entitled under *Lindy*:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| David Berger | 36.25 | $100 | $ 3,625.00 | $ 3,625.00 | $ 24,230.00 |
| Montague | 86.25 | $50/100 | $ 7,875.00 | $11,050.00 | $ 30,862.50 |
| Davidoff | 34.5 | $50 | $ 1,725.00 | $ 1,725.00 | $ 15,272.50 |
| Savett | 53 | $50 | $ 2,650.00 | $ 2,650.00 | $ 11,410.00 |
| Daniel Berger | 143.5 | $50 | $ 7,175.00 | $ 7,175.00 | $ 29,055.00 |
| Bernstein | 139.25 | $50 | $ 6,962.50 | $ 9,131.25 | $ 24,417.50 |
| Zubras | 354.75 | $50 | $17,737.50 | $17,737.50 | $ 56,142.50 |
| Henkin | 3.75 | $50 | $ 187.50 | $ 187.50 | $ 637.50 |
| Paralegals | 1318.25 | $25 | $32,956.25 | $32,956.25 | $ 72,092.00 |
| Total | | | $80,892.75 | $86,237.50 | $266,100.50 [59] |

**58.** The attorneys are: Harold Berger (2.75 hours); Robert Balter (1 hour); Russell Henkin (3.75 hours); Howard Langer (3 hours); Richard Eppinger (3 hours); Denise Colliers (.5 hours); and Jay Stiefel (2.5 hours). The summer law clerk is J. Eiseman (1 hour).

**59.** The firm's "Total Requested" figure of $266,100.50 includes the amount requested for the six attorneys and one law clerk whose time has been disallowed entirely.

Expenses:

| | |
|---|---|
| Amount Requested | $43,402.18 |
| Amount Previously Distributed | $32,551.00 |
| Amount Outstanding | $10,851.18 |
| Amount Disallowed | 0 |
| Amount to be Distributed | $10,851.18 |

TOTAL AWARD

| | |
|---|---|
| Attorneys' Fees | $86,237.50 |
| Expenses | $10,851.18 |
| Final Award | $97,088.68 |

---

## CHESTNUT & BROOKS

Chestnut & Brooks, a Minnesota law firm, entered the *Fine Paper* litigation on February 17, 1978 as counsel of record for plaintiffs Artcraft Press, Inc. and Prompt Printing, Inc. The firm was assigned joint responsibility with the Illinois Attorney General's Office for discovery of defendant Kimberly-Clark Corporation. Chestnut & Brooks was also put in charge of the Rule 30(b)(6) Merchant Discovery Program and was lead counsel for ten merchant depositions. Other contributions to the litigation included Industrial Analysis Committee work, providing office space and supportive assistance for the James Nelson deposition, and arranging a settlement conference with defendant Wausau Paper Mills Co. The firm seeks an award of $262,268.75 in fees for 2447.7 hours of work and reimbursement of $36,434.21 in expenses.

### I. Jack Chestnut

#### (A) Hours Expended

Jack Chestnut, the firm's president, was co-chairman of the Kimberly-Clark discovery subcommittee and chairman of the Rule 30(b)(6) merchant discovery subcommittee. Many of his 177.7 hours were devoted to supervision and coordination of these programs. In addition, he argued against the Minneapolis merchants' motion to quash the subpoena served on them and participated in settlement negotiations with Wausau Paper Mills Co.

After a careful review of Chestnut's time records, I conclude that the following time must be disallowed:

1. 24.3 hours are supported by entries which are either illegible or too vague to provide any basis for determining if the time spent was of any benefit to the class. Many entries simply give the name of another plaintiffs' counsel and indicate that a meeting or telephone call occurred.

2. 7 hours spent preparing for and attending the April 19, 1978 pretrial conference in Philadelphia. The class was adequately represented by co-lead counsel at this conference.

3. 2.9 hours for Industrial Analysis Committee work. As stated in the Guidelines, I find that this work was of no benefit to the class.

4. 13.1 hours devoted to "read and review" of matters that were not Chestnut & Brooks' responsibility. Since he was not a member of the Executive Committee, Chestnut will not be permitted to charge the class for time spent reading plaintiffs' counsel status reports or reviewing settlement agreements between the states and the defendants.

5. 10.8 hours spent on the fee petition.

**(B) Hourly Rate**

Chestnut & Brooks asks for a rate of $150–175/hour for Chestnut. However, to be consistent with the fees awarded to other attorneys of similar experience and ability for similar work, Chestnut's time will be compensated at $100/hour.

**(C) Total Lodestar**

119.6 hours × $100/hour = $11,960

**(D) Multiplier**

Although Chestnut headed two subcommittees, his role in the litigation was primarily ministerial. His substantive efforts (e.g. arguing against motion to quash), although quite capable, did not exhibit such an unusually high degree of skill to merit a quality multiplier. I will, however, allow Chestnut a 1.5 contingency multiplier for the 21.6 compensable hours expended before the end of the first wave of settlements.

**II. Thomas Malone**

**(A) Hours Expended**

Malone, an associate, devoted 533 hours to the litigation. He spent many hours reviewing Kimberly-Clark documents and was lead counsel at the two depositions of Kimberly-Clark employees. Malone also took several paper merchant depositions as part of the 30(b)(6) program. I find that all of Malone's time is compensable except:

1. 31.8 hours which are supported by entries that are too vague to permit any determination of whether the time benefited the class.

2. 4.5 hours spent reading and reviewing material for which Chestnut & Brooks had no responsibility.

3. 5 hours spent attending the Nelson deposition. This time was duplicative and of no benefit to the class.

**(B) Hourly Rate**

Malone asks for $55–65/hour for his time. I find that $50/hour is a fair and reasonable compensation for this associate-level work.

**(C) Total Lodestar**

491.7 hours × $50/hour = $24,585

**(D) Multiplier**

Malone seeks a multiplier of 1.75. Because he was not in a position of leadership and spent most of his time on associate-level discovery work (e.g. reviewing documents, preparing for and taking depositions), he does not merit a quality multiplier. Furthermore, since all of Malone's time was logged after the first wave of settlements, I will not apply any contingency multiplier.

**III. Floyd Boline**

**(A) Hours Expended**

Boline was a partner in the firm until March 1980. He spent 308.3 hours working on *Fine Paper*. The time records show that Boline prepared pleadings, answered defendants' interrogatories, participated in Kimberly-Clark discovery, attended Discovery Committee meetings, and did Industrial Analysis Committee work. I find that the following time is not compensable:

1. 16.1 hours supported by entries too vague to permit a determination of whether or not the time benefited the class. Most of this time was comprised of small fractions of an hour devoted to "review of new correspondence".

2. 26.5 hours devoted to reviewing settlement agreements, reading new complaints, and reviewing the discovery of other defendants. Chestnut & Brooks was not responsible for these matters and Boline (not a member of the Executive Committee) may not charge the class for this time.

3. 37.8 hours spent on Industrial Analysis Committee work. As explained in the Guidelines, I find that this work did not benefit the class.

4. 3.5 hours spent on the fee petition.

**(B) Hourly Rate**

Boline requests $150/hour for his time. An examination of his records reveals that

he spent a good deal of time answering interrogatories, reviewing defendants' answers to interrogatories and reviewing documents. Accordingly, I will award Boline $50/hour for the 90.3 hours he spent doing associate-level work. The remaining 134.1 compensable hours will be paid at $100/hour.

### (C) Total Lodestar

134.1 hours × $100/hour = $13,410
90.3 hours × $ 50/hour = $ 4,515

### (D) Multiplier

I find that Boline's work was not of such unusually high skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 105 compensable hours expended before the end of the first wave of settlements.

## IV. Michael Burns

### (A) Hours Expended

Burns devoted 99.7 hours to this litigation. His efforts consisted primarily of reviewing and annotating Kimberly-Clark documents and participating in one of the merit depositions. I find that all of this time is compensable.

### (B) Hourly Rate

Since nearly all of Burns' time was spent reviewing documents, I find that an hourly rate of $50 is reasonable for his services.

### (C) Total Lodestar

99.7 hours × $50/hour = $4,985

### (D) Multiplier

I will not apply any multiplier to Burns' lodestar since the nature of the work does not suggest that a quality adjustment is justified. Moreover, all of his time was logged after January 1979 so there is no contingency factor to be considered.

## V. Karl Cambronne

### (A) Hours Expended

Cambronne spent 46.1 hours on *Fine Paper* matters. He attended the deposition of Chestnut & Brooks' client Prompt Printing, Inc., worked on the response to the merchants' motion to quash the subpoena, and participated in the deposition of a Kimberly-Clark employee. I find that all of this time is compensable.

### (B) Hourly Rate

Cambronne requests an hourly rate of $85. However, to be consistent with the rates awarded for similar associate-level work, I find that $50/hour is fair compensation.

### (C) Total Lodestar

46.1 hours × $50/hour = $2,305

### (D) Multiplier

Cambronne's work was not of such unusually high skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 13 hours expended before the end of the first wave of settlements.

## VI. Thomas Stringer

### (A) Hours Expended

Stringer devoted 8.6 hours to conferences with clients and the drafting of pleadings. I find that all but .9 hours are compensable. The disallowed time is supported by entries that are too vague to permit a determination of any benefit to the class.

### (B) Hourly Rate

The nature of these activities does not warrant the hourly rate of $100 that Stringer requests. A rate of $50/hour is fair and reasonable for such services.

### (C) Total Lodestar

7.7 hours × $50/hours = $385

**(D) Multiplier**

Stringer's minimal role in the litigation does not merit a quality multiplier. Indeed, Chestnut & Brooks does not ask for one. I will, however, apply a 1.5 contingency multiplier to Stringer's lodestar since all of his time was expended before January 1979.

**VII. Joseph Burkard**

**(A) Hours Expended**

Burkard, a partner in the firm, spent 2.5 hours very early in the litigation. Most of this time was in a conference relating to the original pleadings filed by Chestnut & Brooks. I find that all of this time is compensable.

**(B) Hourly Rate**

▮ Although he is a partner in the firm, Burkard's involvement in this litigation was minimal. It does not merit the hourly rate of $150 he requests. Accordingly, Burkard will be compensated at a rate of $50/hour.

**(C) Total Lodestar**

2.5 hours $\times$ $50/hour = $125

**(D) Multiplier**

No quality multiplier is warranted here. To be consistent, however, I will apply a 1.5 contingency multiplier to Burkard's time since it was expended before the end of the first wave of settlements in January 1979.

**VIII. Paralegals**

Two paralegals worked on *Fine Paper* matters. Gayle Wahl spent 1196.8 hours and Gary Peterson spent 62.7 hours on the case. I find that all of this time is compensable except the time devoted to the fee petition. Accordingly, I will disallow 84 hours of Wahl's time and 28.1 hours of Peterson's time. The remaining time will be compensated at an hourly rate of $25. No multiplier is applied to paralegal time.

**IX. Bradley Johnson**

▮ Johnson, a college student at the time, worked a total of 12.3 hours. He obtained subpoenas, prepared notices of deposition for distribution to process servers, and filed the notices with the court. Chestnut & Brooks asks that he be compensated at a rate of $20/hour, but I find that an hourly rate of $10 is fair and reasonable for such services.

**X. Expenses**

▮ Chestnut & Brooks requests reimbursement for $36,434.21 in expenses. Seventy-five percent of this figure ($27,325) has already been awarded. Of the remaining $9,109.21, I disallow:

1. $444.93 for transportation, meals and lodging for Jack Chestnut to attend the April 19, 1978 pretrial conference in Philadelphia. Attorney's fees for this time have been disallowed as duplicative and unnecessary.

2. $155 for transportation, meals and lodging for Floyd Boline to attend the Industrial Analysis Committee meeting in Chicago in September 1978. The work of this committee did not benefit the class.

The remaining $8,509.28 in expenses may be recovered from the class fund.[60]

**XI. Conclusion**

The following chart summarizes the compensable fees of Chestnut & Brooks:

---

**60.** I am, however, somewhat puzzled that Chestnut & Brooks felt it necessary to send Thomas Malone and Gayle Wahl on a southern swing through Jacksonville, New Orleans and Dallas in May 1980 for eight merchant depositions. This time resulted in well over $2,000 in expenses and almost $4,000 in attorney and paralegal fees. Chestnut & Brooks organized the merchant deposition program. It was an inefficient use of resources to send two individuals from Minneapolis to these southern cities when Bruce Waltzer, another petitioner class counsel, is located in New Orleans. Waltzer, of course, made unnecessary trips to Chicago and New York (see discussion of Fine, Waltzer & Bagneris, *infra*) on matters that could have been handled by class counsel in those cities. Moreover, the Louisiana Attorney General's Office was involved in this litigation. Its fee petition reveals that a representative of that office participated in the depositions taken in New Orleans.

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Chestnut | 119.6 | $100 | $11,960.00 | $13,040.00 | $ 61,037.50 |
| Malone | 491.7 | $50 | $24,585.00 | $24,585.00 | $ 58,210.25 |
| Boline | 224.4 | $50/100 | $17,925.00 | $21,925.00 | $ 92,490.00 |
| Burns | 99.7 | $50 | $ 4,985.00 | $ 4,985.00 | $ 11,216.25 |
| Cambronne | 46.1 | $50 | $ 2,305.00 | $ 2,630.00 | $ 5,877.75 |
| Stringer | 7.7 | $50 | $ 385.00 | $ 577.50 | $ 860.00 |
| Burkard | 2.5 | $50 | $ 125.00 | $ 187.50 | $ 375.00 |
| Wahl | 1112.8 | $25 | $27,820.00 | $27,820.00 | $ 30,287.50 |
| Peterson | 34.6 | $25 | $ 865.00 | $ 865.00 | $ 1,668.50 |
| Johnson | 12.3 | $10 | $ 123.00 | $ 123.00 | $ 246.00 |
| Total | | | $91,078.00 | $96,738.00 | $262,268.75 |

EXPENSES:

| | |
|---|---|
| Amount Requested | $ 36,434.21 |
| Amount Previously Distributed | $ 27,325.00 |
| Amount Outstanding | $ 9,109.21 |
| Amount Disallowed | $ 599.93 |
| Final Expense Award Not Yet Disbursed | $ 8,509.28 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' fees | $ 96,738.00 |
| Expenses | $ 8,509.28 |
| FINAL AWARD | $105,247.28 |

## CONTARINO, HUTCHINSON & SCHERIN

The Contarino firm located in Los Angeles, California, submitted a joint fee petition with the firms of Cotchett, Dyer & Illston and Johnson, Johnson & Eklund and with the Attorney General of South Dakota. Contarino, Hutchinson & Scherin served as co-counsel with the Cotchett firm on the complaint which Royal Printing Company filed in January 1977. This was the first fine paper action. Five months later the Supreme Court decided *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), which held that only direct purchasers can recover from an antitrust violator. In July 1977 the district court granted summary judgment against Royal Printing because it had not purchased its paper directly from the defendants. Royal Printing appealed to the Ninth Circuit. In April 1980 the Ninth Circuit reversed the summary judgment against Royal Printing on the ground that its "indirect" purchases were largely made from divisions or subsidiaries of the defendants. *Royal Printing Co. v. Kimberly-Clark,* 621 F.2d 323 (9th Cir.1980). This case, decided only a few months before the *Fine Paper* plaintiffs were to go to trial, was of some importance to the class since many class members had made their purchases from subsidiaries of the defendants.[61] The *Royal Printing*

---

**61.** As the class objectors correctly point out, the Third Circuit came to the same conclusion on the issue of purchases from subsidiaries two years earlier in *In re Sugar Industry Antitrust Litigation (Stotter & Co. v. Amstar Corp.),* 579 F.2d 13 (1978). However, the court in *Stotter* expressly declined to resolve a question that was relevant to the claims of many *Fine Paper* class members. Many defendants in these cases operate paper merchants (paper sales

case was ultimately transferred to the MDL proceedings in Philadelphia.

I find that the work done on the *Royal Printing* case benefited the *Fine Paper* class. The Third Circuit's *Stotter* decision in 1978 lessened the impact of the Ninth Circuit's decision, but the *Royal Printing* appeal was fully briefed (although not argued) before the Third Circuit decided *Stotter*. Moreover, *Stotter* left unresolved an important issue that the Ninth Circuit decided in favor of the class. Therefore, I find that the time spent on the *Royal Printing* litigation (unless otherwise disallowed) is compensable.

(A) Hours Expended

 Royal Printing hired Contarino to represent it in December 1976. Contarino brought the Cotchett firm into the litigation as associate counsel. It appears from the time records that the two firms devoted about the same amount of time to the case, but that the Cotchett firm did most of the substantive work. The Contarino firm seeks compensation for 289 hours expended by Alfred Contarino at an hourly rate of $125 and a multiplier of 2.5. Much of Contarino's time was spent directing the research of two students, in conference or on the telephone with members of the Cotchett firm, and reviewing documents. Moreover, most of his time records are cryptic and vague. After a careful analysis of these records, I find that the following time must be disallowed.

1. 80.5 hours supported by entries too vague to permit any determination of possible benefit to the class. Most of these entries simply indicate that a telephone conversation took place with a member of the Cotchett firm. Included in these disallowed hours is time spent by Contarino traveling from Los Angeles to San Francisco for meetings with members of the Cotchett firm. I note that no member of the Cotch-

ett firm ever found it necessary to travel to Los Angeles to confer with Contarino, and in view of the numerous telephone calls between the two firms, I can find nothing in Contarino's records to show the necessity of charging the class for this travel time.

2. 4.5 hours devoted to review of documents and court opinions at a time when such review was duplicative. The class objectors would like all of Contarino's "read and review" time disallowed as duplicative. Most of this time, however, was spent in 1977 when there was no Executive Committee and the cases had not yet been consolidated by the MDL panel. Since I have found that time spent on the *Royal Printing* case is compensable, I will not disallow any of Contarino's 1977 "read and review" time. He was co-counsel with Cotchett at that point. However, once the MDL proceedings got underway, it was of no benefit to the class for Contarino to review the work of others.

3. 7.75 hours reviewing his file for and attending oral argument on *Royal Printing's* appeal to the Ninth Circuit. The argument was handled by a member of the Cotchett firm. I can see no benefit to the class from Contarino's presence at the argument.

4. 2 hours devoted to writing a memorandum on time and expenses to be incorporated into the joint fee petition.

With the disallowance of the above 94.75 hours, Contarino is left with 194.25 compensable hours.

(B) Hourly Rate

Contarino directed the initial investigation into the pricing practices of the defendants. This work accounted for 94 hours of his time. The remaining 100.25 compensable hours were devoted to conferences, review of documents, the deposition of his client and further research. The initial 94

---

outlets) as subsidiaries. These paper merchants frequently sell various brands of paper, some manufactured by the parent, some manufactured by other paper producers. In *Royal Printing* the Ninth Circuit held that Royal Printing need not have purchased a defendant's

*own* product from that defendant's subsidiary to recover. It was sufficient that the product was manufactured by one of the defendants. An adverse ruling on this issue in the MDL proceedings may have excluded large numbers of claimants.

hours will be compensated at the partner-level rate of $100/hour, but the remainder of the work was of the type normally done by associates. After the initial investigation Contarino played a secondary role in the *Royal Printing* case. This associate-level work will be compensated at $50/hour.

(C) Total Lodestar

94 hours × $100/hour = $9400.00
100.25 hours × $ 50/hour = $5012.50

(D) Multiplier

Contarino's work was not of such unusually high quality to warrant a quality multiplier, but I will apply a 1.5 contingency multiplier to his time since all of his compensable hours were expended prior to the end of the first wave of settlements in January 1979.

(E) Expenses

Contarino requests reimbursement for $1516.84 in expenses. He has already received 75% or $1,137. I find that his expenses are reasonable except for $674.20 requested for several trips to San Francisco to meet with members of the Cotchett firm. As discussed above, I see nothing in Contarino's time records to indicate that these trips provided any benefit to the class. Since Contarino has already received more for his expenses than I find compensable, I will deduct $294.36 from his award for attorney's fees.

(F) Conclusion

The following represents my determination of the fees and expenses to which the Contarino firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Contarino | 194.25 | $50/100 | $14,412.50 | $21,618.75 | $90,312.50 |

| Expenses: | |
|---|---|
| Amount Requested | $ 1,516.84 |
| Amount Previously Distributed | $ 1,137.00 |
| Amount Outstanding | $ 379.84 |
| Amount Disallowed | $ 674.20 |
| Amount to be returned to the class | $ 294.36 |
| TOTAL AWARD | |
| Attorneys' Fees | $21,618.75 |
| Less: Amount of previously awarded expenses to be returned to the class | $ 294.36 |
| Final Award | $21,324.39 |

---

## COTCHETT, DYER & ILLSTON

The Cotchett firm, located in San Mateo, California, served as co-counsel with the Contarino firm on the Royal Printing complaint that was filed in January 1977. During the pendency of Royal Printing's appeal to the Ninth Circuit of the summary judgment granted against it, the Cotchett firm was contacted by the South Dakota firm of Johnson, Johnson & Eklund about representing the State of South Dakota in its action against several fine paper manufacturers.[62] Most of the firm's time in the

---

**62.** It was agreed that Johnson, Johnson & Eklund would concern itself with the local aspects of the case and the Cotchett firm would handle matters outside South Dakota. The Johnson firm has also petitioned the court for an award of fees and expenses.

MDL proceedings was devoted to representing South Dakota.[63]

At the February 3, 1978 organizational meeting Joseph Cotchett was elected to the Executive Committee and chosen as one of the co-lead counsel. It appears that his firm's representation of one of the certified states was a factor in Cotchett's appointments. *See, e.g.,* letter from John Noel, Illinois Assistant Attorney General, 3/28/78, Class Objectors' E 766–68, and N.T., 4/19/78 at 24–25. Cotchett was later chosen as spokesman for the nine certified states to the extent that their proof differed from that presented by the private plaintiffs. He was to have given the opening statement for the certified states at trial.

██ The class objectors want to exclude a large portion of the Cotchett firm's time as benefiting only South Dakota or only the certified states and not of any benefit to the private plaintiffs' class. Class Objectors' Report at 261–62. They contend that the private plaintiffs should not be required to pay for work done to benefit the certified states. This argument is quite clearly misdirected. The fund from which petitioners seek attorneys' fees resulted from settlements with the private plaintiffs *and the certified states.* The certified states are just as entitled to a pro rata portion of the settlement fund as are the private plaintiffs. Consequently, attorneys whose efforts benefited the certified states are entitled to receive reasonable fees from the fund. Moreover, I note that the Cotchett firm, Johnson, Johnson & Eklund and the South Dakota Attorney General's Office agreed that South Dakota would pay no fees to the two outside firms. It was agreed that any fees would be those awarded by the court pursuant to a fee petition. It would be inequitable for the court to deny the Cotchett firm any fees for the work it did for South Dakota since that work also benefited the class of private purchasers.

The Cotchett firm was involved in several areas of this litigation. It was primarily responsible for the discovery of Boise Cascade Corp. and for limited discovery of defendant Crown Zellerbach Corp. Members of the firm did Industrial Analysis Committee work, participated in the Rule 37 motions, assisted the Sloan firm with the price analysis project, and worked on the final pretrial memorandum. The firm seeks an award of $1,372,190.38 in fees and $59,298.74 in expenses for its efforts. The time records reveal that the firm devoted 3914.3 hours to the case.

I. Joseph Cotchett

This senior attorney had perhaps the greatest number of titles of any attorney in the case. In an organizational structure in which nearly every senior attorney was given a title or two, Cotchett was one of five co-lead counsel, a member of the Executive Committee, vice-chairman of the Discovery Committee, chairman of the Rule 37 Subcommittee, and chairman of the Industrial Analysis Committee. He was also a member of the trial team and spokesman for the certified states.

Cotchett was involved in nearly every major aspect of the litigation. He drafted Royal Printing's complaint, argued before the Judicial Panel on Multidistrict Litigation, directed the work of the Industrial Analysis Committee, conducted discovery of Boise Cascade, participated in settlement talks, assisted in the price analysis study, contributed to the final pretrial memorandum, and prepared an opening statement on behalf of the certified states. Cotchett seeks an award of $864,675 for 1647 hours of work.

(A) Hours Expended

██ In view of Cotchett's membership on the Executive Committee and, more im-

---

**63.** The Ninth Circuit did not reverse the summary judgment against Royal Printing until April 28, 1980, just a few months before the scheduled trial of the private plaintiffs' and certified ("minority") states' cases. *See* the discussion of the *Royal Printing* case under the section dealing with the Contarino firm's fee request. I have determined that, unless otherwise disallowed, time spent on the *Royal Printing* case is compensable.

portantly, his position as one of the trial counsel, I find that Cotchett may properly charge the class for time spent keeping abreast of aspects of the litigation outside his firm's areas of responsibility. Furthermore, since Cotchett was a spokesman for the certified states, I find that his attendance at various pretrial conferences, discovery committee meetings, etc. is compensable. Nevertheless, my review of Cotchett's time sheets reveals that the following hours must be disallowed:

1. 17.9 hours supported by entries too vague to permit any determination of whether the time benefited the class. Such entries simply show that a conference or a telephone conversation took place without any indication of the subject matter. Entries of "correspondence" without further explanation are similarly disallowed.

2. 1 hour devoted to drafting the firm's fee agreement with South Dakota.

3. 105.8 hours devoted to Industrial Analysis Committee work. As explained in the Guidelines, I have determined that this work did not benefit the class.

4. 222 hours were spent working on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Cotchett will be compensated for 111 hours.

With the disallowance of the above 235.7 hours, Cotchett is left with 1411.3 compensable hours.

(B) Hourly Rate

Cotchett requests an hourly rate of $150. To be consistent with rates awarded other senior attorneys for partner-level work, I will award Cotchett $100/hour subject to reductions in two areas. Cotchett spent 15.6 hours on tasks such as setting up files, preparing interrogatories, and reviewing prior court decisions that could have been assigned to an associate. This time will be compensated at $50/hour. In addition, he spent 20.5 hours working on matters related to the defendants' discovery of his client South Dakota. As explained in the Guidelines, this class action discovery will be compensated at $50/hour.

(C) Total Lodestar

1375.2 hours × $100/hour = $137,520
36.1 hours × $ 50/hour = $ 1,805

(D) Multiplier

■ Cotchett's work on behalf of the class was quite commendable. Nevertheless, I do not think it was of such unusually high quality to justify a quality multiplier. Senior trial attorneys are expected to work at a level of competence that justifies their higher hourly rates. Cotchett's efforts were commensurate with his position of responsibility in the litigation.

I will apply a contingency multiplier of 1.5 to the 445.1 compensable hours Cotchett expended prior to the end of the first wave of settlements.

II. Susan Illston

(A) Hours Expended

Susan Illston spent 1486.3 hours on *Fine Paper*. Her involvement in the case was as extensive as Cotchett's. She did Industrial Analysis Committee work, participated in every stage of the discovery of Boise Cascade, assisted in the price analysis study, contributed to the final pretrial memorandum, and worked on settlement documents. She also argued Royal Printing's successful appeal to the Ninth Circuit. As with her partner Cotchett, I find that most of Illston's time benefited the class. My analysis, nevertheless, reveals that the following hours must be disallowed:

1. 5.3 hours supported by entries too vague to permit a determination of any possible benefit to the class. Such entries include "Call to Contarino" and "analysis of correspondence" without further explanation of the subject matter.

2. 101.1 hours expended on Industrial Analysis Committee work. As explained in the Guidelines, I have determined the work of this committee did not benefit the class.

3. 211.4 hours were devoted to the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Illston will be compensated for 105.7 hours.

With the disallowance of the above 212.1 hours, Illston is left with 1274.2 compensable hours.

(B) Hourly Rate

Class objectors suggest that a substantial portion of Illston's time should be compensated at an associate rate because she essentially acted as Cotchett's associate in this case. Class Objectors' Report at 266–67. My analysis reveals that the class objectors overstate their case. I have determined that 199.8 hours were spent on matters that warrant an hourly rate of only $50/hour. This time included preparation of interrogatories, organization of files, document inspection, making travel arrangements, preparation for the microfilming of Boise Cascade documents, and preparing materials for use at depositions taken by Cotchett. On these matters, she was acting as Cotchett's associate and will be compensated accordingly, but in view of this firm's many responsibilities in the litigation, I find that the great bulk of Illston's time deserves compensation at the partner-level rate of $100/hour.

The above considerations notwithstanding, the 35.1 hours spent on class action discovery (e.g. answering defendants' interrogatories, preparing for the deposition of the firm's client) will be compensated at $50/hour as explained in the Guidelines.

(C) Total Lodestar

 1039.3 hours × $100/hour = $103,930
 234.9 hours × $ 50/hour = 11,745

(D) Multiplier

The work done by Illston was not of such an unusually high degree of skill to warrant a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 429.1 hours expended before the end of the first wave of settlements.

III. Other Attorneys

Eight of the attorneys request compensation for a total of 170.2 hours spent on *Fine Paper*.[64] I find that all of this time is compensable except for .9 hours of Charles Dyer's time which must be disallowed for vagueness and 4.8 hours of his time which was devoted to Industrial Analysis Committee work. Furthermore, I have determined that all of Dyer's compensable time warrants an hourly rate of $100 and that the seven associates will be paid $50/hour. Finally, while none of the work done by these attorneys justifies a quality multiplier, I will apply a 1.5 contingency multiplier to the 97.3 hours expended before the end of the first wave of settlements.

IV. Paralegals

The firm requests compensation for 610.8 hours of paralegal time. I find the work done to be compensable at $25/hour. No multiplier is applied to paralegal time.

V. Expenses

The firm seeks reimbursement of $59,-298.74 in expenses. It has already received 75% of this figure ($44,474). I find that the remaining expenses are reasonable with the exception of $1272.01 spent on travel, meals and lodging for attendance at the two meetings of the Industrial Analysis Committee in Chicago. Attorneys' fees have been disallowed for this time.

VI. Conclusion

The following represents my determination of the fees and expenses to which the Cotchett firm is entitled under *Lindy*:

---

**64.** The hours claimed by each attorney are: Charles Dyer (38.7); Girard Fisher (20); Iatham Annand (20.8); Lisa Nicol (3.2); Roger Nielsen (13); Robert Danneskiold (21.6); Michelle McKim (16); and David McKim (36.9). Dyer is a partner; the others are associates.

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Cotchett | 1411.3 | $50/100 | $139,325 | $160,892.50 | $ 864,675.00 |
| Illston | 1274.2 | $50/100 | $115,675 | $134,662.50 | $ 464,468.75 |
| Dyer | 33 | $100 | $ 3,300 | $ 4,450.00 | $ 8,968.75 |
| Fisher | 20 | $50 | $ 1,000 | $ 1,500.00 | $ 3,325.00 |
| Annand | 20.8 | $50 | $ 1,040 | $ 1,135.00 | $ 3,458.00 |
| Nicol | 3.2 | $50 | $ 160 | $ 240.00 | $ 532.00 |
| Nielsen | 13 | $50 | $ 650 | $ 975.00 | $ 2,161.25 |
| Danneskiold | 21.6 | $50 | $ 1,080 | $ 1,080.00 | $ 3,591.00 |
| M. McKim | 16 | $50 | $ 800 | $ 800.00 | $ 2,660.00 |
| D. McKim | 36.9 | $50 | $ 1,845 | $ 2,702.50 | $ 6,134.63 |
| Paralegals | 610.8 | $25 | $ 15,270 | $ 15,270.00 | $ 12,216.00 |
| TOTAL | | | $280,145 | $323,707.50 | $1,372,190.38 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 59,298.74 |
| Amount Previously Distributed | $ 44,474.00 |
| Amount Outstanding | $ 14,824.74 |
| Amount Disallowed | $ 1,272.01 |
| Amount to be Distributed | $ 13,552.73 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $323,707.50 |
| Expenses | $ 13,552.73 |
| Final Award | $337,260.23 |

## FINE, KAPLAN & BLACK

The Fine, Kaplan & Black firm is located in Philadelphia, Pennsylvania. The firm became co-counsel with the Sachnoff, Schrager firm for Joli Greeting Card Company on January 17, 1978. The Fine firm seeks compensation for 90.25 hours of work performed by Messrs. Fine, Kaplan and Black. Each of these attorneys is a partner in the firm.

The fee petition requests this court to accept one of two suggested lodestar figures. The lodestar requested based on the current rates the firm charges is $12,830. The requested lodestar based on the rates charged during the course of the firm's involvement in this litigation is $8,268.75. Regardless of which lodestar figure is used the firm seeks a total compensation for attorneys' fees of $20,000. By presenting the alternate lodestar requests with a multiplier request of 1.56 for the current rates figure and 2.42 for the historical rates figure the firm is able to arrive at the bottom line amount of $20,000. In addition, the Fine fee petition seeks $1,844.43 in expenses. The firm seeks no compensation for associate or paralegal hours.

Fine, Kaplan & Black have not billed for any time subsequent to April of 1978.[65]

65. Fine, Kaplan was barred from further participation in the litigation by the plaintiffs' Executive Committee which declined to give the firm any work assignments or committee appointments. Members of the Fine, Kaplan firm claim that Harold E. Kohn caused the commit-

Most of the hours for which compensation is sought were expended in multidistrict panel proceedings and in seeking access to Grand Jury documents. The remainder of the requested time was spent in more general reading, review and preparation endeavors. On balance, the Fine firm's involvement in this litigation was very limited.

## I. Allen D. Black

### (A) Hours Expended

Black, a partner, asks to be compensated for 73.75 hours of work. Upon analysis of the time sheets submitted I find, however, that Black can only be compensated for 47.75 hours. This is the only time which reasonably can be said to have benefited the class. According to the Guidelines set forth in the beginning of this Memorandum, I have determined Black cannot be compensated for the following hours:

1. 11.5 hours spent in reading, review, or discussion related to the Judicial Panel on Multidistrict Litigation proceedings. Black's efforts in this area were duplicative. There was no discernible benefit to the class from these efforts.

2. 8.75 hours spent in general discussions with various counsel and other undefined miscellaneous time which is inadequately documented, rendering impossible a determination of benefit to the class.

3. 5.75 hours spent in preparation for and attendance at pretrial conferences and meetings. Black was not chairman of any of the committees and had no leadership position in this litigation. In view of the firm's limited support role Black's attendance at these pretrial conferences was neither necessary nor beneficial to the class.

I will allow the remaining 47.75 hours which Black seeks relating to the Grand Jury documents, preparation and drafting of documents, Judicial Panel on Multidistrict Litigation work and attendance at the Chicago discovery meeting.

### (B) Hourly Rate

■ Black suggests alternative computations based on either the historical or current rates which range between $90 and $140 an hour. Black's compensable hours, however, involve only that time devoted to Grand Jury documents, initial complaint drafting, Judicial Panel on Multidistrict Litigation proceedings, and the Chicago discovery meeting. Almost all of this work was completed early in the history of this litigation and within two months of the firm's entry into the action. The rate at which Black was being compensated at this time was $90 an hour. This rate is reasonable and, therefore, I will allow it as compensation.[66]

### (C) Total Lodestar

47.75 hours × $90/hour = $4297.50

### (D) Multiplier

■ There will be no adjustment for quality. Mere success in an undertaking by a firm, as with the Grand Jury documents, is not demonstrative of exceptional work for which a positive quality multiplier will be awarded. However, I will apply a contingency factor of 1.5 to Black's lodestar since all his time was expended prior to January 1979.

## II. Arthur M. Kaplan

### (A) Hours Expended

■ Kaplan is a partner in the firm. He asks to be compensated for 13.25 hours

---

tee to take this action although the precise motive for Kohn's actions has not been suggested. *See* letters Fine to Specks, 3/8/78, reprinted in full in section II(3) at the beginning of this memorandum; Black to Atkins, 4/23/79, Class Objectors' E 155–56, 601–02.

**66.** Fine, Kaplan & Black argue for the higher hourly rate as reflected by the fees calculated on a current basis in order to compensate for the loss due to inflation and loss of interest over the time period during which they have had to wait for payment. Any delay in payment can be considered in determining whether to add a positive multiplier. *Aamco Automatic Transmissions, Inc. v. Tayloe*, 82 F.R.D. 405, 412 (E.D.Pa.1979). Since a substantial part of the delay in this case has been occasioned by the protracted litigation over fees among plaintiffs' counsel, I will not enhance any award for the delay factor.

of work. After analysis of the time sheets submitted, I have concluded that Kaplan should not be compensated for any of his work in this litigation. Of the hours Kaplan expended, none can reasonably be said to have benefited the class. According to the Guidelines set forth in the beginning of this decision, Kaplan should not be compensated for the following:

1. 1.5 hours reviewing Pretrial Orders No. 1 and correspondence in preparation for attendance at a conference with plaintiffs' counsel in Washington will not be allowed as such work made no significant contribution to the creation or preservation of the settlement fund. Considering the firm's limited involvement in this litigation and the number of other firms and lawyers who were participating, Kaplan's work was duplicative and simply does not warrant compensation.

2. Similarly, 11.75 hours in travel time, attendance, and follow-up review of the April 1978 Washington conference of plaintiffs' counsel will not be compensated. Kaplan was not a chairman of any of the committees and he had no leadership position in this litigation. Kaplan's attendance at this conference was neither necessary nor beneficial to the class.

Since no compensation will be allowed for Kaplan, it is unnecessary to analyze any hourly rate, compute a lodestar, or discuss a multiplier figure.

### III. Aaron M. Fine

Fine is a senior partner in the firm. He asks to be compensated for 3.25 hours of work in 1978. I will allow compensation for three hours at the rate of $100 per hour. The .25 hour charged to telephone conversation with partner Black and co-counsel will be disallowed. On the face of it, there is no discernible benefit to the class from this telephone call. Since Fine's time was logged before the initial settlements, I will apply a 1.5 contingency multiplier to his lodestar. No quality multiplier is warranted.

### IV. Expenses

The Fine, Kaplan & Black firm lists total expenses as $1,844.43. As previously explained, the firm has already received 75% of these expenses or $1,383. However, I will not allow $98.59 of the claimed expenses. This figure represents travel costs to the conference in Washington for which attorneys' fees have been disallowed.

### V. Conclusion

The following represents my determination of the fees and expenses to which the firm is entitled under *Lindy*:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total [67] Requested |
|---|---|---|---|---|---|
| Black | 47.75 | $ 90 | $4,297.50 | $6,446.25 | $16,054.42 |
| Kaplan | 0 | 0 | 0 | 0 | $ 2,884.35 |
| Fine | 3.00 | $100 | $ 300.00 | $ 450.00 | $ 1,061.23 |
| TOTAL | | | $4,597.50 | $6,896.25 | $20,000.00 |

Expenses:

| | |
|---|---|
| Amount Requested | $1,844.43 |
| Amount Previously Distributed | $1,383.00 |
| Amount Outstanding | $ 461.43 |
| Amount Disallowed | $ 98.59 |
| Amount to be Distributed | $ 362.84 |

**67.** As it has been concluded that the compensable hours of work were all within the first two months of the firm's involvement in this litigation, the lodestar figures computed on an historical basis in the fee petition are utilized as the total requested.

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $6,896.25 |
| Expenses | $ 362.84 |
| Final Award | $7,259.09 |

## FINE, WALTZER & BAGNERIS

This firm, located in New Orleans, Louisiana, seeks compensation for the work of Bruce C. Waltzer, a partner, and for the time of two para-professionals. The firm, along with Specks & Goldberg, Ltd., represented Phillip and Ruth Meroney in this litigation. Waltzer claims to have been co-chairman with two other law firms of the Champion International discovery subcommittee. He bills the class for 260.3 attorney and paralegal hours spent on administrative, ministerial, and general associate-level and non-lawyer work in connection with Champion discovery. The firm asks for a total fee award of $77,986.

### (A) Hours Expended

Waltzer claims compensation for 220.2 hours.[68] After a careful review of Waltzer's time records, I find that only 181.2 of the total hours claimed by him have benefited the class. Specifically, in accordance with the Guidelines set forth above, I find the following hours did not benefit the class:

1. 22 hours for time and travel from New Orleans to Chicago for discovery-related meetings. These trips were unnecessary, duplicative and of no benefit to the class since one of his co-chairmen for Champion discovery, Freeman, Atkins & Coleman, Ltd., was already located in Chicago and Waltzer's co-counsel on the Meroney complaint, Mr. Specks, was present at these meetings.

2. 14.5 hours expended on a trip to New York City from New Orleans to recruit a document review staff, rent microfilm readers and obtain office space in connection

with the Champion discovery. This trip was wasteful and duplicative since either co-counsel Robinson, Silverman, Pearse, Aronsohn & Berman, a New York City law firm, or Kleinman, Steinberg & Lapuk of Hartford, Connecticut, who were co-chairman with Waltzer for Champion discovery, could have easily taken care of these ministerial tasks.

3. 2.5 hours for "Discussions with Specks and D. Nast". (Entry September, 1978). This entry is too vague and inadequately documented to allow compensation since it cannot be determined whether the time benefited the class or what an appropriate hourly rate would be.

For these reasons, then, Waltzer will be compensated for a total of 181.2 hours.

### (B) Hourly Rate

Waltzer asks $150 per hour for his time. This is too high. Waltzer's compensable time was spent reviewing microfilm and documents, telephoning other attorneys in the case and preparing a report on Champion discovery and depositions. This type of work—routine discovery and administrative tasks—is the kind normally assigned to an associate in a law firm and consequently does not warrant the inflated rate asked for here by Waltzer. Waltzer will be paid an associate's rate of $50 an hour.

### (C) Total Lodestar

181.2 hours × $50/hour = $9,060

### (D) Para-Professionals

■ Fine, Waltzer seeks compensation for 37 hours of work by "para-professionals" Dennis Bagneris, a law student whose

---

68. In its petition, Fine, Waltzer asks for compensation for a total of 260.3 hours. My computation of the firm's time sheets, however, shows only 257.2 hours were spent by the firm on this litigation. After deducting 37 hours for paralegal time from the 257.2 total, I arrive at the sum of 220.2 hours for Waltzer.

brother is a partner of the firm, and Collette Creppel, an undergraduate college student, both of whom reviewed Champion microfilm. Fine, Waltzer seeks $20 per hour for their time. These two individuals did not have formal paralegal training although Bagneris had a law school background. They will not be awarded normal paralegal rates but an average rate of $10 per hour seems fair and appropriate.[69] Accordingly, I will award Fine, Waltzer $370 for 37 hours of "para-professional" time.

(E) Multiplier

■ Fine, Waltzer requests the application of a multiplier of 2.3 to the lodestar. Aside from a contingency multiplier of 1.5 to Waltzer's 72.1 compensable hours spent prior to the January 1979 settlements, no positive multiplier will be applied. As explained in the Guidelines section, given the circumstances of the case, a lawyer who played such a minor role does not warrant a positive multiplier on the basis of quality. Similarly, no multiplier will be applied for "para-professional" time.

In accordance with the above discussion, the total fee award for Fine, Waltzer is $11,232.50.

(F) Expenses

■ Fine, Waltzer asks reimbursement for $7,910.22 in expenses. After careful review of the firm's petition and documentation in support thereof, I will not permit reimbursement for the following expenses:

1. Fine, Waltzer seeks reimbursement for $1,303.86 for telephone charges and "taxi fares, gratuities, meals and other miscellaneous expenses" without submitting any invoices, bills, cancelled checks, check stubs or any other documentation in support thereof other than an affidavit listing the items for which reimbursement is sought. Since this missing documentation was required to be submitted to the Court by Pretrial Order

No. 143,[70] these claimed expenses will be disallowed.

2. The firm will not be reimbursed for trips made to Miami, Florida, Chicago and New York City for which attorneys' fees have been disallowed. These trips did not benefit the class. Included are the following bills which Fine, Waltzer attached to its fee petition:

(a) Invoice of February 1, 1979 ($206) for round trip air fare—New Orleans to Miami (one-half of which was billed to class).

(b) Invoice of June 6, 1979 ($248) for round trip air fare: Chicago—New Orleans.

(c) Invoice of July 8, 1979 ($480) for round trip air fare for "S. Fine and T. Christopher": New Orleans—New York City.

(d) Invoice of July 31, 1976 ($612) for round trip air fare: New Orleans—Miami; Miami to Santo Domingo; Santo Domingo—New York; New York to New Orleans (one-half of which was billed to class).

(e) Numerous (and mostly illegible) invoices for restaurants and hotels utilized during these trips. For example, $534.27 bill for stay at Waldorf-Astoria in New York City; $139.60 bill for meal at Romea-Salta restaurant in New York City.

3. Other bills (again, many illegible) which were submitted by the firm for reimbursement are not appropriate for payment by the class. For example: Invoice of June 18, 1979 ($412) for round trip air fare: Los Angeles—New Orleans. There is no indication in the fee petition that a member of Fine, Waltzer was or had to be in Los Angeles for the *Fine Paper* case.

4. Fine, Waltzer will not be reimbursed for a number of bills for meals consumed in hometown restaurants.[71] Examples of these bills are as follows:

(a) $90.68 for meal at "Willy Coln's restaurant" in Gretna, Louisiana (on the

---

**69.** Compare the $15 an hour Walter Riordan paid to lawyers of the Rogers, Rude firm for their assistance. *See* N.T., 3/3/82 at 1086; Riordan fee petition.

**70.** *See* Pretrial Order No. 143, ¶ 17, attached to this memorandum as an appendix.

**71.** As noted above, attempts by lawyers in this case, to obtain reimbursement for meals at expensive restaurants in their hometowns contributed to the "gravy train" atmosphere which permeates the fee requests in this case. This in turn imposes on the court the burden of exam-

voucher it was written "Ruth and Phil Meroney Review of Fine Paper Antitrust Case").

(b) $65.34 for meals at Bienville House, New Orleans.

(c) $71.13 for meal at "Ruth's Steak and Lobster House" in New Orleans.

(d) $61.85 for meal at "—on Ton Restaurant" in New Orleans.

The remaining expense vouchers totaling $2,762.33 appear to be proper. Since I have already distributed $5,932 to Fine, Waltzer for its expenses, the firm has been overpaid $3,169.67. Accordingly, this sum will be deducted from the fee award. Thus, the total award to Fine, Waltzer, including reimbursement for expenses, is $8,062.83.

### G. Conclusion

The following represents my determination of the fees and expenses to which Fine, Waltzer is entitled under *Lindy*:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Waltzer | 181.2 | $50 | $9,060.00 | $10,862.50 | $77,246.00 |
| Para-pro-fessionals | 37.0 | $10 | $ 370.00 | $ 370.00 | $ 740.00 |
| TOTAL | | | $9,430.00 | $11,232.50 | $77,986.00 |

| Expenses: | |
|---|---|
| Amount Requested | $ 7,910.22 |
| Amount Previously Distributed | $ 5,932.00 |
| Amount Outstanding | $ 1,978.22 |
| Amount Disallowed | $ 5,147.89 |
| Amount to be returned to Class | $ 3,169.67 |
| TOTAL AWARD: | |
| Attorneys' fees | $11,232.50 |
| Less: Amount to be Returned to Class | $ 3,169.67 |
| Final Award | $ 8,062.83 |

### FREEMAN, ATKINS & COLEMAN, LTD.

Freeman, Atkins & Coleman, Ltd., located in Chicago, entered the *Fine Paper* litigation on January 26, 1978 as counsel of record for Campbell Office Supply.[72] The firm was a member of the Executive Committee and participated in the financing of this case through its membership on the Finance Committee. Additionally, Freeman, Atkins & Coleman was assigned joint responsibility with the firms of Kleinman, Steinberg & Lapuk, and Fine, Walter & Bagneris for discovery of defendants Pot-lach and Champion. The firm was also represented on the Industrial Analysis Committee. The fee petition seeks an award of $727,105 in fees for 5479.5 hours of work and reimbursement of $39,974.57 for expenses.

### I. Robert S. Atkins

#### (A) Hours Expended

Robert S. Atkins, a partner with the firm, was a member of the Executive Committee and chairman of the Finance Committee.

---

ining the supporting documents with greater intensity and care in order to prevent overreaching at the expense of the fund.

**72.** The following attorneys are also counsel of record for Campbell Office Supply: Lawrence Walner of Lawrence Walner & Assoc.; Guido Saveri of Saveri & Saveri; and Roy B. Schneider of Schneider, Graf & Trio.

A large portion of the time expended by Atkins related to the firm's responsibility for discovery of defendants Potlach and Champion. Atkins prepared for and took eleven depositions of Champion personnel and supervised the analysis of Potlach documents with the assistance of the California Attorney General's Office. Additionally, as a member of the Industrial Analysis Committee, Atkins analyzed data regarding the fine paper industry.

After carefully reviewing Atkins' time records, I conclude that the following time must be disallowed:

1. 32 hours are supported by entries which are too vague to provide any basis for determining if the time spent was of any benefit to the class. Many entries simply supply the name of another plaintiffs' counsel and indicate that a meeting or telephone call occurred.

2. 17 hours spent traveling to and attending the April 19, 1978 pretrial conference in Philadelphia. The class was adequately represented by co-lead counsel at this conference.

3. 15.8 hours for Industrial Analysis Committee work. As stated in the Guidelines, I find that this work was of no benefit to the class.

4. 95.1 hours were spent working on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Atkins will be compensated for 47.6 hours.

(B) Hourly Rate

 Robert S. Atkins requests a rate of $150/hour. To be consistent with rates awarded other senior attorneys for partner-level work, however, I will award Atkins $100/hour, subject to reduction in two areas. Atkins spent 69.4 hours reviewing various discovery documents which could have been reviewed by associates. This time, therefore, will be compensated at $50/hour. Atkins also spent 12.7 hours on settlement administration and review of computer companies' bids for the purchase of equipment to process claims. I have determined that this non-legal work should be compensated at $25/hour.

(C) Total Lodestar

979.2 hours × $100/hour = $97,920.00
69.4 hours × $ 50/hour = $ 3,470.00
12.7 hours × $ 25/hour = $ 317.50

(D) Multiplier

Although Atkins was a member of four committees, his role in the litigation was often supervisory. His substantive efforts (e.g., taking depositions of defendants' personnel), were not of such an unusually high degree of skill to merit a quality multiplier. I will, however, allow Atkins a 1.5 contingency multiplier for the 45.9 compensable hours expended prior to the end of the first wave of settlements in January 1979.

II. Robert C. Goldberg

(A) Hours Expended

Robert C. Goldberg, a partner in the petitioner's firm, devoted a substantial portion of his 256.9 hours to Industrial Analysis work and review of Champion discovery documents. Additionally, he made an FOIA request to the Federal Trade Commission and reviewed government documents relating to the investigation of the fine paper industry.

After reviewing Goldberg's time records, I concluded that the following time must be disallowed:

1. 14.3 hours are supported by entries which are too vague to provide any basis for determining if the time spent was of value to the class. Many entries simply give the names of other attorneys and indicate that a conference or telephone call occurred.

2. 58.1 hours spent on Industrial Analysis Committee work. As stated in the Guidelines, I find that this work was of no benefit to the class.

3. 8.5 hours were spent preparing for the depositions of Champion personnel. This

was duplicative of the work performed by Atkins.

### (B) Hourly Rate

Robert Goldberg requests an hourly rate of $125. To be consistent with rates awarded other attorneys for partner-level work, however, I will award Goldberg $100/hour subject to reductions in two areas. Goldberg spent 93.6 hours reviewing Champion discovery and Federal Trade Commission documents. This work could have been assigned to an associate and, therefore, it will be compensated at $50/hour. In addition, Goldberg spent 19 hours on matters related to the defendants' discovery of his client, Campbell Office Supply. As explained in the Guidelines, this class action discovery will be compensated at $50/hour.

### (C) Total Lodestar

63.4 hours $\times$ $100/hour $=$ $6,340
112.6 hours $\times$ $ 50/hour $=$ $5,630

### (D) Multiplier

I do not think Goldberg's work on behalf of the class was of such an unusually high degree of skill to justify a quality multiplier. Goldberg's efforts were commensurate with his position of responsibility in the litigation. I will, however, apply a contingency multiplier of 1.5 to the 64.1 compensable hours Goldberg expended prior to the end of the first wave of settlements in January 1979.

### III. Nora Mahaney

### (A) Hours Expended

Nora Mahaney, an associate with Freeman, Atkins & Coleman, devoted 366.2 hours to the *Fine Paper* litigation during the period June 1979 to December 1979. A substantial portion of Ms. Mahaney's time was spent preparing the Champion discovery book, attending Champion document production sessions and preparing reports on defendants' interrogatory responses. I find that all of Mahaney's time is compensable except 112.9 hours which are supported by entries which are too vague to provide any basis for determining if the time spent was of any benefit to the class. Many entries merely state that Mahaney received and reviewed incoming correspondence and pleadings without any further description of the documents. Other entries simply give the names of other attorneys and indicate that a meeting or telephone conversation occurred.

### (B) Hourly Rate

Nora Mahaney requests an hourly rate of $85. I find that $50/hour is fair and reasonable compensation for her associate-level work.

### (C) Total Lodestar

253.3 hours $\times$ $50/hour $=$ $12,665

### (D) Multiplier

Mahaney seeks a multiplier of 1.75. In light of the fact that she was not in a position of leadership and spent most of her time doing associate-level discovery work, she does not merit a quality multiplier. Furthermore, since all of Mahaney's time was logged after the first wave of settlements, I will not apply any contingency multiplier.

### IV. Scott L. Fredericksen

### (A) Hours Expended

As an associate of Freeman, Atkins & Coleman, Scott L. Fredericksen devoted 43.2 hours to *Fine Paper* in 1980. The bulk of Fredericksen's work involved examination of documents on uniformity of freight charges and sales terms for the plaintiffs' pricing project. I find that all of Fredericksen's hours are compensable.

### (B) Hourly Rate

Fredericksen seeks an hourly rate of $85. I find that $50/hour is fair and reasonable compensation for this associate-level work.

### (C) Total Lodestar

43.2 hours $\times$ $50/hour $=$ $2,160

## (D) Multiplier

Fredericksen requests a multiplier of 1.75. However, he was not in a position of leadership and spent most of his time doing associate-level discovery work. Therefore, he does not merit a quality multiplier. Furthermore, since all of Fredericksen's time was logged after the first wave of settlements, I will not apply any contingency multiplier.

## V. Kenneth Ross

### (A) Hours Expended

As an associate of Freeman, Atkins & Coleman, Ross devoted 21.8 hours to *Fine Paper* in July and September, 1980. A substantial portion of Ross' time was spent abstracting depositions. I find that all of the hours expended by Ross are compensable.

### (B) Hourly Rate

Ross requests an hourly rate of $85. I find that $50/hour is fair and reasonable for this associate-level work.

### (C) Total Lodestar

21.8 hours × $50/hour = $1,090

### (D) Multiplier

Ross seeks a multiplier of 1.75. However, he spent most of his time doing associate-level work such as abstracting depositions. Therefore, he does not merit a quality multiplier. Furthermore, since all of Ross' time was logged after the first wave of settlements, I will not apply any contingency multiplier.

## VI. Paralegals

Seven paralegals worked on *Fine Paper* for a total of 3617.8 hours. I find that all of this time is compensable at an hourly rate of $25. No multiplier is applied to paralegal time.

## VII. Expenses

Freeman, Atkins & Coleman requests reimbursement for $39,974.57 in expenses incurred in connection with this litigation. Seventy-five percent of this figure ($29,981) has already been awarded. Of the total expenses I have disallowed $41.29 incurred by Robert S. Atkins for transportation to the April 19, 1978 pretrial conference in Philadelphia. Attorneys' fees for this time have been disallowed as duplicative and unnecessary. The remaining $9,952.28 in expenses may be recovered from the class fund.

## VIII. Conclusion

The following graph summarizes the compensable fees of Freeman, Atkins & Coleman:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Atkins | 1061.3 | $25/50/100 | $101,707.50 | $106,672.50 | $440,100.00 |
| Goldberg | 176.0 | $50/100 | $ 11,970.00 | $ 16,897.50 | $ 64,225.00 |
| Mahaney | 253.3 | $50 | $ 12,665.00 | $ 12,665.00 | $ 54,472.25 |
| Fredericksen | 43.2 | $50 | $ 2,160.00 | $ 2,160.00 | $ 6,426.00 |
| Ross | 21.8 | $50 | $ 1,090.00 | $ 1,090.00 | $ 3,242.75 |
| Paralegals | 3617.8 | $25 | $ 90,445.00 | $ 90,445.00 | $158,639.00 |
| | | | $220,037.50 | $229,930.00 | $727,105.00 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 39,974.57 |
| Amount Previously Distributed | $ 29,981.00 |
| Amount Outstanding | $ 9,993.57 |

| | |
|---|---|
| Amount Disallowed | $ 41.29 |
| Amount to be Distributed | $ 9,952.28 |
| TOTAL AWARD: | |
| Attorneys' Fees | $229,930.00 |
| Expenses | $ 9,952.28 |
| Final Award | $239,882.28 |

## PHILLIP C. GOLDSTICK & ASSOCIATES, LTD.

This Chicago law firm entered the case on March 10, 1979, two months after the 30 million dollar settlement. At the time, the firm filed a complaint on behalf of its client, Franz Stationery Company. Goldstick & Associates seeks fees in the amount of $31,203.76 for 6.6 hours of partner time, 155.9 hours of associate time and 48.9 hours of paralegal time. The firm assisted in evaluating defendant's document production, took one deposition and assisted in briefing the Motions to Compel Production of Documents and the Motion to Dismiss the Appeal of the State of New York. The firm had no committee appointments, did not participate in settlement negotiations, had no leadership positions and did no trial preparation work. Again, it is difficult to understand why the plaintiffs' Executive Committee or its co-chairmen assigned work to this firm at all in view of the number of lawyers already participating.

### I. Phillip C. Goldstick

▮ No fees will be awarded to Goldstick, a partner of the firm, for the 6.6 hours he claims he devoted to *Fine Paper* for the following reasons:

1. 2.4 hours are described by such vague entries as "conf. call R. Atkins" and "conference w/ALF MST & MLM". As stated earlier, such entries are too vague to permit compensation since it cannot be determined whether the time benefited the class and what an appropriate hourly rate would be.

2. The remaining 4.2 hours of Goldstick's time were devoted to meeting and communicating with his client and work on the client's complaint. These efforts were of no benefit to the class, especially since they took place long after class certification. The complaint was merely a vehicle to enable the firm to enter the case and consequently was only a benefit to the Goldstick firm.

### II. Alan L. Fulkerson

Fulkerson is an associate with the firm. He seeks compensation for 18.75 hours spent on the case. For the following reasons, all of this time will be disallowed:

1. 10 hours devoted to the drafting, filing and service of the Franz Stationery complaint is not compensable for, as noted above, such activity did not benefit the class.

2. 2.75 hours of reading and reviewing documents, correspondence and filings for which the firm was not responsible will not be compensated. For example, on April 20, 1979 and on May 7, 1979, Fulkerson reviewed the Motion to Disqualify Certain Counsel and the Majority States Motion for Reconsideration. Such unnecessary and duplicative read and review time was of no benefit to the class.

3. 5.5 hours of Fulkerson's time entries are too vague to permit compensation. For example, 3.5 hours were spent "reviewing correspondence". I cannot discern from these nebulous entries whether the work was of any benefit to the class.

4. Fulkerson spent .5 hours on phone calls to Specks and Sara Wolff relating to document review. The petition and time records do not indicate that Fulkerson ever performed such review, and, accordingly,

these telephone calls did not benefit the class. Thus, the firm will not receive remuneration for this time.

## III. Michael Tepper

 Tepper, an associate with the firm, seeks compensation for 5.5 hours. All of his time was spent reviewing various filings and documents. Tepper did not draft any of these documents and apparently never took any action as a result of his review. Tepper's efforts, therefore, did not benefit the class and will not be compensated. As stated earlier, in a case such as this, with scores of lawyers participating, massive duplication would result if every attorney is to be compensated for reading every piece of correspondence and every document.

## IV. Stewart M. Weltman

### (A) Hours Expended

 Weltman, a 1978 law school graduate, is an associate with the law firm. The firm seeks compensation for 132 hours of his time. After careful review of the time sheets submitted, I find the following time is not compensable:

1. 11.1 hours will be disallowed because they are described only as "correspondence and document review". Because of the vagueness of these entries, I am unable to determine whether such activity benefited the class.

2. 7 hours expended at two conferences on February 6, 1980, the date of Weltman's first appearance in *Fine Paper,* will not be compensated. At the one meeting, Weltman spoke with Specks and Howard Fink about a document search Weltman never did participate in or perform. At the second conference, Weltman met with Mary Burke, a paralegal at the Sloan & Connelly firm, concerning third party depositions. Weltman, however, took only one third party deposition nearly four months later. I cannot detect any benefit to the class as a result of either of these meetings and,

therefore, these seven hours will be disallowed.

 I have considered the class objectors' challenge to the 18.6 hours devoted to Weltman's preparing for, traveling to and taking of the depositions of the Paper Converters Association ("PCA") at Washington, D.C. Although I share the objectors' doubt as to the benefit conferred on the class by this deposition since the goal of the deposition—to authenticate and lay a foundation for the introduction into evidence of documents—was never attained, this failure, however, was due to PCA's designation of a deponent who had no knowledge of the origin of the documents. Moreover, during the course of the deposition, Weltman did obtain disclosure of the identity of an individual who was able to authenticate the documents. The deposition, therefore, did benefit the class but at a cost. Since Weltman acted in good faith in taking this deposition, he should receive reasonable compensation for his effort. Thus, the total number of Weltman's compensable hours is 113.-9.[73]

### (B) Hourly Rate

The Goldstick firm asks for an hourly rate of $75 per hour for Weltman's research, brief drafting and the PCA deposition. This rate is too high for a very recent law school graduate. Fifty dollars an hour is more appropriate.

### (C) Total Lodestar

113.9 hours × $50/hour = $5,695

### (D) Multiplier

The firm asks that a multiplier of 2.5 be applied to Weltman's time. This request is denied. In addition to the reasons stated in the Guidelines section of this memorandum, this result is justified because all of Weltman's time was expended after the initial $30 million of settlements and a substantial portion of his total hours was billed after the September 1980 final settlements.

---

73. In the appearances section of the deposition transcript, Weltman is listed as a member of the firm of Sloan & Connelly, not of the Goldstick firm. *See* Class Objectors' E 774.

Thus, no substantial contingency factor exists which would justify an increase in his lodestar amount. Similarly, no increment to the lodestar is justified for the quality of his services. Weltman did not have a leadership position; all of his compensation is for routine discovery matters; and his taking of the PCA deposition was not handled in the most efficient manner. A quality factor is inherent in Weltman's $50 hourly rate and an adjustment to that rate is not justified because he did not demonstrate an unusually high degree of skill.

## V. Paralegals

The Goldstick firm seeks compensation for 48.9 hours of work for Margaret C. May, a paralegal of the firm, at the rate of $30 an hour. A review of Ms. May's time records indicated that her work did benefit the class and the time expended was reasona-

ble. For the reasons set forth earlier, $25 an hour for paralegal time is fair and appropriate. As also stated above, no multiple will be applied to paralegal time. Accordingly, the Goldstick firm will be awarded $1,222.50 for Ms. May's time.

## VI. Expenses

The Goldstick firm's total expenses are $2,505.35. The firm has already received 75% of these expenses or $1,878. The firm's total expenses appear reasonable, and accordingly, I will award the firm the remainder of its expenses, the total of which is $627.35.

## VII. Conclusion

The following represents my determination of the fees and expenses to which the Goldstick firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Goldstick | 0.0 | 0 | 0 | 0 | $ 2,062.50 |
| Fulkerson | 0.0 | 0 | 0 | 0 | $ 3,515.63 |
| Teppery | 0.0 | 0 | 0 | 0 | $ 965.63 |
| Weltman | 113.9 | $50 | $5,695.00 | $5,695.00 | $20,992.50 |
| Paralegals | 48.9 | $25 | $1,222.50 | $1,222.50 | $ 3,667.50 |
| Total | | | $6,917.50 | $6,917.50 | $31,203.76 |

| Expenses: | |
|---|---|
| Amount Requested | $2,505.35 |
| Amount Previously Distributed | $1,878.00 |
| Amount Outstanding and Awarded | $ 627.35 |
| TOTAL AWARD: | |
| Attorneys' Fees | $6,917.50 |
| Expenses | $ 627.35 |
| | $7,544.85 |

## GREENFIELD & SCHOEN, P.C.

Greenfield & Schoen ("G & S"), a Philadelphia law firm, was substituted for Pomerantz, Levy, Haudek & Black as counsel for Irving Kanter, t/a Ever-Ready Kanter Press. The firm played a very limited role in this litigation. It was not responsible for any brief, did not participate in any merits

discovery, and was not on any committee. The firm assumed no leadership role whatsoever. The only member of the firm seeking compensation is Richard D. Greenfield. He wants to be compensated for a total of 164.7 hours devoted to representing his client with respect to the preparation for and taking of his deposition as a class representative. Greenfield also responded to de-

fendants' interrogatories on Kanter's behalf. In addition, Greenfield asks for remuneration for serving "as liaison with plaintiff" and for "moniter[ing] [sic] the progress of the litigation for plaintiff." G & S Petition at 1.

After the class was certified and Kanter was certified as one of the many class representatives on February 10, 1979, Greenfield's work on class action discovery ceased. Greenfield now seeks compensation for 164.7 hours at rates of $115—$135 per hour for the period 1977 through 1979 and requests a multiplier of 2 for a total award of $70,154.

The class objectors oppose the award of any fee to Greenfield because most of his time was devoted to class action discovery and the class did not benefit from having sixteen representatives certified. This same objection has been raised against numerous petitioners here, and for the reasons stated in the Guidelines section, it is not a bar to Greenfield's recovery of reasonable fees. Accordingly, I proceed to the *Lindy* analysis.

## (A) Hours Expended

■ Greenfield asks for remuneration for 164.7 hours. According to my calculations, the time listings on Greenfield's petition total 163.5 hours. Of this total number, 28.5 were expended after the class was certified. There is no detailed explanation provided in the petition as to what Greenfield did during this post-certification period; however, since the class was already certified, this time could not have been spent on class action discovery but rather must have been devoted to Greenfield's assumed role as "liaison" for Kanter or for monitoring the litigation for his client. Obviously, the effort did not benefit the class and will not be compensated from the fund.

■ The remaining 135 hours were presumably spent solely on class-action discovery. An examination of Greenfield's answers to defendants' interrogatories filed on behalf of Kanter show that Greenfield adopted verbatim the answers and objections previously filed by class representa-

tive Magazine Management. Docket Entry Nos. 319, 320, filed 8/3/78. I have also reviewed Kanter's deposition, which was attended by Greenfield and my reading of it convinces me that neither a high degree of preparation was needed nor was demonstrated by Greenfield. Docket Entry No. 984, filed 11/21/78. Based on this analysis it seems that the 135 hours Greenfield spent on class-action discovery was excessive. Eighty-five hours would be a reasonable time within which to accomplish this task and Greenfield will be compensated accordingly.

## (B) Hourly Rate

Greenfield seeks an hourly rate of $115—$135. As stated in the Guidelines, the type of work Greenfield performed in this litigation—class action discovery—will be compensated at the associate level rate of $50 an hour. Accordingly, Greenfield will not be paid at his requested rate.

## (C) Total Lodestar

85 hours × $50/hour = $4,250

## (D) Multiplier

Since all of Greenfield's allowed time occurred prior to the initial settlements, a contingency multiplier of 1.5 will be applied. No increment to the lodestar is justified for the quality of Greenfield's services. He did not have a leadership position; his time was spent on routine matters; and he did not demonstrate an unusually high degree of skill.

Accordingly, the total fee award for attorney time for Greenfield & Schoen, P.C. is $6,375.

## (E) Expenses

The firm's total expenses are listed as $345.19. As noted previously, the firm has already received 75% of this amount. Since the firm's expenses appear reasonable and proper, I will permit reimbursement of the outstanding $87.19.

(F) Conclusion

The following represents my determination of the fees and expenses to which Greenfield & Schoen is entitled under *Lindy*:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Greenfield | 85 | $50 | $4,250 | $6,375 | $70,154 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 345.19 |
| Amount Previously Distributed | $ 258.00 |
| Amount Outstanding | $ 87.19 |
| Amount Disallowed | 0.00 |
| Total Awarded | $ 87.19 |
| TOTAL AWARD | $6,462.19 |

---

## GROSS & SKLAR

The Philadelphia firm of Gross & Sklar was counsel of record on the complaint of The Pengad Companies, Inc., filed in this district in September 1977.[74] Two attorneys and one legal assistant expended a total of 924.5 hours on the case. The firm requests an award of $274,592.81 in attorneys' fees (including an across the board multiplier of 2.25) and $20,694.17 in expenses.

Gross & Sklar was represented on the Executive Committee and the Compliance with Defendants' Discovery Subcommittee. In the early stages of the litigation, the firm was involved in the MDL proceedings and in the effort to impound Grand Jury documents. The firm was assigned responsibility for the discovery of defendant St. Regis Paper Co.[75] It also participated in the discovery of defendants Hammermill Paper Co. and Mead Corp.

For the first six months of its involvement in the litigation, Gross & Sklar has submitted time records that do not contain any written description of the work done. The entries are grouped under general categories of legal services (e.g., "Pleadings",

"Discovery", "Court Appearances", and "Legal Research & Briefs"). Standing alone, these categories do not lend themselves to a meaningful *Lindy* analysis. My review of the entries for these six months is guided by considerations discussed above in connection with the fee petition of Berger & Montague. I have not disallowed time for vagueness if I can find some basis elsewhere in the record for a determination that the work benefited the class.

I. Warren Rubin

(A) Hours Expended

Rubin devoted 575 hours to the litigation. He was a member of the Executive Committee and co-chairman (under chairman John Noel) of Plaintiffs' Compliance with Defendants' Discovery Subcommittee. His early contributions to the litigation included involvement in the MDL proceedings, opposition to defendants' Rule 11 motions, and seeking the impoundment of Grand Jury documents. He also directed the discovery of St. Regis Paper Co. and participated in the discovery of Hammermill Paper Co. Rubin took the depositions of the president of St. Regis and a former chief executive officer of Hammermill. He

---

74. In my analysis of its fee petition, I have taken into consideration the firm's agreement with its client that it will seek its fees only through a petition filed with the court.

75. St. Regis was the first defendant to settle with the private plaintiffs and "minority" states. This settlement, in July 1978, began the first wave of settlements. Within six months six defendants had settled.

spent a good deal of time reviewing the documents produced by these defendants. The firm requests a fee of $156,709.68 for his time. I have determined that the following hours must be disallowed:

1. 34.75 hours for which I can find no basis for a determination of any benefit to the class. This figure includes 26.25 of the 69 hours logged from September 1977 through January 1978 which merely group the time entries under general categories of legal service and contain no written description of the work.

2. 10.5 hours for attendance at the pretrial conferences on 4/19/78, 6/14/78, 3/7/79, 9/10/79, 9/27/79 and 9/3/80. The class was adequately represented by co-lead counsel at these conferences.

3. 22 hours for attendance at Rule 37 Subcommittee meetings. Rubin was not a member of this subcommittee, and I will not permit him to charge the class for this time.

4. 2 hours for the 3/6/81 Executive Committee meeting. I cannot see any benefit to the class from such a meeting so many months after the final settlements.

5. 15.5 hours spent working on the fee petition.

With the disallowance of the above 84.75 hours, Rubin is left with 490.25 compensable hours.

(B) Hourly Rate

I find $100/hour to be a reasonable rate for Rubin's efforts subject to modification in two areas. As explained in the Guidelines, his 19.5 hours spent on class certification discovery will be compensated at $50/hour.[76] Rubin also spent 142.25 hours on tasks (e.g. reviewing defendants' answers to interrogatories, preparing a cast of characters for St. Regis and reviewing documents produced by the defendants) that warrant compensation at the reduced rate of $50/hour.

(C) Total Lodestar

$$328.5 \text{ hours} \times \$100/\text{hour} = \$32,850.00$$
$$161.75 \text{ hours} \times \$50/\text{hour} = \$8,087.50$$

(D) Multiplier

Rubin's work was not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply 1.5 contingency multiplier to the 167.25 compensable hours expended before the end of the first wave of settlements.

## II. Bernard Gross

(A) Hours Expended

■ This attorney worked on the motion for class certification and participated in the discovery of St. Regis Paper Co. and Hammermill Paper Co. The firm requests a total fee of $116,519.06 for 325.25 hours of work, but I have determined that a good deal of this time may not be charged to the class. My review of the records submitted for Gross reveals that the following hours must be disallowed:

1. 68.75 hours for which I can find no basis for a determination of any benefit to the class. This figure includes 32 of the 60.5 hours logged from October 1977 through February 1978 which merely group the time entries under general categories of legal service and contain no written description of the work. Most of the descriptions for the remaining hours are either illegible or indicate only that some type of correspondence or communication with another attorney took place.

2. 12 hours for attendance at the MDL proceedings. I have compensated Rubin for 13.25 hours in connection with this hearing. I will not permit both attorneys to charge the class for this time.

3. 91.25 hours spent reading and reviewing various status reports, pleadings, motions,

---

**76.** Although I recognize that as co-chairman of Plaintiffs' Compliance With Defendants' Discovery Subcommittee Rubin may have had some special responsibility for class certification discovery, the firm's fee petition has nothing to say about the work of this particular committee. In any event, these 19.5 hours represent the time spent responding to discovery directed at the firm's client, The Pengad Companies.

briefs, and settlement agreements. As explained in the Guidelines, there were too many attorneys involved in this litigation to permit all of them to charge the class for their "read and review" time. Since Gross was not a member of the Executive Committee, I have disallowed the time spent reviewing documents outside the firm's area of responsibility.

4. 12.75 hours of preparation for and attendance at the pretrial conferences on 4/19/78, 6/14/78, 7/10/78, 12/19/78, 3/7/79, and 9/10/79. The class was adequately represented by co-lead counsel at these conferences.

5. 1.5 hours devoted to the fee petition.

With the disallowance of the above 186.25 hours, Gross is left with 139 compensable hours.

(B) Hourly Rate

To be consistent with hourly rates awarded other senior attorneys, I will compensate Gross at a rate of $100/hour subject to modification in one area. Gross spent a total of 24 hours reviewing documents produced by St. Regis Paper Co. Since this type of work does not warrant a higher rate, I will compensate the time at $50/hour.

(C) Total Lodestar

115 hours × $100/hour = $11,500
24 hours × $ 50/hour = $ 1,200

(D) Multiplier

Gross' work was not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 40 compensable

hours expended before the end of the first wave of settlements.

III. Paralegals

█ The firm requests compensation for 24.25 hours of paralegal time in July 1979, but provides absolutely no explanation of what type of work was done. In the absence of any basis for a determination of whether the work benefited the class, I must disallow this time.

IV. Expenses

The firm seeks reimbursement of $20,694.17 in expenses. It has already received 75% of the figure ($15,520). Because I have disallowed attorney time for the following activities, I also disallow the associated expenses:

1. $179.35 spent by Gross on April 7, 1978, two days before the first pretrial conference, for a "meeting with plaintiff's counsel" at La Famiglia Restaurant in Philadelphia.

2. $224.95 in travel expenses by Rubin for attendance at two Rule 37 Subcommittee meetings.

3. $38.75 in expenses by Gross in connection with his attendance at the 6/13/78 pretrial conference.

4. $113 in travel expenses by Rubin for attendance at the 3/6/81 Executive Committee meeting.

Subtracting the above $556.05 from the amount of expenses still outstanding results in an award of $4,618.12.

V. Conclusion

The following represents my determination of the fees and expenses to which Gross & Sklar is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Rubin | 490.25 | $50/100 | $40,937.50 | $48,756.25 | $156,709.68 |
| Gross | 139 | $50/100 | $12,700.00 | $14,700.00 | $116,519.06 |
| Paralegal | – | – | – | – | $ 1,364.07 |
| | | | $53,637.50 | $63,456.25 | $274,592.81 |

Expenses:

| | |
|---|---|
| Amount Requested | $20,694.17 |
| Amount Already Distributed | $15,520.00 |
| Amount Outstanding | $ 5,174.17 |
| Amount Disallowed | $ 556.05 |
| Amount to be Distributed | $ 4,618.12 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $63,456.25 |
| Expenses | $ 4,618.12 |
| Final Award | $68,074.37 |

## JOHNSON, JOHNSON & EKLUND

Johnson, Johnson & Eklund, located in Gregory, South Dakota, entered this litigation in October 1977 as special assistant attorney general with the Cotchett firm to represent the State of South Dakota. Johnson, Johnson & Eklund did the local work in South Dakota, and the Cotchett firm handled matters outside the state. As discussed in the section on the Cotchett firm, it was agreed that no attorneys' fees would be paid to the firms by the state. The firms agreed to seek their fees in a joint petition to the court should a fund for such fees become available.

Johnson, Johnson & Eklund's involvement in *Fine Paper* was limited to conducting local discovery and locating and interviewing potential third party witnesses with knowledge of defendants' pricing practices. The firm seeks an award of $47,349.99 in fees and $3,705 in expenses.

### (A) Hours Expended

The firm's time records reveal that a total of 253.6 hours were devoted to this litigation.[77] I find that the following reductions must be made from the firm's fee request:

1. 152.1 hours were spent corresponding with other counsel in the litigation and reading various pleadings, motions, briefs, and memoranda. The time records contain repeated entries such as "Letter from Joe"; "Letter to Joe"; "Letter from Susan Illston"; "Letter from Specks". It is apparent from the great number of these entries and from the time spent reviewing the work of others, that Charles Johnson was keeping himself informed on the progress of the litigation outside South Dakota. This time was more of a benefit to Johnson than it was to the class. The class objectors do not want this firm to be awarded any fee at all. However, since Johnson was aware of what was going on outside South Dakota, he undoubtedly geared his substantive efforts (e.g. local discovery, locating and interviewing witnesses) to assisting the national litigation. For this reason, I will not disallow all of Johnson's time. Nevertheless, I find the 152.1 hours devoted to correspondence and "read and review" to be excessive in view of the firm's limited role in the litigation. Accordingly, only half of this time (76.05 hours) will be compensated.

2. 49.5 hours must be disallowed for three trips made by Johnson to meet with Joseph Cotchett. In February 1979 Johnson went to San Francisco to discuss class certification. In January 1980 he went to Las Vegas to confer with Cotchett on "Deps. and motions".[78] In July 1980, Johnson went to San Mateo for a meeting "on settlement and trial preparation". In view of the constant communication by telephone and letter between the Cotchett and Johnson

---

[77] Almost all of this time was expended by one attorney, Charles Johnson, who seeks compensation for 248.85 hours. Two other attorneys, Wally Eklund and Gary Davis accounted for the remaining 4.75 hours. My disposition of this firm's fee request permits me to deal with the work of these three lawyers together.

[78] I note in passing that Cotchett's time sheets do not show any entry for this meeting.

firms, it is difficult to see the necessity of these trips. The firm's response to the report of the class objectors insists that the firm "worked only on matters local to South Dakota", leaving matters outside the state to the Cotchett firm. Response of Johnson, Johnson & Eklund, Docket No. 3610, filed 11/16/81 at 3. I can find no justification for these trips on the record before me.

3. .5 hours must be disallowed since the time was devoted to preparation of material for the joint fee petition.

With the disallowance of the above 126.05 hours, the Johnson firm is left with 127.55 compensable hours.

### (B) Hourly Rate

The firm requests an hourly rate of $75 for the time of Charles Johnson and Wally Eklund and $50 for Gary Davis. My analysis of the firm's time records indicates that this firm played a very limited role in the litigation. General discovery and interviewing potential third party witnesses is not the type of work that justifies partner-level compensation. Accordingly, I will award an hourly rate of $50.

### (C) Total Lodestar

127.55 hours × $50/hour = $6377.50

### (D) Multiplier

■ The firm's efforts were not of such an unusually high caliber to warrant a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 80.5 compensable hours expended before the end of the first wave of settlements in January 1979.

### (E) Expenses

The firm requests reimbursement for $3705 in expenses. It has already received 75% of this figure ($2,778). Apart from notations made on the monthly time summaries, the firm has provided no documentation to support its expenses. Pretrial Order No. 143 required that all expenses and costs be accompanied by copies of the original supporting documentation. Johnson, Johnson & Eklund has not supplied the court with any documentation. Accordingly, the firm will not be reimbursed for any expenses, and the $2,778 already disbursed will be subtracted from the award for fees.

### (F) Conclusion

The following represents my determination of the fees and expenses to which the Johnson firm is entitled under *Lindy*:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Johnson [79] | 127.55 | $50 | $6,377.50 | $8,390.00 | $47,349.99 |

Expenses

| | |
|---|---|
| Amount Requested | $3,705 |
| Amount Previously Distributed | $2,778 |
| Amount Outstanding | $ 927 |
| Amount Disallowed | $3,705 |
| Amount to be returned to the class | $2,778 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $8,390.00 |
| Less: amount of previously awarded expenses to be returned to the class | $2,778.00 |
| Final Award | $5,612.00 |

---

**79.** Includes the compensable time (less than 3 hours) of Wally Eklund and Gary Davis.

## KLEINMAN, STEINBERG & LAPUK

The firm of Kleinman, Steinberg & Lapuk (formerly Kleinman, O'Neill, Steinberg & Lapuk), located in Hartford, Connecticut, devoted 770.72 hours to this litigation.[80] It was retained in June 1977 as special counsel for the State of Connecticut on the latter's fine paper complaint.[81] The firm also served as local counsel on the two other complaints filed in Connecticut in 1977. Four attorneys (514.6 hours) and three summer law clerks (256.12 hours) ask for an award of $147,185.97 in fees and $24,564.74 in expenses. The firm's fee request includes a multiplier of 3 applied to the time of each attorney and law student.

The Kleinman firm was represented on the Executive Committee, the Industrial Analysis Committee, and the discovery subcommittee for defendant Champion International.[82] In addition, the firm represented Connecticut when the State of New York appealed this court's overruling of New York's objections to the initial settlements.[83]

Class objectors recommend that this firm not be awarded any fees because its computer records are not specific enough to permit an analysis of whether the time benefited the class. Class Objectors' Report at 318. As discussed above in connection with the fee request of Berger & Montague, I have taken the limitations of computerized timekeeping systems into consideration in my review of such records.[84] Nevertheless, certain entries here are so vague that the information elsewhere in the fee petition, in the firm's response to the class objectors, and in other documents on the record sheds absolutely no light on the substance of the work done. A total of 146 of the 514.6 attorney hours are supported by computer entries which reveal no more than that a telephone conversation or a conference took place followed by the name of another attorney. In view of the Kleinman firm's limited role in the litigation and the absence of any explanation of the subject matter of these hours, I will not permit the firm to charge the class for all of this time. Accordingly, I am disallowing half of this time as both excessive and too vague to be compensable even for computer records.

## I. Norris O'Neill

Norris O'Neill represented Connecticut in this litigation from the beginning of its involvement until May, 1978, when he withdrew his appearance in anticipation of becoming a judge of the Connecticut Superior Court. During this time, he handled all *Fine Paper* matters involving the Kleinman firm. O'Neill was a member of the Executive Committee, one of the four co-chairmen (under chairman Joseph Cotchett) of the Industrial Analysis Committee, and a co-chairman of the discovery subcommittee assigned to Champion International. He devoted 173.23 hours to the case and requests an award of $44,174.49.

## (A) Hours Expended

Although many of the computer entries for O'Neill are rather vague, I have determined that a good deal of the time is compensable. Since O'Neill was on the Executive Committee, he will be compensated

---

**80.** On February 1, 1978 the firm began keeping its computer records in hours and minutes. I have converted minutes to decimals to facilitate totaling up the time.

**81.** The class objectors assert that work done for the certified ("minority") states should not be compensated from this settlement fund. *See, e.g.,* Class Objectors' Report at 320. I have already rejected this contention. *See* discussion of the fee request of Cotchett, Dyer & Illston.

**82.** The firms of Fine, Waltzer & Bagneris and Freeman, Atkins & Coleman also had responsi-

bility for discovery of Champion International. My analysis of the time records reveals that the Kleinman firm did not play a major role in Champion discovery, but that the time spent is compensable.

**83.** The Third Circuit's opinion is reported at 632 F.2d 1081 (3d Cir.1980).

**84.** For a full discussion of my treatment of computer time records, see the section of the opinion dealing with the fee petition of Berger & Montague.

for time spent reviewing pleadings, motions, and memoranda. Members of that committee had to keep abreast of all aspects of the litigation. Since Connecticut's complaint was one of the earliest filed, O'Neill will be compensated for time spent on early factual investigation and legal research. I have concluded, however, that the 69.68 hours (40.2% of O'Neill's time) supported by entries such as "PH Conf w/other atty" or "Conf w/client" are too vague and too numerous to warrant full compensation. Disallowing half of this time (34.84 hours) leaves O'Neill with a total of 138.39 compensable hours.

## (B) Hourly Rate

The firm asks for an hourly rate of $85 for O'Neill's time. I find this to be a reasonable request subject to adjustment in two areas. As stated in the Guidelines, time spent on class certification discovery will be compensated at $50/hour. O'Neill spent 7.18 hours on such matters. Furthermore, my review indicates that 3.29 hours were devoted to tasks (e.g. "attendance at clerk's office", "service of process") that must be compensated at a reduced rate of $50/hour.

## (C) Total Lodestar

127.92 hours $\times$ $85/hour $=$ $10,873.20
10.47 hours $\times$ $50/hour $=$ $ 523.50

## (D) Multiplier

O'Neill's contributions were not of such an unusually high degree of skill to warrant a quality multiplier. I will, however, apply a 1.5 contingency multiplier to all of his time since it was all expended before the end of the first wave of settlements.

## II. Marvin Lapuk

When Norris O'Neill assumed his judicial duties, Marvin Lapuk took over as the firm's principal participant in the litigation. He succeeded O'Neill on the Executive Committee and the discovery subcommittee for Champion International. Lapuk's total requested fee is $41,326.74.

## (A) Hours Expended

 Lapuk devoted 177.32 hours to the case. Since he took over O'Neill's position of responsibility on the Executive Committee in May, 1978, Lapuk will be compensated for his "read and review" time after that date. Lapuk went to several pretrial conferences, some of which coincided with meetings of the Executive Committee. He will be compensated for the time spent in the Executive Committee conferences but not for his "attendance at court" (computer entry to describe the pretrial conferences in this litigation). The class was sufficiently represented by co-lead counsel on these occasions. Travel time for these pretrial conferences will only be compensated if Lapuk was going to an Executive Committee meeting as well. With these considerations in mind, I have disallowed the following hours:

1. 9.25 hours for "attendance" at and, where appropriate, travel to the pretrial conferences of 4/19/78, 6/14/78, and 3/7/79. The class was adequately represented by co-lead counsel at these conferences.

2. 17.01 hours devoted to Industrial Analysis Committee work. As explained in the Guidelines, I have determined that the work of this committee did not benefit the class.

3. 47.93 hours (27% of Lapuk's time) are supported by computer entries such as "PH Conf w/other atty" or "PH Conf w/client", which I find to be too numerous and too vague to warrant full compensation. Accordingly, one-half (23.96 hours) will be disallowed.

With the disallowance of the above 50.22 hours, Lapuk is left with 127.1 compensable hours.

## (B) Hourly Rate

The firm seeks an hourly rate of $75–$85 for Lapuk's time. I find $85/hour to be a reasonable request subject to adjustment in two areas. Two hours spent on class certification discovery (e.g. deposition of the client) will be compensated at $50/hour as explained in the Guidelines. Furthermore,

16 hours devoted to review of Champion documents will also be compensated at $50/hour since the nature of this work does not justify a higher rate.

(C) Total Lodestar

109.1 hours × $85/hour = $9,273.50
18 hours × $50/hour = $ 900.00

(D) Multiplier

Lapuk's efforts were not of such an unusually high degree of skill to warrant a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 65.99 compensable hours expended before the end of the first wave of settlements.

III. Daniel Kleinman

(A) Hours Expended

Work on class certification discovery of the firm's client accounts for more than half of this attorney's 25.42 hours. With a proposed multiplier of 3, Kleinman's total requested fee is $4,575.

I will only disallow time for those hours supported by computer entries such as "PM Conf w/other atty" which I find to be too numerous and too vague to warrant full compensation. Kleinman has a total of 7.34 hours (28.9% of his time) supported by such entries. Disallowing half (3.67 hours) leaves Kleinman with 21.75 compensable hours.

(B) Hourly Rate

The firm seeks an hourly rate of $60 for Kleinman's time. I find this to be a reasonable request subject to reduction to $50, as explained in the Guidelines, for the 13 hours devoted to class certification discovery.

(C) Total Lodestar

8.75 hours × $60/hour = $525
13 hours × $50/hour = $650

(D) Multiplier

The work done by Kleinman was not of such an unusually high degree of skill to merit a quality multiplier. All of his time was logged before January, 1979, so I will apply a 1.5 contingency multiplier to all 21.75 compensable hours.

IV. Donald Holtman

■■■ This attorney got involved in *Fine Paper* in mid-1979. He did some work on Champion International discovery, but his major contribution to the litigation was handling the appeal taken by the State of New York from the overruling of its objections to the initial settlements. Holtman briefed and argued the case to the Third Circuit on behalf of Connecticut and in support of the settlements. The Kleinman firm requests a fee of $31,207.50 for his efforts.

(A) Hours Expended

Holtman devoted 138.7 hours to this litigation. I have determined that the following time must be disallowed:

1. 21.05 hours (15.2% of his time) are supported by computer entries such as "PH Conf w/atty" followed by a name. As explained above, I find that these entries are too numerous and too vague to warrant full compensation. Half of this time (10.52 hours) will be disallowed.

2. 6 hours spent at the 12/20/79 Discovery Committee meeting. Marvin Lapuk also attended this meeting and has charged the class for 6 hours. I cannot see the benefit to the class of having both attorneys attend the meeting. The firm will only receive compensation for one attorney's time.

3. 1.5 hours for "attendance" at the 9/3/80 pretrial conference. There was an Executive Committee meeting that day which Holtman attended in Lapuk's place. He will be compensated for the time at the Executive Committee meeting but not for attending the pretrial conference.

After disallowing the above 18.02 hours, Holtman is left with 120.68 compensable hours.

(B) Hourly Rate

The firm requests an hourly rate of $75 for Holtman's work. I find this to be reasonable.

(C) Total Lodestar

120.68 hours $\times$ \$75/hour = \$9,051

(D) Multiplier

Since Holtman's efforts were not of such an unusually high degree of skill to merit a quality multiplier, and since all of his time was expended after the initial settlements had eliminated any contingency, I will not award any multiplier.

V. Law Clerks

The firm employed three law students as summer clerks who spent a total of 256.12 hours on *Fine Paper* matters. I find that this time is compensable at \$25/hour. No multiplier is applied to law student time.

VI. Expenses

█ The firm requests reimbursement for \$24,564.74 in expenses. It has already received 75% of this figure (\$18,423). I have determined that all but certain travel expenses may be reimbursed by the class.

All the disallowed expenses relate to trips for which attorneys' fees have been disallowed. The firm has not requested reimbursement for all travel expenses and I have not disallowed any expenses for travel when the attorney was also going to attend an Executive Committee meeting. With these considerations in mind, I have disallowed the following expenses:

1. \$263.73 for travel by Marvin Lapuk to the 8/11/78 Industrial Analysis Committee meeting.

2. \$164.46 for travel by Lapuk to the 4/19/78 pretrial conference.

3. \$155.20 for travel by one attorney to the 12/20/79 Discovery Committee meeting. Both Lapuk and Holtman attended this meeting. I will not permit both to charge the class for their expenses.

VII. Conclusion

The following represents my determination of the fees and expenses to which the Kleinman firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| O'Neill | 138.39 | \$50/85 | \$11,396.70 | \$17,095.05 | \$ 44,174.49 |
| Lapuk | 127.1 | \$50/85 | \$10,173.50 | \$12,943.08 | \$ 41,326.74 |
| Kleinman | 21.75 | \$50/60 | \$ 1,175.00 | \$ 1,762.50 | \$ 4,575.00 |
| Holtman | 120.68 | \$75 | \$ 9,051.00 | \$ 9,051.00 | \$ 31,207.50 |
| Law Students | 256.12 | \$25 | \$ 6,403.00 | \$ 6,403.00 | \$ 25,902.24 |
| TOTAL | | | \$38,199.20 | \$47,254.63 | \$147,185.97 |

Expenses:

| | |
|---|---|
| Amount Requested | \$24,564.74 |
| Amount Previously Distributed | \$18,423.00 |
| Amount Outstanding | \$ 6,141.74 |
| Amount Disallowed | \$ 583.39 |
| Amount to be Distributed | \$ 5,558.35 |

Total Award:

| | |
|---|---|
| Attorneys' Fees | \$47,254.63 |
| Expenses | \$ 5,558.35 |
| | \$52,812.98 |

## KOHN, SAVETT, MARION & GRAF

The Kohn firm entered this litigation in November 1977 by filing a complaint in the Southern District of New York on behalf of Magazine Management Co. (hereinafter "MM").[85] Harold Kohn, the senior partner of the firm, served as co-lead counsel, co-chairman of the Executive Committee, chairman of the Briefing Committee, and was designated as Senior Trial Spokesman. The firm had joint responsibility with Specks & Goldberg for the discovery of defendant International Paper Co. Members of the firm, in particular Kohn and his associate Dianne Nast, were involved in nearly every major aspect of the case. The fee petition divides the litigation into three phases and requests multipliers of 2 to 3 for attorney time in Phase I (pre-January 1979), 1.5 to 2.5 for Phase II (January 1979 to January 1980), and 1.25 to 2 for Phase III (post-January 1980). With the application of these multipliers, the firm's total fee request comes to $1,914,287 for 9,777.75 hours of work. The firm also seeks reimbursement of $124,625.07 in expenses.

Although no one disputes the many important contributions made by the Kohn firm to this litigation, both the class objectors and several of Kohn's fellow plaintiffs' counsel have raised questions about the hours, rates and multipliers in the firm's petition.[86] Some of these objections will be discussed before proceeding with the *Lindy* analysis of the fee petition.

An objection is made to the firm's billing the class for the attendance of associates at certain arguments, conferences and depositions. Dianne Nast was Kohn's primary associate in this case and attended most arguments and conferences with him. Moreover, the firm sent either Nast, Jay Cohen, Robert LaRocca or Elkan Katz to attend discovery committee meetings and monitor several depositions that were thought to be important.

It is a truism that cases of this nature are too big to be handled by one attorney. On the other hand, this case is an unfortunate example of what can happen when the "litigation by committee" system is not tightly controlled. In my judgment, Kohn's use of associates to assist him in keeping abreast of all aspects of the litigation was an efficient way to carry out his responsibilities as co-lead counsel. The class is best served when lead counsel are as well informed and prepared as possible.[87] These associates will, of course, be compensated at the appropriate associate-level rate, but it is my determination that this time was beneficial to the class.

A second objection is made to the so-called "unauthorized damage study" undertaken at Kohn's direction by members of the Kohn and Berger firms.[88] There seems to be no dispute that as of the end of July, 1980, the plaintiffs had essentially no case to present on damages. Kohn is accused of proceeding "in direct violation of specific instructions by Plaintiffs' Executive Committee not to undertake a pricing study." Preliminary Statement of Certain Plaintiffs in Support of Objections to the Petition of Kohn, Savett, Marion & Graf, filed 6/5/81, Docket Entry No. 3411, at 11 (hereinafter "Preliminary Statement"). The Kohn firm claims some 275 hours for this work.

85. The firm filed a second *Fine Paper* complaint, this one in the Eastern District of Pennsylvania, on behalf of Philadelphia Newspapers, Inc., but the suit was later voluntarily dismissed at the request of the client. N.T., 4/21/82 at 2016.

86. *See* Class Objector's Report at 323–345; Preliminary Statement of Certain Plaintiffs in Support of Objections to the Petition of Kohn, Savett, Marion & Graf, filed 6/5/81, Docket Entry No. 3411; Affidavits filed in support thereof, Docket Entry No. 3412; and Supplemental Statement of Sachnoff, Schrager, Jones,

Weaver & Rubinstein, filed 8/10/81, Docket Entry No. 3504.

87. When cross-examined at the fee hearings about the attendance by an associate at certain depositions, Kohn testified "We went to those depositions that we thought we had to in view of my responsibility as co-chairman and the responsibility of the person who had to try [the case]." N.T., 4/21/82 at 2043.

88. *See* the discussion of the Berger firm's involvement in the section of this memorandum on that firm's fee petition.

A third objection involves trial preparation. Although my treatment of the time spent on the pretrial memorandum (see the Guidelines) will apply equally to the Kohn firm, the problem of duplicative trial preparation extended beyond the work done on that document. In the final months before the scheduled trial, a schism developed between Kohn and Specks over control of the case. It was nothing more than an out-and-out power struggle that began with name calling [89] and ended with the establishment of separate camps (rival trial headquarters) in Philadelphia in anticipation of the trial. The Kohn contingent prepared for trial at the Adler, Barish office; the Specks group worked from the Barrack office.

The class objectors recommend that the court "make an adjustment for the admittedly duplicative time spent in the pretrial period for two sets of attorneys simultaneously engaged in the same preparation for the same trial." Class Objectors' Report at 177.

▮▮ I will deal with the Specks camp in due course. As for the Kohn camp, I begin by recognizing that not only was Kohn co-lead counsel, but he was designated as Senior Trial Spokesman for the class. If anyone had the ultimate responsibility to make final preparations for trial, it was Kohn. Therefore, I will not disallow any damage study or trial preparation time

(apart from work on the pretrial memorandum) for Kohn's firm. Nevertheless, there was clear duplication of effort and I will not permit the class to be saddled with the additional costs generated by the discord among their lawyers.

It is my considered judgment that rather than involve the court in the nearly impossible and somewhat arbitrary process of resolving counsel's battles over who authored the disqualification brief (Kohn firm or Sachnoff firm) or whose damage study was of greater benefit to the class (Specks-Sloan or Kohn-Berger) or which camp should have been the one to prepare for trial in Philadelphia (Specks or Kohn), the interests of the class will be as well served by simply denying a multiplier for quality. Accordingly, as discussed below, despite its considerable contributions to the class effort, the Kohn firm will receive no multiplier for quality.

With these considerations in mind, I now proceed with the *Lindy* analysis of the Kohn firm's fee petition.

## I. Harold Kohn

As co-lead counsel, Kohn was heavily involved in all aspects of the action except discovery.[90] He made major contributions in the areas of settlement negotiations, briefing and appellate work. He was gen-

---

89. In an August 21, 1980 letter, Specks took Kohn to task for "your repeated efforts to cripple the preparation of Plaintiffs' Trial Memorandum by the drafting committee and your continuing failure and refusal to abide by the decisions of Plaintiffs' Executive Committee and to cooperate with other counsel in preparing the case for trial." Exhibit E to Preliminary Statement. On August 23, Kohn responded, "I don't propose to waste further time reviewing or responding to the manic minutiae of your letter of August 21st. In view of the tone of the letter and your prior communications, I think the matter must be referred forthwith to the Court for resolution. If you and your two conferees [Sloan and Saveri] want to repeat your folly before Judge Singleton, so be it." Letter to Specks, Class Objectors' E 749. Specks replied that, "it is clear from the record who is 'manic'.... [E]very effort has been made by the other members of the trial team to conciliate your hostile, uncooperative and counter-productive actions, but apparently to

no avail." Letter to Kohn, 8/25/80, Class Objectors' E 750.

90. In its fee petition, the firm explains its limited role in the discovery effort:

Petitioner participated actively in the discovery program when it appeared such participation would be fruitful. Petitioner Kohn examined many documents, conducted the interrogation of two of the third-party witnesses, and monitored several other significant depositions to the extent warranted, believing that some of the on-going deposition program was not particularly productive in terms of the amount of time and money spent.

Petitioner on the other hand believed that most of its efforts should be directed to the day-to-day effort to prepare for a trial of the magnitude which this litigation would entail. Kohn Petition at 32.

erally the spokesman for the class at conferences and arguments and would have been Senior Trial Spokesman had the case gone to trial. With the application of the requested multipliers of 3, 2.5 and 2 for the three phases described above, Kohn's total fee award would be $1,006,682 for 1649.75 hours of work.

(A) Hours Expended

I have determined that the following hours must be disallowed:

1. 38.5 hours supported by entries too vague to permit a determination of whether the time benefited the class. Much of this time is merely reported as "51", the firm's time code for "pleadings and briefs". Other entries indicate only that a meeting or telephone conversation took place without any description of the subject discussed.

2. 120.5 hours were spent working on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Kohn will be compensated for 60.25 hours.

With the disallowance of the above 98.75 hours, Kohn is left with 1551 compensable hours.

(B) Hourly Rate

Kohn requests an hourly rate of $250 for the time expended before January 1981 and $270/hour for the remainder of his time. As explained above, I have determined that $150/hour is a fair and reasonable rate for lead counsel to charge the class in this case.

(C) Total Lodestar

1551 hours × $150/hour = $232,650

(D) Multiplier

Kohn's efforts on behalf of the class were often quite impressive. If any attorney for the class displayed the unusually high degree of skill that *Lindy II* requires for the

award of a quality multiplier, it was Kohn. Certainly he has been awarded generous multipliers in other cases. Nevertheless, *Lindy II* also teaches that a quality multiplier "may be considered in the nature of a bonus or penalty. The heavy burden of proving entitlement to such an adjustment is on the moving party." *Lindy II* at 118. Although there is sufficient support in the record for rewarding Kohn for efficient use of his own time and that of his associates in carrying out the firm's many responsibilities, I am not persuaded that any participant in plaintiffs' top-heavy organizational structure deserves a bonus.[91]

I recognize that Kohn's objections helped bring into focus the enormous excesses of this case and I commend his integrity. On the other hand, I cannot overlook the internal power struggle that generated needless duplication of work and a deplorable breakdown in communications in the final weeks before trial. Kohn must share some of the responsibility for that state of affairs. Accordingly, although I will apply a 1.5 contingency multiplier to his 443.5 compensable hours expended before the end of the first wave of settlements, I will not award any quality multiplier to Kohn's lodestar.

II. Dianne Nast

(A) Hours Expended

As Kohn's principal associate in this case, Dianne Nast had extensive involvement in nearly every area of the litigation. She participated in the research and drafting of briefs, orders, and class notices, assisted Kohn at settlement conferences, pretrial conferences and oral arguments, monitored a number of depositions, and worked on trial preparation, damage study, and settlement administration matters. With the application of the requested multipliers of 2.5, 2, and 1.5 for the three phases described above, Nast's total fee award would be $570,916 for 3526.25 hours of work. I have determined that the following hours must be disallowed:

---

**91.** I note that although Kohn now criticizes the organizational structure established in early 1978, he was one of its original supporters. *See* N.T., 4/19/78 at 15.

1. 30.5 hours supported by entries too vague to permit a determination of whether the time benefited the class. The great bulk of this time is described only as telephone calls or correspondence without any further indication of the substance of the matters discussed.

2. 68.5 hours were spent working on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Nast will be compensated for 34.25 hours.

3. 12.25 hours spent traveling to and attending the Executive Committee meeting on 3/6/81. I can see no benefit to the class from such a meeting so long after the final settlements were reached. Nast's expense records for this time indicate that the subject of the meeting was the filing of fee petitions.

With the disallowance of the above 77 hours, Nast is left with 3449.25 compensable hours.

### (B) Hourly Rate

As Kohn's associate, Nast will be compensated at an hourly rate of $50 subject to modification in one area. She spent 55.5 hours working on such settlement administration matters as answering inquiries and handling telephone calls from class members pertaining to the class notice. This non-legal work will be compensated at $25/hour.[92]

### (C) Total Lodestar

3393.75 hours × $50/hour = $169,687.50
55.5 hours × $25/hour = $ 1,387.50

### (D) Multiplier

Although Nast's involvement in the case was extensive and her efforts on behalf of the class quite commendable, she did not have a position of leadership and acted primarily as Kohn's assistant. This type of work does not merit the application of a quality multiplier since it does not rise to the unusually high degree of skill required by *Lindy II.* I will, however, apply a 1.5 contingency multiplier to the 1111.25 compensable hours expended before the end of the first wave of settlements.

### III. Jay Cohen

### (A) Hours Expended

This associate did most of his work on discovery-related matters. He summarized depositions and discovery responses, analyzed International Paper Co. documents and prepared a cast of characters for that defendant. In addition, Cohen worked on briefing, trial preparation, damage study, and settlement administration matters. With the application of the requested multipliers of 2, 1.5, and 1.25 for the three phases described above, Cohen's total fee award would be $151,414 for 1908 hours of work. I have determined that the following hours must be disallowed:

1. 9.5 hours supported by entries too vague to permit a determination of whether the time benefited the class.

2. 4 hours for attendance at the pretrial conferences on 6/14/78 and 3/7/79. I have compensated Kohn for the second conference and Nast for both. I will not permit Cohen to charge his time to the class as well.

3. 82 hours were spent working on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Cohen will be compensated for 41 hours.

With the disallowance of the above 54.5 hours, Cohen is left with 1853.5 compensable hours.

### (B) Hourly Rate

Cohen will be compensated at the associate rate of $50/hour subject to modification

---

**92.** I have not included work on the class notice itself in this reduction.

in one area. His 285.5 hours spent on such settlement administration matters as responding to inquiries from class members will be compensated at $25/hour.

(C) Total Lodestar

1568 hours × $50/hour = $78,400.00
285.5 hours × $25/hour = $ 7,137.50

(D) Multiplier

Cohen's work was not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 239.75 compensable hours expended before the end of the first wave of settlements.

IV. Robert LaRocca

(A) Hours Expended

LaRocca devoted most of his time to briefing motions and to work on plaintiffs' case in opposition to the appeal of the denial of Kimberly-Clark's motion to disqualify certain class counsel. With the application of the requested multipliers of 2, 1.5, and 1.25 to the three phases described above, LaRocca's total fee award would be $79,598 for 884.25 hours of work. I have determined that all of this time is compensable except for the 8.75 hours charged for attendance at the pretrial conferences on 4/19/79 and 6/5/79. I have compensated both Kohn and Nast for these conferences and will not permit LaRocca to charge the class for this time. LaRocca is thus left with 875.5 compensable hours.

(B) Hourly Rate

LaRocca will be compensated at the associate rate of $50/hour subject to modification in one area. His 19.75 hours devoted to such settlement administration matters as handling inquiries from class members will be compensated at $25/hour.

(C) Total Lodestar

855.75 hours × $50/hour = $42,787.50
19.75 hours × $25/hour = $ 493.75

(D) Multiplier

LaRocca's efforts were not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 46.75 compensable hours expended before the end of the first wave of settlements.

V. Elkan Katz

(A) Hours Expended

Katz had discovery-related responsibilities similar to those of Jay Cohen. He summarized depositions, prepared a digest of defendants' interrogatory responses, and reviewed International Paper Co. documents. He also was involved in trial preparation, damage study, and settlement administration work. With the application of the requested multipliers of 2, 1.5, and 1.25 for the three phases described above, Katz' total fee award would be $61,736 for 744.75 hours of work. I have determined that all of this time is compensable except 4.25 hours which are supported by entries too vague to permit an analysis of whether the time benefited the class. These entries either indicate that a telephone call took place without further elaboration or contain no description of how the time was spent. Katz is thus left with 740.5 compensable hours.

(B) Hourly Rate

Katz will be compensated at the associate rate of $50/hour subject to modification in one area. His 31.75 hours devoted to such settlement administration matters as handling inquiries for class members and maintaining a class list will be compensated at $25/hour.

(C) Total Lodestar

708.75 hours × $50/hour = $35,437.50
31.75 hours × $25/hour = $ 793.75

(D) Multiplier

Katz' work was not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to his 194.75 compensable

hours expended before the end of the first wave of settlements.

## VI. Steven Raab

### (A) Hours Expended

This attorney worked on settlement administration for six weeks in the summer of 1979. He sent out letters to class members and handled inquiries regarding the early settlements and the submission of claims. With the application of the requested multiplier of 1.5, Raab's total fee award would be $15,189 for 225 hours of work. I have determined that all of his time is compensable.

### (B) Hourly Rate

The type of work done by Raab does not warrant the $45 hourly rate requested by the firm. It was essentially non-legal—indeed, often clerical—in nature and will be compensated at a rate of $25/hour.

### (C) Total Lodestar

225 hours × $25/hour = $5625

### (D) Multiplier

No multiplier will be applied to Raab's time since it was not of such an unusually high degree of skill to merit a quality multiplier and was all logged after the end of the first wave of settlements.

## VII. Other Attorneys

The firm seeks compensation for the time of eleven other attorneys, none of whom worked more than 21 hours on the case.[93] The total number of hours claimed for these attorneys is 106.25 and would result in a total award of $17,598 for their time.

I have determined that:

1. All the time for Marion, Swift, Savett, Weinberg, Klein, Weinstein, and Roda must be disallowed. Most of this time indicates only participation in early meetings to discuss the case. Many hours are not describ-

[93]. The attorneys and their time: David Marion (17.5 hours); Bayard Graf (20.25); Robert Swift (13.25); Wayne Thomas (16.25); Stuart Savett (4.25); Michael Hausfeld (8); Donald

ed at all. Others indicate only file review or telephone calls. A total of 53.25 hours is disallowed.

2. Of the four remaining attorneys, I will compensate the 13 hours Graf spent on document review, the 11 hours Thomas spent on the case in New York before the MDL transfer to Philadelphia, the 7 hours Hausfeld spent traveling to and attending a discovery committee meeting, and the 8.5 hours Bazier spent attending and summarizing a deposition. The remaining 13.5 hours are disallowed for vagueness or duplicative attendance at conferences.

The 39.5 compensable hours will all be compensated at $50/hour. No quality multiplier is warranted, but a 1.5 contingency multiplier will be applied to the compensable time of Thomas and Hausfeld since it was logged before the end of the first wave of settlements.

## VIII. Paralegal/Law Clerks

The firm used one paralegal and two law clerks during the litigation. It seeks an hourly rate of $15 for the 723.75 paralegal hours, $20/hour for one law clerk (5.75 hours) and $25/hour for the other (4 hours). I find this to be reasonable compensation.

## IX. Expenses

The Kohn firm requests reimbursement of $124,625.07 in expenses. It has already received 75% of this figure ($93,468). Of the outstanding $31,157.07 I disallow only $410 in travel expenses for Dianne Nast's attendance at the 3/6/81 Executive Committee meeting in Chicago. Attorneys' fees have been disallowed for this meeting. I find the remainder of the firm's expenses to be reasonable.

## X. Conclusion

The following represents my determination of the fees and expenses to which the Kohn firm is entitled under *Lindy:*

Weinberg (9.5); Samuel Klein (1); David Weinstein (2.75); Joseph Roda (5); and Judith Bazier (8.5).

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Kohn | 1551 | $150 | $232,650.00 | $265,912.50 | $1,006,682 |
| Nast | 3449.25 | $25/50 | $171,075.00 | $198,856.25 | $ 570,916 |
| Cohen | 1853.5 | $25/50 | $ 85,537.50 | $ 91,531.25 | $ 151,414 |
| LaRocca | 875.5 | $25/50 | $ 43,281.25 | $ 44,450.00 | $ 79,598 |
| Katz | 740.5 | $25/50 | $ 36,231.25 | $ 41,100.00 | $ 61,736 |
| Raab | 225 | $25 | $ 5,625.00 | $ 5,625.00 | $ 15,189 |
| Graf | 13 | $50 | $ 650.00 | $ 650.00 | $ 3,113 |
| Thomas | 11 | $50 | $ 550.00 | $ 825.00 | $ 2,646 |
| Hausfeld | 7 | $50 | $ 350.00 | $ 525.00 | * |
| Bazier | 8.5 | $50 | $ 425.00 | $ 425.00 | * |
| Paralegal/ Law Clerks | 733.5 | $15/20/ 25 | $ 11,071.25 | $ 11,071.25 | $ 11,154 ** |
| Total [94] | | | $587,446.25 | $660,971.25 | $1,914,287 |

EXPENSES:

| | |
|---|---|
| Amount Requested | $124,625.07 |
| Amount Previously Distributed | $ 93,468.00 |
| Amount Outstanding | $ 31,157.07 |
| Amount Disallowed | $ 410.00 |
| Amount to be Distributed | $ 30,747.07 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $660,971.25 |
| Expenses | $ 30,747.07 |
| FINAL AWARD | $691,718.32 |

\* I am not able to determine these amounts from the figures provided in the fee petition.

\*\* This figure was based on erroneous calculations in the fee petition.

---

## LITMAN, LITMAN, HARRIS & SPECTER, P.A.

The Litman, Litman, Harris & Specter firm is located in Pittsburgh, Pennsylvania. The Litman firm became counsel for Copies Unlimited, Inc. on August 3, 1977. Formerly, Gene Mesh had been co-counsel with the Litman firm in this litigation but Mesh dropped out of the case early and has not filed a fee petition with this court.

The firm seeks compensation for 35.1 partner hours, 40.9 associate hours, and 31.6 paralegal hours. The total lodestar requested is $7,065 and with the application of the requested multiplier of 1.84 the total fee award sought is $12,999.60. In addition, the Litman firm seeks reimbursement for $3,529 in expenses. Litman's involvement in the litigation consisted primarily of discovery of defendant Union Camp with some minor document review and preparation. On balance, the firm's overall involvement in this litigation was very limited.

94. The firm's "Total Requested" figure of $1,914,287 includes the amounts requested for the seven attorneys whose time has been disallowed entirely.

## I. Howard Specter

### (A) Hours Expended

 Specter is a partner in the firm. He asks to be compensated for 34.1 hours of work. Upon analysis of the time sheets submitted I find, however, that Specter can be compensated for only 5.9 hours as this is the only time which can reasonably be said to have benefited the class. I have determined that Specter should not be compensated for the following:

1. 13 hours spent in meetings with other counsel and at pretrial conferences. Specter was not chairman of any of the committees formed for this class action, and the firm's discovery activities were limited to one company, Union Camp. The Litman firm had no leadership position, and its limited support role meant Specter's attendance at pretrial conferences was neither necessary nor beneficial to the class. This is especially so since the firm's discovery responsibilities were later turned over to the firm of Berger & Montague. Similarly, Specter's meeting with Mr. Mesh, who dropped out of the case, cannot be compensated as this meeting was of no benefit to the class.

2. .4 hours Specter seeks as compensation for "other general matters" related to this litigation. The classification is too vague and inadequately documented to allow a determination of whether there was any benefit to the class.

3. 14.8 hours for review of documents and court activities not related to the firm's discovery assignment will not be allowed as such work made an insignificant contribution to the creation and/or preservation of the fund. The Litman firm's activities were limited to its client and the discovery of one paper company. The time spent on review of documents and court activities unrelated to the firm's assigned task was unnecessary and duplicative in light of the number of other firms involved, the distribution of work, and the Berger & Montague firm's later discovery of Union Camp. Furthermore, a number of time entries under this category are inadequately described.

The remaining 5.9 hours of compensation which Specter seeks for specific Union Camp discovery and initial industry review I will allow. The total number of hours for which Specter is not compensated is 28.2.

### (B) Hourly Rate

Specter seeks an hourly rate of $100 for all work done prior to January 1, 1979 and an hourly rate of $125 for all work done since that date. Specter's compensable time, however, involves those hours devoted to discovery of Union Camp and some initial review concerning the paper industry as a whole. Although this type of work need not have been performed by a senior partner, an hourly rate of $100 would not be unreasonable.

### (C) Total Lodestar

5.9 hours $\times$ $100/hour $=$ $590

### (D) Multiplier

No positive quality multiplier will be applied to Specter's Lodestar. As noted, the discovery work and review performed by Specter were of the routine variety. I find no discernable demonstration of exceptional quality from Specter's performance and completion of these tasks. However, a contingency factor of 1.5 will be applied to all of Specter's compensable hours since they were expended prior to the January 1979 settlements.

## II. Michael Buchwach

### (A) Hours Expended

Buchwach is an associate. The firm seeks compensation for 39.9 hours of his time. Upon analysis of the time sheets submitted, I find, however, that only 27.2 hours are compensable. Buchwach will not be compensated for the following hours:

1. 6.3 hours for "other general matters" related to this litigation are too vague. This classification is inadequately documented and renders impossible a determination of benefit to the class.

2. 6.4 hours for preparation and review of pleadings, motions, briefs, and memos will

not be allowed as such work made no contribution to the creation or preservation of the fund.

The remaining 27.2 hours Buchwach spent in review of Union Camp discovery documents or in attendance at the Chicago discovery meeting I will allow.

## (B) Hourly Rate

The hourly rate at which Buchwach is to be compensated is $50. This hourly rate reflects reasonable compensation measured both objectively and by what the Litman firm was charging for its attorneys' services during the time in question.

## (C) Total Lodestar

27.2 hours × $50/hour = $1,360

## (D) Multiplier

No positive quality multiplier will be applied to Buchwach's lodestar for the same reasons no increment was added to Specter's lodestar. For the reasons stated earlier, a contingency multiplier of 1.5 will be applied to the .3 hours of Buchwach's compensable time spent prior to the January 1979 settlements.

## III. Irving Portnoy and M. Beth Troiano

■ Portnoy is a partner in the firm and Troiano was an associate with the firm during the relevant time period. Both attorneys seek to be compensated for one hour of work each. I find there can be no compensation for the work either of the two attorneys performed in this litigation. The time is disallowed as follows:

1. The one hour of work expended by Portnoy was allocated to document review and preparation. The time involved 60 minutes of conversation with the client. It is difficult to discern any real benefit to the class from the time expended by Portnoy.

2. The one hour of work expended by Troiano was allocated to document review and preparation. The hour involved 10 minutes to prepare a notice of appearance and the remaining 50 minutes to locate Lockwood's directory for Mr. Specter. On the face of it these activities lacked any real benefit to the class.

Accordingly, no compensation will be allowed for either attorney and it is unnecessary to analyze any hourly rate, compute a lodestar, or arrive at a multiplier figure.

## IV. Paralegals

■ The Litman firm seeks compensation for 31.6 hours of paralegal time. I have determined the firm is entitled to be compensated for only 10 of these hours at $25 an hour for a total of $250. My review of the records indicates that this was the only time spent by the support staff working directly with Union Camp or Copies Unlimited documents. This is the only time which can reasonably be said to have benefited the class as an ancillary service to that work already compensated and accomplished by the attorneys of the Litman firm.

## V. Expenses

The Litman firm lists total expenses of $3529. The firm has already received 75% of these expenses. I will award the firm the outstanding $883 since all the expenses appear to have been necessary and reasonable.

## VI. Conclusion

The following represents my determination of the fees and expenses to which the Litman firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Specter | 5.9 | $100 | $ 590.00 | $ 885.00 | $ 6,407.80 |
| Buchwach | 27.2 | $ 50 | $1,360.00 | $1,367.50 | $ 4,871.40 |
| Portnoy | 0.0 | 0 | 0 | 0 | $ 147.20 |

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Troiano | 0.0 | 0 | 0 | 0 | $ 119.60 |
| Paralegals | 10.0 | $ 25 | $ 250.00 | $ 250.00 | $ 1,453.60 |
| TOTAL | | | $2,200.00 | $2,502.50 | $12,999.60 |

Expenses:

| | |
|---|---|
| Amount Requested | $3,529.00 |
| Amount Previously Distributed | $2,646.00 |
| Amount to be Distributed | $ 883.00 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $2,502.50 |
| Expenses | $ 883.00 |
| Final Award | $3,385.50 |

## MEAGHER, GEER, MARKHAM, ANDERSON, ADAMSON, FLASKAMP & BRENNAN

At the urging of Walter Riordan, this Minneapolis firm entered the *Fine Paper* case on April 20, 1979 as counsel for Federated Insurance Company. *See* Perry Affidavit, Class Objectors' E 527–28. It also entered its appearance on behalf of three other companies.

The firm claims that it devoted 62.5 partner hours, 133.5 associate hours and 37.75 paralegal hours to this litigation. The total fee requested is $24,972.50, based on hourly rates of $70 and $100 for a partner, $50 to $60 for associates and $40 for legal assistants with a multiplier of 1.75.

The firm's contribution to the prosecution of this case was very limited. Indeed, as explained below, most of the firm's time was of no benefit to the class. The lawyers and paralegals of the firm spent all of their time drafting complaints on behalf of their clients, communicating with their clients, reviewing their clients' records to determine the amount of their purchases, reviewing documents on microfilm, and preparing an index.

At the time this firm entered the litigation there was already an abundance of attorneys, the class had been certified and thirty million dollars in settlements were in the bank. Both the class objectors and Kohn have urged that no fees be awarded to this firm, primarily because of their late entry into the case and since the "firm's work was undertaken almost exclusively on behalf of its client...." Kohn Objections at ¶ 1.

### I. William D. Flaskamp

 Flaskamp, a partner of the firm, seeks reimbursement for 62.5 hours. After a careful review of the time records submitted, I have concluded that petitioner should not be awarded any compensation for his time. Nearly all his hours were devoted to meetings and communications with his clients and co-counsel, none of which time benefited the class. He did spend some minimal time doing research and reviewing pleadings, but this effort was plainly duplicative of the already enormous amount of research and review time expended by the numerous other attorneys in the case. Accordingly, no compensation will be awarded for Flaskamp's time and it is therefore unnecessary to determine an hourly rate, compute a lodestar, or arrive at a multiplier figure for his time.

### II. Donald C. Mark

This associate requests compensation for 5.25 hours spent in review of pleadings and documents, meetings with Flaskamp, and correspondence and conferences with clients. I fail to see any benefit to the class from these hours and, accordingly, no compensation will be awarded for Mark's time.

It is therefore unnecessary to determine an hourly rate, compute a lodestar, or arrive at a multiplier figure for Mark's time.

## III. Douglas J. Muirhead

### (A) Hours Expended

 The firm requests compensation for 45.5 hours of this associate's time spent reviewing defendants' records on microfiche and preparing a report for "plaintiffs' class action committee". This appears reasonable and to have benefited the class. Accordingly, compensation will be allowed.

### (B) Hourly Rate

The firm requests $50 per hour for Muirhead's time. This appears reasonable.

### (C) Total Lodestar

45.5 hours $\times$ $50/hour $=$ $2,275

### (D) Multiplier

For the reasons stated below, no multiplier will be awarded to Muirhead or any other member of the firm.

## IV. David A. Larson

### (A) Hours Expended

 The firm requests compensation for 82.75 hours of this associate's time. After careful review of the time records submitted, I find that all but the following hours are compensable:

1. 12.75 hours spent in preparation of the firm's fee petition. Such time is not compensable.

2. 49.5 hours spent on various activities which were of no benefit to the class such as "file review," "review of class action mailings," meetings with and telephone calls and letters to clients, telephone calls to co-counsel regarding status of the case, and "review of new pleadings and correspondence."

The remaining 20.5 hours spent reviewing microfiche of defendants' records and responding to requests of plaintiffs' co-lead counsel, appear to have benefited the class.

The firm, therefore, will receive remuneration for this time.

### (B) Hourly Rate

The firm requests $50 an hour for Larson's time which I have found to be compensable. This rate appears reasonable and therefore will be awarded for Larson's time.

### (C) Total Lodestar

20.5 hours $\times$ $50/hour $=$ $1,025

### (D) Multiplier

For the reasons stated below, no multiplier will be awarded to Larson or any other member of the firm.

## V. Paralegals

The firm seeks compensation for 37.75 hours of four paralegals spent organizing files, making library pickups and reviewing microfilm. All of these hours, with the exception of 5.75 hours devoted to fee petition preparation, appear reasonable and to have benefited the class. This time will be reimbursed at $25 per hour, however, not the $40 requested here. Thus, the total award for paralegal time is $800.

## VI. Multiplier

The firm requests a multiplier of 1.75 to be applied to all of the firm's time. This request is denied. The Meagher firm entered this litigation well after the $30 million dollar settlements were consummated and thus an award of a positive multiplier is not warranted on the basis of non-payment. Furthermore, the quality of the firm's work was not of such superior or unusual quality as to merit an increment to the firm's lodestar for quality. The firm had no leadership role and did no more than review documents. Therefore, no multiplier will be awarded to this firm.

## VII. Expenses

The Meagher firm's total expenses are $681.88. The firm has already received 75% of these expenses or $511. The firm's total

expenses appear reasonable. Accordingly, I will award the firm the remainder of its expenses, the total of which is $170.88.

VIII. Conclusion

The following represents my determination of the fees and expenses to which the Meagher firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Request |
|---|---|---|---|---|---|
| Flaskamp | 0 | 0 | 0 | 0 | $10,333.75 |
| Mark | 0 | 0 | 0 | 0 | $ 551.25 |
| Muirhead | 45.5 | $50 | $2,275.00 | $2,275.00 | $ 3,981.25 |
| Larson | 20.5 | $50 | $1,025.00 | $1,025.00 | $ 7,463.75 |
| Paralegals | 32 | $25 | $ 800.00 | $ 800.00 | $ 2,642.50 |
| | | | $4,100.00 | $4,100.00 | $24,972.50 |

Expenses

| | |
|---|---|
| Amount Requested | $ 681.88 |
| Amount Previously Distributed | $ 511.00 |
| Amount Outstanding | $ 170.88 |
| Amount Disallowed | 0.00 |
| Amount to be Distributed | $ 170.88 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $4,100.00 |
| Expenses | $ 170.88 |
| Final Award | $4,270.88 |

---

## MUCH, SHELIST, FREED, DENENBERG, AMENT & EIGER, P.C.

This Chicago law firm represented Merchandisers Association, Inc. and was also co-counsel with Sloan and Connelly and Wolf, Popper for David Weiss Wholesale Jewelers, Inc. and Peoria Supplies. None of the clients of the Much, Shelist firm filed a proof of claim.

The firm seeks reimbursement for 3,692.8 hours of attorney, law clerk and paralegal time devoted primarily to discovery of Great Northern Nekoosa ("GNN"). This effort involved examination of documents and twenty-four days of depositions of sixteen deponents. The firm also participated in the drafting of Rule 37 motions against GNN and one motion against multiple defendants. Two associates of the firm also spent a large amount of time just prior to the trial researching Canadian paper prices for an alternative damage theory. The total award requested, after the application of a multiplier of 2.5 for associates and 3.0 for partners, is $787,433.25 for attorney fees and $50,410.29 for expenses.

I. Lawrence H. Eiger

(A) Hours Expended

Eiger, a partner, requests compensation for 801.1 hours spent on this case. After careful consideration of Eiger's daily time sheets, I have concluded that all but the following hours are compensable:

1. 7.1 hours spent preparing the fee petition.

2. 88.75 hours spent on the trial memorandum and final contentions appears excessive in light of the combined 4604.93 hours spent on these same tasks by all of the lawyers, including Eiger. Accordingly, I will reduce the 88.75 hours claimed by Eiger by one-half. Only 44.38 of these hours will be compensated by the Class.

3. 40.6 hours are described by such vague entries as "conferences" or "telephone

calls" with no description of the subject matter. The time will not be compensated since such entries are too ambiguous to permit a determination of precisely what was done, whether it was of benefit to the class, whether it was duplicative of work performed by others, or an appropriate hourly rate.

4. 7.5 hours were spent by Eiger at a meeting of plaintiffs' Executive Committee on July 23, 1980 and to prepare deposition summonses. All of this time will not be compensated since Eiger was not a member of the Executive Committee and there was no benefit to the class from his attendance. Accordingly, Eiger will be compensated for 4.5 hours of this 7.5 hour entry.[95]

The total number of disallowed hours for Eiger therefore is 95.07, leaving 706.03 compensable hours.

### (B) Hourly Rate

Eiger has requested compensation at the rate of $115 to $125. As was stated earlier, Eiger's compensable time in this litigation was devoted almost exclusively to discovery of Great Northern Nekoosa. He reviewed that defendant's documents and took several depositions. This task was performed in conjunction with members of the Wolf, Popper office and under the supervision of discovery chairmen, Specks, Saveri and Cotchett. In view of Eiger's limited role, and in view of the multitude of lawyers representing the class, compensation of $100 per hour for all of Eiger's partner-level time is fair and appropriate. However, based on the entries in his time records, 86.8 hours of Eiger's time were spent on associate-level tasks such as reviewing and collating documents, doing legal research, summarizing depositions and organizing price work sheets. Only $50 per hour will be awarded for this associate-level work.

### (C) Total Lodestar

86.8 hours × $ 50/hour = $ 4,340
619.23 hours × $100/hour = $61,923

**95.** Since Eiger did not specify how many of the 7.5 hours were spent at the meeting, I estimated the number.

### (D) Multiplier

Eiger asks for a multiplier of 3 for his time. As explained below, no quality multiplier will be awarded any member of the firm. I will, however, apply a 1.5 contingency multiplier to Eiger's 47.9 compensable hours expended before the end of the first wave of settlements.

### II. Michael J. Freed

 Freed, a partner of the firm, expended most of his hours during the early part of the case attending meetings and organizing and assigning discovery work. He claims a total of 112 hours. After a careful review of Freed's daily time records, I have concluded that all but the following hours are compensable:

1. 3.3 hours spent in conversations with the firm's client and on the preparation of a contingent fee agreement for the client. This effort did not benefit the class.

2. 9.5 hours spent prior to the February 3, 1978 formal organizational meeting of counsel on conversations and meetings with Specks and Sloan and other Chicago counsel concerning the organization of the case. This time did not benefit the class; rather, as discussed earlier in this memorandum, the record reveals that these meetings were used by counsel to line up votes or establish "power-blocks" to assure control over the course of the litigation. Accordingly, Freed will not be compensated for this time.

3. 3.3 hours spent at the February 3, 1978 organizational meeting. Freed's partner, Lawrence Eiger, also attended this meeting and has received compensation for his attendance. Thus, Freed's attendance at this meeting was superfluous, of no benefit to the class, and, therefore, not compensable.

4. 10 hours expended traveling to and attending the April 19, 1978 pretrial conference in Philadelphia. The essential purpose of this conference was to seek Court approval of the agreements made by plain-

tiffs' counsel at their organizational meeting on February 3, 1978. During the hearing, Messrs. Kohn and Specks were spokesmen for the private plaintiffs and, therefore, Freed's attendance was unnecessary, duplicative, and of no benefit to the class.

A total of 26.1 hours, therefore, will be disallowed. The remaining 85.9 hours logged by Freed are compensable but, as explained below, only at associate rates.

(B) Hourly Rates

The firm asks for $100 to $125 per hour for Freed's time. However, Freed spent most of his time in conferences or on the phone with other co-counsel reading and reviewing various pleadings and documents filed in the case, drafting a complaint for his client and attending depositions taken by others. In view of Freed's minor role in this case, the number of lawyers involved in the case, and the tasks Freed performed, $50 per hour for his time is a fair and appropriate rate.

(C) Total Lodestar

85.9 hours × $50/hour = $4,295

(D) Multiplier

Freed asks for a multiplier of 3 for his time. As explained below, no quality multiplier will be awarded to any member of the firm. I. will, however, apply a 1.5 contingency multiplier to Freed's 62.7 compensable hours expended before the end of the first wave of settlements.

III. Robert A. Skirnick [96]

(A) Hours Expended

Skirnick, a partner of the firm, requests compensation for 95.1 hours spent principally on document review, and research and drafting Rule 37 motions. After a careful review of Skirnick's time records, I have concluded that all but the following hours are compensable:

1. 13 hours spent at the February 3, 1978 organizational meeting and at the March 1, 1979 discovery meeting will be disallowed. Michael Freed attended the discovery conference and Lawrence Eiger was present at the organizational meeting. Both men have been compensated for this time. Skirnick's presence at these meetings was superfluous and of no benefit to the class.

2. 7.7 hours are described by such vague entries as "review of discovery material", "conference with Freed", or "telephone conference with Walner". Such entries are too ambiguous to permit compensation since it cannot be determined whether this time was of any benefit to the class.

A total of 20.7 hours, therefore, will be disallowed from the total time claimed by Skirnick, leaving 74.4 compensable hours.

(B) Hourly Rate

The firm asks for $115 to $125 for Skirnick's time. However, all of Skirnick's work while at the Much, Shelist firm—document review, research and the drafting of motions—was of the type normally performed by an associate and therefore only $50 per hour will be awarded for Skirnick's time.

(C) Total Lodestar

74.4 hours × $50/hour = $3,720

(D) Multiplier

Skirnick asks for a multiplier of 3 for his time. As explained below, no quality multiplier will be awarded to any member of the firm. I will, however, apply a 1.5 contingency multiplier to Skirnick's 57.4 compensable hours expended before the end of the first wave of settlements.

IV. Anthony C. Valiulis

(A) Hours Expended

Valiulis, a partner in the firm since June 1, 1979, requests compensation for 5.6 hours devoted to legal research and the drafting

---

**96.** Skirnick was a member of the Much, Shelist firm until May 31, 1979. He then became a partner in the New York firm of Wolf, Popper, Ross, Wolf & Jones, but continued his participation in this litigation. His time after June 1, 1979 is the subject of a separate fee petition.

of motions. I find this time compensable with the exception of 2.3 hours, which are described by such vague entries as "conference", "telephone calls", or "legal research". These nebulous entries do not tell the Court whether the time they reflect benefited the class; accordingly, Valiulis will not be compensated for this time. The number of compensable hours therefore is 3.3 hours.

Since the tasks performed by Valiulis are normally performed by an associate, $50 per hour will be awarded for his time, not the requested $65 to $110 per hour. The total lodestar therefore is $165. No multiplier is sought for Valiulis' time and none will be awarded.

## V. Michael B. Hyman

### (A) Hours Expended

Hyman, an associate of the firm, seeks compensation for 1261.5 hours he devoted to this litigation. After a careful review of Hyman's daily records, I have concluded that all but the following hours are compensable:

1. 5.7 hours expended after the final settlements were consummated on the preparation of the firm's fee petition and other matters which were of no benefit to the class.

2. 17.1 hours spent preparing for and attending a discovery committee meeting in Philadelphia on December 20, 1979 and on matters related thereto. This meeting was also attended by Eiger who has received compensation for his attendance, and thus Hyman's time spent on this meeting was duplicative, of no benefit to the class, and therefore not compensable.

3. 10.5 hours spent by Hyman attending and travelling to Philadelphia on March 31, 1980 for Eiger's argument to this Court regarding plaintiff's Rule 37 motion against GNN. Hyman's attendance was duplica-

tive, unnecessary, and of no benefit to the Class.[97]

4. 26 hours are vaguely described as "telephone calls" or "meetings" without an indication of the other participants or the subject matter, or merely as "review and organize file" or "review correspondence and pleadings". I cannot tell from these entries whether this time benefited the class and therefore no compensation will be allowed.

5. 88.45 of Hyman's hours were spent preparing the plaintiffs' trial memorandum and final contentions. This appears excessive in light of the combined 4604.93 hours spent on these same tasks by all of the lawyers, including Hyman. Accordingly, I will reduce the 88.45 hours claimed by Hyman by one-half. Only 44.23 of these hours will be compensated by the class.

The total number of Hyman's hours which will be disallowed is 103.52, leaving 1157.98 compensable hours.

### (B) Hourly Rate

Much, Shelist seeks $75 to $85 per hour for Hyman's time. Hyman is a 1977 law school graduate. A review of his time records and the evidence presented at the firm's evidentiary hearing indicates that he spent 350 hours reviewing documents, see N.T., 4/6/82 at 1918, and that the remaining hours were devoted to preparing partners for depositions, drafting motions, abstracting and indexing depositions and documents for use in the trial memorandum and final contentions, and working on Canadian Paper price materials immediately prior to trial.

The Class Objectors' Report recommends that much of Hyman's time be compensated at only $25 per hour since many of the tasks he performed could have been done by a paralegal. Lawrence Eiger, at his firm's evidentiary hearing, countered this suggestion by stating that in view of the 140,000 GNN documents the firm reviewed, it was

---

**97.** *Cf.* Affidavit of Lawrence H. Eiger (dated June 4, 1982):

"5. My only appearances before this Court occurred on March 31 and May 21, 1980 for the express purpose of arguing Rule

37 motions to compel discovery by defendant Great Northern Nekoosa. On both occasions, *I was the only attorney arguing the motions for plaintiffs. . . .*" (emphasis added).

more efficient to have Hyman and Stephen A. Kanner, another associate of the firm, review them since these two lawyers were more familiar with the case and had more knowledge of the antitrust laws and the discovery process than the paralegals employed by the firm. *See* N.T., 4/6/82 at 1914–1918. In view of this record, I will award an associate-level hourly rate for Hyman's time, but not at the inflated figure requested by the firm. In view of Hyman's limited contribution to this litigation and the vast number of lawyers involved in this case, $50 an hour is a fair and appropriate rate for Hyman's work.

## (C) Total Lodestar

1,157.98 hours × $50/hour = $57,899

## (D) Multiplier

Much, Shelist requests a multiplier of 2.5 for Hyman's time. As explained below, no quality multiplier will be awarded to any member of the firm. Moreover, since all Hyman's time was logged after the first wave of settlements, I will not apply any contingency multiplier.

## VI. Stephen A. Kanner

Kanner, an associate in the firm, seeks compensation for 819.2 hours he devoted to this litigation. After a careful review of Kanner's daily records, I have concluded that all but the following hours are compensable:

1. 2.9 hours spent on preparation of the fee petition.

2. 30.82 hours spent reviewing unspecified documents, or having conferences where the participants' names or the subject matter were not listed. These time entries are too vague to warrant compensation.

3. 105.95 hours spent preparing the plaintiff's trial memorandum and final contentions. Most of this time was devoted to reviewing and abstracting documents or depositions. This large number of hours appears excessive in light of the combined 4604.93 hours spent on these tasks by all of the lawyers, including Kanner. Accordingly, I will reduce the 105.95 hours claimed by Kanner by one-half. Only 52.98 of these hours will be compensated by the class.

The total number of Kanner's hours which will be disallowed is 86.69, leaving 732.51 compensable hours.

## (B) Hourly Rate

The firm requests $65 for Kanner's time. Kanner graduated from law school in 1979 and began work on the *Fine Paper* case soon thereafter. His compensable hours were spent on basic discovery work, abstracting depositions, working on the Canadian Pricing Analysis,[98] and reviewing price lists and other documents. Most of his efforts—abstracting, price document review and designation of documents—were of the type normally assigned to a paralegal. Nonetheless, for the same reasons given with respect to Mr. Hyman's time, I will award Kanner an associate level rate, but not the high rate requested by the firm. $50 an hour is a fair and appropriate rate for Kanner's time.

**98.** Much, Shelist was directed to work on the Canadian Pricing study by Specks shortly before the start of trial. N.T., 4/5/82, at 1881, 1899; Much Petition at 18. Pursuant to this request, the firm's lawyers obtained pricing documents from different paper companies in Canada and then attempted to match them with price sheets from United States paper companies. N.T., 4/5/82 at 1900. The firm spent a total of 163.6 hours on this project. In addition, 156.45 hours were billed by Lawrence Walner and Associates, Ltd. The final and only product of all these hours was a "memorandum to the trial team concerning Canadian paper prices." Much Petition at 18; N.T., 4/5/82 at 1901. From the record before me, it is difficult to discern any benefit to the class resulting from this study. Indeed, Lawrence Walner, Esquire, testified at his firm's evidentiary hearing that there were "several problems" with the study and that after repeated attempts to develop a Canadian pricing damage theory, he concluded that it "was not a viable course to take." N.T., 3/8/82 at 1148. Nevertheless, since members of the Much, Shelist firm appear to have performed this task in good faith upon the orders of Specks, I have allowed compensation for the time spent on this study.

(C) Total Lodestar

732.51 hours $\times$ \$50/hour $=$ \$36,625.50

(D) Multiplier

Much, Shelist requests a multiplier of 2.5 for Kanner's time. As explained below, no quality multiplier will be awarded to any member of the firm. Moreover, since all Kanner's time was logged after the first wave of settlements, I will not apply any contingency multiplier.

VII. Fred G. Yeager

 The firm asks for compensation for 10.2 hours of Yeager's time spent preparing a memorandum on his economic study of the paper industry pricing structure. I find this time reasonable and to have benefitted the class. Curiously, no resume of Yeager's background and qualifications was submitted as required by Pretrial Order No. 143, even though the firm supplied this information with respect to other attorneys and paralegals. Yeager is merely described as "an attorney attending the University of Chicago School of Business". Petition at 22. The petition states, however, that it "does not request any fees on behalf of the Firm for any lawyer who is not a partner, associate or employee of the Firm," petition at 2, so I must assume that Yeager is an associate or an employee of the firm, rather than merely an outsider temporarily hired for a specific task.[99] The firm asks \$35 an hour for Yeager's time, but no documentation is supplied which shows that this is Yeager's historic or customary rate, as required by Pretrial Order No. 143. Because I am without the benefit of this information, and in view of the non-legal work done by Yeager, I will not award him the rate of \$35 per hour as requested. Instead, he will be compensated at the paralegal rate of \$25 per hour. Thus, Yeager's total lodestar is \$255. No multiplier has been requested for Yeager's time and none will be awarded.

IX. Paralegals and Law Clerks

 Much, Shelist asks for compensation for 478.1 paralegal hours and 88.6 law clerk hours for a total of 566.7 hours. I find all but the following hours reasonable and to have benefited the class:

1. 10.4 hours spent after the final settlements were consummated on administrative and "house-keeping" matters which were of no benefit to the class.

2. 15.9 hours are described by such vague entries as "telephone calls", "conference with Eiger", "prepare for meeting in Philadelphia", and "research". I cannot tell from these ambiguous entries whether the time benefited the class or was duplicative of the efforts of others. Accordingly, this time will be disallowed.

The total number of paralegal/law clerk hours which will be compensated therefore is 540.4, the number of disallowed hours being 26.3. Much, Shelist requests an hourly rate of \$35 for all paralegals and law clerks. This request is denied. As stated earlier, \$25 per hour will be awarded for all paralegals' and law clerks' time in the case. No multiplier for paralegals or law clerks is requested and none will be awarded. Accordingly, Much, Shelist will be awarded \$13,510 for all paralegal time.

X. Quality Multiplier

The quality of the firm's work was not unusually high. The firm was not one of the two co-chairmen, five co-lead counsel, six-man trial team, or even a member of the fourteen-member Executive Committee. It was responsible for discovery of one defendant, along with the Wolf, Popper firm. While the members of the firm performed this task competently, they did not exhibit an unusually superior degree of skill so as to warrant the award of a positive quality multiplier. Accordingly, given the firm's support role and limited contribution to this

**99.** If my assumption is incorrect and Yeager was an outsider merely hired to perform this specific task, Yeager's time must be considered as an "expense" and Pretrial Order No. 143 therefore requires that before remuneration can be given to Yeager's time, a voucher must be submitted verifying the amount paid by the firm to Yeager.

litigation, no multiplier is warranted for the quality of the firm's work.

## XI. Expenses

■ The Much, Shelist firm requests reimbursement for $50,410.29 in expenses. Seventy-five percent of this amount, or $37,807, has already been distributed to the firm. After carefully reviewing the two large volumes of expense vouchers submitted by the firm, I have concluded that the following expenses should not be reimbursed by the class:

1. $228 for airfare and $119.78 in travel expenses incurred by Hyman for traveling to and attending the Discovery Conference in Philadelphia with Eiger on December 20, 1979 for which attorney fees have been disallowed. I will also disallow one-half ($33.77) of Eiger's bill of $67.54 for a meal at the Fish Market Restaurant in Philadelphia on December 19, 1978 on the assumption that Hyman joined Eiger at this meal.

2. $242 for airfare and $31.15 for travel expenses incurred by Hyman for traveling to and attending the March 31, 1980 pretrial conferences with Eiger for which attorney fees have been disallowed.

3. $94.20 for flight insurance for Eiger. Eiger justifies these charges on the ground that he normally bills his other clients for this expense. N.T., 4/6/82 at 1956. However, I fail to see any benefit to the class from this insurance. Under the rule of *Lindy,* therefore, this is not a legitimate expense which should be reimbursed by the class.

4. In its petition, Much, Shelist requests reimbursement for payment of Stephen Kanner's $30 American Express membership fee. The class objectors objected to any reimbursement for this cost in their report. In response, the Much, Shelist firm stated that this $30 expense was erroneously submitted in the petition and have asked that it be withdrawn. Accordingly, this $30 expense will be disallowed.

5. In its petition, the firm requested reimbursement of $1,772 for work done by a Chicago law firm on some corporate problems of Much, Shelist's client, which were unrelated to *Fine Paper.* The class objectors have challenged any remuneration for this expense. In response, Much, Shelist again pleads "error" and withdraws its request for reimbursement. Accordingly, this "expense" will be disallowed.

6. $12.74 incurred by Skirnick for lunch with "Gig & Gary Specks" on April 19, 1979 will be disallowed. Skirnick's time records indicate he did not work on *Fine Paper* on that day nor does it appear that this luncheon was of any benefit to the class.

7. $162 for airfare, $58.30 for a meal and $50 in travel advance incurred by Freed for travel and attendance at a pretrial conference on April 19, 1978 for which attorney fees have been disallowed.

8. $100 for travel advance to Michael J. Freed on January 25, 1978. Freed's time records indicate that on this day he had a meeting with Specks and Chicago attorneys regarding organization of the case. Freed has not been awarded any attorney fees for this time, and, accordingly, will not be reimbursed for this expense.

Finally, I wish to note that my examination of the firm's request for reimbursement of expenses has been made very difficult by Much, Shelist's failure to arrange its expense vouchers in chronological order. Moreover, numerous vouchers were submitted which represent expenses for which, presumably, the firm is not asking any remuneration since they did not add these vouchers into their typewritten summary of expenses. For example, according to the time records submitted from March 14 to April 18, 1978, Michael Freed spent no time on the *Fine Paper* case, yet for this same time period, the firm submits almost ten vouchers for costly expenses incurred by Freed during a trip to Aspen, Colorado.[100]

---

100. *See also* the $121.48 American Express bill incurred by Eiger at "Our Palace" on October 3, 1979. Eiger has no time billed to *Fine Paper* on this date, and this bill apparently is not reflected in the firm's 1979 Summary of Expenses.

Other illustrations are the several bills submitted which were signed by Eiger's wife

I find the remaining expenses of the firm to be reasonable and to have benefitted the class. The total amount of expenses which will be disallowed is $2,933.94. The total amount of expenses for which the firm has not yet received reimbursement is $12,603.29. Thus, the firm will be awarded $9,669.35.

## XII. Conclusion

The following represents my determination of the fees and expenses to which Much, Shelist is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Request |
|---|---|---|---|---|---|
| Eiger | 706.3 | $50/100 | $ 66,263.00 | $ 68,233.00 | $298,960.50 |
| Freed | 85.9 | $50 | $ 4,295.00 | $ 5,862.50 | $ 39,052.50 |
| Skirnick | 74.4 | $50 | $ 3,720.00 | $ 5,155.00 | $ 33,547.50 |
| Valiulis | 3.3 | $50 | $ 165.00 | $ 165.00 | $ 524.00 |
| Hyman | 1,157.98 | $50 | $ 57,899.00 | $ 57,899.00 | $263,878.75 |
| Kanner | 732.51 | $50 | $ 36,625.50 | $ 36,625.50 | $133,120.00 |
| Yeager | 10.2 | $25 | $ 255.00 | $ 255.00 | $ 357.00 |
| Pavon | 21 | $25 | $ 525.00 | $ 525.00 | $ 1,260.00 |
| Paralegals & Law Clerks | 540.4 | $25 | $ 13,510.00 | $ 13,510.00 | $ 16,733.00 |
| | | | $183,257.50 | $188,230.00 | $787,433.25 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 50,410.29 |
| Amount Previously Distributed | $ 37,807.00 |
| Amount Outstanding | $ 12,603.29 |
| Amount Disallowed | $ 2,933.94 |
| Amount Awarded | $ 9,669.35 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $188,230.00 |
| Expenses | $ 9,669.35 |
| Final Award | $197,899.35 |

---

## O'BRIEN & HALLISEY

O'Brien & Hallisey is located in San Francisco, California. The firm became involved in this litigation in September of 1977, and filed a class action complaint on behalf of William Grader on October 27 of that year. Early the following year the firm filed a complaint on behalf of Fred Ernst. It seeks compensation for 694.05 partner hours, 1373.94 associate hours, and 388.65 paralegal hours.[101] The requested hourly rate for partner time varies from $50 to $100 an hour. The firm asks for a lodestar of $241,927.55 and with the re-

which are obviously unrelated to *Fine Paper. See* Class Objectors' Report at 518.

The submission of irrelevant vouchers made an already tedious task more onerous.

**101.** The O'Brien & Hallisey firm made the task of determining the reasonable number of hours for which it should be compensated more difficult by the manner in which its time entries were recorded. Apparently some of the entries were noted in tenths of an hour while others were recorded in minutes.

quested multiplier of 3 the total compensation sought by O'Brien & Hallisey is $725,-782.65. Finally, the firm seeks reimbursement for $35,783.69 in expenses.

Primarily, O'Brien & Hallisey was charged with the responsibility for discovery of Crown Zellerbach but in addition, they conducted an initial paper industry analysis, performed class certification activities, and some minor multidistrict litigation work. Members of the firm also attended Executive Committee meetings and assisted their clients in preparing answers to interrogatories served by defendants' counsel. They also charged time to "general review", "reading", or "preparation".

## I. Jeremiah F. Hallisey

### (A) Hours Expended

Hallisey is a partner. He asks to be compensated for 694.05 hours of work. Upon analysis of the time sheets submitted, I find, however, that Hallisey can be compensated only for 539.43 hours as the only time which can reasonably be said to have benefited the class. In accordance with the guidelines heretofore set forth I have determined Hallisey cannot be compensated for the following hours:

1. 11.5 hours spent in review of documents and materials produced in discovery by other paper companies which were not O'Brien & Hallisey's responsibility.

2. Entries for 68.25 hours are too vague.[102] It was impossible to determine from the entries exactly what work was done and, therefore, it was not possible to make a determination of benefit to the class. All entries for telephone conversations without reference to what was discussed were disallowed. Likewise all conference time which was entered without specifying the subject matter was disallowed. Finally, all entries noted simply as review of documents, correspondence, or file maintenance will not be compensated.[103]

3. 3.75 hours spent in reviewing the Multidistrict Panel proceedings, grand jury stipulation, and pretrial conference material. Also time spent in a telephone conference concerning the Boston consulting group deposition and in review of the majority states' report. These efforts were duplicative of the work of many other firms in this litigation and clearly of no benefit to the class.[104]

4. 22 hours for traveling to and attending pretrial conferences will not be compensated. Hallisey's attendance at these conferences did not benefit the class and duplicated the efforts of many other attorneys who were in attendance.

5. 18 hours for travel to and attendance at Executive Committee meetings. Hallisey was not a member of this committee.

6. 62.25 hours are billed generally to pretrial memorandum work, viz., brief writing, contentions, etc. Over 4604 hours were expended for these tasks by many attorneys involved in this litigation. This "$1,000,000 brief" plainly reflects duplication. In addition, I have allowed Hallisey to be compensated for some of his trial preparation work which involved similar types of effort. Accordingly, I have reduced the number of requested compensable hours in this area by one-half. Hallisey will be compensated for 31.13 hours.

The total hours for which Hallisey will not be compensated is 154.62. The remaining 539.43 hours will be allowed. The hours for which Hallisey will be compensated include depositions and other discovery of the Crown Zellerbach Company. Furthermore,

---

102. The Class Objectors' Report claimed only 41 hours of entries should be disallowed as too vague.

103. Excluded under the rubric of vagueness were 14.5 hours expended by Hallisey in closing down files. At best I can infer, this was mostly a convenience to the O'Brien & Hallisey firm and of no benefit to the class.

104. The Class Objectors' Report contends 52 hours reflect tasks which appear to be duplicative. O'Brien & Hallisey counter that the class objectors fail to provide specific references to such duplicative effort. Both the 3.75 disallowed hours here and the previously disallowed 11.5 hours spent in review of discovery materials produced by companies other than Crown Zellerbach are patently duplicative.

Hallisey is to be compensated for the time he expended in traveling to, attending, or preparing for the discovery meetings in Chicago. Brief and Motion preparation time as related to Crown Zellerbach is also compensated. Finally, Hallisey is compensated for the hours he expended on the deposition of Grader and in responding to the interrogatories addressed to his client.

### (B) Hourly Rate

Hallisey seeks an hourly rate of $150 for all his work throughout the entire course of this litigation. The firm has not provided the court with a statement of its historical rates; rather, it has provided estimates of fees charged. In any event, I find the requested rate excessive. Based on rates received by partners in other firms for similar work, particularly those involved in this litigation, I have determined a reasonable compensable hourly rate for Hallisey is $100. However, I can only allow this rate of compensation for the hours of work which Hallisey expended on the depositions of Crown Zellerbach executives and travel to and attendance at the discovery committee meetings. The remaining compensable hours, 219.55, involved the type of general research, conference time, correspondence, and review which could have readily been performed by an associate. Accordingly, this time will be compensated at a rate of $50 an hour with the remaining 319.88 allowed hours to be compensated at the $100 an hour rate.

### (C) Total Lodestar

319.88 hours × $100/hour = $31,988.00
219.55 hours × $ 50/hour = $10,977.50

### (D) Multiplier

Hallisey asks for a multiplier of 3 for himself and other members of the firm. No quality multiplier will be applied to Hallisey's lodestar. His work was not so extraordinary as to warrant compensation beyond the hourly rate. His contributions to the discovery efforts, brief preparation and other work are reflected in the hourly rate

allowed. I will, however, apply a 1.5 contingency multiplier to the 17.67 compensable hours expended before the end of the first wave of settlements.

### II. Anne Treseder

### (A) Hours Expended

 Treseder is an associate. She seeks to be compensated for 771.3 hours of work. Upon analysis of the time sheets, submitted, however, I find that Treseder should be compensated only for 550.06 hours. Treseder will not be compensated for the following hours:

1. The entries for 78.25 hours of time are too vague. It was impossible to determine exactly what work was done and, therefore, it was not possible to make a determination of benefit to the class. Entries disallowed as too vague include: (a) hours spent in review, reading, conference, or telephone conversation without further explanation; (b) time noted simply as "arranging and cleaning files",[105] (c) hours spent in "designation of documents" without further notation; (d) all entries noted merely as "researching and arranging"; (e) time logged under the general category of "prep exhibits"; (f) "depo designation"; and (g) "microfilm search".

2. 50.25 of the hours spent in preparation for depositions of Crown Zellerbach executives. Much of the effort by Treseder plainly duplicated Hallisey's, who devoted approximately 140 hours to the same task. While it is understandable that the attendance of two attorneys might be necessary at a particularly long and complicated deposition session, I find the concurrent time expended by Hallisey and Treseder to be excessive. Accordingly, since I have permitted Hallisey to be reimbursed for all of his deposition preparation time, I will not allow compensation to Treseder for these hours.

3. 82.59 hours billed generally to pretrial memorandum work, *viz.*, brief writing, contentions, etc. will be disallowed. This figure represents ½ the total hours Treseder

---

**105.** Similarly all time spent by Treseder in "closing files" is disallowed.

billed for this work. As noted, the total number of hours expended for these tasks by all the attorneys involved in this litigation was excessive and warrants this reduction.

4. 6.15 hours expended in review of documents and reports concerning other defendants and the Majority States case for which the firm was not responsible. Such redundant activity was clearly of no benefit to the class.

5. 4 hours of Xerox and copying work. This is a job for non-legal support staff.

The total hours for which Treseder is not compensated is 221.24. The remaining 550.-06 hours of compensation which Treseder seeks I will allow. The hours of work for which Treseder is compensated include her review and organization of Crown Zellerbach documents and preparation of exhibits for trial.

### (B) Hourly Rate

Treseder seeks an hourly rate of $95. I find this requested rate to be quite excessive. Treseder began working on the *Fine Paper* case only six months after graduating from law school and, therefore, was only a first to second year associate for nearly the entire period of her involvement with this case. In light of her limited experience and in the absence of explicit historic rates, I have determined a reasonable compensable rate for Treseder's work to be $50 an hour.

### (C) Total Lodestar

550.06 hours × $50/hour = $27,503

### (D) Multiplier

No multiplier will be applied to Treseder's lodestar. The routine and basic tasks of discovery, review, and preparation for which she is being compensated were not of such exceptional quality as would warrant the application of a positive multiplier. Furthermore, since all Treseder's time was logged after the first wave of settlements, I will not make any contingency adjustment.

## III. Gary Reiss

### (A) Hours Expended

Reiss is an associate and the firm seeks compensation for 470.47 hours of his time. However, I conclude that only 371.92 hours of his time is compensable. According to the Guidelines set forth earlier, compensation will not be allowed for the following hours:

1. 17.1 hours reviewing documents produced in discovery by firms other than Crown Zellerbach.

2. 81.45 hours of time entries will not be compensated as too vague. It was impossible to make a determination of benefit to the class from these entries as it was not possible to determine exactly what was done. Entries disallowed as too vague include: (a) time spent in research, review, or teleconference without further explanation; (b) "file organization"; (c) "file maintenance"; (d) meetings without an adequate explanation of the subject matter discussed; (e) all entries marked simply "mail", "read correspondence", "document summary", or "discovery"; and (f) time writing letters without subject matter explanation.

The total hours which will be disallowed is 98.55. The remaining 371.92 hours of Reiss' time will be approved. These hours include defense of the firm's clients' class action depositions, definitive review and indexing of Crown Zellerbach documents, and preparation of the discovery book.

### (B) Hourly Rate

The nature of the work performed by Reiss was quite routine and ordinary. The requested rate of $95 an hour is excessive in light of Reiss' contribution to this litigation. Like his fellow associate Treseder, Reiss had only limited experience. As a 1977 law school graduate, Reiss was only a second to third year associate with the firm throughout this litigation. For reasons already noted with respect to Treseder, a reasonable compensable rate for Reiss' work is $50 an hour.

(C) Total Lodestar

371.92 hours × $50/hour = $18,596

(D) Multiplier

For the same reasons I denied the application of a quality multiplier to Hallisey's and Treseder's hours, no such multiplier will be awarded to Reiss' lodestar. I will, however, apply a 1.5 contingency multiplier to his 117.11 compensable hours expended before the end of the first wave of settlements.

## IV. Daniel B. Leraul

### (A) Hours Expended

 Leraul is an associate and the firm asks to be compensated for 56.25 hours of his time. However, I find that only 48.67 hours are compensable. I have determined Leraul cannot be compensated for the following hours:

1. 1.2 hours spent in review of motions concerning transfer of this litigation before the Judicial Panel on Multidistrict Litigation. I cannot discern any benefit to the class.

2. 6.38 hours cannot be compensated as too vague. Entries disallowed because of vagueness include those marked as simply "file maintenance", "review of documents", "complete filing system", "research", "conference", and "correspondence". The lack of an adequate explanation following these entries makes it impossible to determine exactly what work was done and whether the class was benefited.

The remaining 48.67 hours of compensation which Leraul seeks for his work in preparing the Grader complaint, definitive document review, and initial document discovery coordination I will allow. The total number of hours for which Reiss is not compensated is 7.58.

### (B) Hourly Rate

Leraul seeks to be compensated for his work at a rate of $60 an hour. $50 an hour is appropriate under the circumstances.

(C) Total Lodestar

48.67 hours × $50/hour = $2,433.50

(D) Multiplier

No quality multiplier will be awarded for Leraul's lodestar for the same reasons no such multiplier has been awarded to the hours of Hallisey and the other members of the firm. I will apply a 1.5 contingency multiplier to all 48.67 compensable hours since they were all logged before the end of the first wave of settlements.

## V. George J. McNabb

### (A) Hours Expended

McNabb is an associate for whom the firm seeks compensation for 36.1 hours of work in this litigation. However, the total number of hours for which I will allow McNabb to be compensated is 35.8. I will not allow compensation for the .3 hours entered as staff conference time concurrently with Mr. Reiss. These entries lack an adequate subject matter explanation and are too vague. Again, it is impossible to make a determination of benefit to the class from these types of entries.

The remaining 35.8 hours of work spent in preparing the discovery book and cast of characters and examining the expenses reports I will allow.

### (B) Hourly Rate

McNabb seeks to be compensated at $50 an hour. I find this is a reasonable rate of compensation for the type of work accomplished by McNabb. Therefore, I will allow him to be compensated at this rate.

(C) Total Lodestar

35.8 hours × $50/hour = $1,790

(D) Multiplier

No quality multiplier can be awarded for McNabb's lodestar for the same reasons no such multiplier is awarded to the other members of the firm. I will apply a 1.5 contingency multiplier to his 1.67 compensable hours expended before the end of the first wave of settlements.

## VI. Robert Murphy

### (A) Hours Expended

Murphy is an associate with the firm. The firm seeks to be compensated for 19.07 hours of his work. However, 2.37 hours of work cannot be compensated as too vague or duplicative and, therefore, of no benefit to the class. Murphy spent 2.32 hours in teleconference and conference but has no explanation of the subject matter discussed. It was impossible to make a determination of benefit to the class from these entries. In addition, Murphy spent .05 hour in telephone conversation concerning the Judicial Panel on Multidistrict Litigation, and this time cannot be compensated for it did not result in any appreciable benefit to the class.

The remaining 16.7 hours of work involving initial industry research and complaint preparation I will allow to be compensated.

### (B) Hourly Rate

Murphy asks to be compensated at $75 an hour. However, I have determined a reasonable hourly rate for Murphy's work to be $50 an hour. The type of work for which Murphy is being compensated is of routine variety which warrants compensation at this lesser rate.

### (C) Total Lodestar

16.7 hours × $50/hour = $835

### (D) Multiplier

I will not award a quality multiplier for Murphy's lodestar for the same reasons no such multiplier has been awarded to the other members of the firm. I will, however, apply a 1.5 contingency multiplier to Murphy's 14.25 compensable hours expended before the end of the first wave of settlements.

## VII. Don B. Kates

### (A) Hours Expended

Kates is an associate with the firm. He claims compensation on the basis of 8.5 hours of work. I have determined that 2.7 hours of work represented by entries simply marked as "staff conference", "office memorandum", "research", "call to U.S. District Court", or "conference" without further explanation will not be compensated. It was impossible to make a determination of benefit to the class from such entries. Also disallowed is an entry marked "travel to depo or JFH" as this time is duplicative of Hallisey's efforts.

The remaining 5.8 hours of work devoted to a discovery motion aimed at Crown Zellerbach will be allowed.

### (B) Hourly Rate

The firm asks for $100 an hour for Kates' time. His work in preparing a discovery motion in order to obtain more documents from Crown Zellerbach was of a routine nature usually performed by lower echelon attorneys and therefore a reasonable rate of $50 an hour.

### (C) Total Lodestar

5.8 hours × $50/hour = $290

### (D) Multiplier

I will not award a quality multiplier for Kates' lodestar for the same reasons no such multiplier is awarded to the other members of the firm. Moreover, since all Kates' time was logged after the initial settlements, I will not make any contingency adjustment.

## VIII. Stanley S. Taylor and Kenneth Goshorn

Both Taylor and Goshorn are associates for whom the firm seeks to be compensated based upon 3 hours and 7.25 hours of work, respectively. Upon analysis of the time sheets submitted, I find, however, that none of this time is compensable. Their hours are disallowed as follows:

1. 3 hours charged by Taylor with absolutely no explanation of what was done.

2. 6.7 hours charged by Goshorn for preparation, attendance at, and review of a deposition of the firm's client Grader. However, the exact same work was done by Reiss for

which compensation has been allowed. The remaining .55 hours will not be allowed as the supporting entries are too vague. Time spent in a "staff conference" without indicating the subject matter of the conference cannot be compensated because it is impossible to determine if there was a benefit to the class.

Accordingly, no compensation will be allowed for either Taylor or Goshorn and it is unnecessary to analyze any hourly rate, compute a lodestar, or discuss the application of a multiplier figure.

## IX. Paralegals

O'Brien & Hallisey asks to be compensated for 388.65 paralegal hours. I find the hours expended by the firm's paralegals in this litigation benefited the class as an ancillary service to the work performed by the attorneys of the firm. A reasonable hourly rate for the paralegal time is $25 an hour.

The total amount awarded for paralegal time is $9,716.25.

## X. Expenses

O'Brien & Hallisey lists total expenses as $35,783.69. As previously explained in the memorandum, the firm has already received 75% of these expenses. I will award O'Brien & Hallisey the remainder of its expenses less $80 for meals claimed by Hallisey on September 3, 1980 which is not documented and $101.05 for Hallisey's attendance at the Executive Committee meetings. Accordingly, the O'Brien & Hallisey firm will receive final reimbursement for expenses in the amount of $8,764.64.

## XI. Conclusion

The following represents my determination of the fees and expenses to which the firm is entitled under *Lindy*:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Hallisey | 539.43 | $50/100 | $ 42,965.50 | $ 43,828.25 | $312,337.50 |
| Treseder | 550.06 | $50 | $ 27,503.00 | $ 27,503.00 | $219,877.50 |
| Reiss | 371.92 | $50 | $ 18,596.00 | $ 21,523.75 | $134,083.95 |
| Leraul | 48.67 | $50 | $ 2,433.50 | $ 3,650.25 | $ 10,121.40 |
| McNabb | 35.80 | $50 | $ 1,790.00 | $ 1,831.75 | $ 5,416.80 |
| Murphy | 16.70 | $50 | $ 835.00 | $ 1,191.25 | $ 4,290.75 |
| Kates | 5.80 | $50 | $ 290.00 | $ 290.00 | $ 2,550.00 |
| Taylor | 0 | — | 0 | 0 | $ 1,631.25 |
| Goshorn | 0 | — | 0 | 0 | $ 495.00 |
| Paralegals | 388.65 | $25 | $ 9,716.25 | $ 9,716.25 | $ 34,978.50 |
| TOTAL | | | $104,129.25 | $109,534.50 | $725,782.65 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 35,783.69 |
| Amount Previously Distributed | $ 26,838.00 |
| | $ 8,945.69 |
| Amount Disallowed | $ 181.05 |
| Total Awarded | $ 8,764.64 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $109,534.50 |
| Expenses | $ 8,764.64 |
| Final Award | $118,299.14 |

## WALTER E. RIORDAN, P.A. and STEWART PERRY

Perhaps, more than any other fee petition filed in this case, these two bring into sharp focus the potential for abuse which casts a shadow on the integrity of the class action device. In addition, they raise serious questions about counsel's good faith and the efficiency of the standards used in fee determination. The activities of Riordan and Perry are so intertwined that their petitions will be considered jointly.

### I. Entry into the Case

Walter E. Riordan, P.A., is a law firm consisting only of Mr. Riordan. Riordan has been practicing law since 1943 principally in Minneapolis, Minnesota and has been primarily engaged in plaintiff's personal injury work. However, Riordan has had a limited amount of experience in class action antitrust work.

Riordan has been critical of the plaintiffs' antitrust bar. He accused them of being "vociferous crocodiles" and "pirates" who "just get in, get [their] fees, _____ the public and go on to the next [case]". He stated that "[t]hey are careful not to take too much because they deal with the same [defense] lawyers over and over. They are close." Class Objectors' E 149; Perry affidavit, September 1981; Perry deposition at 89.

Riordan first heard about the *Fine Paper* case in the early part of 1979. He read about the first 30 million dollars in settlements in the *Wall Street Journal*. According to Perry, Riordan thought the *Fine Paper* case was worth much more than 30 million dollars and that plaintiffs' lawyers were "selling-out" the class.[106] Perry affidavit, September 1981. Riordan then decided to get into the case. As he testified: "I thought there was a better way to prove this case up than what I had been seeing ...." N.T., 3/2/82 at 1047.

So Riordan contacted his longtime friend, Minneapolis attorney Stewart Perry, and other attorneys from his hometown[107] and asked them to get involved in the *Fine Paper* case. Perry was a particularly close associate of Riordan. Although both men had their own firms, the two were associated in numerous personal injury claims on a fee sharing basis.[108] According to Perry, Perry was a "depository" for Riordan's "crap cases" and on many occasions, he converted Riordan's "junked cases into sizeable fees". Class Objectors' E 144. Perry had also been Riordan's attorney for a number of lawsuits in which Riordan was a named defendant.

Riordan told Perry and the other interested Minneapolis lawyers "that there were large fees to be made in [class action] cases" which could be shared among the firms if they could find a client. Perry affidavit, September 1981 at 3. According to Perry: "He [Riordan] stated that we should try to get on the committees running the case; through the committee positions, we would be able to work substantial hours in the case for which we would be entitled to high hourly rates, and large multipliers as well; and we would perform a service to the class by our work ... by preventing [a] 'sell-out'." *Id.*[109] All of the firms, including Riordan, managed to find clients and they

---

**106.** Later Riordan's view of the wisdom of this initial settlement changed. According to Perry, Riordan "stated that he now understood why the initial settlement of $30,000,000 was made. It helped finance the rest of the case. He then thought it was 'shrewd.' I agreed." Perry affidavit, September 1981 at 3 n. 1.

**107.** These included lawyers from the firms of Austin, Roth, Sunde, McDonough & Tierney; Bartsh & McIntosh, P.A.; and Meagher, Geer, Markhem, Anderson, Adamson, Flashkamp & Brennan, all petitioners here.

**108.** The initial referral, however, was a bizarre divorce action in which Riordan was personally involved. Deposition admitted as Exhibit No. 3 at Perry evidentiary hearing at 64.

**109.** Perry took Riordan's promise of earning big money seriously. Perry told Riordan's investigator "that he [Perry] built his house on a punitive damage award [from another case] and that he would create for himself the nestegg on the punitive damage award in this case." Melloy Deposition at 51–52.

each filed complaints on behalf of their respective plaintiffs in the spring of 1979.[110]

## II. General Paper Corporation and James Nelson

As the various Minneapolis firms entered the *Fine Paper* case, they were asked to pay assessments to the Fine Paper Finance Committee by Robert Atkins, the chairman of that committee.[111] In return for the payment of their assessments, these new firms received various work assignments from the Executive Committee, consisting generally of searching and reviewing documents of defendants already assigned to other law firms in the case.

Meanwhile, Riordan was conducting his own independent investigation of the paper industry. Specifically, Riordan was searching for a bankrupt paper company which still had its records intact. Riordan reasoned that a bankrupt's records would not have undergone a recent "housecleaning," and therefore there would be more of a chance to find documents which would incriminate the defendants. Riordan found such a company, the General Paper Company ("GPC"), a paper distributor located in Minneapolis. After making application to the Bankruptcy Court, Riordan had himself retained on August 2, 1979, as counsel for the Trustee of GPC in connection with the possible claim as a class member in the *Fine Paper* case and other pending antitrust actions.

About this time and entirely separate from Riordan's efforts, Stewart Perry met Douglas Nelson, son of the former president of General Paper Corporation, James Nelson. Perry surmised that the Nelsons, especially James Nelson, could be of assistance in the prosecution of the *Fine Paper* case. Accordingly, he arranged a meeting attended by himself, James Nelson, Douglas Nelson and Walter Riordan at a Minneapolis hotel on October 2, 1979.

This meeting was the first time either Riordan or Perry met James Nelson. At the meeting, James Nelson gave Riordan and Perry a detailed description of how the defendants fixed prices. He related that he had diaries and memoranda of price conversations among the defendants and photographs taken at meetings attended by various officers of the defendants. Riordan and Perry concluded that they had found a "gold mine". They arranged a meeting with Granvil Specks and his son Gary in Chicago on October 10, 1979. Granvil Specks was most impressed with the detailed and first-hand information Nelson gave of the alleged price-fixing conspiracy.[112] At his evidentiary hearing, Granvil Specks testified that "Mr. Nelson was the most important witness that the private plaintiffs and certified states had in the Fine Paper Antitrust Litigation." N.T., 2/8/82 at 9.[113]

---

**110.** Riordan also attempted to get involved in the *Corrugated Box Litigation,* MDL 310, presently pending in Houston. After he filed his complaint in *Fine Paper,* Riordan contacted a former law school classmate who was a former President, Chairman and Chief Executive Officer of a large company, to solicit his help in finding clients who would be willing to present claims in *Corrugated.* Riordan thought that by filing another lawsuit in *Corrugated* it "would give him added leverage" in connection with any settlement that would occur in *Fine Paper* since some of the defendants named in *Corrugated* were defendants in *Fine Paper.* Thorfinnson Deposition at 12 (Perry Exhibit # 4).

**111.** Atkins ignored the objections of Harold Kohn to the entry of any new attorneys at this stage in the litigation. Class Objectors' E 754–61.

**112.** As recounted by Perry, while Specks was listening to Nelson's account of the conspiracy, he "looked like Groucho Marx with his eyebrows going up and down and up and down and then he'd smile and kept looking at his son. He was hearing things that he had never heard before. That was my impression. In fact, that's what he said." Perry Deposition at 16; affidavit of November 6, 1981 at 50.

**113.** Nevertheless, this information was withheld from the court and from opposing counsel at a hearing held December 4, 1979 on Defendants' Rule 37 motions. *See* N.T., 12/4/79 at 18.

Specks informed the court "that except to the extent that the information is set forth in those documents [answers to interrogatories seeking to identify all persons believed by plaintiffs to have knowledge of plaintiffs' allegations] or in the responses to the defendants'

After this meeting, Specks ordered Riordan to conduct a thorough search of the documents of the General Paper Corporation in order "to develop the testimony of Mr. Nelson." N.T., 3/2/82 at 1052. Pursuant to this request, Riordan began the task of searching through 390 boxes in a basement of an office building in Minneapolis. In addition to obtaining the help of the Minneapolis firms then in the case, Riordan hired several young lawyers at $15 per hour, including James Rude of the firm of Rogers, Rude, Candlin, Faulkner and Sjostrom. He also hired a private investigator, Michael Melloy, for $13 an hour and two young men to move the boxes for $5 to $8 an hour. N.T., 6/10/81 at 106.

Perry assisted Riordan with this document search. They were looking for a document known as a "Pattern A" which, according to Nelson, was circulated among the defendants and contained the formulae for setting the prices. They also hoped to locate James Nelson's personal memoranda of price conversations. To assist him, Perry hired his two sons, Shawn and Shane, who were of college and pre-college age at the time. In his fee petition, Perry requests the class to pay his sons $25 and $15 per hour for their time.

Specks traveled to Minneapolis on December 7, 1979 to obtain a formal statement from Nelson. Perry claims that on that occasion, Specks told him how happy he was with Nelson and as a reward told Perry to "Get hours." Perry Deposition at 76; Perry affidavit, September 1981. Howard Fink, a lawyer in the Specks firm also told Perry that he "would be assigned depositions as a reward for producing Nelson and for the good work done in the record search." Perry Affidavit, September 1981 at 7.[114]

Perry interpreted Specks' "Get hours" statement to mean that he should continue his work reviewing General Paper documents.[115] With this understanding Perry advertised in the newspaper for lawyers to work on the document search at a rate of $9.35 per hour. Perry, apparently acting on Riordan's advice, in his fee petition asks for compensation for these lawyers at the rate of $75 per hour. Perry claims Riordan told him that "the way it is done is you hire an attorney and you pay them so much per hour, you will then charge [the class] $75 per hour for these attorneys." Perry Deposition at 76. As a result of this ad, Perry did manage to hire some lawyers to assist him in the document search. Perry deposition at 77. Furthermore, to stimulate their initiative, he promised a reward of $1000 to the first worker to find the crucial "Pattern A" document. Class Objectors' E 141.[116]

On January 7, 1980, Specks and Fink decided that they had procured a sufficient

contention interrogatories, we have no present knowledge or information sufficient to give further response to any information required by Pretrial Order No. 70." N.T., 12/4/79, at 16. Based on Specks' representation that the plaintiffs had no more evidence to support their case than that already revealed to defendants, I denied defendants' motion. *See* N.T., 12/4/79 at 16–17. It is now clear that Specks' representation to the court was false since Specks had lengthy discussions with James Nelson regarding the alleged price-fixing conspiracy among the defendants almost two months earlier on October 10, 1979 and since that time had been working closely with Riordan and others in the development of his testimony.

According to the testimony of Guido Saveri, as of December 7, 1979, four of the plaintiffs' counsel knew of the existence of Mr. Nelson: Riordan, Specks, Saveri and Cotchett. The others were not told because: "We were afraid to tell anybody else about it because some dummy on our side would go on and tell the defendants about Nelson." N.T., 6/10/81 at 81.

**114.** Specks and Fink have both denied making such statements to Perry. *See* Fink's and Specks' affidavits of November 10, 1981, appended to Response of Specks & Goldberg, Ltd. to Class Objectors' Report.

**115.** Riordan told Perry that his interpretation of Specks' "Get hours" statement was erroneous. In his affidavit of September 1981 at 8, Perry states: "Riordan later said, 'That is not what he (Specks) meant; he meant get hours for the prior months.' I said 'you mean pad my hours?' I told him that that was not what Specks meant, as I interpreted it, and that I would not do that."

**116.** Riordan claims Perry offered $10,000, not $1,000. Riordan Deposition at 140.

number of documents from the General Paper Document Depository to take the deposition of James Nelson and decided to terminate the search of GPC records. On this same day, Fink informed Perry of the decision. When Perry heard the news, he became "quite distraught."[117] He thought if he were allowed more time, he could find a "Pattern A" document which had not yet been found.

As a result, Specks permitted Perry to continue the GPC document search "for an additional 10 days, but no longer." Specks' affidavit, November 10, 1981 at 14. In violation of Specks' order, Perry continued his search up to January 28, 1980 in order to "finish all cartons and not risk missing the pot of gold." Perry letter to Specks and Kohn, Feb. 4, 1980, Class Objectors' E 140.

III. James Nelson Deposition

Plaintiffs' counsel noticed the deposition of James Nelson for January 29, 1980. The day before the deposition, Specks told Riordan, that his strategy was to "low key" Nelson's testimony. By doing this, Specks hoped that the defendants would assign their "second-string" lawyers to attend the deposition. Consistent with this plan, Specks ordered that there should be no unnecessary attendance on the plaintiffs' side at the deposition. Only Specks and Fink would attend for the plaintiffs.[118] Riordan would attend as counsel for Nelson.

On the morning of Nelson's deposition, Riordan's investigator, Michael Melloy, approached Perry and told him not to attend Nelson's deposition because Specks and Riordan did not want him there. Melloy, however, did not tell Perry the reason for the decision. Perry ignored Melloy's message and attended the deposition anyway.

Perry was not invited to attend any of the remaining Nelson deposition sessions or any of the many meetings spent preparing for the deposition. Moreover, Specks did not give Perry any further work assignments. As a result of this treatment and Specks' decision to close down the GPC document search, Perry concluded he was being excluded from the *Fine Paper* case by Specks and Riordan and decided to withdraw from the litigation.

The Nelson deposition lasted eighteen days, with hundreds of hours involved in its preparation. The petitioning lawyers claim to have spent and seek compensation from the class for more than 1,475 hours—the equivalent of three attorneys each spending two and one-half months doing nothing else except preparing for and taking this deposition.[119] The total fees sought for this one deposition approximate a half a million dollars. Granvil Specks, assisted by Howard Fink, took the deposition on behalf of the plaintiffs. Walter Riordan entered an appearance at the deposition on behalf of General Paper Company and Nelson. Perry appeared for his client, Eagle Drug, Inc. for the first day and a half of the deposition.

IV. Perry's Dispute with Specks and Riordan

On February 4, 1980, Stewart Perry began writing a series of strongly worded letters to Specks, Kohn, and Riordan about his alleged exclusion from *Fine Paper* by Riordan and Specks. At the heart of Perry's caustic rhetoric was his allegation that Specks and Riordan wanted Perry out of *Fine Paper* so that they, alone, could claim credit for the Nelson testimony and, moreover, so that Specks could have the exclusive use of Nelson in class action suits against the paperboard and fiberboard industries which Specks was planning to bring after the completion of *Fine Paper*.

---

117. "It occurred in the restaurant at the booth. He got down on his knees and hit the table pleading to continue." Riordan Deposition at 120. According to Riordan, the following day Perry commented that "this is a money tree and 'I'm going to shake it, I don't care what you guys say.'" Riordan Deposition at 143.

118. An attorney from Harold Kohn's office, Elkan M. Katz, also entered his appearance for the plaintiffs at this deposition.

119. This figure does not include additional time spent by the lawyers reviewing the transcript.

*See* N.T., 5/11/82 at 2254; Perry affidavit 11/6/81, at 34.[120]

About the time the plaintiffs' attorneys filed their fee petitions with the court in March 1981, Perry filed a complaint in a Minnesota state court seeking compensatory and punitive damages against Riordan[121] for, *inter alia,* interference with Perry's attorney-client relationship with James Nelson. In the complaint, Perry states that as a result of Riordan's "theft" of his client, Riordan will earn in excess of $300,000 in attorney fees and therefore he has been unjustly enriched.[122]

On June 18, 1981, Perry filed in this court a "Notice of Attorney's Lien" purporting to attach any fees payable to Walter Riordan in *Fine Paper.* Riordan has filed a motion to dismiss this lien and to declare that this court has exclusive jurisdiction over all matters relating to fees to be awarded in *Fine Paper.* Perry has also filed a similar motion requesting this court to determine whether it has concurrent jurisdiction with the Minnesota Court over Mr. Perry's suit.

I have carefully reviewed these motions. It is clear that this court is without any jurisdiction to determine the merits of the Riordan-Perry controversy because no action with respect to this matter has ever been commenced in this court. Rule 3 of the Federal Rules of Civil Procedure provides: "A civil action is commenced by filing a complaint with the court." "Until an action has been commenced in this court, obviously, it has no jurisdiction to act." *In re Market Basket,* 122 F.Supp. 321, 322 (W.D.Mo.1954). All that has been filed is a "Notice of Attorney's Lien", which does not comply with Rule 3. *Cf. Application of Howard,* 325 F.2d 917, 918 (3d Cir.1963). It follows that the jurisdiction of the court has never been properly invoked by Perry.

Moreover, I note that Perry's complaint filed in the Minnesota court against Riordan sounds in breach of contract, quantum meruit, tort and alleges violations of the rules governing the conduct of attorneys in Minnesota. While the operative facts which are the basis of Perry's charges stem from his involvement in *Fine Paper,* the issues presently pending before the Minnesota court are completely beyond the scope of this court's responsibility in determining the fee award. I also note that Riordan filed a motion to dismiss Perry's action in the Minnesota court for lack of subject matter jurisdiction and this motion was denied. Perry's "Notice of Attorney's Lien", therefore, does not prevent this court from awarding fees to either Riordan or Perry. The Minnesota court can determine whether Perry is entitled to any part of the fees awarded to Riordan.

## V. Compensation for the Nelsons

Two additional aspects of the Perry dispute with Riordan and Specks remain to be discussed. First is Specks' alleged promise to pay James Nelson compensation in return for his testimony; and second, the purported agreement among Perry, Riordan, and James Nelson's sons, Douglas and Walter to divide any fees awarded to Perry and Riordan as a result of their work in *Fine Paper.*

---

**120.** In one of his letters, Perry comments:

Riordan's treachery is spelled out in my previous letter. There is no question that Riordan wanted to hitch his star to the Specks wagon as it rolled through the rich fields of anti-trust cases—a position fed by Speck's statement made in front of me to Riordan that "I'll bring you into big cases. The paint case is small," or words to that effect.

Why exclude Perry? Specks and Riordan could join in stealing Jim Nelson. Paper Board would be surfacing next.

Letter of 2/25/81, Class Objectors' E 148.

**121.** Several depositions have been taken in connection with Perry's lawsuit and have been admitted into evidence at the fee hearings held before this court.

**122.** Perry also threatened to sue Specks but was told by Melloy that if he did not sue Specks, Perry could submit his fee petition for any amount and it would be approved by Specks and, with Specks approval, his petition would automatically be approved by the court. Perry affidavit of 11/6/81.

### 1. James Nelson

Perry claims that in December of 1979 he told Specks of James Nelson's concern regarding the loss of income he would incur as the result of his giving testimony in the *Fine Paper* case. Perry states that when he told Specks of Nelson's demand for compensation, Specks told Perry to tell Nelson not to worry about money, because he would "be taken care of." Perry gave Nelson Specks' message. After the case was settled, James Nelson sent an itemized bill to Specks for $19,627.94 in reimbursement of his costs and loss of income. Specks responded to this request by denying he made any promise to reimburse Nelson for his losses; Specks instead suggested that Nelson look for remuneration to whatever sum General Paper Corporation would receive from the fund.

In view of Specks' refusal to pay Nelson, Perry has filed a motion with this court requesting the class to pay Nelson $37,-039.11 for his time. By affidavit, Nelson affirms Specks' promise to reimburse him.

 In response to this motion Specks relies on a February 24, 1980 affidavit in which Nelson states:

> At all times when I discussed any aspect of the fine paper antitrust litigation and when I gave testimony or any information pursuant to the fine paper antitrust litigation, I did so voluntarily and without any promise or inducement of any consideration whatsoever (except the $30.00 witness fee which was tendered to me at the time of service of the subpoena.)

In view of these inconsistent affidavits, I will not award James Nelson any class funds. Accordingly, the motion filed by Perry on behalf of James Nelson is denied without prejudice to any rights or claims for compensation Nelson may have against Specks.

### 2. Douglas and Walter Nelson

Douglas Nelson is the son of James Nelson and a former employee of General Paper Corporation. He is not a lawyer. Douglas claims that he was promised by Perry and Riordan that he and his brother Walter, a lawyer in California, would share in any fees awarded to Perry and Riordan in *Fine Paper* in return for their assistance in the prosecution of the case.

Initially, Douglas Nelson was very reluctant to get involved in *Fine Paper,* but he changed his mind after Riordan and Perry told him that he would make a great deal of money if he assisted the plaintiffs' lawyers. As he stated in his deposition:

> When I first heard about this thing from Perry I was ... very reluctant to get in .... I decided to go ahead and explore it a little further, but I was not mentally committed to it because, to be frank, I saw these men chasing a rainbow, and I just didn't need any fantasy in my life at that time ....
>
> As I recall, Mr. Riordan and Perry both emphasized to me that there was a lot of money to be had and that the money that General Paper would get would be a tremendous amount, and that considering my small interest in the General Paper stock, which is maybe 5 percent or something like that, that the minimum amount that I would get, I believe Mr. Riordan said, was $250,000, and that if I would just cooperate and tell the truth, and so on, that all these big floods of money would be pouring into the family coffers as well.

Douglas Nelson Deposition at 5, 7.

Lured by the prospect of receiving a small fortune, Douglas Nelson agreed to help Perry and Riordan. Douglas had been working as an accountant for Touche Ross and Co. One of the clients of that firm was Mead Corporation, a defendant in this litigation. Douglas quit his job at Touche Ross because he was told by Specks that a conflict of interest would exist if he continued to work there while aiding the plaintiffs.[123]

---

**123.** Specks has denied telling this to Douglas Nelson. Stewart Perry, however, confirms Douglas' version of the facts. *See* Perry affidavit, September 1981 at 15.

As time passed, Douglas Nelson decided he wanted a more firm financial arrangement with Perry and Riordan. He decided to approach Perry and Riordan and negotiate an agreement with them whereby Douglas and his brother, Walter, would receive a share of any fees awarded to Perry and Riordan. As explained by Douglas at his deposition:

I talked to them [Perry and Riordan] at first and finally, I believe it was in the Fall, they were starting to take up more and more of my time, and I had accumulated enough time with these two so that I felt it was time to, oh, I guess, bring the thing to a head. So I resolved in my mind that I was going to get an agreement from them and that not only would General Paper get some money out of this thing, then I would be entitled to my 5 percent, but I also wanted a share of all the fees that would come out of all of this, because the fees are normally, at least to me, 20 percent or 33 percent or something like that, and these men had told me they would be getting large fees, and I thought that if anybody would be getting paid on this thing, the lawyers would be.

So I told both of them that the only conditions under which I would continue to work with them would be if I was to share in the lawyers' fees. They asked me how much I wanted and I said well, first of all, and this is my first point, I can remember this one clearly, "first of all we have to take out the expenses." I said "We'll take the net fees, or the gross fees less the expenses, then we'll be left with the net fees and we'll divide those some way." And I wasn't greedy. I didn't say that I wanted this amount or that amount. I said, "What do you guys think?" And they said, "Well, how about a third?" Everybody gets a third, there are three of us here, that's the way we'll do it.

Now I said I want to get this clear because this is important to me. I don't want to spend any more time on this unless we have this understanding, and the understanding again, gentlemen, is

that we divide up the attorneys' fees among us, so that each of us gets a third after the expenses are paid. And I said, "Now is that clear?" And I thought to myself there is no way I'm going to get a written agreement on this issue because I think it is unethical for them to make this agreement. If they want to be unethical, that's their business but I want a gentleman's agreement. That is just as good.

I've studied the law too as part of my education and I know verbal agreements are just as binding as written agreements. Here I had a verbal agreement with two men of reputation. I said, "I want to confirm this agreement, let's shake hands." And we shook hands. From that point I figured I don't have any problems. These guys aren't going to break their word.

\* \* \* \* \* \*

Mr. Riordan said, "I've got a better deal for you." He said, "This is what we'll do: Instead of splitting it a third, what we'll do is give 20 percent to myself"—Mr. Riordan would get 20 percent, Mr. Perry will get 20 percent, and I was to get 60 percent and I was going to share that with my brother Walter, who we were also going to bring into the case. The reason for this, Mr. Riordan said many times, "I'm going to restore you and your family to your former financial position."

\* \* \* \* \* \*

And I just thought, well, this is good enough for me. A man's handshake. A man who has been in the legal profession all of his adult life, I can certainly trust him. And I knew I could trust Mr. Perry. So I didn't have any qualms about it. I never once thought that they wouldn't keep their agreement.

Douglas Nelson Deposition at 7–10.

Riordan denies having made any such agreement. Perry, on the other hand, acknowledges the agreement and supports Douglas' version.

Douglas Nelson has not petitioned the court for compensation, as his father has

done, although he apparently has never received any compensation from either Riordan or Perry. Perry, however, in his fee petition does ask for remuneration at the rate of $150 per hour for the consulting services of Douglas Nelson. This request will be discussed below. Furthermore, both Riordan and Perry claim to have compensated Walter Nelson for some of the time spent by him on consulting work and they each seek reimbursement for this expense from the class.

With this background in mind, I now come to the fee petitions of Riordan and Perry.

## VI. Petition of Walter E. Riordan, P.A.

Mr. Riordan claims to have devoted 2,304.5 hours to the case [124] primarily on the Nelson deposition and preparing for it, reviewing GPC documents, coordinating the 30(b)(6) merchant discovery program (for which Riordan billed 25 minutes of actual deposition time), and representing Nelson at the Majority States trial. He seeks $125 per hour for his time and requests a multiplier of 2.5 to 3. His total request is $795,-482 in fees. He asks an additional $45,-061.59 for expenses, most of which resulted from Riordan's retention of the private investigator, Michael Melloy.

### (A) Hours Expended

 After a thorough review of the testimony, time records and exhibits, I have concluded that the following hours are not compensable:

1. 201 hours spent obtaining immunity from criminal prosecution for James Nelson and for preparing him to testify as a witness in the Majority States trial. This time was spent after the private class action had been settled and thus did not benefit the class.

2. Riordan seeks compensation for 678 hours spent representing James Nelson at his deposition. Nelson, a third party to this litigation, was deposed by both plaintiffs and defendants. Granvil Specks appeared, along with various other plaintiffs' counsel, on behalf of the class at these depositions. Indeed, Specks & Goldberg bill the class more than 500 hours for the preparation and taking of these depositions. During the depositions, Riordan entered his appearance on behalf of Nelson and defended his client's interest throughout the proceedings. It is clear from a reading of the transcript that Riordan was not representing the class during these depositions.[125] The class will not be required to pay for the 678 hours Riordan spent representing Mr. Nelson at his deposition. The class was represented by Specks.

3. Riordan spent 78.25 hours reviewing pleadings and other documents that had nothing to do with any phase of the case assigned to him such as briefs relating to disqualification, contribution and class certification. Riordan will not be compensated for this time. As explained earlier, attorneys such as Riordan, who did not have any leadership role in the litigation, will not be compensated for simply reading every piece of paper filed in the case. These activities may have benefited Riordan or his individual client, but they did not benefit the class.

4. Riordan's remaining hours amount to 1,347.25. After a careful analysis of the time sheets submitted, however, I have concluded that Riordan should not receive remuneration for all these hours. For the following reasons, I will award Riordan fees for only half of this time or 673.63 hours.

 First, Riordan's claims are excessive and unreasonable. For example, on October 9, 1979, Riordan spent 14 hours in conference with lawyers and his investiga-

---

**124.** This amount reflects the changes contained in the amended and supplemental fee petition filed by Riordan on July 20, 1981.

**125.** At page 6, Volume 1 of the James Nelson deposition transcript the following colloquy appears:

MR. SPECKS: ... Mr. Riordan, as I understand, you are counsel for the witness, is that correct?

MR. RIORDAN: I am.

MR. SPECKS: And you've entered your appearance as such?

MR. RIORDAN: Yes, I have.

tor on "J. Nelson discovery"; 10 hours on September 30, 1979 at a meeting with his private investigator regarding Nelson; and another 10 hours on October 2, 1979 on "conferences with Doug Nelson, Jim Nelson and Tom Bartsh." He spent five hours in a general discussion about General Paper Corporation on October 1, 1979 and on October 5, 1979, he spent an additional 8 hours on this same subject. Similarly, on June 6, 1980, Riordan billed 3 hours; on June 11 and 12—17 hours; on June 23—12 hours; on June 26—5 hours; and on July 1—7 hours, just for conversations with his co-counsel and investigator regarding Rule 30(b)(6) discovery. From February 19–23, 1979 he billed 30 hours for conferences with a member of the Arizona Attorney General's Office regarding "price fixing data". There are other examples of excessive billing throughout Riordan's petition which will not be listed here. Riordan entered this litigation at a late stage. Despite this circumstance, he seeks a fee award for over 2300 hours. By way of contrast, Harold Kohn, the plaintiff's co-lead counsel, expended less than 1700 hours during the entire period of the litigation. I am convinced that Riordan's hours are grossly inflated.

Second, Riordan requests compensation for nearly 100 hours (at the rate of $125 per hour) spent on tasks that should have been performed by a non-lawyer. For example, on March 22–23, 1979, Riordan bills the class for 22 hours spent Xeroxing documents. He also expended numerous hours searching for documents, ordering paper catalogs, telephoning the American Paper Institute regarding the definition of fine paper, examining microfilm of airline records, and obtaining and distributing Canadian Mill price records.

Last, some 858 hours of Riordan's time are reflected by vague entries, making it difficult, if not impossible, to determine what work was done, or whether it was excessive or duplicative of work done by other firms. For example, some 400 hours are reflected by the entry "J. Nelson investigation (documents depository)". Other hours are reflected by such entries as "Conference with Bartsh"; "Conference with

Melloy"; "re J. Nelson deposition"; "multiple meetings and telephone conference re J. Nelson and records"; "Conference with Melloy re: Fine Paper"; "re: Nelson discovery proceedings and defendant's examination of records in Plymouth Bldg."; and "re Nelson deposition".

In view of the excessive hours billed by Riordan, the nature of the tasks he performed and the incompleteness of the supporting records, I will not allow Riordan compensation for all of the remaining 1,347.25 hours. To do so would be to condone inefficiency, incompetency and overreaching. Accordingly, I will reduce this time by one-half. Only 673.63 of Riordan's hours will be compensated by the class. A reduction by one-half may seem arbitrary, but given the circumstances outlined above, it represents the court's best judgment of Riordan's actual contribution to the creation of the fund.

(B) Hourly Rate

Riordan requests $125 per hour for his time. This request will be denied. Riordan has no historic non-contingent hourly rate. N.T., 3/3/82 at 1089. Riordan's compensable time was spent on document review and on the coordination, rather than the actual conduct of the 30(b)(6) depositions. In view of the associate-level tasks he performed, and Riordan's adjunct role in this litigation, he will be compensated at $50 an hour for his time.

(C) Total Lodestar

673.63 hours × $50/hour = $33,681.50

(D) Multiplier

Riordan asks for a multiplier of 2.5 to 3. This request is denied. This result is justified because all of Riordan's time was expended after the initial 30 million dollars of settlements were consummated. Thus, no substantial contingency factor existed which would justify an increase in his lodestar amount. Similarly, no increment to the lodestar is justified for the quality of his services. Riordan did not assume a

leadership role in this litigation; all of his compensation is for routine discovery matters. Although Riordan's initiative along with that of Perry resulted in the unearthing of the witness James Nelson whom the plaintiffs deemed to be essential to the success of their case, nevertheless, once he was authorized by the trustee to represent the bankrupt GPC, the contact with Nelson was inevitable. Accordingly, I cannot say that Riordan demonstrated such "an unusual degree of skill" as to warrant a multiplier for quality. *Lindy II* at 118. The total amount awarded to the Riordan firm for attorney fees is $33,681.50.

(E) Expenses

Riordan requests reimbursement for $45,061.59 in expenses. After carefully reviewing the expense vouchers submitted by the firm, I have concluded that the following expenses will not be reimbursed by the class:

1. $4,914.66 in meal expenses incurred by Riordan during the course of the litigation. Riordan bills the class for numerous lunches and dinners for himself, his co-counsel, Nelson, and his investigator. Most of the meals were costly, and were incurred when Riordan was working on the General Paper Corporation documents or on the Nelson deposition. Riordan justifies charging the class for these meals because he was working on the *Fine Paper* case on these days. *See* N.T., 3/3/82 at 1102. This rationale does not support the imposition of such large meal expenses upon the class. I fail to see any benefit to the class as a result of these meals and accordingly, the class will not be required to pay for them. Seventy-five percent (75%) or more of the meal expenses were incurred during Riordan's attendance at the Nelson deposition which I have determined was of no benefit to the class.

Several of Riordan's meal charges were for dinners attended by Riordan, Nelson, Melloy and their respective wives or fiancees. Riordan claims that these dinners were purely business engagements. He testified that at these dinners the discussion concerned Nelson's "testimony as to the price fixing and the various methodologies used." Riordan Deposition at 138. This assertion is somewhat contradicted by Nelson who stated that although business was discussed, much socializing occurred during these meals. James Nelson Deposition at 45. I am unable to conclude that those meals inured to the benefit of the class. It is more likely that the sole beneficiaries were Messrs. Riordan, Nelson and Melloy and their respective guests. Accordingly, no reimbursement will be authorized to Riordan for these meals.

2. Riordan asks for remuneration at a rate of $25 per hour for 1,007 hours of work expended by his investigator, Michael Melloy. This request comes to $25,175. The record reveals, however, that Riordan agreed to pay Melloy only $13 an hour. *See* Melloy Deposition at 6 & 64. Accordingly, Riordan will be compensated for Melloy's time at the $13 rate for a total of $13,091.[126]

3. $248.70 in expenses are merely described as "Misc. exp." or "Misc. supplies" and no vouchers were submitted to support these expenses. I cannot tell from these vague descriptions whether these expenses resulted in a benefit to the class. Accordingly, Riordan will not be reimbursed for these expenditures.

4. Riordan and Perry paid $1,802.96 to James Nelson's son, Walter, an attorney, for his services. Part of the bill included a $109.24 expense for dinner for Walter, his father and his father's fiancee. The class should not be required to pay for this dinner. Accordingly, Riordan will not be reimbursed for $54.62 of his payment to Walter Nelson. A similar deduction will be made from Perry's claimed expenses.

The total amount of expenses to be disallowed is $17,301.98. I have perused the

---

**126.** I note that the Bartsh, McIntosh, Trip & Wildfang firm paid Melloy $12 per hour for his services. N.T., 4/5/82 at 1837.

remaining expense vouchers submitted by Riordan and I find them to be legitimate and reasonable. They total $27,759.61. Accordingly, Riordan is entitled to reimbursement in this amount.

(F) Conclusion

The following represents my determination of the fees and expenses to which Walter E. Riordan, P.A. is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Riordan | 673.63 | $50 | $33,681.50 | $33,681.50 | $795,482 |

| Expenses: | |
|---|---|
| Amount Requested | $45,061.59 |
| Amount Disallowed | $17,301.98 |
| Amount Awarded | $27,759.61 |
| TOTAL AWARD | $61,441.11 |

VII. Petition of Stewart R. Perry

Perry filed his complaint on behalf of Eagle Drugs, Inc. on March 8, 1979, almost a month after the Court entered its class certification order. Perry requests compensation for 1,075.75 hours of time. He also seeks reimbursement for 291.5 hours billed by five attorneys he hired on a part-time basis, 459.25 paralegal hours (primarily his son), 139 assistant and "record box mover" hours (another son) and 48.5 consultant hours. Perry's time was devoted almost exclusively to a search of the documents belonging to the bankrupt General Paper Corporation. The total award sought is $294,274 for fees and $2,447 in expenses.

(A) Hours Expended

 After careful consideration of Perry's daily time sheets, I have concluded that the following hours are not compensable:

1. 91.75 hours are reflected by numerous vague entries such as "meet w/Riordan" (3/3/79); "Riordan" (9/9/79); "ph Riordan" (3/5/79); "Doug Nelson and Riordan" (4/17/79); and "read materials Specks gave me to read" (12/15/79). Since I cannot tell from these vague entries whether these hours were of any benefit to the class, Perry will not be compensated for this time.

2. Perry bills 58.5 hours for "Menasha Trip Gilbert Paper Co." This discovery-related trip commenced on the morning of September 12, 1979 and ended the evening of September 14, 1979. Class objectors challenged this amount as being unreasonable. In his detailed response to this objection, Perry concedes that the number of hours he billed for this trip was excessive and accordingly he has reduced his request to 32 hours. I therefore will award fees to Perry only for the reduced amount.

3. Additionally, 44 hours claimed by Perry will not be compensated since they did not benefit the class. Included are 16 hours Perry spent preparing James Nelson for his deposition and attending this deposition. This effort duplicated the hours billed for the Nelson deposition by Specks and other plaintiffs' counsel. 21 hours of the 44 hours were spent preparing the complaint for Eagle Drugs. This time did not benefit the class since Perry filed his complaint after the class was certified. The remaining non-beneficial entries include "pick up—take Shawn & Pat to airport & on return—Dayton Trip (plane 1 hr. late)" (3 hours) (9/19–20/79), and "end of search party for crew" (4 hours) (1/25/80). In his response to the Class Objectors' Report, Perry has conceded that the hours represented by these last two entries did not benefit the class.

4. 58 hours expended after January 17, 1980 on the search of General Paper Corporation documents. This time was expended after the deadline Specks gave Perry to

finish the document search. This time was unauthorized and should not be compensated by the class.

The total number of hours to be disallowed from Perry's claimed time is 220.25, leaving 855.5 compensable hours.

## (B) Hourly Rate

Perry requests $100 per hour for his time. This request will be denied. Perry, like Riordan, has no historic, non-contingent hourly rate. Perry's compensable time was spent almost exclusively on document search. In view of the nature of the tasks Perry performed, and his minor role in this litigation, he will be compensated at $50 per hour for his time.

## (C) Total Lodestar

855.5 hours $\times$ $50/hour = $42,775

## (D) Multiplier

Perry asks for a multiplier of 2. This request is denied. This result is warranted because all of Perry's time was expended after the initial $30 million settlements. Thus, no substantial contingency factor existed which would justify an increase in his lodestar amount. Similarly, no increment to the lodestar is justified for the quality of his services. All of Perry's compensable time was spent on routine discovery matters. His finding of James Nelson resulted purely from chance and the further utilization of Nelson resulted mainly from the efforts of the Specks firm. Accordingly, Perry did not demonstrate the unusually superior degree of skill that would warrant a multiplier for quality. The total amount awarded to the Perry firm for attorney fees is $42,775.

## (E) Expenses

Perry hired several attorneys, legal assistants and one consultant to assist him, on a part-time basis, with his record search of the General Paper Corporation. To the extent that their efforts benefited the class, their time is compensable. *See Shadis v. Beal,* 692 F.2d 924 (3d Cir.1982). However, since they were hired on an *ad hoc* basis (and most have already been paid by Perry), I will treat their time as an expense.[127]

### 1. Attorneys

### A. Richard Monks and Jim Arneson

Monks and Arneson spent 36.5 and 97 hours respectively on the GPC record search. They charged Perry $15 per hour for their services. Perry, however, wants the class to reimburse him for these two attorneys' time at the rate of $75 per hour, five times the rate Perry paid them. Since Perry paid only $15 an hour, the class will not pay more. Thus, Perry will be allowed $2,002.50 for Monks' and Arneson's time.[128]

### B. Walter Nelson

Both Perry and Riordan paid Walter Nelson, James Nelson's son, for his legal services. They each paid half of Walter's invoice of $1,802.96. According to the invoice Walter Nelson charged $200 per day or $25 an hour for his services. In his petition, Perry seeks reimbursement for Walter Nelson's time at $75 per hour. This request is denied. Perry will be reimbursed for $901.48, one-half of Walter's invoice, minus $54.62 which represents one-half of a $109.24 expense Walter Nelson incurred for dinner for himself, his father and his father's fiancee. Thus, Perry will be reimbursed $846.86 for the expense of Walter Nelson's services.

### C. Other Attorneys

Three other attorneys hired by Perry, Diane Hopkins, Janice Laird and Beverly

---

**127.** Accordingly, Perry's request that a multiplier of 1.75 be added to his assistants' time is denied. No multiplier is merited for their time for the same reasons I denied a multiplier for Perry's time.

**128.** *Fine Paper* was Perry's first federal class action case in which he filed a fee petition. He claims that Riordan told him that it was customary for attorneys to bill the class a greater amount than the sum they paid their part-time assistants. *See* Perry affidavit, 11/6/81 at 17; Perry Deposition at 76.

Felska, spent a total of 132.5 hours on the GPC record search. They billed Perry $9.35 per hour for their services. Perry wants the class to pay him $75 an hour for these three attorneys' services, over eight times the amount Perry paid them. This request is denied. Since Perry paid these attorneys $9.35 an hour, the class will reimburse Perry at the same rate. Thus, Perry will be reimbursed $1,238.88 for these three attorneys' time.

## 2. Legal Assistants

■ Perry requests compensation for the work of three legal assistants, Barbara Parks and Perry's two sons, Shawn and Shane. These three assisted Perry in his search of documents belonging to the General Paper Corporation. Neither Ms. Parker nor Perry's sons have any previous formal paralegal training.

### A. Barbara Parks

As described by Perry, this part-time worker "had no previous legal training but was a bright college graduate." Petition at 2. Perry paid her $5 per hour for 26 hours of work for a total of $130. He now asks the class to pay her $15 an hour for her work. This request is denied. The class will reimburse Perry $130 for Parks' time.

### B. Shane Perry

Stewart Perry seeks compensation for 139 hours of his son Shane's time. As described by Perry, Shane, at the time a high school senior, was "utilized for the muscle work of bringing up from basement storage to work rooms (and later returning them) the hundreds of cartons of records . . . . He was also used effectively in the record search. His time was probably 50/50 between brain and brawn." Perry claims that at the time of Shane's work, he paid his son $5 to $7.50 per hour. He now asks the class to pay Shane $15 an hour for his work. This request is denied. Considering at the time Shane did work for his father he was a high school student, the class will only pay Perry $5 per hour for Shane's time. Ac-

cordingly, Perry will receive $695 for Shane's time.

### C. Shawn Perry

Shawn, another of Perry's sons, spent 433.25 hours on this litigation. Shawn, then a second-year college student, spent most of his time reviewing documents of the defendants. Perry seeks $25 per hour for Shawn's time. This request is denied. In view of Shawn's lack of legal training, the tasks he performed and the fact that Perry paid Barbara Parks, a college graduate, $5 per hour and lawyers $9.35 per hour to perform the same tasks Shawn performed, I find $5 per hour is a fair and appropriate rate for Shawn's time. Applying this rate, then, Perry will be awarded $2,166.25 for Shawn's efforts.

## 3. Consultants

### A. Douglas Nelson

Perry requests compensation at $150 per hour for 48.5 hours of time Douglas Nelson spent consulting Perry and Riordan regarding the GPC and the paper industry in general. Neither Perry nor any other plaintiffs' lawyer have paid Nelson any monies for his time, let alone at the rate of $150 per hour.

■ It does appear, however, that Douglas Nelson's advice to the plaintiffs' lawyers did render some benefit to the class, see Perry's Petition at 9, and it would be a grave injustice not to compensate him for this effort in view of the fact that when he became involved in this case he quit his job at Touche Ross and Company because of Specks' and Riordan's representations. Accordingly, the class will compensate him for his time, but only at the rate of $25 per hour (equivalent to $52,000 per annum), which I find to be a fair and appropriate rate. Thus a total of $1,212.50 will be awarded to Douglas Nelson for his service to the class. This sum will be made as part of the expenses awarded to Stewart Perry. Mr. Perry is in turn directed to pay this sum to Mr. Nelson upon the receipt of his award.

**4. Other Expenses**

 Perry's remaining expenses amount to $1,994. After carefully reviewing the vouchers submitted to support these expenses, I have concluded, however, that $813.31 of these expenses are not compensable. This sum includes:

1. $769.79 for meals consumed in Minneapolis by Perry, Riordan, Specks, Fink, Michael Melloy and his wife, and by the lawyers and assistants Perry hired to aid him with the document search. A portion of this amount was for a $146.50 dinner bill incurred by Perry for his "End of the Search Party" for his assistants. These meals were unnecessary and of no benefit to the class.

2. $43.52 for three copies of the book *The Brethren* which Perry purchased as gifts for Specks, Riordan and Fink. It is difficult to fathom how Perry would think that the costs of these gifts should be borne by the class, even in light of Riordan's statement to Perry that federal antitrust class actions were a "gravy train" for the plaintiffs' lawyers in terms of fees.

In accordance with the above discussion, the total amount of remuneration awarded to Perry for his expenses, including his employment of part-time lawyers, assistants and consultants, is $9,472.68.

**(F) Conclusion**

The following represents my determination of the fees and expenses to which Stewart R. Perry is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Perry | 855.5 | $50 | $42,775 | $42,775 | $294,274 (includes expenses for part-time employees) |

Expenses:

| | |
|---|---|
| Amount Requested: | $ 2,447.00 (excludes expenses for part-time employees) |
| Amount Awarded: | $ 9,472.68 |
| TOTAL AWARD: | $52,247.68 |

---

## ROBINSON, SILVERMAN, PEARCE, ARONSOHN & BERMAN

This New York law firm has been involved in this case since its inception in May, 1977, representing the class plaintiff, Herst Litho, Inc., along with Specks & Goldberg Ltd. The firm's primary responsibility was the discovery of defendant Westvaco. In addition, the firm's members served on the Industrial Analysis Committee and the Rule 37 subcommittee, analyzed the Lockwood Directories of the paper industry and compiled the discovery outline book for defendant Westvaco. The firm has submitted a fee application seeking a total of $427,829.38 for the following:

$298,101.75 for 1,285.75 attorney hours (lodestar of $114,025.50 with multiplier of 2–3), $92,987.50 for 2,447.75 paralegal hours and $36,740.13 for expenses.

**I. George Yankwitt**

**(A) Hours Expended**

The Robinson, Silverman firm is seeking compensation for 217.5 hours of work performed by its senior partner, George B. Yankwitt. As chairman of the Westvaco discovery subcommittee and a member of the Rule 37 subcommittee Yankwitt's primary role in this litigation was supervising his firm's participation.

After reviewing Yankwitt's time records I conclude that only 125.35 hours are compensable. A total of 92.15 hours will be disallowed for the specific reasons stated below:

1. 50 hours must be disallowed because of inadequate or insufficient documentation. Nondescript entries such as "conf", "conference", "review papers", "review file", "research", "T/C" (telephone call), and "ltr" (letter) without any indication of relevant subject matter do not provide a sufficient basis to make a determination of benefit to the class. Nor can it be determined whether this time was duplicative or excessive or at what rate it should be compensated.

2. 27.4 hours spent reviewing correspondence and conducting conferences regarding the Lockwood Directories and the Industrial Analysis Committee. As explained in the Guidelines section, in addition to being highly duplicative, the work of this committee was often unreliable and served no useful purpose. The following letter sent by co-lead counsel Harold Kohn on January 19, 1979 was addressed to the chairman of the committee. It reflects the view not only of Kohn but also the view of this Court that the work of the committee was of no benefit to the class:

> Yesterday I received another pack of useless papers from Floran L. Fink on behalf of the Industrial Analysis Committee dated January 15, 1979. The only people likely to benefit from this continued project, and the Fink threat to send still further "information" are the companies that sell the paper.

Class Objectors' E 287. Accordingly the time devoted to the Industrial Analysis Committee will be disallowed.

3. 8.5 hours logged for attendance at and travel to and from the pretrial conference in Philadelphia on April 19, 1978. Yankwitt's attendance at this conference was unnecessary and yielded no discernible benefit to the class.

4. 3.5 hours spent in reviewing documents for which Robinson, Silverman was not responsible, including the class action complaints of the states of Arizona, California and Connecticut.

5. 1.75 hours spent on time reports and disbursements.

6. One hour spent reviewing the minutes of an Executive Committee meeting.

(B) Hourly Rate

The firm's historical profile of Yankwitt indicates that Yankwitt's non-contingent hourly rate ranged from $110–$155 during the course of this litigation. However, to be consistent with the fees awarded to other attorneys of similar experience and ability, for similar work, Yankwitt's time will be compensated at an hourly rate of $100.

(C) Total Lodestar

125.35 hours × $100/hour = $12,535

(D) Multiplier

The firm seeks a multiplier of 3 to be applied to Yankwitt's lodestar. A 1.5 contingency multiplier will be applied to 64.6 hours of Yankwitt's compensable time which were expended prior to the end of the first wave of settlements in January 1979. No quality multiplier is warranted.

II. Leonard Sand

(A) Hours Expended

■ Sand is a former senior partner of the firm. Compensation is sought for 51.25 hours of his time during the nine month period between May 1977 and January of the following year. The handwritten time records of Sand are difficult to decipher and at times are totally illegible. Only with the aid of the firm's typewritten "Monthly Summary of Services Rendered" was an interpretation of Sand's entries possible. An examination of these summaries however, reveals that Sand's involvement in this case amounted to little more than conversations with Mr. Specks and other lawyers regarding participation in the litigation. Sand reviewed some of the initial documents including complaints, interrogatories, motions for extensions of time, memos in opposition to protective orders and

proposed pretrial orders. Much of his time for which compensation is sought involved reviewing documents which were not the responsibility of Robinson, Silverman. These activities were of no benefit to the class and therefore compensation will not be awarded for them. Sands devoted a total of 6.75 hours of time to the Multidistrict Panel transfer motion. Only this time will be compensated.

## (B) Hourly Rate

The firm seeks an hourly rate of $150 for Sand. Having disallowed all of Sands time except for that which was devoted to the transfer motion, I believe this figure to be excessive. An hourly rate of $100 is reasonable compensation for this work.

## (C) Total Lodestar

6.75 hours × $100/hour = $675

## (D) Multiplier

Sand's compensable time was spent prior to the January 1979 settlement. Therefore, a 1.5 multiplier will be applied. No quality multiplier is warranted.

## III. James P. Gill

██ Gill is a senior partner and seeks compensation for only 3.5 hours. This time was spent attending a luncheon and a meeting with Mr. Specks and reviewing the complaint. The class derived no benefit from these activities. No fee award is justifiable.

## IV. Michael Rosen

This partner seeks compensation for 8.5 hours which, according to his time records were spent attending a luncheon, a few conferences and writing one letter. No further documentation was offered as to the subject matter discussed at these conferences or contained in the letter. This time is therefore not compensable because a determination of benefit to the class is not possible.

## V. Floran Fink

### (A) Hours Expended

Fink is a senior associate with the firm who devoted 335.5 hours to this case. For the reasons enumerated below 125 hours will be disallowed:

1. A total of 84.25 hours was expended on Industrial Analysis Committee work. For the reasons noted in the discussion of Mr. Yankwitt's hours this time will be disallowed as not benefiting the class.

2. 25 hours are disallowed because the time records fail to set forth adequate information. Over half of this time was entered with the designation "T/C" (telephone call) and the name or initials of the individual called. No description of the subject matter discussed was included. As with similar entries by other attorneys this time must be disallowed for failing to show any benefit to the class.

3. 8 hours designated as time devoted to the pretrial conference will be disallowed as Fink's attendance was not required and did not result in any benefit to the class.

4. 6.75 hours consumed in reviewing drafts of fee applications and expense reports will be disallowed. While of benefit to the firm these activities did not result in any benefit to the class and are not compensable under *Lindy*.

5. One hour spent on telephone calls to Mr. Specks regarding "Canadian Sources" will be disallowed. The work performed in this regard was of no benefit to the class.

### (B) Hourly Rate

The historic non-contingent hourly rate charged by Robinson, Silverman for Fink's services ranges from $65–$115. However, I believe a fee of $50 per hour is fair and reasonable compensation for the time expended which primarily involved the discovery of defendant Westvaco.

### (C) Total Lodestar

210.5 hours × $50/hour = $10,525

## (D) Multiplier

The firm requests a multiplier of 2.5 to be applied to Fink's lodestar. A 1.5 contingency factor will be applied to the 119.5 hours logged prior to January 1979, but no quality multiplier is justified.

## VI. Stephen Charme

### (A) Hours Expended

With 483.75 hours, Charme has devoted more time to *Fine Paper* than any other member of his firm. An examination of Charme's time records reveals the following:

1. 24.3 hours were recorded as "telephone conversations" or "T/C" and the party spoken to. No reference was made to subject matter. These entries are too vague to permit a determination of whether the work benefited the class.

2. 22.75 hours devoted to making expense reports and time records are disallowed.

3. 12.2 hours logged for attendance at a pretrial conference in Philadelphia, are disallowed. The class was adequately represented by lead counsel at this conference.

### (B) Hourly Rate

The 424.5 hours for which compensation will be allowed were spent on such activities as document review and preparing for and taking depositions. An hourly rate of $50 is reasonable for such services.

### (C) Total Lodestar

424.5 hours × $50/hour = $21,225

### (D) Multiplier

Robinson, Silverman requests a multiplier of 2.5 to be applied to Charme's lodestar. I will allow a 1.5 contingency multiplier for the 76 compensable hours logged before the $30 million settlements, but no quality adjustment is warranted.

## VII. Watler Curchack

The .25 hour entered as "research" will be disallowed as too vague.

## VIII. Robert Wolf

This senior associate with the firm seeks $27.50 for 15 minutes spent filing papers in federal court in 1977. This task could have been performed by a paralegal or messenger and therefore will be compensated at the paralegal rate of $25 an hour. Accordingly, $6.25 will be awarded for Wolf's services. To be consistent, a 1.5 contingency multiplier will be applied. No quality multiplier is merited.

## IX. Myra Karban

### (A) Hours Expended

Karban became an attorney in April 1978. Prior to this time she was a paralegal. Compensation is sought for 115.75 attorney hours and 8.25 paralegal hours. All but 20.5 hours of her time will be compensated.

1. 8 hours spent attending the pretrial conference of July 10, 1978 will not be compensated because Karban's attendance was not necessary and did not benefit the class.

2. 12.5 hours spent reviewing the Lockwood Directories will be disallowed. As previously noted this work did not benefit the class.

### (B) Hourly Rate

An hourly rate of $50—$60 for 115.75 attorney hours and $35 for the 8.25 paralegal hours is sought. However, my review of the time records indicates that all of the services rendered by Karban were those customarily performed by paralegals including: arranging for witness and filing fees; telephoning the courthouse clerk's office; arranging for service of subpoenas; and numbering, organizing, and separating documents. Therefore, the class will only be required to pay compensation for those services at the rate of $25 an hour.

### (C) Total Lodestar

103.5 hours × $25/hour = $2,587.50

(D) Multiplier

I will not award any multiplier to the time logged while Karban was a paralegal. A 1.5 contingency multiplier will be applied to her 78.25 compensable attorney hours expended before the end of the first wave of settlements. No quality multiplier is warranted.

X. Jacalyn Barnett

(A) Hours Expended

Barnett spent a total of 15.5 hours on this case. Over a three day period, she was involved in the production of documents at Herst Litho and in the firm's office. This time will be allowed.

(B) Hourly Rate

The hourly rate of $50 requested by Barnett is in line with the work performed and will therefore be awarded.

(C) Total Lodestar

15.5 hours × $50/hour = $775

(D) Multiplier

Since Barnett's time was logged before the initial settlements, a 1.5 contingency multiplier will be applied. No quality multiplier is warranted.

XI. Julia von Schilling

(A) Hours Expended

 Robinson, Silverman seeks compensation for 54 hours of this associate's time, the majority of which was spent in preparation of summaries of Boise Cascade and Union Camp interrogatories for dissemination to other plaintiffs' counsel. Except for 1.5 hours of vague entries, von Schilling's time is compensable.

(B) Hourly Rate

Consistent with the fees given to the other associates in this firm and for the reasons there stated, an hourly rate of $50 will be applied to von Schilling's time.

(C) Total Lodestar

52.5 hours × $50/hour = $2,625

(D) Multiplier

All of von Schilling's compensable time was expended prior to the first settlement in this case. Therefore, a 1.5 contingency factor will be applied. No quality multiplier is warranted.

XII. Paralegals

Paralegal services were used extensively by this law firm. A total of 2,439.5 hours have been entered. Yet for the reasons which follow, 1,068.75 hours will be disallowed.

1. 941 hours were devoted to work for the Industrial Analysis Committee researching the Lockwood Directories. The value of this work has been discussed above. This time will be disallowed.

2. 127.75 hours were spent preparing Robinson, Silverman time and expense reports. This did not benefit the class.

The remaining 1,370.75 hours will be compensated at an hourly rate of $25. Accordingly, the firm will receive $34,268.75 for the services rendered by paralegals during the course of this litigation.

XIII. Expenses

 Robinson, Silverman seek reimbursement of $36,740.13 in expenses. I find that a total of $1,516.82 must be disallowed for the following reasons:

1. $755.17 for meals and fares will be disallowed because the only documentation supplied were the firm's "petty cash" registration forms and "charge slips". Without additional documentation such as the original bill or invoice, it is impossible to verify the expense incurred and determine its relationship to *Fine Paper*.

2. $761.65 for travel expenses attending pretrial conferences in Philadelphia and an Executive Committee meeting in Chicago.

The firm's attendance at these meetings was unnecessary. Yankwitt was not even a member of the Executive Committee.

## XIV. Conclusion

The following summarizes the compensable fees of Robinson, Silverman:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Yankwitt | 125.35 | $100 | $12,535.00 | $15,765.00 | $ 78,997.50 |
| Sand | 6.75 | $100 | $ 675.00 | $ 1,012.50 | $ 23,064.00 |
| Gill | 0 | 0 | 0 | 0 | $ 1,312.50 |
| Rosen | 0 | 0 | 0 | 0 | $ 3,187.50 |
| Fink | 210.50 | $ 50 | $10,525.00 | $13,512.50 | $ 64,796.25 |
| Charme | 424.50 | $ 50 | $21,225.00 | $23,125.00 | $107,850.00 |
| Curchack | 0 | 0 | 0 | 0 | $ 42.50 |
| Wolf | .25 | $ 25 | $ 6.25 | $ 9.38 | $ 27.50 |
| Karban | 103.50 | $ 25 | $ 2,587.50 | $ 3,565.63 | $ 11,869.00 |
| Barnett | 15.50 | $ 50 | $ 775.00 | $ 1,162.50 | $ 1,550.00 |
| von Schilling | 52.50 | $ 50 | $ 2,625.00 | $ 3,937.50 | $ 5,405.00 |
| Paralegals | 1,370.75 | $ 25 | $34,268.75 | $34,268.75 | $ 92,987.50 |
| | | | $85,222.50 | $96,358.76 | $391,089.25 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 36,740.13 |
| Amount Previously Distributed | $ 27,555.00 |
| Amount Yet to be Distributed | $ 9,185.13 |
| Amount Disallowed | $ 1,516.82 |
| Total Expenses Allowed | $ 7,668.31 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $ 96,358.76 |
| Expenses | $ 7,668.31 |
| Final Award | $104,027.07 |

## ROGERS, RUDE, CANDLIN, FAULKNER & SJOSTROM

This Minneapolis firm bills the class for 513.6 hours spent on *Fine Paper* from September, 1979 through October, 1980. The firm claims that it became associate counsel with the law firm of Walter E. Riordan, P.A. in August, 1979, for Riordan's three clients.[129] This petition is not consistent with other information now on record including the testimony of Walter Riordan, the affidavit of Stewart Perry, and various exhibits filed in connection with the fee petition.

Several cancelled checks submitted by Riordan clearly indicate that James Rude, a partner of the firm who is responsible for the majority of the firm's hours (387.1) was hired by Walter E. Riordan, P.A. in 1979 to review documents relating to the *Fine Paper* case for $15 per hour and that he was paid for 60.4 hours of his time. Although the Riordan firm does not seek reimbursement for these expenses, Mr. Rude, in his fee petition, seeks compensation for 65.5 hours of document review in 1979 at the rate of $75 per hour. Rude was also paid $240 by the Riordan firm in 1980 for *Fine Paper* work. At $15 per hour, this sum

129. The Hennepen Press, Inc., Barr, Inc. and Varpohl Printing Co.

represents 16 hours of work. In his petition, Rude asks for a rate of $85 and $95 for his time in 1980.

The information contained in Riordan's fee petition is corroborated by his testimony that he hired "young lawyers who wanted to work nights at $15 an hour....", N.T., 3/3/82 at 1086, and by the affidavit of Stewart Perry, Esquire, in which Perry states:

Another firm which was brought into the case in 1979 was the Rude and Flynn firm.[2] The first time I was aware of that firm being in any way involved in the case was in September of 1979. Pat Flynn went on one assignment with my son to Dayton, Ohio, and went with me on assignment to The Gilbert Paper Company in Neenah-Menasha, Wisconsin. I later met Mr. Rude (maybe in October-November) at the General Paper Company depository. *Riordan told me he hired Flynn for $15.00 per hour. I assumed the same was true of Rude but I do not have a present recollection of any mention of that. Neither Flynn nor Rude indicated at anytime to me that they had a client of their own in the case, or that they were co-counsel with Mr. Riordan for one of Mr. Riordan's clients.* I have been advised that the Rogers, Rude firm has filed a fee application in this case. That firm is also counsel to Mr. Riordan in my lawsuit against him.

130. In a fourteen page, detailed, affidavit filed to refute the charges made by Perry in his September 1981 affidavit, Riordan does not refute this aspect of the Perry assertion.

131. MR. BATES: [Deponent's Counsel] Just for purposes of clarification I would like to ask Mr. Faulkner who he represents in this case.
 MR. FAULKNER: I am an employee of the plaintiff's committee employed to do [30(b)(6)] depositions by Walt Riorden's [sic] law firm in Minneapolis.
 MR. BATES: You are employed by Mr. Riorden? [sic]
 MR. FAULKNER: Right.
 MR. BATES: Does Mr. Riorden [sic] represent a party in this litigation?

[2] I do not know what the firm name was. I think the only lawyers were Patrick Flynn and Jim Rude. Flynn later left the State, I believe, and Jim Rude is now a member of Rogers, Rude, Candlin and Faulkner.

Class Objectors' E 529 (emphasis added).[130] Furthermore, a partner of Rude's law firm, Charles W. Faulkner, when asked whom he represented at the May 1980 deposition of William E. Johns stated that he was employed by Riordan.[131]

On June 11, 1980, Rogers, Rude filed a document with the Court reciting a "Notice of Association" with the firm of Walter Riordan, P.A., Docket Entry No. 2334.

After thorough consideration of all the circumstances, I have concluded that no fees or reimbursement of expenses should be awarded to this firm.

▮ First, the firm represented no plaintiff or client in the *Fine Paper* case in the period before June 1980 when it expended the vast majority of its hours on the case.

Second, the firm did not comply with paragraph 14 of Pretrial Order No. 143, which required the disclosure of the agreement with Walter Riordan, P.A.[132] While technically the firm itself was not hired[133] by Riordan, nevertheless, the attorneys for whom the firm seeks compensation were employed by Riordan.

Third, since James W. Rude having agreed to do the work for $15 per hour, I think it is entirely inappropriate for the

MR. FAULKNER: He does. He represents a plaintiff in this litigation and I cannot remember at this moment which plaintiff it is. Johns Deposition at 4, Docket Entry No. 2377, filed June 18, 1980, excerpts found in Class Objectors' E 178.

132. Pretrial Order No. 143 provided in pertinent part:
 (14) The petition shall contain an identification and complete description of any agreement, either written or oral, petitioner has with any . . attorney or any other person, in connection with this litigation. Any written evidence confirming or memorializing any such arrangement shall be filed with the court.

133. *See* Rogers, Rude Response to Class Objectors' Report at 5.

firm to ask the class to reimburse it for Rude's time at $75 per hour.

 The court awards attorney fees by virtue of its "historic power of equity." *Silberman v. Bogle,* 683 F.2d at 64 (quoting *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975)). Given the petitioner's burden to establish its entitlement to fees, I am not satisfied that this petitioner has been completely "frank and fair with the court." *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 244, 54 S.Ct. 146, 147, 78 L.Ed. 293 (1933), quoting Story, Equity Jurisprudence, § 98 (14th ed.), particularly with respect to its relationship with Walter Riordan.

Under the circumstances, therefore, the petition of Rogers for compensation for services rendered and for reimbursement of expenses will be denied. *See Precision Instrument Manufacturing Co. v. Automotive Maintenance Co.,* 324 U.S. 806, 814–15, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945); *Gaudiosi v. Mellon,* 269 F.2d 873, 881 (3d Cir.), *cert. denied,* 361 U.S. 902, 80 S.Ct. 211, 4 L.Ed.2d 157 (1959).

## SACHNOFF, WEAVER & RUBENSTEIN, LTD.

Sachnoff, Weaver & Rubenstein, Ltd.,[134] a Chicago law firm, represented Joli Greeting Card Co., along with Fine, Kaplan & Black on a complaint filed in 1978. The firm's major contribution to the class was discovery of the Mead Corporation, under the direction of the Discovery Committee. In addition, the firm worked on briefs including the trial brief and supplied personnel for the trial support team.

The firm's total fee request for attorney and paralegal time is $1,160,295.33. This includes a lodestar of $370,382.50 for 3,992.25 hours of attorney time at the firm's historical, non-contingent rates, and $128,323.75 for 3,677.25 hours of paralegal time. The firm asks for the application of a multiplier of 3.25 for all work by the senior partners, 2.5 for the work performed by Sarah Wolff, an associate, and 2.25 for all

other attorneys who worked on the case. Finally, the firm has asked to be reimbursed for expenses of $93,278.10.

## I. Lowell Sachnoff

### (A) Hours Expended

Sachnoff, a partner in the firm, bills 373.25 hours to the class. Although he was a member of the Executive Committee, Sachnoff's contributions to the creation of the fund were rather modest. His involvement included attending meetings and conferences, spending 50 hours supervising discovery of the Mead Corporation and over a hundred hours researching, drafting and revising several briefs and memoranda. A careful review of Sachnoff's time records reveal that only 320.5 of the total hours claimed by him benefited the class. Specifically, in accordance with the Guidelines set forth above, compensation will not be awarded for the following hours:

1. 41.75 hours for traveling to and attending pretrial conferences will not be compensated since such attendance did not benefit the class. Sachnoff played no appreciable leadership role; his participation was limited to the task of Mead discovery and a limited support role. It therefore was neither necessary nor beneficial to the class for Sachnoff to attend these pretrial conferences.

2. 5 hours have been charged for "Wash., D.C. Conf. Senefield re immunity grant & contrib. test. Sen.Com. re contribution." The portion of this time which was spent on testimony before a Senate subcommittee regarding contribution among antitrust defendants will be disallowed as not providing any benefit to the class of private plaintiffs involved here. Accordingly, Sachnoff will not be compensated for 3 hours of this 5 hour entry.

3. Similarly, 1 hour for "Conference with Specks re St. Regis settlement, Illinois Brick legis." will be disallowed since I cannot discern any benefit to the class by such discussion.

---

**134.** Formerly known as Sachnoff, Schrager, Jones, Weaver & Rubenstein, Ltd.

4. 3.5 hours spent on the preparation of the firm's or other lawyers' fee petitions.

5. 3.5 hours vaguely described as "miscellaneous" or "Steering Committee" will not be compensated since such entries do not permit a determination of precisely what was done, whether it was of benefit to the class, whether it was duplicative of work performed by others, or whether the rate sought is appropriate.

The total number of hours disallowed, therefore, is 52.75, leaving 320.5 compensable hours.

### (B) Hourly Rate

Sachnoff asks the class to pay him at a rate of $175 to $200 per hour for his time. A review of the time records, however, indicates that many of the tasks performed by Sachnoff were duplicative of the efforts of other counsel and therefore do not justify the application of such a high hourly rate.

 Sachnoff spent much of his time reading and reviewing various pleadings and documents filed in the case, perusing Mead discovery, supervising his associates, corresponding and communication with his co-counsel and associates, reviewing SEC 10–K forms and other industry statistics, and researching, drafting and revising several briefs. Much of his time was spent assisting the Kohn firm on the briefs opposing the Kimberly-Clark Motion for Disqualification and also on the contribution issue.[135] Sachnoff was not a lead counsel or co-chairman of the Executive Committee nor did he have a substantial role in the preparation for trial. See N.T., 5/12/82 at 2326–27. Accordingly, I find that $100 an hour is a fair and appropriate rate for Sachnoff's time.

### (C) Total Lodestar

320.5 hours × $100/hour = $32,050

### (D) Multiplier

Sachnoff asks for a multiplier of 3.25 for his time. No quality multiplier will be awarded for reasons stated below, but I will apply a 1.5 contingency multiplier to the compensable time (80 hours) expended before the end of the first wave of settlements.

## II. Dean A. Dickie

### (A) Hours Expended

 Dickie, a junior partner of the firm, bills 799 hours to the class for essentially reviewing Mead documents and taking Mead depositions under the supervision of the Discovery Committee Chairmen, Specks, Saveri and Cotchett. After a review of Dickie's time records, I find that the following hours are not compensable:

1. 25.25 hours expended after the final settlements on preparation of the firm's fee petition, filing a proof of claim for the firm's client, "fee discussion" with Specks, "fee resolution situation", "H. Kohn problem" and other related matters. Such time clearly did not benefit the class.

2. 2.75 hours spent on August 21–22, 1980 conferring with Specks on "Harold Kohn situation". This time clearly did not benefit the class and therefore is not compensable.

3. 2 hours for attendance at meeting of plaintiffs' Executive Committee in Philadelphia on June 13, 1978. Dickie was not a member of this committee.

4. 8 hours for attending and traveling to a pretrial conference on September 3, 1980. His attendance did not benefit the class. Dickie had no leadership role; his participation was limited to the task of Mead Corporation discovery and a limited support role. It was therefore neither necessary nor beneficial to the class for Dickie to attend this conference.

---

**135.** Both Kohn and Sachnoff claim primary responsibility for the disqualification brief filed in the Third Circuit. See Class Objectors' E 829. Sachnoff's testimony at the fee hearings, however, indicates that it was Kohn who successfully argued the issue before the Third Circuit and that it was Kohn's edited version of Sachnoff's research which was submitted in the brief filed with the Court of Appeals. N.T., 5/12/82 at 2318–2525; MM Exhibit # 63.

5. 92.5 hours are duplicative of the work of other counsel and of no benefit to the class, including time reviewing pleadings and documents filed by other parties or which did not directly pertain to Mead discovery, sitting in on depositions in which the firm took no part or preparing for depositions which were taken by another partner of the firm.

The total number of Dickie's hours which will be disallowed, therefore, is 130.5, leaving 668.5 compensable hours.

(B) Hourly Rate

Dickie asks for an hourly rate between $85 to $145 per hour. Although most of Dickie's efforts benefited the class, he did not serve in any leadership position. Nevertheless, his active role and responsibility for the Mead depositions warrant a rate of $100 per hour for most of his work. $50 an hour will be awarded for the 53.75 hours Dickie spent on associate-level tasks such as scheduling, preparing indices, and inspecting microfilm and documents.

(C) Total Lodestar

$$53.75 \text{ hours} \times \$ 50/\text{hour} = \$ 2,687.50$$
$$614.75 \text{ hours} \times \$100/\text{hour} = \$61,475.00$$

(D) Multiplier

Dickie asks for a multiplier of 3.25 for his time. No quality multiplier will be awarded for reasons stated below, but I will apply a 1.5 contingency multiplier to all compensable time (40 hours) expended before the end of the first wave of settlements.

III. Arnold A. Pagniucci

Pagniucci was a senior associate of the firm at the start of his participation in the litigation on June 13, 1978 but became a partner in September of 1978. He asks compensation for 211.25 hours essentially spent taking Mead depositions and reviewing documents.

(A) Hours Expended

 I find all but 10 of Pagniucci's hours benefited the class. The entry of May 21, 1980 for 10 hours spent at the deposition of Dorothy J. Eifert will be disallowed since during the deposition Pagniucci sat as a spectator while Sarah Wolff took the deposition. These 10 hours did not benefit the class and Pagniucci will not be compensated for this time.

(B) Hourly Rate

Pagniucci asks for an hourly rate of $65 to $110 for his time. Since he was a junior partner during almost all the time he spent on the case, and since his contribution was of less significance than Mr. Dickie's, I will allow a rate of $75 per hour.

(C) Total Lodestar

$$201.25 \text{ hours} \times \$75/\text{hour} = \$15,093.75$$

(D) Multiplier

Pagniucci asks for a multiplier of 3.25 for his time. No quality multiplier will be awarded for reasons stated below, but I will apply a 1.5 contingency multiplier to the compensable time (.75 hours) expended before the end of the first wave of settlements.

IV. Sarah R. Wolff

(A) Hours Expended

Ms. Wolff was a first and second year associate during her participation in this case. She asks for compensation for 2,308.75 hours. The vast majority of her time was spent preparing other attorneys for, outlining, and sitting in on depositions, reviewing Mead documents, and working on the trial brief and the disqualification motion and appeal. After a review of Wolff's time records, I find that the following hours are not compensable:

1. 41 hours expended after October 7, 1980 on preparation of the firm's fee petition and other related matters did not benefit the class and will not be compensated.

2. 24 hours on September 26–27, 1979 for travel to and attendance with Dean Dickie at a discovery meeting in Philadelphia is duplicative and of no benefit to the class and therefore will not be compensated.

There was no need to have two members of the Sachnoff firm present at this meeting.

3. 10 hours on December 13, 1979 for travel and time spent in Philadelphia watching Harold Kohn argue before the Third Circuit the Kimberly-Clark disqualification appeal. *See* N.T., 5/12/82 at 2336. This time did not benefit the class.

4. 13 hours on December 19–20, 1979 for travel to and attendance with Dean Dickie at a discovery meeting in Philadelphia is again duplicative and therefore will not be compensated.

5. 10 hours on July 23, 1980 for attendance with Lowell Sachnoff at the Executive Committee meeting in Chicago. This was duplicative and unnecessary and will not be allowed.

6. 333.25 hours were spent on the Trial and Final Contentions Memoranda. While I recognize that Ms. Wolff is a prodigious worker—she billed the class for 23 hours spent in one day, August 13, 1980, for preparation of the trial brief [136]—the expenditure of so much time by so many attorneys on these projects is patently excessive. As explained in the Guidelines, their time will be cut in half. Accordingly, I will allow Wolff 166.63 hours.

The total number of Wolff's hours which will be disallowed is 264.62, leaving 2,044.13 compensable hours remaining.

(B) Hourly Rate

The Sachnoff firm seeks $85 an hour for Wolff's time. Harold Kohn as well as the class objectors challenge this rate for Ms. Wolff's time, claiming it is too high. I agree. Since Wolff was a recent law school graduate when she worked on this case, $50 an hour is a fair and appropriate hourly rate. This rate is consistent with the hourly rate of $45 to $50 per hour which the Sachnoff firm proposed for Wolff on the periodic time summaries the firm submitted to Robert Atkins, Esquire, Chairman of the Plaintiff's Finance Committee. *See* Class Objectors' E 843–46, E 832–842.

(C) Total Lodestar

2,044.13 hours × $50/hour = $102,206.50

(D) Multiplier

Wolff asks for a multiplier of 2.5 for her time. No quality multiplier will be awarded for reasons stated below, and no contingency multiplier will be applied since all of Wolff's time was logged after the initial settlements.

V. Charles Watkins

Watkins joined the firm as an associate in 1979. He billed 52.75 hours for research and writing of legal memoranda. The hours appear reasonable and to have benefited the class. However, in view of the routine nature of Watkins' work and his limited involvement in the case, the firm will be compensated at $50 an hour for his time, not the $55 to $80 rate requested. Thus, the total lodestar for his time is $2,637.50. As stated below, no multiplier for quality will be awarded. Moreover, since his time was logged in 1980, I will not apply a contingency multiplier.

VI. Joel Feldman

 Feldman, an associate with the firm, seeks compensation for 14.25 hours in September 1980 for drafting a memorandum on the admission at trial of a deposition. This time will be allowed but at a rate of $50 per hour; not the $70 rate requested. The total lodestar for his time is $712.50. As with Watkins, no multiplier will be applied.

VII. Marvin Tenenbaum

 Tenenbaum, an associate with the firm, asks to be compensated for 42.5 hours of his time spent principally on drafting legal memoranda. The time appears reasonable and to have benefited the class. The requested $80 to $100 per hour rate, however, is too high for the type of work Tenenbaum performed; $50 an hour is a

---

**136.** On the day before and the day after this 23 hour marathon session, Ms. Wolff billed the class 16 and 12 hours respectively for work on the trial brief.

more appropriate and fair rate. Thus, the total lodestar for his time is $2,125. As stated below, no quality multiplier will be awarded for Tenenbaum's time. Moreover, no contingency multiplier will be applied because all the time was logged after the initial settlements.

## VIII. Barry Rosen

Rosen joined the firm in 1979. He charged 54 hours to *Fine Paper*. Only 28.25 of these hours are compensable. 25.75 hours are described only in such vague terms as "Discovery" or "Discovery Coordination"; "Discovery Meeting." Such entries are not specific enough to permit compensation since it cannot be discerned whether such time benefited the class or was duplicative of the efforts of other members of the firm or other counsel. The requested hourly rate of $65 to $85 an hour for Rosen's time is rejected as too high. The vast majority of Rosen's time was dedicated to document search and review, and therefore $50 an hour is more than appropriate for such tasks. Accordingly, Rosen's total lodestar is $1,412.50. For the reasons stated below, no multiplier for quality will be awarded to Rosen's time. Moreover, no contingency multiplier will be applied because all the time was logged after the initial settlements.

## IX. Jack Block

Block, another attorney with the firm, asks for compensation for 6.25 hours for drafting and reviewing the complaint the firm filed on behalf of their client. I find these hours compensable, but not at the $70 an hour rate requested. Given Block's limited involvement in the *Fine Paper* case and the nature of the tasks he performed, I find that $50 an hour is a fair and appropriate rate for his time. Accordingly, Block's total lodestar is $312.50. For the reasons stated below, no multiplier for quality will be awarded to Block's time. I will apply a 1.5 contingency multiplier since the time was logged in 1978.

## X. Kate Yannias

Ms. Yannias, another attorney with the firm, asks for compensation for 7.75 hours. A review of Ms. Yannias' time sheets, however, shows that only 4.5 hours of this time is compensable. 2.75 hours for discussions with other members of the Sachnoff firm on the status of the case and .5 hours spent reviewing the Oregon amended complaint were of no benefit to the class and therefore the firm will not receive remuneration for this time. In view of Yannias' limited contribution to this case and the nature of the tasks she performed, Yannias' requested hourly rate of $60 an hour is rejected. Only $50 per hour will be awarded for her time. Accordingly, Yannias' total lodestar is $225. For the reasons stated below, no quality multiplier will be awarded to Yannias' time. I will apply a 1.5 contingency multiplier since the time was logged in 1978.

## XI. Mitchell Goldsmith

■ Goldsmith is an associate for whom the firm asks compensation for 47 hours spent principally answering the defendants' discovery of the firm's client as a class representative. I find the hours reasonable and to have benefited the class with the exception of a vague entry of .5 hours for "Discussion with LES, DAD." It is impossible to tell from this court description whether this discussion was of any benefit to the class. Accordingly, only 46.5 of the total 47 hours will be compensated. I find that $50 per hour is a fair and appropriate rate to be applied to all of Goldsmith's time. Accordingly, Goldsmith's total lodestar is $2,325. For the reasons stated below, no quality multiplier will be awarded to Goldsmith's time. I will apply a 1.5 contingency multiplier to the 43 compensable hours expended before the end of the first wave of settlements.

## XII. Anthony DiVincenzo

DiVincenzo, another attorney in the firm, asks for compensation for 7 hours spent researching and writing legal memoranda. I find the hours reasonable and to have benefited the class. DiVincenzo requests

an hourly rate of $60 per hour. In view of DiVincenzo's limited involvement in this case, and the nature of the tasks performed, I find $50 per hour is a fair and reasonable rate. Accordingly, DiVincenzo's total lodestar is $350. For the reasons stated below, no quality multiplier will be awarded to DiVincenzo's time. I will apply a 1.5 contingency multiplier because the time was logged in 1978.

## XIII. Morton Denlow

This attorney asks for compensation for 3.25 hours spent "reviewing the file" and in one conference with Sarah Wolff regarding discovery. I fail to see any benefit to the class resulting from these activities and accordingly no fees will be awarded for Denlow's time.

## XIV. Andrew Schatz

Schatz, a partner with the firm since March of 1979, seeks compensation for 61.75 hours spent principally drafting legal memoranda opposing defendants' claims for contribution against co-defendants. After a careful review of the time sheets submitted by Schatz, I find that the following hours are not compensable:

1. 1.5 hours for conferences on March 20, 27 and 28, 1980 with Sachnoff and Wolff dealing exclusively with the *In re Folding Carton Antitrust Litigation,* MDL 250.

2. 7.5 hours on March 6, 1980 on "Hearing on motion for default." The court's docket sheets and records indicate that no hearing dealing with the *Fine Paper* case was held on this day. Obviously, then, no compensation can be awarded for this time.

3. 24.25 hours are described by such vague entries as "rev. brief; conf. C.W."; "Review memo"; "Conf LES; research." As stated earlier, such entries are too vague to permit compensation since it cannot be determined whether the time benefited the class or what an appropriate hourly rate would be.

The total number of Schatz' compensable hours is 28.5. Schatz asks for an hourly rate of $80 to $85 for his time. In view of

Schatz' limited involvement in this case and the nature of the tasks he performed I find that $50 an hour is fair and appropriate. Accordingly, Schatz' total lodestar is $1,425. For the reasons stated below, no quality multiplier will be awarded to Schatz' time. Moreover, no contingency multiplier will be applied since all of Schatz' time was logged after the initial settlements.

## XV. Steve Cohen

Cohen, an attorney with the firm, asks for compensation for 3 hours for "cite checking for brief" and for "case search for SRW." This time appears to have benefited the class. Cohen, however, will only be awarded the paralegal rate of $25 an hour because of the nature of his work and not the $50 to $70 an hour which the firm requests. Accordingly, the total lodestar is $75. For the reasons stated below, no quality multiplier will be awarded to Cohen's time. Moreover, no contingency multiplier will be applied since the time was logged after the initial settlements.

## XVI. Paralegals

The Sachnoff firm claims 3677.25 hours for the work of seven paralegals and for "Outside Services". Because of the large number of hours claimed for paralegal time by the Sachnoff firm and because of the objections filed by Harold Kohn and the class objectors to this specific time, I will consider each paralegal's time records individually rather than as a group as previously done with other petitioning law firms.

## A. Sara Johnson

Ms. Johnson requests compensation for 85.75 hours devoted to the case. After a careful review of Johnson's time records, however, I find that the following hours cannot be compensated by the class:

1. 68.25 hours are described by such vague entries as "Legal Research"; "Began drafting memo."; "Conference with Sarah Wolff." I cannot tell from these hazy entries whether the research and conferences pertained to the *Fine Paper* case, and if so, whether they benefited the class or were

duplicative of other efforts. Accordingly, compensation will not be awarded for this time.

2. 4.5 hours on June 23, 1980 for conferring "with Sarah/Wolff [sic] Legal Research, attended meeting of creditors" will not be compensated. Not only is the entry too vague, but also the "meeting of creditors" apparently has no connection with the *Fine Paper* case. The remaining 13 hours spent proofreading the trial brief are compensable. However, the requested hourly rate of $35 to $40 will be denied. As stated earlier, $25 per hour will be awarded to all paralegals involved in the case. The total lodestar for Ms. Johnson's time, therefore, is $325. No multiplier has been requested for Ms. Johnson's or any other of the firm's paralegals and none will be awarded.

### B. Carol Tuggle-Cutright

Ms. Tuggle-Cutright requests compensation for 28.75 hours principally devoted to the abstracting of documents. This work appears reasonable and to have benefited the class. Thus, at the rate of $25 per hour, the Sachnoff firm will be awarded $718.75 for her effort. No multiplier will be awarded.

### C. Bonnie Gathman

The Sachnoff firm requests compensation for 169 hours of Ms. Gathman's time. This time appears to be reasonable and to have benefited the class. Thus, at the rate of $25 per hour, the Sachnoff firm will be awarded $4,225 for Gathman's contributions. No multiplier will be awarded.

### D. Edward O'Brien

The firm requests compensation for 5.25 hours of Mr. O'Brien's time devoted principally to the review of documents. This time appears reasonable and to have benefited the class. Thus, at the rate of $25 per hour, the Sachnoff firm will be awarded $131.25 for O'Brien's efforts. No multiplier will be awarded.

### E. Laura Hickey

The firm requests compensation for 8.5 hours of Ms. Hickey's time devoted to abstracting the Ordemann deposition. This time appears reasonable and to have benefited the class. Thus, at the rate of $25 per hour, the Sachnoff firm will be awarded $212.50 for Ms. Hickey's efforts. No multiplier will be awarded.

### F. John Wylie

The firm requests compensation for 845.25 hours of Mr. Wylie's time. After a careful review of Wylie's time sheets, however, I have concluded that the following hours must be disallowed:

1. 52.5 hours spent on preparing the firm's fee petition.

2. 10 hours expended on September 22, 1980 for attending a hearing on Westvaco's motion for summary judgment and for preparation for trial. This time will be disallowed because of the vagueness of the entry and because Wylie's attendance at the hearing did not benefit the class.

3. 0.5 hours for "Review and prepare file for disposal". This time was of no benefit to the class and will be disallowed.

4. 1.5 hours for "Conf. W/SRW" will be disallowed because I cannot tell from this ambiguous entry whether this time was of any benefit to the class.

Accordingly, a total of 64.5 hours of Wylie's time will be disallowed. The number of compensable hours is therefore 780.75. Thus at the rate of $25 per hour, the Sachnoff firm will be awarded $19,518.75 for Mr. Wylie's time. No multiplier will be awarded.

### G. Barby Goldberg

Of all the paralegals in the Sachnoff firm, Ms. Goldberg claims the greatest number of hours for this case. Specifically, she requests compensation for 2,311 hours. After a careful review of Goldberg's time sheets, however, I have concluded that not all these hours are compensable. Specifically, the following hours will be disallowed:

1. 272 hours spent on preparing the firm's fee petition.

2. 167.3 hours claimed by Ms. Goldberg, which are reflected by such entries as "prep. memo.", "administration", "filing", and "administrative duties," are so vague that it cannot be determined whether such tasks benefited the class or were duplicative of the efforts of other counsel or other paralegals. I note that the class objectors specifically challenged these hours on the grounds of vagueness but in its lengthy response to the Class Objectors' Report, the Sachnoff firm did not in any way supplement these entries. Accordingly, no compensation will be awarded to the firm for these hours.

In sum, a total of 439.3 hours of Goldberg's time will be disallowed. The number of compensable hours is therefore 1,871.7. At the rate of $25 per hour, the Sachnoff firm will be awarded $46,792.50 for Ms. Goldberg's time. No multiplier will be awarded.

## H. Outside Services

■■■ The Sachnoff firm requests $5,593.75 in reimbursement for the firm's employment of "Outside Services" at $25 per hour for 223.75 hours of work. I am unable to find invoices for this expense, so it is unclear whether $25 per hour is the rate which the Sachnoff firm was charged by the outside agency. The class objectors specifically objected to any compensation for this time because of the absence of any supporting documentation, and in their response to the Class Objectors' Report, the firm did not address the issue or submit any documentation on the subject. Since Pretrial Order No. 143 required supporting documentation for each expense before it would be reimbursed and because no such documentation has been submitted for these "Outside Services", they will be disallowed.

In conclusion, therefore, the total amount awarded to the Sachnoff firm for paralegal services is $71,923.75.

## XVII. Multiplier

No quality multiplier has been awarded to any of the compensable hours of any member of the Sachnoff firm. The quality of the firm's work was not unusually high. The firm was not one of the two co-chairmen, five co-lead counsel or six-man trial team. It was merely one of 14 members of the Executive Committee, was responsible for discovery for one defendant, and although one of only three firms on the Briefing Committee, it was one of numerous law firms which participated in briefing. The firm's support role and limited contributions to this litigation do not warrant the award of a quality multiplier.

## XVIII. Expenses

The Sachnoff firm requests reimbursement for $93,278.10 in expenses, the third largest amount of all the petitioning law firms. Seventy-five percent of this amount or $69,958 has already been distributed to the firm. After carefully reviewing the three volumes of expense vouchers submitted by the firm, I have concluded that the following expenses should not be reimbursed by the class:

### A. Expenses Related to Disallowed Attorney Time

1. $50 for travel expense and $162 for air fare incurred by Sachnoff for traveling to and attending the pretrial conference in Philadelphia on April 19, 1978.

2. $100 for travel expenses and $218 for air fare incurred by Dean Dickie for traveling to and attendance at the pretrial conference in Philadelphia on June 13, 1978.

3. $100 for travel expenses, $116.72 for a stay at Fairmount Hotel and $218 for air fare (estimated since no voucher could be found) incurred by Dean Dickie for travel to and attendance at pretrial conference in Philadelphia on September 3, 1980.

4. $53.25 for travel expenses and $128.50 for air fare incurred by Sarah Wolff for traveling to and attending Harold Kohn's oral argument before the Third Circuit Court on December 13, 1979.

5. $75 in travel expense and $225 for air fare incurred by Sarah Wolff for attendance at a discovery meeting in Philadelphia on September 26–27, 1979.

6. $100 in travel expenses and $130 for air fare incurred by Arnold Pagniucci for his trip to Dayton, Ohio for the deposition of Dorothy J. Eifert on May 21, 1980.

### B. Extravagant Costs for Hotels and Meals

 In their response to the Class Objectors' Report, the Sachnoff firm boasts that their fee petition is "lean, economical and devoid of padding of time, duplication or waste of hours." Response at 7.[137] As has been seen with respect to the attorneys' fees requested, there is a great amount of hyperbole in this statement. The same holds true for the $36,871.08 the firm seeks for reimbursement of its travel expenses. As stated in the Guideline section, the class members should be expected to pay only

"modest to moderate travel and per diem costs when the trip served their beneficial interests." *In re Armored Car Antitrust Litigation,* 472 F.Supp. at 1389. Thus, counsel should only seek reimbursement for "moderately-priced hotel rooms and meals." *Id.* Some of the expenses claimed by Sachnoff for lodging and meals are difficult to swallow, and therefore will not be allowed:

1. Dean Dickie's $93.22 meal at the Rive Gauche Restaurant in Washington, D.C. on June 5, 1979.[138]

2. $50 given by the firm to Dean Dickie for "Travel advance 12/13/79 trip to Philadelphia." *See* "Request for Check Form Dated 12/10/79." Dickie's time records indicate he was not in Philadelphia on December 13, 1979.

3. Dean Dickie bills the class $236.46 for stay on July 24, 1980 at the Hyatt Regency Hotel, San Francisco. Dickie's time records, however, indicate that he did not work

---

**137.** In a similar vein is Sachnoff's letter to Granvil Specks of April 27, 1981 (found in Class Objectors' E 521–22 and *MM Exhibit 6,* N.T., 2/17/82 at 604):

This will set forth my position on my firm's fees. I enclose your summary sheet on which I have computed the basic lodestar time and rates which establish the minimum basic position from which any further across-the-board reductions will be made.

I am assuming a lodestar $175 hourly rate for myself, $135 for Dean Dickie, $100 for Arnie Pagniucci and $85 for Sarah Wolff, with multiples of 2.25 for myself and 2 for Dean, Arnie and Sarah. These numbers are irreducible because, as you well know, every single hour is hard time and no one can dispute that. The other lawyers' rates cannot be questioned and I have assigned a 1.5 multiple, which is certainly reasonable if not low.

Paralegal time for our firm and Atkins' firm is crucial. I don't think a multiple is possible, though paralegal multiples have been awarded in some cases. However, the $35 hourly rate is essential and must be preserved.

Next I have serious concerns about an across-the-board reduction to get to $13.5 million. *Many of the firms have started out with inflated lodestar time, rates and multiples, and I can't permit our fees to suffer because our time, rates and multiples are straight.* Therefore, although I am not on the fee committee, I insist on the opportunity to participate in any decisions regarding the ini-

tial lodestar numbers for the other firms from which any across-the-board reductions are made.

Gig, you in particular have an absolute obligation to squeeze out the water from those applications where you know that it exists. If I am not convinced that the initial lodestar numbers for the other firms are fair and reasonable, and I cannot persuade you of my position, I reserve the right to refuse to participate in the joint application, file a separate fee application and apprise the Court of my views either in camera or in open court. (emphasis added)

**138.** The book *Washington: The Official Bicentennial Guidebook* (N. Love, editor 1975) describes this exclusive restaurant as follows:

*"Very expensive.* For many years, this was the capitol's most prestigious French restaurant. Its superior food and service, its elegant atmosphere, made it the darling of senators and socialites, tycoons and tyros, the movers and shakers of the Washington scene. Sometime in the early 70s, however, this paragon of local eateries seemed to go into a decline. As its quality eroded, prices escalated and Rive Gauche appeared to welcome only patriarchal patrons. Happily, these dark days have passed, and a new spirit of dedication to the highest standards of French restaurant tradition is in evidence. *A meal at the Rive Gauche still costs the world, but once again, its worth it."* (emphasis added)

on the *Fine Paper* case from July 17, 1980 to July 28, 1980. On the hotel voucher, Dickie wrote "Seminar-Labor", so apparently he was in San Francisco for that purpose alone. Accordingly, the class cannot be expected to pay for his hotel bill.

4. On February 1, 1980, Ms. Wolff stayed at the Arizona Biltmore Hotel in Phoenix, Arizona. Ms. Wolff wants the class to pay for the $202.51 hotel bill. The Biltmore is not the "moderately-priced hotel room" which the court made reference to in the *Armored Car* case. On the contrary, this hotel has been described as *"[t]he first and most luxurious resort in the Valley—first class in every way.* Golf and tennis facilities are outstanding and so are the swimming pools. Horseback riding trails too. The dining room serves the finest cuisine in the State—*Expensive."* Stephen Birnbaum, *United States 1982* (1981) (emphasis added).[139] Moreover, Wolff's time records do not indicate that she was in Phoenix for the *Fine Paper* case on this day.

5. For October 23, 1980 and March 6, 1981, Sachnoff billed the class $21.35 and $128.64 respectively for meals eaten in Chicago. The only work Sachnoff did relating to *Fine Paper* on these days was on the fee petition. The firm has not been awarded attorney fees for time worked on the fee petition. Accordingly, Sachnoff will not be reimbursed for these meals.

The total amount of expenses which will not be reimbursed is $2,408.65. The total amount of expenses for which the firm has not yet received reimbursement is $23,320.10. Thus, the firm will be awarded $20,911.45 for expenses.

## XIX. Conclusion

The following represents my determination of the fees and expenses to which the Sachnoff firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Sachnoff | 320.5 | $100 | $ 32,050.00 | $ 36,050.00 | $ 183,722.50 |
| Dickie | 668.5 | $50/100 | $ 64,162.50 | $ 66,112.50 | $ 319,125.62 |
| Pagniucci | 201.25 | $75 | $ 15,093.75 | $ 15,121.88 | $ 44,969.06 |
| Wolff | 2,044.13 | $50 | $102,206.50 | $102,206.50 | $ 438,884.37 |
| Watkins | 52.75 | $50 | $ 2,637.50 | $ 2,637.50 | $ 6,555.94 |
| Feldman | 14.25 | $50 | $ 712.50 | $ 712.50 | $ 2,244.38 |
| Tenenbaum | 42.5 | $50 | $ 2,125.00 | $ 2,125.00 | $ 8,274.38 |
| Rosen | 28.25 | $50 | $ 1,412.50 | $ 1,412.50 | $ 7,897.50 |
| Block | 6.25 | $50 | $ 312.50 | $ 468.75 | $ 984.38 |
| Yannias | 4.5 | $50 | $ 225.00 | $ 337.50 | $ 1,046.25 |
| Goldsmith | 46.5 | $50 | $ 2,325.00 | $ 3,400.00 | $ 4,798.13 |
| DiVincenzo | 7.0 | $50 | $ 350.00 | $ 525.00 | $ 945.00 |
| Denlow | 0.0 | 0 | 0 | 0 | 694.69 |

**139.** By singling out this stay by Wolff at the Arizona Biltmore, I do not wish to imply that this was the only instance when members of the firm did not stay at moderately-priced hotels. On numerous occasions, the lawyers of this firm billed the class for lodging at first-class hotels, e.g., in Washington, D.C.: Washington Hilton, Georgetown Inn, Hyatt Regency; in Philadelphia: Fairmount Hotel (now the Bellevue Stratford); in Denver: The Denver Hilton. An excellent case can be made that these are not the "moderately-priced" hotels the court in the *Armored Car* case had in mind. Having said this, I will nonetheless allow reimbursement to the firm for these hotel expenses. In view of the limited time and resources in a case of this size it is too much to expect the court to embark on an in-depth analysis of the availability of hotels and their rates from 1977 to 1980 for the cities where the lawyers in this case lodged. The court's time will be more profitably spent in examining in detail other facets of the fee petitions.

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Schatz | 28.5 | $50 | $ 1,425.00 | $ 1,425.00 | $ 11,390.63 |
| Cohen | 3.0 | $25 | $ 75.00 | $ 75.00 | $ 438.75 |
| | | | $225,112.75 | $232,609.63 | $1,031,971.58 |

| Paralegal's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Johnson | 13 | $25 | $ 325.00 | $ 325.00 | $ 3,010.00 |
| Tuggle-Cutright | 28.75 | $25 | $ 718.75 | $ 718.75 | $ 1,016.25 |
| Gathman | 169 | $25 | $ 4,225.00 | $ 4,225.00 | $ 5,915.00 |
| O'Brien | 5.25 | $25 | $ 131.25 | $ 131.25 | $ 183.75 |
| Hickie | 8.5 | $25 | $ 212.50 | $ 212.50 | $ 297.50 |
| Wylie | 780.75 | $25 | $19,518.75 | $19,518.75 | $ 31,422.50 |
| Goldberg | 1,871.7 | $25 | $46,792.50 | $46,792.50 | $ 80,885.00 |
| Outside Services | 0 | 0 | 0 | 0 | $ 5,593.75 |
| | | | $71,923.75 | $71,923.75 | $128,323.75 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 93,278.10 |
| Amount Previously Distributed | $ 69,958.00 |
| Amount Outstanding | $ 23,320.10 |
| Amount Disallowed | $ 2,408.65 |
| Total Awarded | $ 20,911.45 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $232,609.63 |
| Paralegals' Fees | $ 71,923.75 |
| Expenses | $ 20,911.45 |
| TOTAL | $325,444.83 |

## SAVERI & SAVERI

This San Francisco firm submitted the second highest fee petition, requesting $2,076,792.75 in attorneys' fees and $60,771.24 for expenses. Compensation is sought for 1717.25 associate hours and 2878.35 partner hours. There are no paralegal hours. Objections to the Saveri petition have been filed by the class objectors and by plaintiffs' co-lead counsel, Harold Kohn, alleging, inter alia, grossly excessive hours, hourly rates and multipliers.[140]

The Saveri firm first became involved in this case as co-counsel with the Mesh firm for Copies Unlimited, Inc., which filed a complaint on August 7, 1977. This claim was not pursued,[141] however, and the Saveri firm became co-counsel with Freeman, Atkins & Coleman, Ltd., Walner & Associates, Ltd., and Schneider, Graf & Trio for Camp-

140. The Kohn objections allege that the Saveri petition was not filed in good faith and is in violation of Rule 11 of the Federal Rules of Civil Procedure. Kohn's objections to Saveri & Saveri at 5–6. *See* discussion of Specks & Goldberg petition, *infra*, at 217.

141. Copies Unlimited has not filed a proof of claim.

bell Office Supply Company which filed a complaint on December 13, 1977.[142]

## I. Guido Saveri

### (A) Hours Expended

Guido Saveri was a member of the Executive and Settlement Committees and a member of the trial team. In addition he was vice-chairman of the discovery committee and chairman of the Weyerhaeuser discovery subcommittee. Compensation is sought for 2,518.6 hours of Saveri's time. For the reasons which follow 746.15 hours of this time will be disallowed:

1. 772.5 or approximately one-third of the hours claimed in Saveri's petition are supported by time reports with multiple entries which do not specify the time devoted to each activity.[143] Kohn objects on the grounds that the time records submitted by Saveri are not contemporaneous and therefore are unreliable. He contends that:

> The hours claimed by petitioner are grossly excessive. Its hourly records are not contemporaneous and are worthless. To illustrate: As of November 23, 1979 the petitioner had filed with the Committee of Counsel a claim of only 398.65 hours, ostensibly for the period through March, 1979; as of September 30, 1980, (after trial and settlement) this figure was increased (for the period to February, 1980) to 1,955.15 hours. Thereafter, that is since September 30, 1980, the figure has been revised upward more than double, to 4259.6 hours.

Kohn's objections to Saveri & Saveri at 4.

The activities described in these entries are varied and include many tasks which resulted in no benefit to the class. Other entities are vague and do not permit a determination of class benefit. However, there are also entries which were clearly of benefit to the class and aided in bringing about the settlements in this case. Thus, while total compensation for this time would be inappropriate, total disallowance would be equally unjust. Since the petitioner has the burden of establishing his entitlement, I think it is reasonable to conclude that he has not met that burden with respect to at least half of these hours.[144] Therefore, 386.25 hours will be disallowed.

2. 50.75 hours devoted to Industrial Analysis Committee work. As previously set forth in the Guidelines, this endeavor yielded no ascertainable benefit to the class and, therefore, will not be recompensed.

3. 144.5 hours spent preparing for, traveling to and attending pretrial conferences.[145] Saveri's presence at these conferences was not required.

4. 164.65 hours will be disallowed because the entries are vague and do not provide a

---

142. According to co-lead counsel Harold Kohn:

> [T]he Saveri firm, from San Francisco, itself has no client. Mr. Specks first designated them as co-counsel with an Ohio lawyer, the Mesh firm, which was required to withdraw from the litigation. He thereupon designated them as co-counsel with Freeman, Atkins & Coleman, LTD., Walner & Associates, LTD., and Schneider, Graf & Trio to represent in the Eastern District of Pennsylvania, a relatively small claimant, Campbell Office Supply of Chicago, without any request from the law firm which actually represents Campbell, namely, Walner & Associates, Ltd., or any need, in the interest of the litigation, to do so.

Kohn's objections to Saveri & Saveri at 4.

143. For example, the entry for July 24, 1980 reads:

> Study proposed instructions; study pending interrogatory answers for use at trial of all

defendants; conf. Lamont and Kithas re meeting in Chicago; review Union Camp material for brief; draft suggested instructions; work on damage material; tel. Hallisey re meeting and Crown price sheets; tel. Boeder re brief; tel. Ellis re damages; tel. Johns re brief; tel. Hallisey re damages for 1977. 8.00 [hours]

144. Included in this figure is the time spent on plaintiff's trial memorandum and trial preparation time. Because of the failure to break down the time records into time devoted to each activity, a precise calculation of the time devoted to these activities is not possible.

145. The time which Saveri devoted to the pretrial conference on September 19, 1980 is not included in the 144.5 hours disallowed. It was proper for Saveri to attend this conference in that trial was scheduled to begin three days later on September 22, 1980 and Saveri was a member of the trial team.

sufficient basis for determining if this time was devoted to activities which benefited the class. Such entries also do not permit a determination as to whether the time was excessive or duplicative or allow calculation of an appropriate rate of compensation. Examples of such entries are: "prepare for meeting", "work on Florida depositions", "review proposals" and "prepare for depositions." [146]

### (B) Hourly Rate

Saveri has requested an hourly rate of $200. Much of the work performed by Saveri was at the junior partner or associate level [147] and, therefore, $100 per hour is fair and just compensation for Saveri's time.

### (C) Total Lodestar

1772.45 hours × $100/hour = $177,245

### (D) Multiplier

Saveri requested a multiplier of 3.25. This request is denied. A 1.5 multiplier for contingency will be applied to the 149.25 hours of compensable time expended by Saveri prior to the January 1979 settlements for an additional $7,462.50. Also, while Saveri's participation in this case did result in benefits to the class, his work was not of such an "exceptional quality" as to warrant a quality multiplier.

### II. Richard Saveri

The firm seeks $10,390.25 for 23.75 hours of this partner's time which was devoted to "reviewing the memoranda prepared on the admissibility of the *Allied Mills* findings and the Nelson deposition testimony." Saveri's response to Kohn's objections at 14. I find that these efforts of Richard Saveri were duplicative of the work of other competent counsel and, therefore, no compensation will be awarded for this time.

### III. John A. Kithas & Charles Lamont

The Class Objectors' Report as well as the objections filed by Kohn firm voice opposition to the Saveri firm's request for compensation for the work performed by these two attorneys. The basis for this opposition is that Kithas and Lamont are not members of the Saveri & Saveri law firm. In the 1980 and 1982 Martindale-Hubbell Law Directory, Kithas & Lamont are listed as a separate entity—a partnership. Furthermore, the listing for Saveri & Saveri does not mention either attorney as being associated with the firm. No W-2 forms were issued by the firm for either attorney. Also, copies of the time reports submitted with the Saveri petition show Kithas & Lamont as a separate entity.

In response to these objections, Guido Saveri stated at the June 10, 1981 hearing, "So they have their own practice. What's the difference? They're working for me and I take care of them, and I filed a Petition, as I said from the beginning on their behalf. . . ." N.T., 6/10/81 at 71. If Kithas and Lamont were entitled to any fees, they should have filed a fee application on their own behalf. Apparently, the reason this was not done is that Kithas & Lamont do not represent any party to this lawsuit.

Paragraph 12 of this Court's Pretrial Order No. 143 reads:

(12) If the time or rate of any lawyer who is not a partner or employee of the petitioning firm is included in any petition, the petition shall contain a detailed statement prepared by petitioning firm and such other lawyer, setting forth in detail the arrangements between them for compensation and defraying of cost disbursements during the litigation and the division or allocation of any fee or reimbursements awarded, together with a statement of the reasons why it was nec-

---

**146.** Harold Kohn has charged that Mr. Saveri was not adequately prepared for many of the depositions taken by him. N.T., 4/21/82 at 2028–31.

**147.** The Class Objectors' Report criticizes Saveri for not utilizing paralegals. Obviously, it is improper to award an hourly rate of $200 for administerial and low level legal tasks such as reviewing documents and researching.

essary for the petitioner to enter into such arrangements.

The Saveri firm has not complied with this order with regard to Kithas & Lamont. Neither a statement of the fee arrangements between these two firms nor a statement of the reasons why it was necessary to employ additional attorneys has been provided to the court. It is impossible to justify the hiring of Kithas & Lamont to work on a case which was already staffed with scores of attorneys from some forty law firms. Accordingly, I will not award any fees to the Saveri firm for the time of these two lawyers.

## IV. Expenses

The firm seeks reimbursement in the amount of $60,771.24 for expenses. All but the following $6,176.28 will be allowed:

1. $2,574.21 in travel and lodging expense incurred while attending the pretrial conferences in Philadelphia for which attorney hours have been disallowed.

2. $976.17 in expenses incurred by the firm of Kithas & Lamont. As previously noted, the Saveri firm did not comply with the Court's Pretrial Order No. 143 regarding the disclosure of the fee arrangements with this firm.

3. $433.54 in lodging expenses for rooms at the Arizona Biltmore Hotel in Phoenix, Arizona. As set forth in the expense section of the discussion of the Sachnoff firm's petition, counsel should seek reimbursement for "moderately-priced hotel rooms and meals", *In re Armored Car Antitrust Litigation,* 472 F.Supp. at 1388–89. This hotel by no means falls into this category and the class will not be required to pay the price of extravagant accommodations.

4. A total of $2,192.36 will be disallowed because of inadequate documentation. Without documentation such as flight tickets, vendor's invoices or cancelled checks, it is impossible to verify the expense incurred and determine its relationship to *Fine Paper.*

The Saveri firm has already received 75% of the requested expenses totaling $45,578. Of the remaining $15,193.24, a total of $6,176.28 has been disallowed. Thus $9,016.96 will be awarded for reimbursement of expenses.

## V. Conclusion

The following represents the fees and expenses to be awarded Saveri & Saveri for the firm's participation in this case:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Guido Saveri | 1,772.45 | $100 | $177,245.00 | $184,707.50 | $1,637,090.00 |
| Richard Saveri | 0 | 0 | 0 | 0 | $ 10,390.25 |
| John Kithas | 0 | 0 | 0 | 0 | $ 352,250.00 |
| Charles Lamont | 0 | 0 | 0 | 0 | $ 77,062.50 |
| Total | | | $177,245.00 | $184,707.50 | $2,076,792.75 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 60,771.24 |
| Amount Previously Distributed | $ 45,578.00 |
| Amount Outstanding | $ 15,193.24 |
| Amount Disallowed | $ 6,176.28 |
| Total Awarded | $ 9,016.96 |

TOTAL AWARD:

| | |
|---|---:|
| Attorneys' Fees | $184,707.50 |
| Expenses | $ 9,016.96 |
| Final Award | $193,724.46 |

## SCHNEIDER, GRAF & TRIO

This firm, located at Morton Grove, Illinois, seeks compensation for the time of one of its partners, Roy B. Schneider, Jr., and for paralegal time. Schneider was one of several counsel on the complaint filed by Campbell Office Supply Co., Inc. on December 13, 1977.[148] He seeks compensation for providing the class with a certified representative and for hours he expended examining the documents of the Mead Corporation. The firm requests compensation for 171.3 hours of attorney time and 50.2 hours of paralegal time. With the application of the requested multiplier of 2, the total fee requested is $44,080, plus expenses of $968.15.

### I. Roy B. Schneider, Jr. and Paralegals

#### (A) Hours Expended

Schneider asks to be compensated for 171.3 hours of work. After a careful review of the time records submitted, I find that only 101.65 of the total hours claimed by Schneider and 37.65 of the 50.2 claimed paralegal hours benefited the class. Specifically, in accordance with the Guidelines set forth above, compensation will not be awarded for the following hours:

1. 11.5 hours spent preparing for, traveling to and attending counsel meetings and pretrial conferences will be disallowed. In view of Schneider's minor role in this case, his presence at these gatherings was superfluous, unnecessary and of no benefit to the class.

2. 14.8 hours spent reviewing pleadings and motions will be disallowed since the firm never participated in any briefing or interrogatory activity which would warrant such a review.

3. 15.3 hours are described by such vague entries as "Telecons (2) w/co-counsel" or "telecon w/Walner" without any description of the purpose of the telephone calls. As stated before, such entries are too vague to permit compensation since it cannot be determined whether the time benefited the class or what appropriate hourly rate should be awarded.

4. 0.8 hours in 1979 for "Preparation for defendant's deposition." Since there is nothing in the fee petition which shows that Schneider in fact took a deposition of a defendant, this preparation time was of no benefit to the class and is not compensable.

5. The 109 hours spent by Schneider and 50.2 hours expended by paralegals on coordinating, preparing for and reporting on the firm's discovery efforts is an excessive and unreasonable amount of time. Only 75% of these hours will be compensated—81.75 hours for Schneider, 37.65 hours for paralegals.

Finally, I have considered the class objectors' challenge to any fees for the time Schneider spent preparing for the deposition of Campbell Office Supply Company. This same objection, however, has been raised against numerous petitioners here, and consistent with my prior rulings, it does not bar Schneider's recovery of reasonable fees for his time. Accordingly, 69.65 hours of Schneider's claimed 171.3 hours and 12.55 of the 50.2 paralegal hours will be disallowed. Thus, Schneider's total compensable time is 101.65 hours; the total compensable paralegal time is 37.65 hours.

---

148. Campbell Office Supply Co., Inc. was also represented by Saveri & Saveri, Freeman, Atkins & Coleman, Ltd., and Lawrence Walner & Associates, Ltd. At one time, David S. Logan, Esq. of Chicago was also counsel of record for this plaintiff.

**(B) Hourly Rate**

Schneider asks for $125 per hour for time spent on the *Fine Paper* case. His normal billing rate, however, amounts to only $70 to $80 per hour. Moreover, the type of work he performed in the litigation—review of documents and one class representative deposition—is the type normally assigned to junior partners or high level associates and consequently does not warrant the $70 to $80 per hour rate normally charged by Schneider. Accordingly, only $50 per hour will be allowed for Schneider's compensable hours. The firm's request for $25 an hour for paralegal time is reasonable and therefore will be applied to the 37.65 compensable paralegal hours.

**(C) Total Lodestar**

Schneider:
 101.65 hours $\times$ $50/hour = $5,082.50
Paralegals:
 37.65 hours $\times$ $25/hour = $941.25

**(D) Multiplier**

No positive quality multiplier will be awarded. Schneider and his paralegals assumed no leadership role, served no important committee function, did only a minimal amount of discovery and, aside from the initial complaint, did not draft any briefs or pleadings. In accordance with the Guidelines section of this memorandum, a contingency multiplier of 1.5 will be applied to the 32.1 hours of Schneider's compensable time spent prior to the initial settlements.

**(E) Expenses**

The firm's total expenses are listed as $968.15. The firm has already received 75% of these expenses or $726. With the exception of one entry, the firm's expenses appear reasonable and proper. The $41.50 entry for "Misc. Supplies—Bag Lost" will be disallowed. *See* Exhibit "B", page 6 of Petition. Apparently, during his discovery trip to Escanaba, Illinois, Schneider lost a bag or suitcase and had it replaced. He now attempts to assess the class for the cost of its replacement. I am unable to connect the loss of the bag with a benefit to the class and, accordingly, the fund will not reimburse him for this loss. Thus, only $200.65 of the $242.15 outstanding expenses will be awarded to Schneider.

**F. Conclusion**

The following represents my determination of the fees and expenses to which Schneider, Graf & Trio is entitled to under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Schneider | 101.65 | $50 | $5,082.50 | $5,885.00 | $42,825.00 |
| Paralegals | 37.65 | $25 | $ 941.25 | $ 941.25 | $ 1,255.00 |
| Total | | | $6,023.75 | $6,826.25 | $44,080.00 |

Expenses:
| | |
|---|---|
| Amount Requested | $ 968.15 |
| Amount Previously Distributed | $ 726.00 |
| Amount Outstanding | $ 242.15 |
| Amount Disallowed | $ 41.50 |
| Amount to be Distributed | $ 200.65 |

TOTAL AWARD:
| | |
|---|---|
| Attorney and Paralegal Fees | $6,826.25 |
| Expenses | $ 200.65 |
| Final Award | $7,026.90 |

## SLOAN & CONNELLY, P.C.

Sloan & Connelly represented David Weiss Wholesale Jewelers, Inc. and Peoria Suppliers, Inc. The great bulk of the firm's work consisted of taking discovery of several trade associations and conducting a project to computerize the pricing information produced by the defendants. The firm also handled the Rule 30(b)(6) discovery of Diamond International Corporation. Sloan & Connelly was not represented on the Executive Committee and, although originally given positions on the Industrial Analysis Committee and the Great Northern Nekoosa discovery subcommittee, made only minimal contributions to these efforts.[149]

The fee petition requests an award of $510,944.86 in attorneys' fees for a total of 3166.4 hours of work (1559.45 attorney hours and 1606.95 paralegal hours). Included are multipliers ranging from 1.5 to 2.5 for attorney time and 1.5 to 2 for paralegal time. The petition also seeks reimbursement of $20,760.80 in expenses.

The firm's involvement in *Fine Paper* was rather limited until 1980. Only 535.7 (16.9%) of the total 3166.4 hours were logged before January 1980. My review indicates that nearly 70% (some 1818.65 hours) of the remaining time was devoted to the pricing project the firm undertook in March 1980 and continued until the time of the final settlements.[150]

In late 1979 Specks and James Sloan began discussing the possibility of Sloan & Connelly conducting a project to collect, sort, identify, and index the thousands of price lists produced by the defendants. The pricing information would then be put on a computer to make the data more manageable. This would enable the plaintiffs and their economic experts to generate data to support damage theories (e.g. parallel pricing) and rebut evidence offered by the defendants. Sloan & Connelly received Executive Committee approval for the project in early March 1980. N.T., 3/10/82 at 1262–63, 3/23/82 at 1498–1500; Sloan & Connelly Fee Petition at 6–9.

For the next seven months, three Sloan & Connelly attorneys and five paralegals devoted a total of 1818.65 hours (747.9 attorney hours and 1070.75 paralegal hours) to the project. The group was assisted by the personnel of a computer company. Further input and direction came from Specks and Howard Fink of Specks & Goldberg and Professor Madansky, one of plaintiffs' economic experts. N.T., 3/11/82 at 1368–70. Meetings were held on an almost daily basis to coordinate the efforts of all those involved and to deal with the many unanticipated problems that arose. N.T., 3/11/82 at 1349–50.

From the beginning Harold Kohn took the position that this was not a task for lawyers. On February 22, 1980 he wrote to Specks:

> It is a job in which a large amount of detail is involved which has to be under one roof and can be done properly only with an adequate squad of people who are accustomed to this kind of detail and who will do it promptly. We have ample funds to pay for this critical job, and it will actually be cheaper to have it done outside than to charge lawyer time for an inadequate effort.

Magazine Management Exhibit # 32. Kohn wanted the job done by an accounting firm.[151]

An initial pilot study of the data received from the discovery subcommittees revealed that Sloan & Connelly did not have "all or

---

149. Both James Sloan and Robert Davy testified at the firm's fee hearing that Sloan & Connelly did not participate in any significant way in the work of these committees. N.T., 3/22/82 at 1464 and 3/23/82 at 1529–30. *See also* Response of Sloan & Connelly, P.C. to the Objections Filed by Weil, Gotshal & Manges on behalf of Xerox Corporation, et al., filed 11/13/81, Docket Entry No. 3595 at 9.

150. Because Sloan & Connelly's time records do not apportion the time spent on each task, but merely group all tasks together in one daily entry, I have had to estimate the amount of time spent on each activity.

151. Plaintiffs' counsel discussed the project with the accounting firm of Touche Ross in March 1980, but the latter declined to undertake the job. N.T., 3/23/82 at 1502–03.

even the majority of the defendant companies' price lists." Pricing Report No. 2, April 18, 1980. Sloan & Connelly Group Exhibit 4–1. The firm issued Pricing Reports 3 through 19 in the period April 23 to May 28, 1980 to indicate which price lists had been received for each defendant and where the gaps existed. As late as August 22 (Pricing Report 25)—a month before trial—the firm was still directing most of its attention to getting recently received price documents on the computer.

I recognize the difficulties that were caused by the sheer number of documents to be processed as well as the added complexities of weight, volume, and trade name conversions. Moreover, I cannot hold Sloan & Connelly responsible for the continuing problem of gaps in the data. But these factors only point to the validity of Kohn's initial appraisal. This was not a job that could be done promptly and efficiently by a law firm.

The matter came to the attention of the Executive Committee at its July 23, 1980 meeting in Chicago. The upshot of Professor Madansky's damages presentation to the committee was that the months of collating and computerizing the available price lists had not produced the desired support for a theory of parallel pricing. N.T., 2/22/82 at 759, 762; 3/23/82 at 1513. Plaintiffs were only two months from trial and had no support for a damage theory. Sloan & Connelly, however, continued to process the price documents in an effort to close the gaps in the data and secure support for other damage theories and for rebuttal evidence. Price Reports Nos. 24 and 25. Sloan & Connelly Group Exhibit 4–1; N.T., 3/24/82 at 1597.

It is my considered judgment that this pricing project involved too many hours of too many attorneys. The end-product does not justify so substantial a charge against the class fund as Sloan & Connelly requests.[152] Accordingly, to reflect my determination that an excessive number of hours are claimed for this work as compared to the results achieved, I will only permit half of the total 1818.65 hours to be compensated.

I now proceed to the *Lindy* analysis of the fee petition.

### I. James Sloan

### (A) Hours Expended

Sloan primarily played an advisory and supervisory role in this litigation. He was initially appointed one of four co-chairmen (under chairman Joseph Cotchett) of the Industrial Analysis Committee but only spent a few hours on this work. Until he began directing the pricing project in early 1980, Sloan had expended fewer than 200 hours on the case in three years. He supervised the discovery of the trade associations and took the deposition of the president of Gradefinders, Inc. as part of the pricing project. The fee petition seeks a total award of $233,718.75 for 692.5 hours of work. I have determined that the following time must be disallowed:

1. 32.5 hours supported by entries too vague to permit a determination of whether the time benefited the class. This time is described only as meetings or telephone calls without further elaboration of the subject matter discussed, e.g., "conference with Specks re status."

2. 5.2 hours of Industrial Analysis Committee work. As explained in the Guidelines, I have determined that the work of this committee did not benefit the class.

3. 323.6 hours were spent on the pricing project. As discussed above, only half of this time will be compensated in view of the disproportionately small benefit which inured to the class from the over 1800 hours claimed by the firm. Accordingly, Sloan will be compensated for 161.8 hours.

4. 8.4 hours were spent on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total

---

**152.** A lodestar figure of nearly $114,000 increased to over $255,000 with the application

of multipliers.

number of hours claimed for work on this document by all the attorneys involved. Accordingly, Sloan will be compensated for 4.2 hours.

With the disallowance of the above 203.7 hours, Sloan is left with 488.8 compensable hours.

(B) Hourly Rate

I find that $100/hour is a fair and reasonable rate of compensation for Sloan's work in this case. However, the 9.8 hours devoted to such associate-level tasks as drafting document requests, notices and subpoenas will be compensated at a rate of $50/hour.

(C) Total Lodestar

479 hours × $100/hour = $47,900
9.8 hours × $ 50/hour = $ 490

(D) Multiplier

Sloan held no position of leadership. The pricing project he directed produced very meager results for all the hours put into it. His efforts were not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to his 50 compensable hours expended before the end of the first wave of settlements.

II. Michael Connelly

(A) Hours Expended

Connelly devoted most of his time to the discovery of the trade associations. He took two depositions and attended document production sessions. He also did some work on the pricing project. The fee petition requests an award of $54,462.37 for 220.05 hours of work. I have determined that the following time must be disallowed:
1. 4.1 hours supported by entries too vague to permit a determination of whether the time benefited the class. These entries merely indicate telephone calls without any indication of the subject matter discussed.
2. 39.7 hours were spent on the pricing project. As discussed above, only half of this time will be compensated.

Accordingly, Connelly will be compensated for 19.85 hours.

With the disallowance of the above 23.95 hours, Connelly is left with 196.1 compensable hours.

(B) Hourly Rate

I find that $100/hour is a fair and reasonable rate of compensation for Connelly's work. However, the 56.3 hours devoted to such associate-level tasks as drafting stipulations and notices of deposition, attending document production sessions, and the initial review of trade association documents will be compensated at a rate of $50/hour.

(C) Total Lodestar

139.8 hours × $100/hour = $13,980
56.3 hours × $ 50/hour = $ 2,815

(D) Multiplier

Connelly's work was not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 5 compensable hours expended before the end of the first wave of settlements.

III. Robert Davy

(A) Hours Expended

Davy was an associate with Sloan & Connelly when he worked on *Fine Paper*. He was involved in the discovery of Diamond International Corp. and the trade associations. He took six trade association depositions (five of them in one day). He also worked on the pricing project. The fee petition requests an award of $129,103.87 for 637.55 hours. I have determined that the following time must be disallowed:
1. 3.6 hours supported by entries too vague to permit a determination of whether the time benefited the class. These entries indicate only a review of correspondence.
2. 2 hours for Davy's attendance at the 9/27/79 pretrial conference. The class was adequately represented by lead counsel at this conference.

3. 382.2 hours were spent on the pricing project. As discussed above, only half of this time will be compensated. Accordingly, Davy will be compensated for 191.1 hours.

4. 14.8 hours were spent working on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Davy will be compensated for 7.4 hours.

With the disallowance of the above 204.1 hours, Davy is left with 433.45 compensable hours.

(B) Hourly Rate

I find that $50/hour is a fair and reasonable rate of compensation for Davy's work.

(C) Total Lodestar

433.45 hours × $50/hour = $21,672.50

(D) Multiplier

No multiplier will be applied to Davy's lodestar because his work was not of such an unusually high degree of skill to merit a quality multiplier and all of his time was logged after the initial settlements.

IV. Mark Moynihan

Moynihan spent 9.35 hours on the case. Most of this time was spent on trade association discovery. I disallow the 1.5 hours spent on duplicative review of subpoenas and half of the 2.4 hours devoted to the pricing project. The remaining 6.65 compensable hours will be compensated at a rate of $50/hour. No quality multiplier is warranted, and no contingency multiplier will be applied because all the time was logged after the initial settlements.

V. Paralegals

The firm seeks compensation for the time of six paralegals. Two-thirds of the total 1606.95 paralegal hours was devoted to the pricing project. As explained above, I will only compensate 535.38 of the 1070.75 hours expended on this endeavor. Furthermore, 8.5 hours spent on Industrial Analysis Committee work are disallowed. The remaining 1063.08 hours will be compensated at a rate of $25/hour. No multiplier is applied to paralegal time.

VI. Expenses

The firm seeks reimbursement of $20,-760.80 in expenses. It has already received 75% ($15,570) of this figure. I find that all the firm's expenses were reasonable and will, therefore, permit reimbursement of the outstanding $5,190.80.

VII. Conclusion

The following represents my determination of the fees and expenses to which Sloan & Connelly is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Sloan | 488.8 | $50/100 | $ 48,390 | $ 50,890 | $233,718.75 |
| Connelly | 196.1 | $50/100 | $ 16,795 | $ 17,045 | $ 54,462.37 |
| Davy | 433.45 | $50 | $ 21,672.50 | $ 21,672.50 | $129,103.87 |
| Moynihan | 6.65 | $50 | $ 332.50 | $ 332.50 | $ 911.62 |
| Paralegals | 1063.08 | $25 | $ 26,577 | $ 26,577 | $ 92,748.25 |
| Total | | | $113,767 | $116,517 | $510,944.86 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 20,760.80 |
| Amount Previously Distributed | $ 15,570.00 |
| Amount Outstanding | $ 5,190.80 |
| Amount Disallowed | 0 |
| Amount to be Distributed | $ 5,190.80 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $116,517.00 |
| Expenses | $ 5,190.80 |
| Final Award | $121,707.80 |

## SPECKS & GOLDBERG, LTD.

This Chicago law firm, consisting of four attorneys, entered *Fine Paper* on July 18, 1977 by filing a complaint in the Northern District of Illinois on behalf of Herst Litho, Inc. The New York firm of Robinson, Silverman, Pearson, Aronsohn & Berman was co-counsel on the Herst Litho complaint. On October 11, 1977, Specks & Goldberg ("S & G") filed a second *Fine Paper* case in the District of Connecticut, this time on behalf of Phillip and Ruth Meroney. Fine, Waltzer & Bagneris was co-counsel on this complaint. Granvil I. Specks, the senior partner of the firm, served as co-lead counsel, co-chairman of the Executive Committee, chairman of the Discovery Committee, co-chairman of the International Paper Discovery Subcommittee and co-lead trial counsel. The firm's fee petition further claims that the firm supervised the work of the Industrial Analysis and Rule 37 Committees, as well as the development of all damage theories. Granvil Specks and the other members of his firm also participated in various settlement negotiations, depositions, document review and briefing.

The firm claims to have devoted 9,216 hours to this litigation and requests fees in the amount of $4,291,480.63, the largest request of the 41 petitioners here.

Objections to the petition have been filed by Harold Kohn, on behalf of his clients and by the class objectors. They complain that the hours claimed by S & G are exaggerated and its hourly rates "are grossly excessive." Kohn's objections to S & G petition at 1. With respect to the proposed hourly rates, Kohn states that the "firm has no normal billing rates and the purported rates set forth in the petition are fictitious." *Id.* at 1. Both groups of objectors argued that "[t]he work claimed to have been performed by this firm was not assigned efficiently to lower rate lawyers, or to administrative personnel, but instead was claimed to have been performed by lawyers seeking a very high hourly rate, so that the average hourly rate for this firm is in excess of $465." Kohn's objections at 2. The Specks firm does not employ paralegals.

The most serious objection to the petition was leveled by Mr. Kohn:

The petition is not filed in good faith, and is in violation of F.R.C.P. Rule 11.

The petition is in furtherance of a plan to seek excessive fees for petitioner, and for certain other lawyers who have combined with it in these and other proceedings, to devise "busy work" and unproductive duplication of time, and to support fee applications which they know to be excessive, in return for voting for control of litigation. They have stated that they expect substantial reductions by the Court, but they believe that their ploy will still result in fees greater than they are entitled to receive. They have re-

frained from filing objections to petitions such as those of Saveri and Saveri, and Cotchett, Dyer and Illston (and its three co-counsel, appearing on behalf of a claimant with a minor claim, South Dakota,) which Mr. Specks has expressly stated are grossly excessive, "ridiculous," and which must be substantially reduced.

Kohn's objections at 4–5.[153]

### I. Granvil I. Specks

#### (A) Hours Expended

Mr. Specks, a senior partner in the firm, bills the class for 5,778.5 hours. He was involved in every facet of this case and performed a multitude of tasks, including those normally assigned to an associate or paralegal. I have carefully examined the daily time records of Mr. Specks and reviewed the transcript of the firm's evidentiary hearing, and I have decided that all but the following hours should be compensated by the class: [154]

1. 319.8 hours of Mr. Specks' time were devoted to telephone calls and conferences where no indication is given in the time records of the subject discussed or whether the subject matter had anything to do with this case or whether it benefited the class. These vague entries fail to satisfy Specks' burden of proving that these hours benefited the class. Accordingly, no compensation will be awarded for this time.

2. 32 hours spent in preparation of S & G's or other firms' fee petitions will not be compensated by the class.

3. One-half of the 293.5 hours (146.75) Mr. Specks billed for work on the plaintiffs' pretrial memorandum and final contentions will be disallowed for the reasons stated in the Guidelines section of this memorandum.

4. 34 hours spent on work of the Industrial Analysis Committee will be disallowed for the reasons stated in the Guidelines section of this memorandum.

5. 29.75 hours spent on pre-organizational meetings and telephone conversations with other counsel in January and February 1978, during which voting-blocks were established for the February 3, 1978 organizational meeting. As it turned out, this maneuvering worked a detriment to the class—not a benefit—and therefore will be completely disallowed.

Accordingly, a total of 562.3 hours of Mr. Specks' time is disallowed, leaving 5216.2 compensable hours.

#### (B) Hourly Rate

Specks requests an hourly rate of $150 to $195 for all his time. For the reasons that follow, I have decided that Specks should be awarded $50 per hour for associate/paralegal-level tasks and $150 per hour for partner-level tasks.

##### 1. Associate/Paralegal—Level Work

It is my best estimate, *see* note 155, *supra,* that 1646.72 hours were spent by Specks on tasks that are normally assigned to young associates, paralegals or clerical personnel. Included in this total is time spent on legal research and the drafting of interrogatories, notices of depositions, briefs, lists of defendants' subsidiaries and affiliates and discovery outlines. Other tasks included are the payment of bills, acquiring information regarding rates for

---

**153.** Granvil Specks has stated that these allegations are "a figment of Mr. Kohn's overly active imagination" and are "scurrilous and [have] no basis in fact." N.T., 6/10/81 at 24.

**154.** Because S & G's time records do not apportion the time spent on each task, but merely group together several tasks in one 8 or 9 hour daily entry, I have had to estimate the amount of time spent on the activities which should not be compensated by the class.

certificates of deposits, making travel and conference room arrangements, persuading lawyers to pay their assessments, and preparing notices concerning meetings and drafting minutes of meetings. These 1646.-72 hours also encompass time Mr. Specks spent reviewing Moodys, Standard and Poor's and the defendants' annual reports, preparing service lists, obtaining Lockwood's Directory and researching defendants' market shares. Also included are the nearly two hundred hours Specks spent on class certification discovery. See Guidelines section of this memorandum.

For these tasks, the court will allow compensation at the associate-level rate of $50 per hour.

## 2. Partner-Level Work

$150 per hour is a fair and appropriate rate for the remaining 3569.48 of Mr. Specks' hours in view of the leadership role he assumed in this case. His time records show endless strings of days where 8, 10 or 12 hours were billed to the class.[155] Significant portions of these days were spent on the telephone, in conference, writing letters or otherwise communicating with lawyers in the case.[156] While I recognize that co-lead counsel must devote a good deal of time to coordination and communication activities, the inordinate number of such entries reflects the unnecessary multiplication of lawyers and assignments under Specks' management. Finally, Specks has not established that he or any other member of his firm has non-contingent clients that would pay in excess of $150 per hour.

## (C) Total Lodestar

1646.72 hours × $ 50/hour = $ 82,336
3569.48 hours × $150/hour = $535,422

### (D) Multiplier

Mr. Specks requests that a positive multiplier of 3.5 be applied to all of his compensable hours. This request will be denied for the reasons stated below.

## II. Perry Goldberg

### (A) Hours Expended

Mr. Goldberg, a partner with the firm charged 286.25 hours to the class. Most of this time was spent attending meetings and settlement conferences and working on the pretrial memorandum, final contentions and the damage theory. After careful review of Goldberg's time sheets, I have concluded that all but the following of Goldberg's hours should be compensated by the class:

1. 46.25 hours are represented by entries so vague that I cannot determine whether the hours benefited the class, were excessive or duplicative, or what the appropriate rate of compensation should be. These entries include conferences and telephone calls with no indication of the subject matter discussed, as well as such hazy entries as "meetings", "assisting for preparation of trial" and "S & R Nelson deposition".

2. 13 hours expended on February 2 and 3, 1978, at meetings with plaintiffs' counsel regarding the organization of this case. These same meetings were attended by Mr. Specks and, therefore, Goldberg's attendance was duplicative. Moreover, as stated earlier, the February 2nd pre-organizational meeting was not beneficial to the class.

3. One-half of the 77.25 hours (38.6) Goldberg spent on the pretrial memorandum and final contentions will be disallowed for the reasons stated in the Guidelines.

---

**155.** Kohn states in his objections: "It ... appears that 8 hour days were logged when they were not necessary, and to fill up time because there were no other clients and nothing else to do." Kohn's objections to S & G petition at 4.

**156.** For example, the entries on February 13, 14 and 15, 1980 list 8 hours each day and during each of these three days Specks did nothing but write letters and have telephone conversations. N.T., 2/16/82 at 958. At Specks' requested hourly rate of $175 per hour (for that time period) and with the application of his requested multiplier of 3.5, Specks asks the class to pay him $612.50 an hour or approximately $5,000 for each of these three eight hour days. N.T., 2/16/82 at 960–964.

Accordingly, a total of 97.85 hours of Mr. Goldberg's time is disallowed, leaving 188.4 compensable hours.

### (B) Hourly Rate

Goldberg requests $150 to $175 per hour for his time. This request is denied. Goldberg's contribution to the prosecution of the litigation was minimal. He was not in a leadership position, nor was he involved on a daily basis in the case. He did not take any depositions or perform other significant tasks which would distinguish him from the other partners of the numerous law firms who participated in this litigation. Accordingly, I find that $100 per hour is a fair and appropriate rate for his time. This is the rate I have awarded to other plaintiffs' counsel who have partner status at their respective firms.

### (C) Total Lodestar

188.4 hours × $100/hour = $18,840

### (D) Multiplier

Mr. Goldberg requests that a positive multiplier of 2.75 be applied to all of his compensable hours. This request will be denied for the reasons stated below.

### III. Howard L. Fink

The S & G firm seeks compensation for 2008.5 hours for Howard L. Fink, an attorney who joined the Specks firm in November 1979, some eleven months after the first $30 million settlements. Harold Kohn, in his objections to the S & G fee petition, urges denial of any compensation for Fink, because "Mr. Fink is not employed by the petitioner; he is an outside counsel who should have filed a separate application if he were entitled to a fee." Kohn's objections to S & G petition at 3. In response, the S & G firm states that Kohn's assertion

"is simply not correct" and that since November 1979, Mr. Fink has been a member of the firm and continues to be employed by the firm. S & G Response at 15; Affidavit of S & G in Response to Block affidavit at 6. In view of S & G's representation, the firm will receive compensation for Mr. Fink's time.

### (A) Hours Expended

After a careful and difficult review of Fink's sometimes illegible handwritten time records, I have concluded that all but the following of Fink's hours are compensable:

1. 7 hours billed for conferences and telephone calls where no indication is given in the time sheets of the subject discussed. I cannot discern from these vague entries whether these conversations benefited the class.

2. One-half of the 155.25 hours (77.6) spent on the pretrial memorandum and final contentions will not be compensated for the reasons stated in the Guidelines.

Accordingly, a total of 84.6 hours of Fink's time is disallowed, leaving 1923.9 compensable hours.

### (B) Hourly Rate

S & G requests an hourly rate of $125 for Mr. Fink's time. The firm's fee petition does not indicate whether Fink is an associate or partner. It is clear, however, that the overwhelming majority of Fink's hours were spent on such associate-level tasks as reviewing documents, doing legal research, scheduling depositions, arranging for subpoenas, assisting Mr. Specks at depositions, making travel arrangements, drafting notices of depositions, interviewing potential third-party witnesses, collecting materials relating to damages for use at trial, and digesting depositions. Moreover, Fink's hours appear to be excessive. He seems to

have adopted Specks' practice of billing 8, 10 or 12 hours for nearly every day he spent on this case. I note that Fink spent approximately 10 months on *Fine Paper*. From November 21, 1979 to September 25, 1980, he has billed the class for 2000.25 hours [157] which is equivalent to billing the class over 50 hours each week for 40 straight weeks. In view of this excessive billing and the support role played by Fink, he will be awarded $50 per hour for his time.

(B) Total Lodestar

 1923.9 hours $\times$ $50/hour = $96,195

(C) Multiplier

S & G requests a positive multiplier of 2.5 for all of Fink's compensable hours. This request will be denied for the reasons stated below.

## IV. Gary Specks

### (A) Hours Expended

 This associate devoted 1,142.75 hours to *Fine Paper*. After careful review of his time sheets, I find that all the hours are compensable with the exception of 12 hours billed for attendance, with his father, Granvil Specks, at conferences with other plaintiffs' counsel on the organizational structure of this case. This includes six hours spent with his father at the February 3, 1978 organizational meeting. Gary Specks' attendance at all these conferences was redundant and, as stated earlier, these preorganizational meetings where Specks and Goldberg and other counsel planned their strategy to gain control of this litigation were of no benefit to the class. Accordingly, a total of 1,130.75 of Gary Specks' hours will be compensated by the class.

(B) Hourly Rate

S & G asks $75 to $85 for Gary Specks' time. This will be denied. Most of his time was spent researching and preparing initial drafts of interrogatories and briefs, as well as doing associate-level discovery work. In view of the type of work performed and the fact that a majority of Gary Specks' services in *Fine Paper* were performed when he was two to four years out of law school, his time will be compensated at the associate-level rate of $50 per hour.

(C) Total Lodestar

 1,130.75 hours $\times$ $50/hour = $56,537.50

(D) Multiplier

S & G requests a positive multiplier of 2.5 to all of Gary Specks' compensable hours. This request will be denied for the reasons stated.

## V. Multiplier for Members of the Firm

### (A) Multiplier for Contingency

The total lodestar for the firm is $789,330.50. As stated in the Guidelines, a positive multiplier of 1.5 will be awarded to all the compensable time expended prior to the January 1979 settlements. Accordingly, the adjustment will be made to 1660.25 of Granvil Specks' hours, 27.5 of Perry Goldberg's hours, and 373.75 of Gary Specks' hours. Howard Fink had no pre-settlement time. This contingency adjustment results in the addition of $115,900 to the firm's lodestar.

### (B) Multiplier for Quality

*Lindy* teaches that the court may grant a multiplier, either positive or negative, for the superior or inferior quality of work. *Lindy I*, 487 F.2d at 168–69. Specks & Goldberg took control of the litigation and

---

**157.** Harold Kohn, who was involved in the case for over 3 years, has billed the class approximately 1700 hours.

as a consequence claim they deserve one of the largest awards.[158] In my view, however, as I have noted before, Granvil Specks failed miserably in his obligation to the class to prosecute their claims efficiently with a minimum of duplication and unnecessary work. Rather he ran this case like a potentate, recruiting supporters and insuring their loyalty by dispensing favors at the expense of the class. The responsibility for the overstaffing, mismanagement and excessive charges must be laid at his feet.

The organizational structure devised by Specks which involved the participation of 160 lawyers inevitably led to overlapping, inappropriate utilization of manpower, endless rounds of correspondence, telephone calls and meetings and outright padding of time and expense records.

In addition, many of the assignments were "busy work" and of no appreciable benefit to the class. For example, Specks commissioned James Sloan of Sloan & Connelly to perform a pricing project despite Kohn's objection that Sloan was not competent to perform the task which Kohn suggested should be done by an accounting firm or a statistician. Kohn's appraisal was correct for at the time of trial, Sloan had not produced the necessary supporting data for a viable damage theory. Furthermore, Specks ordered the expensive Canadian Pricing Study and the overbroad 30(b)(6) Merchant Discovery Program neither of which resulted in any discernible benefit to the class. Specks also resisted efforts to halt the useless work of the Industrial Analysis Committee, the excessive number of nonproductive committee meetings and the overattendance of lawyers at pretrial conferences. Specks, again over objection, invited eight law firms to participate in this litigation after the January 1979 settlements were consummated (despite the fact that 32 other law firms and attorneys gen-

eral were already participating) and continued to assign work to lawyers who did not regularly file time and expense reports with plaintiffs' Finance Committee as required by their own internal rules. Specks and Kohn were at odds over the development of a damage theory, and Specks refused to accede to Kohn's judgment even though Kohn had been designated "Senior Trial Spokesman". Specks' partner, Perry Goldberg, threatened "inevitable retaliation" against David Berger if he cooperated with Kohn's effort to develop a damage theory for use at trial. Class Objectors' E 453. Specks also was remiss in failing to clarify and then adequately document the status of James and Douglas Nelson with respect to this litigation. Moreover, it seems to me that he breached his duty to the class by failing to object to the fee petitions filed by firms allied with him on the same grounds that he objected to the Kohn petition.

For these reasons and for the reasons stated in the Guidelines section of this memorandum, a negative multiplier of .5 will be applied to the S & G lodestar of $789,330.50. Thus, with the adjustments to the lodestar for contingency and quality, the total fee award to Specks & Goldberg will be $510,565.25.

## VI. Expenses

Specks & Goldberg initially requested reimbursement for $108,382.41 in expenses. An audit conducted at the direction of the class objectors concluded that a significant portion of the firm's expenses, including $24,415.65 in travel expenses, were not substantiated by the documentation required by Pretrial Order No. 143 so that it could not be determined whether the expenses were related to *Fine Paper*. It was further contended that S & G charged the class for items unrelated to *Fine Paper* or for expenses which are customarily considered as part of a law firm's "overhead".

---

**158.** *See, e.g.,* Granvil Specks' statement to the court on June 10, 1981: "Our firm, I submit has contributed as much, if not more, to the successful conclusion of this litigation from start to finish as any other firm. It is respectfully submitted that our firm is entitled to one of the highest multiples in this litigation." N.T., 6/10/81 at 19–20.

Specks & Goldberg responded with an affidavit and two volumes of documentation conceding that mistakes were made by their bookkeeper and reducing their request for reimbursement to $105,840.16.

After careful consideration of the materials submitted to the court by all parties, I have concluded that the corrected S & G request of $105,840.16 is reasonable, with the exception of $851.97 S & G billed to the class for "Meeting Expenses". These "expenses" were for meals for various members of the S & G firm which were consumed in Chicago. In the absence of further explanation, reimbursement will not be allowed for these "hometown" meals. Thus, the total amount of S & G's reimbursable expenses is $104,988.19, less the $81,286 already distributed, for a total of $23,702.19.

## VII. Conclusion

The following represents my determination of the fees and expenses to which Specks & Goldberg are entitled:

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Granvil Specks | 5216.2 | $50/150 | $617,758.00 | $414,060.25 | $3,307,727.50 |
| Goldberg | 188.4 | $100 | $ 18,840.00 | $ 10,795.00 | $ 134,681.25 |
| Fink | 1923.9 | $50 | $ 96,195.00 | $ 48,097.50 | $ 627,656.25 |
| Gary Specks | 1130.75 | $50 | $ 56,537.50 | $ 37,612.50 | $ 221,415.63 |
| | | | $789,330.50 | $510,565.25 | $4,291,480.63 |

Expenses:

| | |
|---|---|
| Amount Requested | $105,840.16 |
| Amount Previously Distributed | $ 81,286.00 |
| Amount Outstanding | $ 24,554.16 |
| Amount Disallowed | $ 851.97 |
| Final Expense Award | $ 23,702.19 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $510,565.25 |
| Expenses | $ 23,702.19 |
| Final Award | $534,267.44 |

## LAWRENCE WALNER & ASSOCIATES, LTD.

Lawrence Walner & Associates, Ltd. is a Chicago law firm which represented Campbell Office Supply Company along with Roy B. Schneider, Saveri & Saveri, Freeman, Atkins & Coleman and, for a brief time, David S. Logan. On June 8, 1981, Thomas B. Rutter, Esquire, a Philadelphia lawyer, also entered an appearance for Campbell Office Supply Company (and also for Herst Litho, Inc., Mr. Specks' client) specifically for the purpose of objecting to the fee petition of the Harold Kohn firm. Docket Entry No. 3418. Upon learning of Rutter's appearance, however, Walner and Schneider wrote a letter to Rutter on June 12, 1981 demanding that the latter withdraw his entry of appearance because it was made without their "knowledge or authorization." Class Objectors' E 944.

Indeed, one of the more intriguing aspects of this fee dispute was how so many law firms came to represent Campbell Office Supply. Campbell has filed a claim of $55,433 [159] against the class fund, but the total fees sought by attorneys representing Campbell amount to $3,583,738. N.T., 3/09/82 at 1202, 1203. Walner claims that Campbell was the regular client of Roy Schneider and that Schneider asked Walner to join him on the complaint against the paper companies because of Walner's expertise in antitrust law. N.T., 3/9/82 at 1204. Walner states that he in turn solicited Atkins, Logan and Saveri to join him as co-counsel for Campbell because he did not want to become overly-committed to the litigation. Id. at 1204; N.T., 3/8/82 at 1173.[160] Walner acknowledges, however, that he was aware, at that time, that numerous other attorneys had filed lawsuits identical to the one he filed for Campbell. N.T., 3/8/82 at 1175. Mr. Kohn offers a different explanation for the appearance of so many counsel for Campbell. He states that Walner told him that he added Saveri to the Campbell complaint "as a favor to Specks," Class Objectors' E 586–87, so that Specks could secure friendly votes to maintain control of the litigation. Walner admits speaking to Specks with respect to this matter, but says Specks merely "recommended" that Saveri be used as Walner's

co-counsel. N.T., 3/9/82 at 1206. Walner said he personally knew Saveri at the time and was familiar with his reputation in the antitrust field. N.T., 3/8/82 at 1178; 3/9/82 at 1206. He is not sure whether he contacted Saveri or whether Saveri contacted him after he spoke with Specks. N.T., 3/8/82 at 1176, 1178.

The Walner firm seeks $735,760 for its participation based on a lodestar of $327,005 and a 2.25 multiplier. The firm's claimed hours can be divided into three phases. Prior to commencement of discovery, the firm did Industrial Analysis Committee work consisting in part of checking the Official Board Reports [161] and reviewing the New York Times and Wall Street Journal for information regarding price increases and product similarity. Although Walner was a member of the Industrial Analysis Committee, he did not have a leadership position. Once discovery began, the firm, as co-chairman of the Wausau discovery subcommittee with the Minnesota Attorney General's office, participated in the discovery of Wausau Paper Mills Company, which consisted primarily of document review and nine depositions.[162] After discovery was completed, the firm drafted the Wausau section of the pretrial memorandum, and at the request of Specks, gathered information to be used in the Canadian pricing study.

**159.** It is estimated that Campbell's ultimate recovery will be $277. N.T., 3/09/82 at 1202.

**160.** In its response to the Class Objectors' Report, Walner's firm gave additional reasons for adding so many co-counsel to the complaint:
We are also accused by the corporate objectors of putting Guido Saveri on our petition as a favor to Gig Specks.... Petitioners have previously explained their position on this subject: we [sic] felt that it was in the interest of the class and class counsel to have experienced antitrust counsel in a geographical area where discovery was contemplated. It also served as a hedge against an otherwise greater commitment of time and risk in the case.
Response at 9–10 (emphasis added). It is interesting to note, however, that Walner admitted that two of the attorneys who were co-counsel to Campbell, Logan and Schneider, were not "antitrust experts". N.T., 3/8/82 at 1173. Also, Walner's statement that so many lawyers

were needed to represent his client so as to reduce his firm's "risk in the case" has been taken into account in considering a multiplier for contingency.

**161.** The Class Objectors' Report points out that Walner spent approximately 114 hours on the task of reviewing all issues of "Official Board Markets" from 1966 through 1977, although the periodical concerns primarily the packaging industry.

**162.** Walner also assisted briefly on Mead discovery. Although the record is not crystal clear, it appears that Walner's firm was removed from its assignment of Mead discovery by Granvil Specks upon the request of Sachnoff, who in October of 1979, wrote the following to Specks: "To Gig. Gig—help! Please take Walner off the Mead Committee. Wausau is enough to keep him 'busy.' Lowell" Class Objectors' E 713; MM Exhibit No. 40; N.T., 3/9/82 at 1200.

In addition to the objections made by the class objectors, Harold Kohn, on behalf of his client, filed numerous objections to Mr. Walner's fee petition, particularly challenging the hourly rates and multipliers requested by the firm. More importantly, however, Kohn alleged that the Walner petition was not filed in good faith, in violation of Fed.R.Civ.P. 11. Kohn's objections to the petition of Lawrence Walner and Asso., Ltd., at 3.[163]

## I. Lawrence Walner

### (A) Hours Expended

Walner asks to be compensated for 1,331.-15 hours of work. After a careful review of the time sheets submitted, however, I find that only 1,007.55 hours of this time are compensable. Specifically, the following hours will be disallowed:

1. 14.7 hours claimed to have been spent on January 26, 28, 29, 1978 on the *Fine Paper* case. Mr. Walner has stated that these hours "were erroneously posted to this case" and "should be deleted from the petition . . . ." Corrections to the Application for Fees of Lawrence Walner & Associates, Ltd. filed March 8, 1982. Docket Entry No. 3703.

2. 1.6 hours for "Discussion with attorney for Merchant House". This entry is vague and since it cannot be determined whether this activity was of any benefit to the class, no compensation will be awarded for this time.

3. 6 hours are billed for "Meeting with Specks, Freed and Eiger at Specks' office". I cannot tell from this entry whether any benefit to the class resulted from this meeting and thus no compensation will be awarded for this time.

4. 9.3 hours spent in 1977 and early 1978 on conversations with Specks and other co-counsel for Campbell Office Supply Co. It appears that during this time, counsel were exchanging information and monitoring each other's activities. This obviously resulted in a duplication of effort which will not be allowed.

5. 216.55 hours devoted to Industrial Analysis Committee work. As discussed in the Guidelines section, none of this time appears to have benefited the class and, accordingly, it will be disallowed.

6. 108.1 hours spent by Walner on the pretrial memorandum and final contentions. This time appears excessive in light of the combined 4,604.93 hours spent on these same tasks by all of the lawyers, including Walner. Accordingly, I will reduce the 108.1 hours claimed by Walner by one-half.

7. 19.9 hours spent preparing, traveling, and attending the April 19, 1978 pretrial conference in Philadelphia. The essential purpose of this conference was to seek court approval of the agreements made by plaintiffs' counsel at their organizational meeting on February 3, 1978. During the hearing, Messrs. Kohn and Specks were spokesmen for the private plaintiffs and therefore Walner's attendance was unnecessary, duplicative and of no benefit to the class.[164]

8. 1.5 hours spent attending pretrial conferences/hearings on June 14, 1978 and on September 27, 1979. Walner's attendance at these court sessions was unnecessary, duplicative of other counsel's efforts and, therefore, was of no benefit to the class.[165]

---

**163.** Walner, at his evidentiary hearing, denied being "part of any agreement or conspiracy to divide up work in this case." N.T., 3/8/82 at 1146.

**164.** At this April 19, 1978 pretrial conference, three law firms—Saveri & Saveri, Freeman, Atkins & Coleman, and the Walner firm—all appeared from out-of-town on behalf of Campbell Office Supply and billed the class 50.2 hours for this conference.

**165.** On each of these two days, Walner bills the class 9 hours and 12 hours respectively for

attendance at court hearings and meetings of counsel held in Philadelphia. Petitioner, however, does not specify what portion of these hours were spent at the court sessions. My courtroom clerk's notes indicate, however, that each of these sessions were 45 minutes in duration.

Walner justifies his attendance at these court sessions by generally stating that he and other counsel were invited to attend these meetings. *See* Walner's June 7, 1982 affidavit. Docket Entry # 3374. Kohn testified that it was Gran-

The total number of disallowed hours for Walner is 323.6, leaving 1,007.55 compensable hours.

#### (B) Hourly Rate

Walner requests an hourly rate of $125–$170. This request will be denied. The Walner firm does not have historic, non-contingent hourly rates regularly billed to clients. The vast majority of Walner's work was of the type normally assigned to an associate. He spent most of his time on such tasks as reviewing Wausau and Mead documents, preparing deposition notebooks, drafting documents and deposition summaries, drafting replies to Rule 11 interrogatories, research, drafting a motion for a protective order, reviewing defendants' first wave of interrogatories, and assembling pricing surveys for the Sloan & Connelly firm. Walner's only partner-level work consisted of 189.58 hours spent preparing for and taking eight depositions. Finally, the firm's role in this case was a limited one. Other than the disallowed Industrial Analysis Committee time, the firm's main contribution was discovery of a single defendant under the supervision of the discovery chairmen and with the assistance of the Minnesota Attorney General's office.

Accordingly, compensation at the rate of $100 per hour for Walner's 189.58 partner-level hours is fair and appropriate; $50 an hour will be awarded for the remaining 801.87 hours of associate-level work.

#### (C) Total Lodestar

189.58 hours × $100 = $18,958.00
817.97 hours × $ 50 = $40,898.50

vil Specks who invited Walner and other lawyers to attend these court hearings:

He brought Mr. Walner, he brought Mr. Eiger, he brought Mr. Atkins, he brought Mr. Kurland, he brought Mr. Barrick [sic], he brought any number of people with him, who gave me no help, who were as totally unprepared as anybody could possibly be, who never said anything, never expected to say anything, who sat in the jury box, who did nothing before, nothing during, and nothing after, and he wanted them to come, and he

#### (D) Multiplier

Walner asks for a multiplier of 2.25 for his time. As explained below, no quality multiplier will be awarded to Walner or any other member of his firm. I will, however, apply a 1.5 contingency multiplier to Walner's 172.95 compensable hours expended before the end of the first wave of settlements.

### II. William Sidlinger

#### (A) Hours Expended

Sidlinger, an associate with the firm, billed 1,523.3 hours to this litigation. After a careful review of the time sheets submitted, I find that all but the following hours are compensable:

1. 100.3 hours devoted to Industrial Analysis Committee work will be disallowed for reasons stated in the Guidelines section.

2. 81.1 hours spent by Sidlinger on the pretrial memorandum and final contentions. This time appears excessive in light of the combined 4,604.93 hours spent on these same tasks by all of the lawyers, including Sidlinger. Accordingly, I will reduce the 81.1 hours claimed by Sidlinger by one-half. Only 40.55 of these hours will be compensated by the class.

3. 27.1 hours spent attending meetings with other co-counsel, which meetings were also attended by Walner, will be disallowed. Sidlinger's attendance was superfluous and, therefore, of no benefit to the class. *See* entries, 7/20/78, 7/21/78, 8/8/78, 6/1/79, 1/10/80, 2/1/80, 2/22/80, 5/14/80.

Finally, I note that Sidlinger spent 100.6 hours in July and August of 1980 on the Canadian pricing study. As discussed earlier in my analysis of the Much, Shelist fee

asked them to come, and he approved their coming, and I disapproved it and told them to stay home.

\* \* \* \* \* \*

... [A]ccording to [Granvil Specks] and the group that you work with, you have to keep these people happy, their votes are important, we need them—your partner, Mr. Goldberg, has the classic answer: "We've got to feed the troops" is his remark.
N.T., 4/21/82 at 2079–80.

petition, it is difficult to discern any benefit to the class from this study, but since it appears that the Walner firm performed this task in good faith, at the direction of Specks, the firm will be compensated for these efforts.

The total number of disallowed hours for Sidlinger, therefore, is 167.95, leaving 1,355.35 compensable hours.

### (B) Hourly Rate

The firm asks for an hourly rate of $65 to $80 for Sidlinger's time. This request will be denied; only $50 an hour will be awarded. This lawyer has no historic, non-contingent hourly rate. Aside from taking one deposition, nearly all of his compensable time was spent doing junior-associate or paralegal tasks such as reviewing Wausau, Mead and Great Northern Nekoosa documents, assisting Walner in the taking of eight depositions, summarizing depositions, aiding Walner in the preparation of the Wausau section of the trial brief, and gathering damages information from sources in Washington, D.C., Canada and the firm's Wausau document files. In view of the Walner firm's limited role in this case, the multitude of lawyers representing the class and Sidlinger's support role within his own firm, $50 an hour is an appropriate rate for Sidlinger's time.

### (C) Total Lodestar

1,355.35 hours $\times$ $50/hour $=$ $67,767.50

### (D) Multiplier

Sidlinger asks for a multiplier of 2.25 for his time. As explained below, no quality multiplier will be awarded, but I will apply a 1.5 contingency multiplier to his 54.8 compensable hours expended before the end of the first wave of settlements.

### III. Harold Novak

This lawyer's primary contribution was to assist the Much, Shelist and Wolf, Popper firms with inspecting and analyzing documents produced by Great Northern Nekoosa. He also assisted in preparing certain deposition summaries and coordinating some documents. After a careful review of Novak's time sheets, I find that his 93.8 hours did benefit the class and, accordingly, Novak will be compensated for this time. Since the tasks performed by Novak are normally performed by an associate, $50 per hour will be awarded for his time, not the inflated $110 per hour rate requested.[166] The total lodestar therefore is $4,690. For the reasons stated below, no quality multiplier will be awarded. Nor will I apply a contingency multiplier since all of Novak's time was logged after the initial settlements.

### IV. Joy Nitti

Ms. Nitti requests compensation for 89.8 hours chiefly spent gathering documents for use at depositions, abstracting documents, and preparing document descriptions. I find this time compensable, with the exception of 5.75 hours spent attending a January 10, 1980 meeting at the Specks office. This conference was also attended by Walner and Sidlinger and, therefore, Nitti's attendance was duplicative and of no benefit to the class. The number of compensable hours, therefore, is 84.05.

Since the tasks performed by Nitti are normally performed by an associate, $50 per hour will be awarded for her time. Nitti's total lodestar therefore is $4,202.50. For the reasons stated below, no quality multiplier will be awarded. Nor will I apply a contingency multiplier since all of Nitti's time was logged after the initial settlements.

### V. Paralegals

The firm treats the 98.2 paralegal hours, for which it seeks compensation of $2,455

---

**166.** I note that no resume of the background and qualifications of Novak or of any other of the firm's attorneys, except Walner, were submitted to the court as required by Pretrial Order No. 143. Nor is there any indication in the petition that Novak has any historic or non-contingent hourly rate.

($25 per hour), as an expense. After review of the firm's daily time sheets, it appears that the firm's paralegal time benefited the class and the rate sought is reasonable. Since the firm grouped its paralegal time with its expenses, the compensation will be allowed as part of the expenses.

## VI. Multiplier

No positive quality multiplier will be awarded to any member of the firm. The firm was not one of the two co-chairmen, five co-lead counsel, six-man trial team, or even a member of the fourteen-member Executive Committee. It was responsible for discovery of one defendant, along with the Minnesota Attorney General's office. Although it appears that the members of the firm performed their tasks competently, they did not exhibit the unusually superior degree of skill that would warrant the award of a quality multiplier. Accordingly, given the firm's support role and limited contribution to this litigation, no multiplier

is merited for the quality of the firm's work.

## VII. Expenses

The Walner firm's total expenses of $37,869.73 appear generally reasonable. As explained earlier, the firm has already received 75% of these expenses, or $28,402. Accordingly, I will award the firm the remainder of its expenses, $9,467.73, with the exception of $194 for Walner's travel expenses to Philadelphia on April 19, 1978 for a pretrial conference for which attorney fees have been disallowed. Thus, $9,273.73 will be awarded to the firm for its expenses.

## VIII. Conclusion

The following represents my determination of the fees and expenses to which the Walner firm is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Walner | 1007.55 | $50/100 | $ 59,856.50 | $ 64,487.75 | $442,548 |
| Sidlinger | 1355.35 | $50 | $ 67,767.50 | $ 69,137.50 | $258,885 |
| Novak | 93.8 | $50 | $ 4,690.00 | $ 4,690.00 | $ 23,215 |
| Nitti | 84.05 | $50 | $ 4,202.50 | $ 4,202.50 | $ 11,112 |
| Total | | | $136,516.50 | $142,517.75 | $735,760 |

| Expenses: | |
|---|---|
| Amount Requested [167] | $ 37,869.73 |
| Amount Already Distributed | $ 28,402.00 |
| Amount Outstanding | $ 9,467.73 |
| Amount Disallowed | $ 194.00 |
| Amount to be Distributed | $ 9,273.73 |
| TOTAL AWARD: | |
| Attorneys' Fees | $142,517.75 |
| Expenses | $ 9,273.73 |
| Final Award | $151,791.48 |

---

## WOLF, BLOCK, SCHORR & SOLIS–COHEN

The Wolf, Block firm served as co-counsel with Adler, Barish, Levin & Creskoff on

behalf of Moses Jaroslawicz, t/a J & B Toy Stationery. The complaint was filed in the Eastern District of Pennsylvania in August 1977; Wolf, Block was added as co-counsel

**167.** Includes compensation for paralegal time.

two months later. The firms had joint responsibility for the discovery of Philadelphia-based defendant Scott Paper Co.[168] Seymour Kurland, the partner in charge of Wolf, Block's efforts, was one of the five co-lead counsel, a member of the Executive Committee, and a member of the Rule 37 Committee. He was also selected to be on the trial team. The firm seeks compensation for 2343 hours (1159.8 attorney hours and 1183.2 paralegal hours) of work. With the application of the requested multipliers (3.5 for Kurland, 2.5 for Barry Schwartz, his principal associate in the case, and 1.75 for all other attorneys) the total fee award would be $442,821.79. Wolf, Block also seeks reimbursement of $42,461.30 in expenses.

My review of Wolf, Block's fee petition was somewhat burdened by the firm's submission of weekly computer records to support its time.[169] Pretrial Order No. 143 (as amended by Pretrial Order No. 147) permitted computer time records, but it expressly required contemporaneous *daily* records as well as weekly and monthly compilations. Except for several months of the daily time sheets for two associates, Wolf, Block only submitted weekly and monthly computer compilations. Standing alone, these records do not lend themselves to the required *Lindy* analysis.[170]

As discussed above in connection with the other firms that filed only computer records, I have taken the limitations of such timekeeping systems into consideration in my review. I have disallowed time only where there was no basis in the record for a

determination of whether the time benefited the class.[171]

I. Seymour Kurland

(A) Hours Expended

Wolf, Block seeks a total award of $261,810.50 for 445.8 hours of Kurland's time. This senior attorney argued before the Judicial Panel on Multidistrict Litigation and was involved in both settlement negotiations and trial preparation work. Since he was one of five co-lead counsel and a member of the trial team, I find that his attendance at various pretrial conferences is compensable. I have determined, however, that the following hours must be disallowed:

1. 5.8 hours supported by entries too vague to permit any determination of whether the time benefited the Class. Such entries indicate only that a telephone call, a conference, or a discussion took place with no further elaboration on the subject matter.

2. 78.5 hours were spent working on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Kurland will be compensated for 39.25 hours.

3. 6 hours devoted to the firm's fee petition.

4. 6 hours for attendance at an Executive Committee meeting on 2/17/81. I can see

---

**168.** Both firms participated in the review of the over 50,000 documents produced by Scott Paper Co., but Adler, Barish was assigned to take all the depositions. Wolf, Block Fee Petition at 3.

**169.** For a full discussion of my treatment of computer time records, see the section of the memorandum dealing with the fee petition of Berger & Montague.

**170.** For example, one week's total of 18 hours is supported by the entry "C/SCHWARTZ TRIAL PREP RVW FI T/C SPECKS." Many entries were more specific about the nature of the work but still gave no indication (apart from

the total for the week) of how much time was spent on each activity.

**171.** Wolf, Block chose not to participate in the evidentiary hearings, but its fee petition included a narrative summary of the work of most of the attorneys and paralegals, the time reports the firm submitted to the Finance Committee, and several months of the daily handwritten time sheets of Barry Schwartz and Roberta Liebenberg. In addition, the firm's response to the Class Objectors' Report contains further elaboration of the firm's efforts and an affidavit of Schwartz in support of the time questioned by the class objectors.

no benefit to the class from such a meeting so long after the final settlements.

With the disallowance of the above 57.05 hours, Kurland is left with 388.75 compensable hours.

(B) Hourly Rate

To be consistent with the hourly rates awarded other senior attorneys for similar work, Kurland will be compensated at a rate of $100/hour. I find this to be fair and reasonable.

(C) Total Lodestar

388.75 hours × $100/hour = $38,875

(D) Multiplier

I find that Kurland's efforts in this case, although commendable, were not of such an unusually high degree of skill to warrant a quality multiplier. His work was commensurate with his position of responsibility in the litigation and is sufficiently rewarded in his hourly rate. I will, however, apply a 1.5 contingency multiplier to his 88.8 compensable hours expended before the end of the first wave of settlements.

II. Barry Schwartz

(A) Hours Expended

Schwartz was Kurland's primary associate during this litigation. He worked on the MDL transfer motion, reviewed Scott Paper Co. documents, prepared Requests for Admission, and worked on the final pretrial memorandum. He was selected to be a member of the trial support team. The fee petition requests an award of $86,-702.25 for 383.6 hours of work. I find that the following time must be disallowed:

1. 61.3 hours supported either by entries too vague to permit a determination of whether the time benefited the class or by no entry at all. 31 of these hours have no entry.[172] 17.5 additional hours indicate only "review". The remaining entries describe telephone calls or conferences but do not elaborate on the subject matter.

2. 2 hours for attendance at the 4/19/78 pretrial conference. The class was adequately represented by co-lead counsel at this conference.

3. 4.6 hours reviewing documents (e.g. brief on contribution issue) prepared by other firms. As explained in the Guidelines, I will not permit every attorney to charge his "read & review" time to the class. Schwartz was not a member of the Executive Committee.

4. 63 hours were devoted to work on the final pretrial memorandum. As explained in the Guidelines, only half of this time will be compensated in view of the excessive total number of hours claimed for work on this document by all the attorneys involved. Accordingly, Schwartz will be compensated for 31.5 hours.

5. 5.9 hours spent on the fee petition.

With the disallowance of the above 105.3 hours, Schwartz is left with 278.3 compensable hours.

(B) Hourly Rate

I find that $50/hour is a fair and reasonable rate of compensation for Schwartz' work.

(C) Total Lodestar

278.3 hours × $50/hour = $13,915

(D) Multiplier

Schwartz' efforts were not of such an unusually high degree of skill to merit a quality multiplier. I will, however, apply a 1.5 contingency multiplier to the 76.5 compensable hours expended before the end of the first wave of settlements.

III. Roberta Liebenberg

(A) Hours Expended

This associate worked primarily on discovery matters. She attended Scott document production sessions, analyzed the documents produced and worked on the dis-

---

172. This total of 31 hours represents those hours for which there is no indication any-

where, e.g., in Kurland's time records or in Schwartz' affidavit, of what Schwartz did.

covery book. The fee petition requests an award of $35,899.50 for 211.9 hours of work. I have determined that all of Liebenberg's time is compensable except 4.9 hours spent reviewing memoranda and motions prepared by other firms. Thus, Liebenberg is left with 207 compensable hours.

(B) Hourly Rate

I find that $50/hour is a fair and reasonable rate of compensation for Liebenberg's efforts.

(C) Total Lodestar

207 hours × $50/hour = $10,350

(D) Multiplier

I will not apply any multiplier to Liebenberg's lodestar because her work was not of such an unusually high degree of skill to merit a quality multiplier, and all of her time was logged after the initial settlements.

IV. Stanley Edelstein

(A) Hours Expended

Edelstein devoted 87.5 hours to this case. This time was spent on trial preparation work and reviewing microfilmed documents relating to purchases of fine paper from Crown Zellerbach by other defendants and their affiliates. I have determined that all of this time is compensable.

(B) Hourly Rate

I find that $50/hour is a fair and reasonable rate of compensation for Edelstein's efforts.

(C) Total Lodestar

87.5 hours × $50/hour = $4,375

(D) Multiplier

No multiplier will be applied to Edelstein's lodestar because his work was not of such an unusually high degree of skill to

merit a quality multiplier and all of his time was logged after the initial settlements.

V. Other Attorneys

Wolf, Block requests compensation for the time of four other attorneys, none of whom worked more than 16 hours on the case.[173] With the application of the 1.75 multipliers, the total fee for the 31 hours expended by these attorneys would be $5,768.01. I have determined that the 13.4 hours spent by Labovitz on the class certification brief, the 2.5 hours spent by Strogatz attending the first Executive Committee meeting in Kurland's place, and the 3.4 hours spent by Colliers on trial preparation work are compensable. The remaining time for these attorneys and all of Rubin's time is disallowed as supported by entries too vague to permit a determination of any benefit to the class.

To be consistent with hourly rates awarded other partners and associates for similar work, I will compensate Labovitz and Strogatz at $100/hour and Colliers at $50/hour. No quality multiplier is warranted, but I will apply a 1.5 contingency multiplier to the compensable time of Labovitz and Strogatz since it was logged before the end of the first wave of settlements.

VI. Paralegals

The firm seeks compensation for 1183.2 hours of paralegal time. This time was primarily devoted to review of Scott Paper Co. documents. I have determined that all of the time is compensable at a rate of $25/hour. No multiplier is awarded for paralegal time.

VII. Expenses

Wolf, Block seeks reimbursement for $42,461.30 in expenses. The firm has already received 75% ($31,845) of this figure. Of the outstanding $10,616.30, I disallow only $483.75 in travel expenses for Liebenberg's attendance at the 3/6/81 Executive Committee meeting in Chicago. Attorneys'

---

173. The attorneys and their time: Judah Labovitz (15.7 hours); Ian A.L. Strogatz (11); Eric Rubin (.9); and Denise Colliers (3.4).

fees have not been requested for this trip, but I will not permit the class to be charged the expenses for traveling to such a meeting so long after the final settlements. The remaining expenses are reasonable.

VIII. Conclusion

The following represents my determination of the fees and expenses to which Wolf, Block is entitled under *Lindy:*

| Attorney's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Kurland | 388.75 | $100 | $38,875 | $ 43,315.00 | $261,810.50 |
| Schwartz | 278.3 | $50 | $13,915 | $ 15,827.50 | $ 86,702.25 |
| Liebenberg | 207 | $50 | $10,350 | $ 10,350.00 | $ 35,899.50 |
| Edelstein | 87.5 | $50 | $ 4,375 | $ 4,375.00 | $ 15,465.63 |
| Labovitz | 13.4 | $100 | $ 1,340 | $ 2,010.00 | $ 3,451.53 |
| Strogatz | 2.5 | $100 | $ 250 | $ 375.00 | $ 1,643.25 |
| Rubin | -- | -- | -- | -- | $ 149.63 |
| Colliers | 3.4 | $50 | $ 170 | $ 170.00 | $ 523.60 |
| Paralegals | 1183.2 | $25 | $29,580 | $ 29,580.00 | $ 37,175.90 |
| Total | | | $98,855 | $106,002.50 | $442,821.79 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 42,461.30 |
| Amount Already Distributed | $ 31,845.00 |
| Amount Outstanding | $ 10,616.30 |
| Amount Disallowed | $ 483.75 |
| Amount to be Distributed | $ 10,132.55 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $106,002.50 |
| Expenses | $ 10,132.55 |
| Final Award | $116,135.05 |

---

**WOLF, POPPER, ROSS, WOLF & JONES**

This New York City firm's participation dates from June 1979, when Robert Skirnick, a partner with the Chicago law firm of Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., left that firm to join Wolf, Popper. While at Much, Shelist, Skirnick was co-chairman, along with Lawrence H. Eiger of the Great Northern Nekoosa ("GNN") discovery subcommittee, and Skirnick continued in this role after he left Much, Shelist. Eiger and the other members of the Much, Shelist firm also continued to work on discovery of GNN after Skirnick's departure.

When Skirnick left Much, Shelist he claims his new firm was retained by his former firm as associate counsel for Much, Shelist's client, plaintiffs David Weis Wholesale Jewelers, Inc. and Peoria Supplies, Inc. The retainer agreement signed by these plaintiffs allowed Much, Shelist to retain Wolf, Popper as associate counsel.[174] Neither of these plaintiffs has filed a Proof of Claim. *See* Class Objectors' E 991.

174. The Much, Shelist firm, however, has disavowed any responsibility for bringing the Wolf, Popper firm into the case. Instead, the firm claims that the decision to add Wolf, Popper to the already large number of lawyers in this case was made "primarily by Mr. Specks." N.T., 4/6/82 at 1950.

Wolf, Popper requests compensation for time spent by Skirnick principally in discovery of GNN and researching and drafting briefs in connection with Rule 37 motions. The firm also asks for compensation for two hours of work by Samuel Dolgon, an associate, and 27 hours and 20 minutes of paralegal time.[175] The total fee sought by the firm, after the application of the requested multiplier of 3 for Skirnick's time, is $149,538.33.

Objections to this firm's petition have been filed by class objectors and by Kohn on behalf of his client. In particular, Kohn stated that "[t]his firm should not be compensated at all because it had no rightful place in this litigation and its services were totally unnecessary." Kohn's Objections to the Petition of Wolf, Popper, Ross, Wolf & Jones at 2.

## I. Robert A. Skirnick

### (A) Hours Expended

Skirnick claims to have spent 361 hours, 35 minutes on this case. After a careful review of the time sheets submitted, however, I find that only 329 hours, 35 minutes of this time claimed are compensable. Specifically, the following hours are disallowed:

1. 31 hours spent at discovery committee meetings on June 8, 1979, September 26, 1979 and December 20, 1979 which were also attended by partners from Much, Shelist, the firm with primary responsibility for discovery of Great Northern Nekoosa. Skirnick's attendance at these meetings was duplicative and will not be compensated.

2. One hour expended on August 17, 1979 at "Conference with Mary Burke", a paralegal at Sloan & Connelly. This entry is too vague to permit the court to determine whether this conference benefited the class.

The total number of Skirnick's compensable hours, therefore, is 329 hours, 35 minutes or approximately 329.6 hours.

### (B) Hourly Rate

Skirnick asks for $125—$150 per hour. However, the vast majority of his time was spent performing associate-level tasks such as reviewing documents, researching and drafting Rule 37 briefs, ·reviewing SEC 10–K forms and Dun & Bradstreet reports and preparing a GNN cast of characters. A substantial amount of his time was spent taking six trips to Chicago to confer with and assist Specks and members of the Much, Shelist firm and to review GNN documents. The time charged for this associate-level work amounts to 284.6 hours. Given the number of lawyers participating in this case and Skirnick's limited contribution, $50 per hour is an appropriate rate for this time. For the remaining 45 hours spent on partner-level work, primarily depositions of employees of defendants,[176] $100 an hour is allowed.

### (C) Total Lodestar
284.6 hours × $ 50/hour = $14,230
 45 hours × $100/hour = $ 4,500

### (D) Multiplier

No multiplier will be awarded to Skirnick's time or to the time of any other member of this firm. At the time Wolf, Popper became involved, the $30 million settlements had been consummated. Thus, no multiplier is warranted on the basis of the contingent nature of the suit. Nor does Skirnick's contribution to the class fund merit a positive quality multiplier. Skirnick was not co-lead counsel or even one of the fourteen members of the Executive Committee. While he served as co-chairman of the Great Northern Nekoosa discovery subcommittee and as a member of

---

**175.** This firm has computed its time spent on *Fine Paper* in minutes rather than in decimal fractions of an hour as was done by the vast majority of the petitioning law firms. In adding up the number of compensable hours, I have utilized the firm's method of computation and then converted to a decimal.

**176.** Skirnick accompanied Lawrence H. Eiger, a partner of the Much, Shelist firm, to most of these depositions. N.T., 4/6/82 at 1951.

the Rule 37 Committee, the tasks assigned to him were routine and were not performed with that unusual degree of skill that would justify the application of a quality multiplier.

## II. Samuel R. Dolgan

The firm asks for compensation for the two hours Dolgan, an associate, spent reviewing a discovery outline. I am unable to determine how this expenditure of time inured to the benefit of the class and, accordingly, no compensation will be awarded.

## III. Meryl Rubin

The firm seeks compensation for 27.3 hours of this paralegal's time. After a careful review of the time sheets submitted for Rubin, I have concluded that all 27.3 hours are reasonable and have benefited the class. Applying the paralegal rate of $25, Wolf, Popper will be awarded $683.33 for Rubin's time. No multiplier is applied to paralegal time.

## IV. Expenses

Wolf, Popper requests reimbursement for $3,858.11 in expenses. The vast majority of these expenses, $3,108.90, were for travel. The firm has already been awarded 75% of this amount or $2,893. After·a careful review of the documentation supporting the firm's claim for costs and expenses, I have concluded that the following expenses should not be paid by the class:

1. $168 for air fare incurred by Skirnick for travel to the Discovery Committee meeting on June 8, 1979 in Chicago for which attorney fees have been disallowed.

2. $111.30 in travel expenses incurred by Skirnick for travel to and attendance at the Discovery Committee meeting on September 26, 1979 in Philadelphia for which attorney fees have been disallowed.

3. $92.39 in travel expenses incurred by Skirnick for travel to and attendance at the Discovery Committee meeting on December 20, 1979 in Philadelphia for which attorney fees have been disallowed.

4. $171.75 in travel expenses incurred by Skirnick for a trip to Chicago on March 6, 1981. Although there is no entry by Skirnick on this date indicating that he worked on *Fine Paper*, I note that there was an Executive Committee meeting in Chicago that day. Not only was Skirnick not a member of the committee, but I have not compensated any attorney for this meeting. It took place long after the final settlements and was apparently called to discuss fees.

5. As mentioned earlier, much of Skirnick's time was spent taking six trips to Chicago to confer with and assist Specks and members of the Much, Shelist firm and to review GNN documents. For example, on May 21, 1980, Skirnick traveled to Chicago to work with Specks on a Rule 37 brief. On nearly all of these trips, Skirnick also worked on other MDL cases. For example, Skirnick, while in Chicago on August 7–10, 1979, worked on the *Ocean Shipping and Folding Carton* cases. *See* Disbursement Requisition 8/10/79. These six trips do not appear to have been necessary to the *Fine Paper* case. The tasks performed by Skirnick in Chicago could have been accomplished by the Much, Shelist firm, by any one of the many Chicago lawyers participating in this case, or by Skirnick himself through the use of the telephone or the mails. As a result, although I have awarded attorney fees for this time to Wolf, Popper, I believe it would be improper to reimburse the firm for these expenses. Accordingly, the firm's request for reimbursement for the following expenses is denied:

 (a) $36.05 in travel expenses and $202 for air fare incurred during the July 25, 1979 trip to Chicago.

 (b) $78.15 in travel expenses and $189 for air fare incurred during the August 9–10, 1979 trip to Chicago.

 (c) $76.25 in travel expenses and $230 for air fare incurred during the September 11–13, 1979 and September 18–21, 1979 trips to Chicago.

 (d) $420.17 for travel expenses and air fare incurred during May 21–23, 1980 trip to Chicago.

(e) $163 of the $326 air fare bill for the July 22, 1980 trip to Chicago (other half of bill charged to the *Corn Derivative* case).

The total amount of disallowed expenses, therefore, is $1,938.06. Thus, the amount of reimbursable expenses is $1,920.05. Since I have already awarded Wolf, Popper $2,893 for expenses, the firm has been overpaid $972.95. The overpayment will be set off against the attorney fees awarded to the firm. Thus, the total award to Wolf, Popper, including reimbursement for expenses, is $18,440.38.

## V. Conclusion

The following represents my determination of the fees and expenses to which Wolf, Popper is entitled under *Lindy:*

| Attorney or Paralegal's Name | Hours | Hourly Rate | Lodestar | Total Awarded | Total Requested |
|---|---|---|---|---|---|
| Skirnick | 329.6 | $50/100 | $18,730.00 | $18,730.00 | $148,755.00 |
| Dolgon | 0 | -- | -- | 0 | $ 100.00 |
| Rubin | 27.3 | $25 | $ 683.33 | $ 683.33 | $ 683.33 |
| TOTAL | | | $19,413.33 | $19,413.33 | $149,538.33 |

Expenses:

| | |
|---|---|
| Amount Requested | $ 3,858.11 |
| Amount Previously Distributed | $ 2,893.00 |
| Amount Outstanding | $ 965.11 |
| Amount Disallowed | $ 1,938.06 |
| Amount to be Returned to Class | $ 972.95 |

TOTAL AWARD:

| | |
|---|---|
| Attorneys' Fees | $19,413.33 |
| Less Amount to be Returned | $ 972.95 |
| Final Award | $18,437.05 |

---

## STATE ATTORNEYS GENERAL

In addition to the class of private purchasers, I certified nine separate classes of governmental entities. These certified states were known as the "Minority States". Since the state classes alleged the same type of conspiracy as the private plaintiffs, the fortunes of both groups remained tied together throughout the litigation. Each settlement that comprises the present fund was a settlement with both the private plaintiffs and the Minority States.

One state—Connecticut—was represented solely by private counsel. The attorney general's office of each of the other eight states has filed a petition for fees and expenses.[177] In the aggregate, the attorneys general expended 12,569.35 hours on *Fine Paper* and seek fees totaling $815,100.06 and reimbursement of $162,499.51 in expenses.

■ I see no reason to treat public attorneys any differently from private attorneys for purposes of awarding fees. *See State of Illinois v. Sangamo Construction Co.,* 657 F.2d 855, 858–62 (7th Cir.1981); *In*

---

**177.** The State of South Dakota was also represented by the firms of Cotchett, Dyer & Illston and Johnson, Johnson & Eklund. South Dakota's fee request is part of a petition filed jointly by its Attorney General, the Cotchett firm, the Johnson firm and the firm of Contarino, Hutchinson & Scherin.

re *Sugar Industry Antitrust Litigation (West Coast)*, MDL 201 (E.D.Pa. Nov. 28, 1979); *In re Armored Car Antitrust Litigation*, 472 F.Supp. at 1387; *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 706, 717 (D.Minn.1975). The public attorneys engaged in the same tasks and were members of the same committees as the private attorneys. Illinois' John Noel (and later his successor Thomas Genovese) served as one of the five lead counsel. Four of the states were co-chairmen of discovery subcommittees.

Since attorneys general do not charge hourly rates as do private counsel, each state fee petition requests compensation based on the prevailing rates charged by private attorneys with similar experience for similar work in the same community. The Third Circuit has indicated that this is an appropriate standard for fixing hourly rates for Community Legal Services attorneys. *Rodriguez v. Taylor*, 569 F.2d 1231, 1247–48 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). The Seventh Circuit has reached the same conclusion with respect to fees awarded under § 4 of the Clayton Act to a state represented by its Attorney General. *State of Illinois v. Sangamo Construction Co., supra.*

Three of the states (Illinois, Massachusetts, and Tennessee) request $90/hour for the heads of their antitrust divisions. I find this to be a fair and reasonable rate of compensation. Unless a lower rate is requested, I will base my fee awards for the time of the senior public attorneys on an hourly rate of $90. Attorneys whose efforts paralleled those of associates in the private law firms will receive a rate of $50/hour. Paralegals will be compensated at $25/hour.

 The class objectors contend that "there is no basis for any contingency or lost opportunity multiplier where public counsel are concerned." Class Objectors' Report at 498. I reject this argument. I am not persuaded that the salaries received by public attorneys eliminate the contingency facor. Associates in private law firms are equally assured of their paychecks. The risk that a state attorney general's office will not be compensated for the work of its staff is the same as the risk that a private partnership will not be compensated for the work of its members. I will follow the lead of Judge Cahn in *In re Sugar Antitrust Litigation (West Coast)*, MDL 201 (E.D.Pa. Nov. 28, 1979) and *In re Sugar Antitrust Litigation (East Coast)*, MDL 201A (E.D.Pa. Sept. 30, 1980) and apply a contingency multiplier to the attorneys general on the same basis as private counsel.

I. Illinois

Illinois requests compensation for 4482.25 hours of work by five attorneys and two paralegals. Two of the attorneys—John Noel and his successor Thomas Genovese—were co-lead counsel and members of the Executive Committee. Illinois was also represented on the Kimberly-Clark Discovery Subcommittee, the Industrial Analysis Committee, and the Compliance with Defendants' Discovery Subcommittee.

I have disallowed the following time from Illinois' lodestar: 248.15 hours for vagueness; 56.75 hours for Industrial Analysis Committee work; 82.75 hours for "read & review";[178] 47.5 hours of work on the final pretrial memorandum; 5.75 hours for the 3/6/81 Executive Committee meeting; and 11.5 hours for work on the fee petition. Illinois is left with 4029.85 compensable hours.

Noel and Genovese will be awarded the $90/hour rate the fee petition requests. However, 83.1 of their hours were devoted to work that warrants compensation at the lower rate of $50/hour. The other attorneys will receive a rate of $50/hour. Illinois' lodestar thus comes to $217,695. I will apply a 1.5 contingency multiplier to all the compensable time (914.2 hours) expended

---

**178.** Since Noel and Genovese were members of the Executive Committee, I have not disallowed any of their "read & review" time.

before the end of the first wave of settlements. No quality multiplier is warranted.

Illinois requests $30,678.52 in expenses. It has already received 75% ($23,009) of this figure. Because I find all of Illinois' expenses to have been reasonable, I will permit reimbursement of the outstanding $7,669.52.

## II. Kansas

Kansas requests compensation for 1102.55 hours of work by four attorneys and two paralegals in the Attorney General's Office.[179] The state was represented on the Industrial Analysis Committee and the Potlach Discovery Subcommittee.

I have disallowed the following time from Kansas' lodestar: 161 hours for vagueness; 54.75 hours for "read & review"; 36 hours for Industrial Analysis Committee work; 32.5 hours for unnecessary attendance at pretrial conferences (4/19/78 and 3/7/79); 35 hours for duplicative attendance by two attorneys at the first scheduled day of trial, and 44 hours for work on the fee petition. Kansas is left with 739.3 compensable hours.

Wayne Hundley and Thomas Regan will receive the requested rate of $75/hour except for 46.5 hours of Hundley's time (preparing for Kansas' document production) which I find to merit compensation at only $50/hour. The other attorneys will be compensated at a rate of $50/hour. Kansas lodestar thus comes to $35,208.75. I will apply a 1.5 contingency multiplier to all the compensable time (394.8 hours) expended before the end of the first wave of settlements. No quality multiplier is warranted.

Kansas requests reimbursement of $43,-721.96 in expenses. This amount includes $22,040 paid to the private firm of Robert Loughbom to represent the state in the early stages of its involvement. Included in the Kansas fee petition is a request for an award for the work of this firm based on hourly rates higher than the $40/hour actually paid as well as a request for a multipli-

er. Any award in excess of the $22,040 is to be paid to the Loughbom firm pursuant to the retainer agreement.

The Loughbom firm devoted 551 hours to *Fine Paper.* The legal services provided by this outside firm are clearly compensable to the extent they benefited the class. *See Shadis v. Beal,* 692 F.2d 924 (3d Cir.1982). I have determined, however, that 130.75 of these hours may not be charged to the class. Disallowed are: 111.75 hours of Industrial Analysis Committee work, 17 hours of "read & review", and 2 hours for unnecessary attendance at a pretrial conference. This leaves 420.25 compensable hours. I will not disturb the parties' agreed-upon rate of $40/hour. Moreover, since the Loughbom firm was being paid for its efforts on a regular basis, I can see no contingency associated with its time that would justify any adjustment to the basic fee. Nor is a quality adjustment warranted. Thus I will only permit Kansas to charge the class $16,810 of the $22,040 it paid to the Loughbom firm.

My review also indicates that $1,562.56 of the remaining expenses must be disallowed. This represents travel expenses for attendance at the 4/19/78 pretrial conference, the first day of the scheduled trial, and the 3/6/81 Executive Committee meeting. Attorneys' fees have been disallowed for all these matters.

Since Kansas has already received $32,792 as interim partial reimbursement of expenses and I have disallowed a total of $6,792.56, the state will be reimbursed for $4,137.40 of the outstanding amount.

## III. Louisiana

Louisiana requests compensation for 1500 hours of work by five attorneys and one paralegal. I have disallowed 191.5 hours for vagueness, 274.6 hours of "read & review", 22 hours for duplicative attendance at depositions, 5 hours of Industrial Analysis Committee work, 8 hours for unnecessary attendance at an Executive Committee

---

**179.** The state also hired a private law firm to assist it in the case. Since this outside firm has already been paid by Kansas at a rate of $40/hour for its 551 hours, I will treat this $22,040 as an expense for which Kansas seeks reimbursement.

meeting and pretrial conference, 27.5 hours of work on the final pretrial memorandum, and 7 hours of work on the fee petition. Louisiana is left with 964.4 compensable hours.

John Flowers will be compensated at $90/hour except for 146 hours (mostly document review) that merit compensation at $50/hour and 3 hours of handling inquiries from class members that will receive a rate of $25/hour. The time of the other attorneys will be compensated at $50/hour (except for those hours of Ernestine Gray for which the petition asks $40/hour). Louisiana's lodestar thus comes to $54,620. I will apply a 1.5 contingency multiplier to all the compensable time (406.8 hours) expended before the end of the first wave of settlements. No quality multiplier is warranted.

Louisiana seeks reimbursement of $18,871.29 in expenses. It has already received 75% ($14,153) of this figure. I disallow only $612.54 in travel expenses associated with trips for which attorneys' fees have been disallowed. The remaining $4,105.75 will be reimbursed.

## IV. Massachusetts

Massachusetts requests compensation for 612.25 hours of work by five attorneys and four paralegals. I have disallowed 74.85 hours (including time spent at two hearings) for work done on the state's motion to proceed as a unitary plaintiff. This time did not benefit the class. In addition, 36.25 vague hours, 2 hours of "read & review", 7.5 hours for attendance at a pretrial conference (12/4/79), and 15.25 hours of duplicative attendance by two attorneys at the first day of the scheduled trial are not compensable. Massachusetts is left with 476.4 compensable hours.

Steven Greenfogel and Alan Kovacs will be awarded the $90/hour and $75/hour rates that the fee petition requests except for 5 hours of Greenfogel's time spent on class action discovery. This type of work and the work of the other attorneys merit compensation at $50/hour. Massachusetts' lodestar thus comes to $23,913.50. I will apply a 1.5 contingency multiplier to all the compensable time (51.75 hours) expended before the end of the first wave of settlements. No quality multiplier is warranted.

Massachusetts seeks reimbursement of $11,641.29 in expenses. It has already received 75% ($8731) of this figure. I disallow $944.91 in travel expenses associated with the pretrial conferences and hearings for which attorneys' fees have been disallowed. The remaining $1965.38 will be reimbursed.

## V. Minnesota

Minnesota requests compensation for 2277.15 hours of work by five attorneys and five paralegals. The state was represented on the Wausau Discovery Subcommittee and the Settlement Administration Committee. Although I heartily commend Minnesota for not seeking compensation for a great many hours which it considered did not benefit the class and for requesting paralegal rates for attorney time spent on paralegal tasks, I find I must make some further adjustment in the state's hours. I disallow 42.9 hours for vagueness, 12.6 hours of "read & review", 2.5 hours for unnecessary attendance at a pretrial conference (4/19/78), 6.3 hours of work on the final pretrial memorandum, 14 hours for duplicative attendance at the first day of the scheduled trial, and 8 hours for the 3/6/81 Executive Committee meeting. Minnesota is left with 2190.85 compensable hours.

Stephen Kilgriff, John Galus and Alan Maclin will be awarded the $75/hour rate the fee petition requests (as well as $25/hour for the time sought at paralegal rates) except for 101.3 hours of Maclin's time devoted to document review that merits compensation at $50/hour. The time of the other attorneys has been requested at paralegal rates. Minnesota's lodestar thus comes to $77,066.25. I will apply a 1.5 contingency multiplier to all the compensable time (260.15 hours) expended before the end of the first wave of settlements. No quality multiplier is warranted.

Minnesota seeks reimbursement of $26,-557.97 in expenses. It has already received $21,794. Of the outstanding $4,763.97, I disallow $916.44 in travel expenses associated with trips for which attorneys' fees have been disallowed.

## VI. New Hampshire

New Hampshire requests compensation for 216.95 hours of work by two attorneys and two paralegals. I disallow 105.4 hours of "read & review" and 1.5 hours of work on the fee petition, leaving New Hampshire with 110.05 compensable hours.

Edward Lawson will be awarded the $85/hour rate requested in the fee petition. Michael Ruedig's work merits compensation of $50/hour. New Hampshire's lodestar thus comes to $5533.25. No contingency multiplier will be applied since all time was expended after the initial settlements. No quality multiplier is warranted.

New Hampshire seeks reimbursement of $10,170.75 in expenses. It has already received 75% ($7,628) of this figure. Since I find all the expenses to have been reasonable, I will permit reimbursement of the outstanding $2,542.75.

## VII. South Dakota

South Dakota requests compensation for 2084.7 hours of work by three attorneys, two paralegals, and ten clerks. Only 300.25 hours of this total was attorney time. South Dakota devoted a great deal of its time to local discovery and was represented on the Industrial Analysis Committee. I disallow 56.05 hours for vagueness, 87 hours of Emma Zeldez' time (in May 1978) for which there are no entries, 20.35 hours of "read & review", 7.25 hours of Industrial Analysis Committee work, 15.2 hours of duplicative attendance at depositions, and 16.2 hours associated with unnecessary attendance at a pretrial conference (3/7/79). South Dakota is left with 1882.65 compensable hours.

Thomas Welk and James McMahon will be compensated at $90/hour except for 32.5 hours of associate-type work which merits compensation at $50/hour. Dennis Holmes will receive $50/hour. The paralegals ($20/hour) and clerks ($8/hour) will be awarded the rates requested in the fee petition. South Dakota's lodestar thus comes to $29,876.40. I will apply a 1.5 contingency multiplier to all the compensable time (126.9 hours) expended before the end of the first wave of settlements. No quality multiplier is warranted.

South Dakota seeks reimbursement of $8,878.15 in expenses. It has already received 75% ($6,659) of this figure. Of the outstanding $2,219.15 I disallow $978 in travel expenses for two trips to meet with co-counsel Joseph Cotchett and Charles Johnson. In view of the exclusively local responsibilities assumed by the Attorney General's Office, I see no need for such trips.[180]

## VIII. Tennessee

Tennessee requests compensation for 217.5 hours of work by two attorneys and two paralegals. I disallow 11.9 hours for vagueness, 73.4 hours of "read & review", and 4 hours for duplicative attendance at the first day of the scheduled trial. Tennessee is left with 128.2 compensable hours.

William Haynes will be awarded the $90/hour requested in the fee petition. William Kelly's work merits compensation at $50/hour. Tennessee's lodestar thus comes to $8,017.50. I will apply a 1.5 contingency multiplier to all the compensable time (19.1 hours) expended before the end of the first wave of settlements. No quality multiplier is warranted.

Tennessee seeks reimbursement of $11,-979.58 in expenses. It has already received 75% ($8985) of this figure. Of the outstanding $2,994.58 I disallow $245.57 in travel expenses associated with attendance

---

**180.** Johnson's time and expenses for these trips have also been disallowed. *See* the section of this memorandum dealing with the petition of Johnson, Johnson & Eklund.

by Haynes at two Executive Committee meetings (3/7/79 and 3/6/81). Haynes was not a member of this committee.

IX. Conclusion

The following represents my determination of the fees and expenses to which the Minority States are entitled under *Lindy:*

| State | Lodestar | Fee Award | Fees Requested | Expense Award | Final Award |
|-------|----------|-----------|----------------|---------------|-------------|
| Illinois | $217,695 | $249,561 | $384,672.51 | $7,669.52 | $257,230.52 |
| Kansas | $ 35,208.75 | $ 46,035 | $ 89,957.82 | $4,137.40 | $ 50,172.40 |
| Louisiana | $ 54,620 | $ 66,280 | $102,075 | $4,105.75 | $ 70,385.75 |
| Massachusetts | $ 23,913.50 | $ 26,037.25 | $ 44,521.88 | $1,965.38 | $ 28,002.63 |
| Minnesota | $ 77,066.25 | $ 86,306.88 | $103,285.50 | $3,847.53 | $ 90,154.41 |
| New Hampshire | $ 5,533.25 | $ 5,533.25 | $ 11,666 | $2,542.75 | $ 8,076.00 |
| South Dakota | $ 29,876.40 | $ 34,976.90 | $ 59,041.90 | $1,241.15 | $ 36,218.05 |
| Tennessee | $ 8,017.50 | $ 8,877.00 | $ 19,879.45 | $2,749.01 | $ 11,626.01 |

X. The Motion of Moore Business Forms & F.N. Burt Company, Inc.

These two members of the class of private purchasers ask the court to exempt their share of the settlement fund from any assessment for class counsel fees. For the reasons which follow, the motion will be denied.

Pursuant to Fed.R.Civ.P. 23(c), notice was sent to putative class members on June 29, 1979, which provided in part:

If you do not elect to be excluded and do not enter an appearance through your own counsel, your interests will be represented by the class representatives and counsel for the Class.

\* \* \* \* \* \*

At the time of distribution, the settlement proceeds will be subject to charges for costs of suit and attorneys' fees in currently undetermined amounts.

*See* Pretrial Order No. 44, Exhibit A at 4 and 6.

Moore and Burt opted to remain in the class, but engaged the law firm of Kaye, Scholer, Fierman, Hays and Handler to represent them. Kaye entered an appearance on Moore's and Burt's behalf on July 25, 1979 for the sole purpose of monitoring the litigation. The private fee agreements between Kaye and each of the two class members provide for a contingency of 10% of recovery. Moore and Burt claim that diminution of their recoveries by an assessment of class counsel fees would unjustly subject them to double payment of attorneys' fees.

In support of their motion, Moore and Burt place great reliance on the *Lindy* cases and the three categories into which the district court divided the *Lindy* class claimants: (1) the class representatives; (2) litigants represented by attorneys other than counsel for the class representatives; and (3) unrepresented claimants.[181] 341 F.Supp. 1077, 1085–86 (E.D.Pa.1972), *vacated and remanded,* 487 F.2d 161 (3d Cir.1973). The district court ruled that claimants in the second category would not have their share of the settlement fund reduced by fees awarded by the court to counsel for the class representatives. *Id.*

The crux of Moore and Burt's argument is that they fit into the second category. They contend that since they were represented by counsel other than class counsel,

---

**181.** Counsel for the class representatives originally divided the class into four categories splitting the middle category into a group of litigants whose attorneys they (counsel for the class representatives) felt had contributed to the creation of the settlement fund and a group of litigants whose attorneys they felt had not so contributed. The district court decided that those two categories should be treated the same and combined them. *Id.*

their portion of the settlement fund should not be diminished by the fee award to class counsel.

Class counsel argue that since Moore and Burt are not litigants, they cannot be in the second category. They contend, using a *Lindy* term of art, that Moore and Burt are actually "unrepresented claimant[s]", responsible for payment of fee awards from their share of the recovery. I agree.

■ From the outset, the *Lindy* cases made a clear distinction between litigating and non-litigating claimants. The second category was composed of those "litigants" who contributed to the creation of the settlement fund by filing suit and incurring the risk of litigation, while the third category, classified as unrepresented claimants, consisted of those who did not file suit or undertake the burdens of litigation. *See generally, Lindy I* and *Lindy II.* It is quite apparent that Moore and Burt do not meet the litigant status requirements. They concede:

> Our efforts to protect our clients' stake in the outcome of this litigation and, from inception, to *monitor its course* have not been unavailing.
>
> \* \* \* \* \* \*
>
> ... mindful of conserving fees and expenses, *we have not taken an intrusive role in this litigation.* Rather, we maintained contact solely with Ms. Nast, Harold Kohn and others in his office for *status reports, advice on settlements and our processing of fact inquiries from them...*
>
> \* \* \* \* \* \*
>
> ... These clients have looked to us to guide them, to *oversee the course of the litigation* and to keep them apprised of its progress...

Objection and Statement of Position, filed 5/20/81, Docket Entry No. 3343, at 2–3 (emphasis added). This limited passive role clearly excludes them from *Lindy's* second category. According to *Lindy* standards, Moore and Burt are non-litigants and should be required to share the costs of those who incurred the risk of litigation.

Having made that determination, it is relatively simple to dispose of the remainder of the Moore and Burt arguments. They cite the district court in *Lindy,* 341 F.Supp. at 1086, for the proposition that making a distinction between private fee arrangements with class counsel and such arrangements with other counsel would "unduly and unnecessarily penaliz[e]" them for selecting attorneys of their own choice. *Id.* at 1086. Moore and Burt fail to recognize, however, that the *Lindy* court was referring to those claimants who had filed suit and participated in the litigation through their own attorneys. As Moore and Burt did not participate to that extent, they can not rely on the *Lindy* court's concern for those class members who did participate.

They also cite *Vincent v. Hughes Air West, Inc.,* 557 F.2d 759 (9th Cir.1977), for its statement of the general rule that "third parties can 'purchase immunity' [from payment of class counsel fees] by hiring their own attorneys and participating in the litigation." *Id* at 771 (footnote omitted). Again, Moore and Burt ignore the phrase "participating in the litigation" which unquestionably excludes them from the general rule.

The remaining arguments are substantially similar to those above, and include references to cases which advocate certain treatment of claimants who "participate in the litigation." Since Moore and Burt did not in fact participate in the litigation of their claims, these arguments must fall.

Moore and Burt also argue that the entry of appearance by Kaye pursuant to Fed.R. Civ.P. 23(c)(2)(C) operates to oust class counsel from representing them. Here again Moore and Burt miss the point. The fund was created by class counsel without any assistance from the Kaye firm. Moreover, as Professor Kaplan stated with respect to a Rule 23(c)(2)(C) appearance:

> "I read this 'appearance' as entitling counsel to receive the papers in the action to enable him to follow the case with a view to deciding, e.g. whether he should move to intervene. If 'appearance' is read as enabling the class member to be admitted automatically into the action as

a party, it would stand in odd contrast to intervention in the action under Rule 24, which is not automatic and requires a showing."

See, Kaplan, *Continuing Work of the Civil Committee 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 Harv.L. Rev. 356, 392 at n. 137 (1967). Professor Kaplan's reading of Rule 23(c)(2)(C) was adopted by the Court in *Ramsey v. Arata*, 406 F.Supp. 435, 442 (N.D.Texas 1975), and by Wright and Miller. 7A C. Wright & A. Miller, *Federal Practice and Procedure*, Vol. 7A § 1799, pp. 256–57 (1972).

Moore and Burt also quote Wright & Miller's latest supplement which states that class members with private fee arrangements should "not be forced to share the burden of a fee award from any fund recovered since to hold otherwise would be to subject them to double liability." *Id.* § 1803 at 243 (Supp.1982). That statement, however, is based upon *In Re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F.Supp. 680 (D.C.Minn.1975), which dealt with attorneys with private fee contracts who took an active role in the case. *Id.* at 688. Such is not the situation here.

Finally, Moore and Burt cite *Nolte v. Hudson Navigation Company*, 47 F.2d 166, 168 (2d Cir.1931), for the proposition that "where creditors are represented by counsel of their own choice, who do in fact act for them, they cannot be compelled to share in the expenses incurred by the employment of other counsel by other creditors . . ." (citation omitted). Moore and Burt fail to note, however, that the court went on to state in the same paragraph:

> Of course one who has an attorney may be shown to have expressly or impliedly consented to be represented, nevertheless, by the attorneys for other creditors who alone are active and achieve the beneficial result. In that event such creditors notwithstanding that they were nominally represented by counsel, should share proportionately in the expense.

*Id.*

By their own admission Moore and Burt concede that the Kaye firm did not partici-

pate in any way in creating the benefit bestowed upon them. Therefore, to exempt Moore's and Burt's share of the funds from an assessment for class counsels' fees would unjustly enrich them at the expense of the class. "Jurisdiction over the fund involved in this litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Boeing Company v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980).

The motion of Moore and Burt to exempt their share of the settlement fund from an assessment of attorneys' fees for class counsel will be denied.

### APPENDIX

PRETRIAL ORDER NO. 143, as Amended by Pretrial Order No. 147

AND NOW, this 27th day of February, 1981, it is hereby ORDERED that each petition for attorneys fees filed pursuant to Pretrial Order No. 142 shall include all time through March 20, 1981 for which compensation is requested. Each such petition shall conform to the following requirements:

(1) An affidavit shall accompany each petition attesting to the truth and correctness of the facts contained in the petition.

(2) The petition shall state the name of each plaintiff represented by petitioning counsel, and the date on which each attorney became counsel of record for that plaintiff.

(3) The petition shall state the name of any other firm or attorney who is also counsel of record for the same plaintiff, and who is not a member or associate of the petitioning firm.

(4) The petition shall contain a narrative summary of the specific contributions made by petitioner for the benefit of the classes as well as a summary of the work of each attorney and legal assistant in the firm for whom compensation is requested.

(5) The petition shall contain a monthly summary of the hours expended in this litigation by each attorney and legal assist-

ant for which compensation is requested, through March 20, 1981, set forth by specific category or description of work performed.

(6) The petition shall include:

(a) A calculation of the total compensation requested by petitioner for each attorney and legal assistant at the applicable hourly rates in effect at the time work was performed;

(b) A statement of the increment or multiplier, if any, which petitioner requests, together with an explanation and justification for any multiplier requested;

(c) A statement of the total amount of compensation requested by petitioner.

(7) The petition shall contain a schedule of the applicable hourly rates in effect for each attorney and legal assistant since the inception of this litigation, which rates are actually billed to and paid by a substantial number of non-contingent fee clients on a regular, periodic basis (the names of which clients may be filed with the Court under seal), or in lieu thereof, a schedule of requested rates, with a statement of the reasons why each rate is appropriate as to the particular lawyer, taking into account all relevant factors.

(8) Each petitioner shall, for each year in which work was performed by any attorney or legal assistant for whose time compensation is requested in this litigation, identify each matter or client (clients in private, non-class action matters may be identified by suitable reference other than name) for which any such attorney or legal assistant worked for 100 hours or more in that year, the number of hours expended by each person in each such matter, the hourly rates actually billed, and a general description of the type of legal services rendered. This information is not required of persons who expended less than 100 hours in this litigation.

(9) The petition shall include the citation of any class action or derivative cases (reported or unreported) in which petitioner's time has been the subject of an award of attorney fees by a court since June 30, 1977.

(10) Each petition shall contain a copy of each fee application in any class action or derivative case filed in any court since June 30, 1977, in which an award has been sought for petitioner's time, or in lieu thereof a schedule stating: (a) the cause, number and style of the case; (b) the court and its location; (c) the number of hours and hourly rate applied for and the period or periods covered thereby; (d) the multiplier applied for in connection with your time; (e) the total fee applied for in connection with petitioner's time; (f) the total amount awarded (if any award has been made) for such time.

(11) For each class action or derivative case in which petitioner has recorded time that will be (but has not yet been) the subject of a fee application, the petition shall contain a schedule stating: (a) the cause, number and style of the case; (b) the court and its location; (c) the number of hours recorded by person for each year or fraction thereof for which compensation is requested in this litigation.

(12) If the time or rate of any lawyer who is not a partner or employee of the petitioning firm is included in any petition, the petition shall contain a detailed statement prepared by petitioning firm and such other lawyer, setting forth in detail the arrangements between them for compensation and defraying of cost disbursements during the litigation and the division or allocation of any fee or reimbursement awarded, together with a statement of the reasons why it was necessary for the petitioner to enter into such arrangements.

(13) The petition shall contain a resume of the background and qualifications of each attorney and legal assistant for whom compensation is requested.

(14) The petition shall contain an identification and complete description of any agreement, either written or oral, petitioner has with any client, attorney or any other person, in connection with this litigation. Any written evidence confirming or memorializing any such arrangement shall be filed with the court. This information may be filed under seal.

(15) Each petition shall be supported by copies of contemporaneous daily handwrit-

ten, typed or computer time records prepared by each attorney or legal assistant, and copies of all weekly, monthly and year end compilations of the daily time sheets prepared by or for any attorney or legal assistant, which may be filed under seal.

(16) The petition shall state whether contemporaneous daily time records and compilations or summaries of such records are maintained on a consistent and systematic basis for all clients in all matters by each person whose time is included in the petition, and whether the overall records are available for the Court's inspection, upon request.

(17) If expenses and costs incurred in connection with this litigation are claimed, the petition shall contain an itemized statement by categories of the out-of-pocket disbursements, and shall be accompanied by copies of the original supporting documentation, including vouchers, statements, disbursement memoranda, checks and similar records. The documents must be segregated into specific categories, such as long distance telephone, travel, transcripts, reproduction, postage and advances to committees of counsel. This supporting documentation may be filed under seal.